**EXHIBIT L**

1 | MARIE L. FIALA (CA BAR NO. 79676)
RUSSELL P. COHEN (CA BAR NO. 213105)
2 | INGRID S. LEVERETT (CA BAR NO. 148813)
HELLER EHRMAN LLP
3 | 333 Bush Street
San Francisco, CA  94104-2878
4 | Telephone: (415) 772-6000
Facsimile: (415) 772-6268
5 | marie.fiala@hellerehrman.com
russell.cohen@hellerehrman.com
6 | ingrid.leverett@hellerehrman.com

7 | Attorneys for Plaintiff
PACIFIC GAS & ELECTRIC COMPANY
8
| [ADDITIONAL PARTIES AND COUNSEL
9 | SHOWN ON SIGNATURE PAGE]

10

11 |                    UNITED STATES DISTRICT COURT

12 |         EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

13 | Pacific Gas and Electric Company, Southern
California Edison Company, and California
14 | Electricity Oversight Board,

15 | Plaintiffs,

16 |              v.

17 | Arizona Electric Power Cooperative, Inc.; City of        Case No.
Anaheim; City of Azusa; City of Banning; City of
18 | Burbank; City of Glendale; City of Los Angeles;          **COMPLAINT FOR DAMAGES AND/OR
City of Pasadena; City of Riverside; City of Santa        RESTITUTION AND DECLARATORY
19 | Clara; City of Seattle; City of Vernon; Eugene           RELIEF AND JURY DEMAND**
Water and Electric Board; Los Angeles Department
20 | of Water and Power; Modesto Irrigation District;
Northern California Power Agency; Public Utility
21 | District No. 2 of Grant County; Sacramento
Municipal Utility District; Salt River Project
22 | Agricultural Improvement and Power District; and
Turlock Irrigation District,
23
| Defendants.
24

25 | <u>**COMPLAINT FOR DAMAGES AND/OR RESTITUTION AND DECLARATORY RELIEF
AND JURY DEMAND**</u>
26

27 |        Plaintiffs hereby demand trial by jury of all issues properly triable thereby.

28

Heller
Ehrman LLP

COMPLAINT FOR DAMAGES AND/OR
RESTITUTION & DECL. RELIEF, JURY DEMAND

1    Plaintiffs Pacific Gas and Electric Company ("PG&E"), Southern California Edison

2    Company ("SCE"), and the California Electricity Oversight Board ("EOB") (collectively, "the

3    California Parties") allege:

### JURISDICTION

5    1.    This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331. Plaintiffs'

6    claims require resolution of a disputed and substantial issue of federal law in that plaintiffs' claims

7    arise out of defendants' sales of electric power in wholesale electricity markets that are within the

8    Federal Energy Regulatory Commission's ("FERC") exclusive regulatory jurisdiction, and

9    plaintiffs are suing to recover for defendants' breaches of their contractual obligations contained in

10    tariffs filed with and regulated by FERC.

### SUMMARY

12    2.    This is an action for damages and declaratory relief against the following defendants:

13    Arizona Electric Power Cooperative, Inc.; City of Anaheim; City of Azusa; City of Banning; City

14    of Burbank; City of Glendale; City of Los Angeles; City of Pasadena; City of Riverside; City of

15    Santa Clara; City of Seattle (Seattle City Light Department); City of Vernon; Eugene Water and

16    Electric Board; Los Angeles Department of Water and Power; Modesto Irrigation District; Northern

17    California Power Agency; Public Utility District No. 2 of Grant County; Sacramento Municipal

18    Utility District; Salt River Project Agricultural Improvement and Power District; and Turlock

19    Irrigation District (collectively, "the Governmental Entities"). PG&E and SCE's (the "California

20    IOUs") claims in this action arise out of their wholesale purchases of electric power and ancillary

21    services (hereinafter "electric power") and the Governmental Entities' sales of electric power in the

22    California wholesale electric power markets from May 1, 2000 through June 20, 2001. The

23    California wholesale markets were operated by the California Independent System Operator

24    Corporation ("ISO") and California Power Exchange Corporation ("PX") under tariffs filed with

25    and approved by the FERC.

26    3.    The Governmental Entities' voluntary sales of electric power into the California

27    wholesale markets pursuant to the ISO and PX tariffs and pursuant to certain written agreements

28    gave rise to binding contractual obligations owed by the defendants to the other market participants,

Heller
Ehrman LLP

1    including the California IOUs. The California IOUs are direct parties to and expressly intended

2    beneficiaries of the Governmental Entities' contractual obligations. The Governmental Entities

3    have breached their contractual obligations, entitling the California IOUs to the relief requested in

4    this Complaint.

5         4.    FERC has determined that sellers in the California wholesale electric markets charged

6    rates that were unjust, unreasonable, and unlawful. Pursuant to the tariffs governing those markets,

7    FERC has corrected and reduced the rates that all sellers, including the Governmental Entities, were

8    entitled to charge for those sales for the period October 2, 2000 through June 20, 2001 ("the Refund

9    Period"). To correct the harm caused by the unlawful prices, FERC ordered all sellers in the

10   California markets to pay refunds for their unlawful overcharges. On September 6, 2005, however,

11   the Ninth Circuit Court of Appeals ("Ninth Circuit") held that FERC's statutory refund authority

12   did not extend to the Governmental Entities. The Ninth Circuit's order put the Governmental

13   Entities in a unique position among ISO and PX market participants in that they alone may seek to

14   benefit from refunds paid by others while escaping liability for their own unlawful overcharges.

15   The Ninth Circuit noted, however, that market participants could bring claims in court directly

16   against the Governmental Entities to enforce the contractual obligations created by FERC tariffs

17   and related agreements under which the Governmental Entities sold power in the ISO and PX

18   markets. Thus, the Governmental Entities are now contractually obligated to reimburse the

19   California IOUs for the difference between the rates that the Governmental Entities charged during

20   the Refund Period and the lawful, corrected rates under the tariffs.

21        5.    Amounts recovered by the California Parties will ultimately benefit California

22   ratepayers in the manner determined by the California Public Utilities Commission ("CPUC").

23                                              **PARTIES**

24        6.    PG&E is a corporation formed under the laws of the State of California with its

25   principal place of business in San Francisco, California. PG&E is a subsidiary of PG&E

26   Corporation. PG&E is engaged in the purchase, transmission, distribution and sale of electric

27   power to the public at wholesale and retail within the State of California, and is a "public utility"

28   within the meaning of the California Public Utilities Code and the Federal Power Act ("FPA").

Heller
Ehrman LLP

COMPLAINT FOR DAMAGES AND/OR                    3
RESTITUTION & DECL. RELIEF, JURY DEMAND

1    PG&E provides retail electric service to approximately 4.9 million customers in Northern and

2    Central California.

3        7.    SCE is a corporation formed under the laws of the State of California with its principal

4    place of business in Rosemead, California.  SCE is a subsidiary of Edison International.  SCE is

5    engaged in the purchase, transmission, distribution and sale of electric power at wholesale and retail

6    within the State of California, and is a "public utility" within the meaning of the California Public

7    Utilities Code and the FPA.  SCE provides retail electric service to approximately 4.6 million

8    customers in a 50,000 square-mile area of Central, Coastal, and Southern California, excluding the

9    City of Los Angeles and certain other cities.

10        8.    The EOB was created by California statute to oversee the ISO and PX, and to

11    "investigate any matter related to the wholesale market for electric power to ensure that the interests

12    of California's citizens and consumers are served, protected, and represented in relation to the

13    availability of electric transmission and generation and related costs, during periods of peak

14    demand."  Cal. Pub. Util. Code § 335.  The EOB joins this action pursuant to its statutory authority

15    to sue and to participate in all proceedings relevant to the purposes of the electricity restructuring

16    provisions in the California Public Utilities Code, Cal. Pub. Util. Code §§ 330-398.5.

17        9.    Defendant Arizona Electric Power Cooperative, Inc. ("AEPCO") is a rural electric

18    generation and transmission cooperative incorporated in Arizona with its principal place of business

19    in Benson, Arizona.  AEPCO provides its generation and transmission services to member

20    distribution cooperatives located in Arizona and California, and is registered to do business in

21    California.

22        10.    Defendants the City of Anaheim; the City of Azusa; the City of Banning; the City of

23    Burbank; the City of Glendale; the City of Los Angeles; the City of Pasadena; the City of

24    Riverside; the City of Santa Clara; and the City of Vernon are California cities.

25        11.    Defendant City of Seattle (Seattle City Light Department) is a city located in the State

26    of Washington.

27        12.    Defendant Eugene Water and Electric Board ("EWEB") is a municipal utility located

28    in Eugene, Oregon.

Heller
Ehrman LLP

COMPLAINT FOR DAMAGES AND/OR    4
RESTITUTION & DECL. RELIEF, JURY DEMAND

13.    Defendant Los Angeles Department of Water and Power ("LADWP") is a municipal utility and a proprietary department of the City of Los Angeles located in Los Angeles, California.

14.    Defendant Modesto Irrigation District is a California irrigation district located in Modesto, California.

15.    Defendant Northern California Power Agency is a California agency located in Roseville, California that assists municipalities, rural electric cooperatives, irrigation districts, and other publicly owned entities with the purchase, aggregation, scheduling, and management of electric power.

16.    Defendant Public Utility District No. 2 of Grant County ("Grant County PUD") is a public utility district located in Ephrata, Washington.

17.    Defendant Sacramento Municipal Utility District is a municipal electric utility located in Sacramento, California.

18.    Defendant Salt River Project Agricultural Improvement and Power District ("Salt River Project") is an agricultural improvement district located in the State of Arizona.

19.    Defendant Turlock Irrigation District is a California irrigation district located in Turlock, California.

20.    All defendants engage or engaged in the business of wholesale and/or retail generation, transmission, distribution, purchase and/or sale of electric power in California and, in particular, voluntarily elected to transact sales in the ISO and PX markets during the relevant time period.

## **PERSONAL JURISDICTION AND VENUE**

21.    Personal jurisdiction is proper in this district over each Governmental Entity because each Governmental Entity has made sales of electric power in this district, because this controversy arises out of each Governmental Entity's sales of electric power within this district, and because each Governmental Entity has consented to the jurisdiction of this Court in connection with this action pursuant to ISO Tariff § 20.7 and/or PX Tariff § 19.6, as to which the Governmental Entities agreed to be bound.

Heller
Ehrman LLP

COMPLAINT FOR DAMAGES AND/OR                    5
RESTITUTION & DECL. RELIEF, JURY DEMAND

1    22.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because defendants are

2    subject to personal jurisdiction in this district and therefore are deemed to reside in this district,

3    because a substantial part of the events or omissions on which the claims are based occurred in this

4    district, and because this is a district wherein an act or transaction constituting the violation

5    occurred.  Venue is also proper in this district pursuant to ISO Tariff § 20.7 and/or PX Tariff § 19.6,

6    as to which the Governmental Entities agreed to be bound.

7                                    **COMMON ALLEGATIONS**

8    23.    The California IOUs' claims arise out of the Governmental Entities' sales of electric

9    power from May 1, 2000 through June 20, 2001, in wholesale markets operated by the ISO and PX

10   under tariffs filed with FERC.  FERC has determined that all sellers in those markets charged rates

11   that were unjust, unreasonable, and unlawful and, pursuant to the tariffs governing those markets,

12   has corrected and reduced the rates that all sellers, including the Governmental Entities, were

13   entitled to charge for various sales during the Refund Period.  As a result of FERC's modification

14   of the tariffs, the Governmental Entities are now contractually obligated to reimburse the California

15   IOUs for the difference between the rates that the Governmental Entities charged and the lawful,

16   corrected rates.

17                                    **The ISO and PX Markets**

18   24.    In 1996, California enacted Assembly Bill 1890 ("AB 1890") to restructure

19   California's electric power markets in order to facilitate the development of competition for the

20   generation and sale of electric power.  AB 1890 separated the California utilities' vertically

21   integrated generation, transmission, and distribution functions into unbundled functions.  PG&E

22   and SCE divested themselves of a substantial portion of their generation facilities.  Under

23   applicable California law, all California investor-owned utilities, including the California IOUs,

24   were required to supply electric power to all retail customers that did not affirmatively elect to

25   purchase electric power elsewhere.

26   25.    AB 1890 provided for the creation of two new wholesale market institutions to

27   facilitate the buying and selling of electric power: the ISO and the PX, which are non-profit, public

Heller
Ehrman LLP    28

1    benefit corporations organized under California law, and subject to the exclusive regulatory

2    jurisdiction of the FERC.

3        26.    Under rules promulgated by the CPUC and approved by FERC, the California IOUs

4    were required, in general, to purchase through the ISO and the PX substantially all of the wholesale

5    electric power that they needed to provide service to their retail customers, including electric energy

6    and associated reserves and other ancillary services. Ancillary services are services such as reserve

7    generating capacity that are necessary to maintain the reliability of the transmission of electricity

8    from generators to customers. Other entities, including the Governmental Entities, were permitted

9    voluntarily to buy or sell electric power in the ISO and/or PX markets.

10       27.    The ISO and PX are "public utilities" under the FPA, and are therefore subject to

11   FERC's jurisdiction. During all relevant times, all sales and purchases in the ISO and PX markets

12   were required to be made pursuant to tariffs filed with and approved by FERC that prescribed the

13   terms and conditions of, and contained formulas used to establish prices for, all transactions in these

14   markets. The ISO and PX Tariffs are the legal equivalent of federal regulations and also establish

15   contractual obligations among the market participants, prescribing the rules, requirements and

16   pricing formulas for all transactions in the ISO and PX markets.

17       28.    The PX was created to function as California's principal power market. The PX acted

18   as a clearinghouse for daily and hourly markets and submitted schedules of electric power to the

19   ISO in which scheduled generation for the following day equaled scheduled demand. Pursuant to

20   the PX Tariff, sellers in the PX market — including the Governmental Entities — submitted offers

21   to sell electric power, and purchasers submitted demand bids for the quantity of electric power that

22   they wanted to buy. The PX conducted day-ahead and same-day auctions that allowed parties to

23   adjust their hourly commitments based on changing needs and availability. Under its tariff, the PX

24   was charged with responsibility for, among other things, settling energy trades between PX market

25   participants and preparing and distributing to PX market participants invoices reflecting the

26   amounts payable and receivable by them in connection with their trading through the PX.

27       29.    In general, the PX determined, for each hour in each of the markets that it operated, a

28   single market-clearing price that all electric power suppliers were paid under the auction provisions

Heller
Ehrman LLP

1   of the PX Tariff. The PX matched offers to buy and sell beginning with the lowest-priced bids and

2   continuing up to the highest-priced bids until the amount of power accepted matched the amount

3   sought by purchasers at that price. The price of the last (and therefore the highest-priced) accepted

4   bid set the price for the entire market. All sellers of electric power in a given auction received the

5   same market-clearing price, even if the seller had offered to sell at a lower price. Thus, any

6   distortions that inflated the market-clearing price affected the prices received by each and every

7   seller in the market, including the Governmental Entities.

8       30.    Although the role of the ISO has changed over time, it was created as the entity

9   responsible for operating and maintaining California's electric transmission grid, including

10  resolving transmission congestion and purchasing electric power to maintain system reliability. To

11  meet these obligations, the ISO operated, and still operates, wholesale markets for real-time energy

12  purchases and ancillary services.

13      31.    In general, in operating its real-time market, the ISO set a single market-clearing price

14  based on bids submitted by sellers pursuant to the ISO Tariff. As in the PX market, every seller in

15  the ISO market received the same market-clearing price set by the ISO for any given interval, even

16  if a seller had offered to sell at a lower price.

17      32.    Thus, the PX operated a day-ahead and a day-of market intended to supply the electric

18  power needed to meet electric power demand as projected before the operating hour. The ISO

19  accepted the PX schedules, then procured electric power needed to make the necessary adjustments

20  in real time in order to ensure that the electric grid operated properly and safely. The ISO also

21  charged market participants, including the California IOUs, for these products and services

22  pursuant to its FERC-approved tariff. Ultimately, as a result of market dysfunction and

23  manipulation, and resulting power shortages, vast quantities of electric power were purchased and

24  sold through the ISO market during the relevant time period.

25      33.    In order to obtain sufficient electric power to maintain reliability of California's

26  electric grid, the ISO at times was required to procure electric power through mechanisms other

27  than its regular auction. During the period at issue, the ISO was often forced to solicit such

28  emergency electric power, known as "out-of-market" or "OOM" electric power, to meet the State's

Heller
Ehrman LLP

COMPLAINT FOR DAMAGES AND/OR                    8
RESTITUTION & DECL. RELIEF, JURY DEMAND

1    demand for electric power.  The ISO Tariff permitted the ISO to solicit this electric power through

2    extraordinary means, such as telephone calls to electric power marketers and generators, including

3    the Governmental Entities.  These purchases were subject to certain price caps applicable in the

4    ISO markets, which price caps varied during the relevant period and were intended to prevent price

5    gouging; but suppliers of OOM electric power regularly demanded more than the FERC-approved

6    price cap for such sales to the ISO.  In order to maintain the reliability of the State's electric grid,

7    the ISO procured the electric power at whatever price it was offered, even if that price exceeded its

8    price caps, and then charged market participants, including the California IOUs, for these products

9    and services.

10        34.    The ISO and the PX Tariffs filed with FERC contained the only terms and conditions,

11    including the pricing formulas, upon which transactions in the ISO and the PX could lawfully be

12    conducted.  The Governmental Entities voluntarily elected to transact sales in the ISO and PX

13    markets and thereby are charged with knowledge of and are deemed to have accepted the terms of

14    the Tariffs, which set forth the mutual rights and obligations among market participants.  These

15    obligations may be enforced by market participants against one another.

16        35.    In addition, the PX Tariff required all PX market participants, including the

17    Governmental Entities, to execute a PX Participation Agreement.  The PX Participation Agreement

18    was prescribed by the PX Tariff and provided that, *inter alia*, the PX market participant "will abide

19    by and will perform all of the obligations under the PX Tariff in respect of all matters set forth

20    therein including, without limitation, all matters relating to the trading of Energy by it through the

21    PX market."  PX Tariff Appendix A, Participation Agreement, § II(B).  The PX Participation

22    Agreement further provided that "[t]he PX Tariff is incorporated herein and made a part hereof."

23    PX Tariff Appendix A, Participation Agreement, § 8.

24        36.    The ISO Tariff contemplated that each market participant, including Governmental

25    Entities, would execute an ISO Scheduling Coordinator Agreement.  The Scheduling Coordinator

26    Agreement was prescribed by the ISO Tariff and provided that, *inter alia*, the ISO Scheduling

27    Coordinator "will abide by, and will perform all of the obligations under the ISO Tariff placed on

28    Scheduling Coordinators in respect of all matters set forth therein including, without limitation, all

Heller
Ehrman LLP

1    matters relating to the scheduling of Energy and Ancillary Services on the ISO controlled grid, . . .

2    [and] billing and payments . . . ." ISO Tariff Appendix B, Scheduling Coordinator Agreement, §

3    2(B). The Scheduling Coordinator Agreement further provided that "[t]he ISO Tariff is

4    incorporated herein and made a part hereof." ISO Tariff Appendix B, Scheduling Coordinator

5    Agreement, § 8.

6        37.    Many market participants both bought and sold electric power in the ISO and PX

7    markets during the relevant time period. As a prerequisite to trading in the ISO and PX markets,

8    the tariffs provided that all market participants would be required to meet stated collateral

9    requirements in the ISO and PX to ensure that they would meet their obligations to the other market

10    participants arising from their purchases and sales.

11        38.    Each month during the relevant time period, the ISO and the PX calculated the total

12    amount of electric power supplied and purchased by each market participant, including the

13    Governmental Entities. The ISO and the PX then issued individual billing statements, invoices, and

14    supporting data, specifying amounts due to or from each market participant.

15        39.    The California IOUs, as market purchasers, are counterparties to sales by

16    Governmental Entities in the ISO and PX markets and have standing to enforce the Governmental

17    Entities' contractual obligations under the ISO and PX Tariffs and related agreements. The ISO

18    and the PX operated as revenue-neutral clearinghouses, and were not themselves counterparties to

19    any market transactions.

20        40.    Under their respective tariffs, the ISO and the PX pass through liability for market

21    shortfalls to market participants, including the California IOUs, that bought or sold power in the

22    markets during the period for which there is a shortfall of funds. A market shortfall may result if

23    one market participant defaults on a payment, causing a shortage of total funds collected by either

24    the ISO or the PX for distribution to the other market participants. An entity that fails to pay its bill

25    becomes responsible for a market shortfall, and is deemed an "ISO Debtor" or a "PX Debtor." An

26    entity that is owed money because of the market shortfalls is deemed an "ISO Creditor" or "PX

27    Creditor," with the right to enforce its contractual right to payment against an ISO or PX Debtor.

Heller
Ehrman LLP

28

COMPLAINT FOR DAMAGES AND/OR      10
RESTITUTION & DECL. RELIEF, JURY DEMAND

1     41.    In summary, the ISO and PX Tariffs provided the mechanisms through which electric

2     power was bought and sold by market participants, with the ISO and the PX acting as

3     clearinghouses for electric power bought and sold by market participants, holding collateral for

4     market participants, and settling the accounts of all market participants.

5                    **FERC's Exclusive Jurisdiction Over the ISO and PX Tariffs**

6     42.    Because the ISO and the PX are "public utilities" under the FPA, 16 U.S.C. § 824(e),

7     the tariffs under which they operate were filed with and approved by FERC, and are subject to

8     FERC's exclusive jurisdiction, continual oversight and regulation.  These tariffs were subject to

9     amendment or revision by FERC, and, in fact, FERC repeatedly revised them during the relevant

10    time period.

11    43.    As entities regulated by FERC, the ISO and the PX were not permitted to act on any

12    terms or conditions other than those contained in the ISO and PX Tariffs.  The ISO and PX Tariffs

13    required each participant in the ISO and PX markets to comply with all rules, conditions and

14    provisions of the ISO and PX Tariffs.

15    44.    Pursuant to the FPA, FERC has exclusive authority to regulate wholesale sales of

16    electric power to ensure, among other things, that the rates charged are just, reasonable, and lawful.

17    FERC thus has exclusive authority to regulate the rates, terms, and conditions of sales made under

18    the ISO and PX Tariffs and to recalculate and correct such rates, terms, and conditions if FERC

19    determines that they are not just, reasonable, and lawful.  The ISO and PX Tariffs provide that

20    parties retain the right to petition FERC to review rates charged under the tariffs and provide for

21    recalculation of charges and resettlement of the accounts of buyers and sellers under the tariffs in

22    the event that FERC determines that any rates charged under the tariffs were unjust, unreasonable,

23    or otherwise unlawful, and thus subject to correction.

24    45.    By voluntarily electing to sell electric power in the ISO and PX markets, the

25    Governmental Entities agreed to be bound by the provisions of the ISO and PX Tariffs and any

26    modifications thereof, including FERC's orders correcting the rates that sellers could lawfully

27    charge for sales governed by those tariffs.  Almost all of the Governmental Entities also executed

28    written contracts, including ISO Scheduling Coordinator Agreements, and/or PX Participation

Heller
Ehrman LLP

COMPLAINT FOR DAMAGES AND/OR               11
RESTITUTION & DECL. RELIEF, JURY DEMAND

1    Agreements, and/or other agreements with the ISO or PX, expressly agreeing to abide by the

2    provisions of the ISO and/or PX Tariffs. The California IOUs are direct parties to and expressly

3    intended beneficiaries of the Governmental Entities' contractual obligations. Because the tariffs are

4    subject to FERC's exclusive jurisdiction, all market participants, including the Governmental

5    Entities, recognized that FERC would exercise its regulatory authority over the tariffs. If the price

6    charged by sellers was found by FERC to be unjust and unreasonable or otherwise unlawful, all

7    market sellers were contractually bound to refund or credit to purchasers the difference between the

8    price charged and the lawful, corrected rate determined by FERC. Thus, all market participants

9    were contractually bound to honor the terms and conditions of the tariffs, as revised by FERC, and

10    these terms and conditions can be contractually enforced by the market participants against one

11    another. The Governmental Entities' obligation to refund or credit their unlawful overcharges is the

12    same obligation owed by all sellers in the ISO and PX markets, although the California IOUs'

13    obligations for their purchases of electric power and other services in the ISO and PX markets

14    remain under FERC's exclusive jurisdiction.

15    **The Power Crisis**

16    46.   Beginning in May 2000, the prices demanded by sellers in the ISO and PX markets

17    rose dramatically and sellers continued to demand unprecedented high prices for over a year,

18    resulting in rates far in excess of those charged in prior and later periods. As a result of the auction

19    provisions of the ISO and PX Tariffs, these extremely high prices were charged by all sellers in the

20    markets, even if individual sellers had offered to sell their power in the auctions at lower prices.

21    The power crisis had severe negative effects on the stability and financial integrity of the California

22    IOUs, and ultimately imposed billions of dollars in additional costs on ratepayers, including

23    business and residential customers throughout the State.

24    47.   The first ratepayer impacts of these extraordinarily high prices were felt in the San

25    Diego area, because San Diego Gas & Electric Company's ("SDG&E's") rates in the summer of

26    2000 provided for immediate, direct pass-through to ratepayers of the increased wholesale electric

27    power costs. By January 2001, PG&E and SCE had amassed crippling debt in order to finance the

Heller
Ehrman LLP    28

1 costs of buying electric power, costs that they were not permitted to immediately pass through to

2 their customers.  PG&E and SCE became unable to pay the PX in January 2001.

3      48.    The surge in electric power prices also affected the reliability of the electric grid.  On

4 June 14, 2000, electric power consumers in Northern California experienced their first wave of

5 rolling blackouts.  These blackouts foreshadowed the rolling blackouts and near-continuous power

6 emergencies that California electric customers experienced over the next year.

7      49.    The crisis did not subside with the arrival of cooler weather in the fall of 2000.

8 Although California's peak electric power usage historically declines by roughly 25 to 33 percent

9 during the cooler months, prices continued to rise throughout the last quarter of 2000 and the first

10 part of 2001.

11      50.    By January 2001, a confluence of events led to the collapse of reliable electric service

12 in California.  At times in January 2001, the ISO ordered rolling blackouts throughout large areas of

13 California in order to maintain the reliability of the transmission grid.  The crisis became a state of

14 emergency, threatening the safety and welfare of California citizens.

15      51.    On December 15, 2000, FERC issued an order eliminating the requirement that the

16 California IOUs purchase all of their needed electric power through the PX, and the PX ceased

17 operations of its core markets on January 30, 2001.  On or about January 5, 2001, the credit ratings

18 of PG&E and SCE fell below investment grade, making PG&E and SCE ineligible to purchase

19 power through the ISO and PX.  The State of California was forced to step in as the buyer of last

20 resort to buy electric power on behalf of the California IOUs to ensure continued service to retail

21 customers throughout the territories served by the California IOUs.  Unrelenting high prices caused

22 PG&E and SCE to become insolvent.

23      52.    The power crisis ultimately ended when FERC, on June 19, 2001, imposed "must-

24 offer" requirements on electric power generators prohibiting them from withholding generation,

25 and imposed price caps on wholesale sellers of electric power across all western states effective

26 June 21, 2001 ("June 19, 2001 Order").  *San Diego Gas & Electric Co., et al.,* 95 FERC ¶ 61,418 at

27 62,558, 62,569 (2001).  The remedies in the June 19, 2001 Order put an end to the rolling

28 blackouts, catastrophically high prices, and near-continuous power emergencies.

Heller
Ehrman LLP

COMPLAINT FOR DAMAGES AND/OR              13
RESTITUTION & DECL. RELIEF, JURY DEMAND

1    53.    The bulk of the crippling costs of the crisis have been passed through to, and paid by,

2    the residential and commercial ratepayers of the California IOUs.  These costs are included in

3    current rates assessed to customers of the California IOUs, and will continue to be included in rates

4    until the costs of the crisis have been paid off.  By this Complaint, the California IOUs are seeking

5    to recover from the Governmental Entities the amounts that each Governmental Entity received in

6    excess of the lawful rates for its wholesale sales of electric power to the California IOUs in the ISO

7    and PX markets.  Amounts recovered by the California IOUs will ultimately benefit California

8    ratepayers in the manner determined by the CPUC.

9                              **The California Parties Seek Relief From FERC**

10    54.    On August 2, 2000, when it became clear that the extremely high wholesale prices

11    were not returning to the lower levels that had prevailed historically, SDG&E filed a complaint

12    with FERC under the FPA against all sellers of energy and ancillary services into markets operated

13    by the ISO and PX.  FERC Docket No. EL00-95.  PG&E, SCE, and the EOB intervened in that

14    proceeding on August 14, 2000.  The Governmental Entities were also parties to that proceeding.

15    In that proceeding, the California Parties requested that FERC investigate the justness,

16    reasonableness, and lawfulness of rates being charged in the California ISO and PX markets and

17    that FERC order refunds to the extent that FERC determined that sellers had charged unjust,

18    unreasonable, or otherwise unlawful rates.

19    55.    In response to SDG&E's complaint, FERC commenced its own investigation into the

20    sellers' rates, which it consolidated with SDG&E's complaint.  Collectively, the associated

21    proceedings are referred to as the "Remedy Proceeding."  In an order issued July 25, 2001 (the

22    "July 25, 2001 Order"), FERC ruled that sellers of electric power in the ISO and PX markets

23    (including the Governmental Entities) had sold electric power at unjust, unreasonable, and unlawful

24    rates, and that the rates charged in the ISO and PX markets should be corrected for the Refund

25    Period.  FERC Docket No. EL00-98-000.  *See San Diego Gas & Electric Co.,* 96 FERC ¶ 61,120

26    (2001).

27    56.    In the July 25, 2001 Order, FERC held: "Our action here establishes a revised method

28    for calculating the just and reasonable clearing prices to be applied in those markets for the period

Heller
Ehrman LLP

COMPLAINT FOR DAMAGES AND/OR                    14
RESTITUTION & DECL. RELIEF, JURY DEMAND

1   beginning October 2, 2000. This is pursuant to the Commission's authority under FPA section 206

2   to fix the just and reasonable rate. Our action thus revises the market clearing prices that all market

3   participants previously agreed to accept for their sales. In this context, we see no reason to treat

4   [the Governmental Entities] differently, as they are receiving the same price, the just and reasonable

5   market clearing price established pursuant to market rules approved by this Commission, that they

6   expected to obtain for their wholesale sales in the centralized ISO and PX spot markets." July 25,

7   2001 Order, 96 FERC at 61,512.

8       57.    FERC also concluded that, on the record before it, its statutory mandate did not grant

9   it authority to order refunds for the Summer Period (i.e., May 1, 2000 through October 1, 2000),

10  and thus denied relief for the Summer Period. FERC also refused to correct the rates for "energy

11  exchange" transactions (in which blocks of electric power were sold to the ISO for payment in-

12  kind) and sales to the ISO or the PX of greater than twenty-four hours (i.e., "multi-day" sales under

13  FERC's definition) made during the Refund Period. *See* July 25, 2001 Order, 96 FERC at 61,499;

14  *see also San Diego Gas & Electric Co.*, 102 FERC ¶ 61,317 at 62,065 (2003). The California

15  Parties have appealed to the Ninth Circuit FERC's decisions to limit refunds to the Refund Period

16  and to certain transactions during the Refund Period, and that appeal is currently pending.

17      58.    In order to remedy the unlawful prices charged in the market during the Refund

18  Period, FERC has, in a series of orders beginning with the July 21, 2005 Order, adopted a

19  methodology to recalculate, on a market-wide basis, the just and reasonable prices that all sellers

20  should have received under the ISO and PX Tariffs. In lieu of the auction pricing mechanism

21  previously provided in the ISO and PX Tariffs, which resulted in unlawful prices, FERC's

22  methodology effectively revised the ISO and PX Tariffs to determine the corrected, maximum rates

23  that could be charged under those tariffs. These corrected, maximum rates were called the

24  "Mitigated Market Clearing Price," or "MMCP." FERC ordered the ISO and PX to apply the

25  MMCP to sales during the Refund Period, including to OOM sales, in order to recalculate the

26  charges that all sellers should have received for each interval during the Refund Period in place of

27  the previous unlawful prices.

28

Heller
Ehrman LLP

59.    The ISO was ordered to calculate the amounts that sellers were required to refund or credit to buyers under the July 25, 2001 Order.  July 25, 2001 Order, 96 FERC at 61,516.  Pursuant to FERC's direction, the ISO and the PX have recalculated the accounts of all sellers and buyers in the ISO and PX markets to reflect the corrected rates for the Refund Period in accordance with the July 25, 2001 Order and the subsequent related FERC orders.

60.    The California Parties have petitioned the Ninth Circuit for review of the July 25, 2001 Order and subsequent FERC rehearing orders on the ground, *inter alia*, that FERC was also required to correct the rates for sales made during the Summer Period.  That petition for review has been briefed and argued and is now pending for decision in the Ninth Circuit.  *Public Util. Comm'n of Cal. v. Federal Energy Regulatory Comm'n*, Case No. 01-71051, *et al.*  The California Parties have also appealed the July 25, 2001 Order on the ground that FERC was required to correct the rates for energy exchange transactions and multi-day sales made during the Refund Period.  The California Parties' challenges to FERC's rulings on energy exchanges and multi-day sales are pending in the Ninth Circuit in the same case.

61.    The question of relief for the Summer Period and other non-mitigated Refund Period transactions also was at issue in a second FERC proceeding, separate from the Remedy Proceeding.  In a petition to the Ninth Circuit for review of orders in that FERC proceeding, the Ninth Circuit held that FERC had erred by concluding that it lacked authority to order refunds for the Summer Period transactions and for other non-mitigated transactions during the Refund Period, and remanded the case so that FERC, "in the first instance," could reconsider whether refunds are appropriate for those transactions.  *California, ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1016-18 (9th Cir. 2004), *pet. for reh'g pending*.

### Market Manipulation Resulted in Windfall Profits for All Sellers

62.    FERC recognized early on that market manipulation could have negatively affected the California markets.  On November 1, 2000, FERC noted that "there is clear evidence that the California market structure and rules provide the opportunity for sellers to exercise market power when supply is tight and can result in unjust and unreasonable rates under the [Federal Power Act]."  *San Diego Gas & Electric Co.*, 93 FERC ¶ 61,121 at 61,350 (2000) ("November 1 Order").

63.     FERC initially refused the California Parties' attempts to obtain discovery and introduce into the Remedy Proceeding evidence of sellers' market manipulation and tariff violations, but in May 2002, acting in a separate non-public docket, FERC released memoranda that described how Enron and other sellers had manipulated the ISO and PX markets in order to increase prices throughout the power crisis. In response, FERC propounded discovery requests to all sellers in the ISO and PX markets regarding market manipulation. On August 23, 2002, the Ninth Circuit directed FERC to allow the California Parties to adduce in the Remedy Proceeding evidence of sellers' market manipulation and tariff violations. As a result of the Ninth Circuit's order, the California Parties conducted discovery from late 2002 to early 2003 of sellers in the ISO and PX markets, including the Governmental Entities. That discovery provided evidence of a pattern of market manipulation and tariff violations involving numerous sellers in the ISO and PX markets.

64.     The California Parties' discovery uncovered evidence that certain sellers in the market engaged in various forms of market manipulation and tariff violations that created the false perception of scarcity in the market and that drove up market prices. For example, sellers practiced physical and economic withholding of generation. This allowed suppliers to increase the price of electricity by keeping large amounts of electric power off the market. Physical withholding occurred when a generator refused to place a supply bid with the PX even when it had power available, or when it falsely reported an outage at a generating plant. Economic withholding occurred when a seller placed high bids unrelated to its generation costs to create the false appearance of scarcity, and so to drive prices higher than true competitive levels would have provided.

65.     Certain sellers in the market engaged in other gaming strategies — the infamous "Fat Boy," "Death Star," and "Ricochet" schemes, among others — and often used other market participants to assist them with these gaming strategies. Notes and tapes of telephone conversations among energy traders revealed discussions about traders' submission of "fake load" in the market, about their intent to "push the price up and keep the price up," and about their implementation of

Heller
Ehrman LLP

1    bidding strategies that would signal other market participants to withhold electric power from the

2    market through physical or economic means.

3        66.    Once this information was available, it became evident that market fraud and

4    manipulation were significant causes of the California Energy Crisis.  Since the end of the

5    California Energy Crisis, numerous energy traders and executives have pled guilty to, or been

6    indicted on, criminal charges, and many have specifically admitted to market manipulation

7    activities.

8        67.    Because all sellers received the same market-clearing prices set by the ISO and PX

9    auctions, the artificially inflated prices created windfall profits for all sellers in the ISO and PX

10   markets, benefiting even those sellers that did not engage in market manipulation.  FERC's July 25,

11   2001 Order and subsequent orders have ameliorated the effects of market manipulation on the

12   transactions that they addressed by correcting the pricing under the ISO and PX Tariffs to reduce

13   the prices that all sellers were authorized to retain for those sales.

14                     **The Ninth Circuit's *Bonneville* Decision**

15       68.    FERC ruled in a series of decisions that its power to enforce sellers' payment of

16   refunds under the FPA extended to governmental entities and rural electric cooperatives, such as the

17   Governmental Entities.  Certain of the Governmental Entities appealed this decision to the Ninth

18   Circuit.  On September 6, 2005, the Ninth Circuit ruled that FERC lacked statutory authority

19   directly to enforce the Governmental Entities' refund obligations under the ISO and PX Tariffs.

20   *Bonneville Power Admin. v. Federal Energy Regulatory Comm'n*, 422 F.3d 908 (9th Cir. 2005).

21   The Court noted, however, that market participants had, as an alternative remedy, the ability to

22   bring claims in court directly against the Governmental Entities to enforce the contractual

23   obligations created by the operative tariffs and related agreements.  *Bonneville Power Admin.*, 422

24   F.3d at 925-926.

25       69.    The Ninth Circuit observed that the Governmental Entities' agreement to abide by the

26   ISO and PX Tariffs "[serves] to demonstrate that the remedy, if any, may rest in a contract action,

27   not a refund action.  Such an approach is not novel . . . ." *id.* at 925 (citing *Alliant Energy v. Neb.*

28   *Pub. Power Dist.*, 347 F.3d 1046, at 1050-51 (8th Cir. 2003)).  The Ninth Circuit quoted with

Heller
Ehrman LLP

COMPLAINT FOR DAMAGES AND/OR                    18
RESTITUTION & DECL. RELIEF, JURY DEMAND

1    approval the Eighth Circuit's holding in *Alliant Energy* that "[w]hen a contract provides that its

2    terms are subject to a regulatory body, all parties to that contract are bound by the actions of the

3    regulatory body . . . . As a result, we are not enforcing the FERC order; instead, we are enforcing

4    an agreement, which [the Governmental Entity] freely entered.") *Bonneville*, 422 F.3d at 926

5    (quoting *Alliant Energy*, 347 F.3d at 1050). The Ninth Circuit has not yet issued the mandate in the

6    *Bonneville* proceeding.

7         70.    In this Complaint, the California Parties seek to enforce in this Court the

8    Governmental Entities' contractual obligations to refund the amounts they charged in excess of the

9    lawful corrected rates, as suggested by the Ninth Circuit in its *Bonneville* decision.

10        71.    On December 2, 2005, without conceding that they were required to take such action

11   at that time, the California Parties complied with state claims presentment statutes by serving copies

12   of written claims on all California defendants and on the Salt River Project, providing them with

13   notice of the California Parties' present claims for relief. Cal. Gov't Code § 910; Ariz. Rev. Stat.

14   12-821-01. The Arizona claims presentment statutes do not apply to RUS-financed cooperatives;

15   consequently, no notice of claim was presented to AEPCO. On the same date, the California

16   Parties also served claims on EWEB, the City of Seattle, and Grant County PUD, in light of

17   ambiguity as to whether the California Parties were required to present these claims under Oregon

18   and Washington law. Ore. Rev. Stat. § 30.275; Rev. Code. Wash. 4.96.010-020.

19        72.    The waiting periods prescribed by the applicable claims presentment statutes have

20   elapsed. The Cities of Anaheim, Azusa, Banning, Burbank, Glendale, Pasadena, Riverside, Santa

21   Clara, Los Angeles, Seattle and Vernon, and the LADWP, Modesto Irrigation District, Turlock

22   Irrigation District, the Northern California Power Agency, and the Sacramento Municipal Utility

23   District have denied the California Parties' claims. The California Parties' claims presented to

24   Grant County and Salt River Project are deemed denied by operation of law because the statutory

25   period for a decision by these entities has expired. The California Parties' claims against EWEB

26   remain unsatisfied, and Oregon law does not require any formal action by EWEB prior to

27   commencement of suit.

Heller
Ehrman LLP

28

73.    Prior to the Ninth Circuit's *Bonneville* order, which was issued on September 6, 2005, FERC asserted and exercised exclusive jurisdiction over claims for refunds from all sellers, including the Governmental Entities.  Thus, in accordance with the July 25, 2001 Order and under FERC's rulings and Ninth Circuit authority, the FERC proceedings were the exclusive forum for the California Parties' refund claims, including claims for refunds from the Governmental Entities. No claim accrued and no limitations period commenced to run until September 6, 2005, when the Ninth Circuit ruled, for the first time, that FERC did not, in fact, have jurisdiction to enforce the refund liability of the Governmental Entities.

74.    Alternatively, to the extent that any limitations period had commenced to run on the California Parties' right to sue in a court to enforce the Governmental Entities' refund obligations prior to the *Bonneville* order, the limitations period was tolled, at a minimum, from the time the California Parties initiated refund proceedings with FERC on August 2, 2000, through the time the Ninth Circuit issued its decision in *Bonneville* on September 6, 2005.

75.    This lawsuit is based on the same facts that were at issue in the Remedy Proceeding and in the various Ninth Circuit appeals from the Remedy Proceeding:  the sellers' (including the Governmental Entities') receipt and retention of rates for sales of wholesale electric power in the ISO and PX markets that are unlawful and unauthorized under the ISO and PX Tariffs.  The California Parties acted promptly, reasonably, and in good faith in seeking relief from FERC against all sellers in the California markets, including the Governmental Entities.  The Governmental Entities were active parties to the FERC Remedy Proceeding, and have had notice throughout the FERC proceedings of the need to gather and preserve relevant evidence.  Following the Ninth Circuit's *Bonneville* decision, the California Parties acted expeditiously to present claims to the Governmental Entities and to commence this action.

Heller
Ehrman LLP

COMPLAINT FOR DAMAGES AND/OR                   20
RESTITUTION & DECL. RELIEF, JURY DEMAND

## CLAIMS FOR RELIEF

## FIRST CLAIM

### Breach of Contract

76.    The California Parties incorporate by reference the allegations set forth above.

77.    All sellers in the ISO and PX markets, including the Governmental Entities, were charged with knowledge that the market-clearing prices, and the formulas and market rules that set the prices, were subject to correction if they were found by FERC to contravene the requirements of the FPA.  By voluntarily choosing to sell electric power at wholesale in the ISO and PX markets, and/or by executing ISO Scheduling Coordinator Agreements, PX Participation Agreements, or other agreements with the ISO or PX, the Governmental Entities contractually agreed to be bound by the provisions of the ISO and PX Tariffs, which incorporate FERC's power to correct prices that it determines to be unjust, unreasonable, or unlawful.

78.    Pursuant to its authority under the FPA, FERC revised the tariffs and corrected the prices that market participants were entitled to receive for their sales during the Refund Period by adopting the MMCP.  Upon FERC's correction of the rates charged and received by sellers, including the Governmental Entities, in the ISO and PX markets, the corrected rates became the only lawful and authorized rates for those sales under the applicable tariffs.

79.    The Governmental Entities are now contractually obligated to reimburse the California IOUs for the difference between the rates that the Governmental Entities initially charged for their sales in the ISO and PX markets and the MMCP.  The Governmental Entities have refused to refund, and continue to refuse to refund, to the California IOUs the amounts that they received in excess of the MMCP during the Refund Period.

80.    The Governmental Entities' conduct constitutes a breach of their contractual obligations to the California IOUs, entitling the California IOUs to judgment against each Governmental Entity for all amounts that each Governmental Entity received in excess of the lawful rate attributable to its wholesale sales of electric power to the California IOUs in the ISO and PX markets during the Refund Period, plus associated interest.

Heller
Ehrman LLP

## SECOND CLAIM

### Anticipatory Breach of Contract

81.    The California Parties incorporate by reference the allegations set forth above.

82.    This Claim is pleaded in the alternative to the First Claim.  If it is determined that the date by which the Governmental Entities would be obligated under the applicable contracts to refund to the California IOUs the amounts that they received in excess of the MMCP during the Refund Period has not yet occurred, the Governmental Entities have nonetheless become obligated to make such refunds immediately, and in advance of such date, because they have wrongfully denied and repudiated any legal duty to so repay the California IOUs.  Specifically, the Governmental Entities have repudiated, in the FERC proceedings, in appeals from FERC orders, and by their denial of the California IOUs' duly-presented claims, their contractual obligations to the California IOUs, including their obligation to comply with the revised Tariff provisions by refunding their unlawful overcharges.

83.    The Governmental Entities' conduct constitutes an anticipatory breach of their contractual obligations to the California IOUs, entitling the California IOUs to judgment against each Governmental Entity for all amounts that each Governmental Entity received in excess of the lawful rate attributable to its wholesale sales of electric power to the California IOUs in the ISO and PX markets during the Refund Period, plus associated interest.

## THIRD CLAIM

### Unjust Enrichment Arising from Contract

84.    The California Parties incorporate by reference the allegations set forth above.

85.    By accepting and retaining prices that are now unlawful under the ISO and PX Tariffs, and by denying their obligations to refund or credit overcharges to buyers in the ISO and PX markets, the Governmental Entities have unjustly enriched themselves at the expense of market purchasers, including the California IOUs and, ultimately, the IOUs' customers, who paid inflated and unlawful prices for electric power.  The Governmental Entities' retention of those unlawful prices violates their contractual duty to abide by the provisions of the ISO and PX Tariffs.

Heller
Ehrman LLP

86.    In addition, the Governmental Entities' retention of prices in excess of the MMCP that are unauthorized under the tariffs is inequitable and unfair:  For transactions where they were buyers, the Governmental Entities are seeking refunds from other sellers of prices they paid in excess of the lawful, corrected rate.  By contrast, for transactions where they were sellers, the Governmental Entities deny any obligation to pay refunds, and seek to retain the windfall benefits of the original unlawful prices they charged other market participants.

87.    The Governmental Entities have been unfairly enriched, entitling the California IOUs to judgment against each Governmental Entity for all amounts that each Governmental Entity received in excess of the lawful rate attributable to its wholesale sales of electric power to California IOUs in the ISO and the PX markets during the Refund Period, plus associated interest.

## FOURTH CLAIM

### Money Had and Received

88.    The California Parties incorporate by reference the allegations set forth above.

89.    By accepting and retaining prices that are unlawful under the ISO and PX Tariffs, and by denying their obligations to refund or credit overcharges to those buyers in the ISO and PX markets, the Governmental Entities have accepted the benefit of illegal profits that rightfully belong to purchasers in the ISO and PX markets, including the California IOUs, that were harmed by the unlawful prices.  Any overcharges received by a Governmental Entity from the California IOUs as a result of unlawful prices rightfully belong to and should be returned to the California IOUs.

90.    The Governmental Entities are accordingly liable to the California IOUs for all amounts each Governmental Entity received in excess of the lawful rate attributable to its wholesale sales of electric power to the California IOUs in the ISO and PX markets during the Refund Period, plus associated interest.

## FIFTH CLAIM

### Declaratory Relief (Refund Period)

91.    The California Parties incorporate by reference the allegations set forth above.

Heller
Ehrman LLP

COMPLAINT FOR DAMAGES AND/OR
RESTITUTION & DECL. RELIEF, JURY DEMAND

23

92.    A controversy has arisen in that the Governmental Entities have denied any liability to the California IOUs for overcharges associated with transactions during the Refund Period for which FERC has ordered relief.  The California Parties seek a declaratory judgment that the California IOUs are contractually entitled to recover from each Governmental Entity all amounts that each Governmental Entity charged in excess of the lawful rate attributable to its sales to the California IOUs in the ISO and PX markets during the Refund Period.

## SIXTH CLAIM

### Declaratory Relief (Energy Exchanges and Multi-Day Sales)

93.    The California Parties incorporate by reference the allegations set forth above.

94.    A controversy has arisen in that the Governmental Entities have denied that they will have any liability to the California IOUs to refund their overcharges associated with energy exchanges and multi-day sales if FERC corrects the prices for these transactions.  The California Parties seek a declaratory judgment that at such time as FERC finds that the rates charged by sellers for energy exchanges or multi-day sales were unlawful, the California IOUs will be entitled to recover from the Governmental Entities the difference between the rates the Governmental Entities charged and the lawful rates as ultimately determined by FERC, plus associated interest.

## SEVENTH CLAIM

### Declaratory Relief (Summer Period)

95.    The California Parties incorporate by reference the allegations set forth above.

96.    A controversy has arisen in that the Governmental Entities have denied that they will have any liability to the California IOUs to refund their overcharges associated with their sales during the Summer Period if FERC corrects the prices for the Summer Period.  The California Parties seek a declaratory judgment that at such time as FERC finds that the rates charged by sellers during the Summer Period were unlawful, the California IOUs will be entitled to recover from the Governmental Entities the difference between the rates that the Governmental Entities originally charged and the lawful rates as ultimately determined by FERC, plus associated interest.

Heller
Ehrman LLP

## EIGHTH CLAIM

### Declaratory Relief (Contractual and Equitable Indemnification)

97.    The California Parties incorporate by reference the allegations set forth above.

98.    Because the ISO and PX are revenue-neutral entities, the Governmental Entities' refusal to honor their repayment obligations will result in a shortfall of funds needed to settle the accounts of ISO and PX participants.  Under the terms of the ISO and PX Tariffs, other market participants, including the California IOUs, may therefore be required to indemnify the ISO and PX for the resulting shortfall.

99.    Any reductions in the California IOUs' accounts to indemnify the ISO and PX for the Governmental Entities' refusal to honor their repayment obligations will constitute amounts due and owing by the Governmental Entities, as ISO Debtors and PX Debtors, to the California IOUs as ISO Creditors and PX Creditors.  The California IOUs, as market participants, are entitled under the ISO and PX Tariffs to bring proceedings directly against the Governmental Entities to recover these amounts owed.  A controversy has arisen in that the Governmental Entities have denied that they have any obligation to disgorge amounts they received in excess of the lawful rate.

100.   The California IOUs seek a declaratory judgment that the Governmental Entities will be liable to the California IOUs on grounds of contractual and equitable indemnification for any amount assessed against the California IOUs' accounts due to the Governmental Entities' refusal to honor their repayment obligations, as well as for all additional costs and expenses incurred by the California IOUs as a result of the Governmental Entities' refusal to honor their repayment obligations.

## NINTH CLAIM

### Declaratory Relief (ISO and PX Accounts)

101.   The California Parties incorporate by reference the allegations set forth above.

102.   This Claim is pleaded in the alternative to the First through Eighth Claims.

103.   A controversy has arisen in that the Governmental Entities have denied that they have any liability to the California IOUs to refund their overcharges associated with their sales during the

Heller
Ehrman LLP

1   Refund Period, and that they will have any liability to the California IOUs to refund their

2   overcharges associated with Energy Exchanges and Multi-Day Sales and sales during the Summer

3   Period if FERC corrects the prices for those transactions.  The California Parties seek a declaration

4   that the Governmental Entities are contractually obligated to permit their accounts at the ISO and

5   PX to be adjusted to reflect all pricing changes resulting from FERC's determination of the

6   corrected, maximum rates under the ISO and PX Tariffs and the recalculation by the ISO and PX

7   pursuant to FERC's direction of the prices charged under the ISO and PX tariffs during the relevant

8   time periods, and are contractually obligated to pay any refunds and to otherwise honor the invoices

9   reflecting the refunds associated with all affected transactions.

10                          **PRAYER FOR RELIEF**

11       WHEREFORE, the California IOUs pray for relief against each Governmental Entity as

12   follows:

13       1.  For judgment against each of the Governmental Entities for all amounts that each

14           Governmental Entity charged in excess of the lawful rate attributable to its sales to

15           the California IOUs in the ISO and PX markets during the Refund Period;

16       2.  For a judgment declaring that the California IOUs are entitled to recover from each

17           Governmental Entity all amounts that each Governmental Entity charged in excess

18           of the lawful rate attributable to its sales to the California IOUs in the ISO and PX

19           markets during the Refund Period;

20       3.  For a judgment declaring that at such time as FERC finds that the rates charged by

21           sellers for energy exchanges or multi-day sales during the Refund Period were

22           unlawful, the California IOUs will be entitled to recover from each Governmental

23           Entity the difference between the rates that each Governmental Entity charged and

24           the lawful rates as ultimately determined by FERC;

25       4.  For a judgment declaring that at such time as FERC finds that the rates charged by

26           sellers during the Summer Period were unlawful, the California IOUs will be

27           entitled to recover from each Governmental Entity the difference between the rates

Heller
Ehrman LLP      28

COMPLAINT FOR DAMAGES AND/OR              26
RESTITUTION & DECL. RELIEF, JURY DEMAND

each Governmental Entity charged and the lawful rates as ultimately determined by FERC;

5.  For a judgment declaring that at such time as the Governmental Entities' refusal to honor their repayment obligations results in a shortfall of funds necessary to settle the California IOUs' accounts, each Governmental Entity will be liable to the California IOUs on grounds of contractual and equitable indemnification for any amount assessed against the California IOUs' accounts;

6.  In the alternative, for a judgment declaring that the Governmental Entities are contractually obligated to permit their accounts at the ISO and PX to be adjusted to reflect all pricing changes resulting from FERC's determination of the corrected, maximum rates under the ISO and PX Tariffs and the recalculation by the ISO and PX pursuant to FERC's direction of the prices charged under the ISO and PX tariffs during the relevant time periods, and are contractually obligated to pay any refunds and to otherwise honor the invoices reflecting the refunds associated with such transactions;

7.  For an award of pre-judgment and post-judgment interest;

8.  For recoverable costs of suit and other expenses; and

9.  For such further relief as the Court may deem just and proper.

Heller
Ehrman LLP

1

2    DATED: March 16, 2006                    HELLER EHRMAN LLP

3

4                                             By: /s/ Marie L. Fiala
                                                  Marie L. Fiala
5
                                              Attorney for Pacific Gas & Electric Company
6

7

8    [ADDITIONAL COUNSEL OF RECORD]

9    STAN BERMAN (WA BAR NO. 29898)
     PEGGY J. WILLIAMS (WA BAR NO. 11281)
10   LISA D. HARDIE (WA BAR NO. 35708)
     (*Pro Hac Vice Applications Pending*)
11   HELLER EHRMAN LLP
     701 Fifth Ave, Suite 6100
12   Seattle, WA 98104-7098
     Telephone: (206) 447-0900
13   Facsimile: (206) 447-0849
     stan.berman@hellerehrman.com
14   peggy.williams@hellerehrman.com
     lisa.hardie@hellerehrman.com
15

16   Attorneys for Plaintiff
     Pacific Gas and Electric Company
17

18

19

20

21

22

23

24

25

26

27

Heller
Ehrman LLP    28

DATED: March 16, 2006                STEPTOE & JOHNSON LLP

                                     By:  /s/ Lawrence P. Riff (as authorized on March 16,
                                          2006)
                                          LAWRENCE P. RIFF

                                     Attorney for the Southern California Edison Company


[COUNSEL OF RECORD]

LAWRENCE P. RIFF (SBN 104826)
JAY E. SMITH  (SBN 162832)
STEPTOE & JOHNSON LLP
633 West Fifth Street, Seventh Floor
Los Angeles, California 90071
Telephone: (213) 439-9400
Facsimile: (213) 439-9599
lriff@steptoe.com
jsmith@steptoe.com


RUSSELL C. SWARTZ  (CA BAR NO. 078360)
LEON BASS (CA BAR NO. 127403)
2244 Walnut Grove Ave
Rosemead, CA 91770
Telephone:  (626) 302-1212
Facsimile: (626) 302-3990
russell.swartz@sce.com
leon.bass@sce.com

Attorneys for Plaintiff Southern California Edison Company

Heller
Ehrman LLP

COMPLAINT FOR DAMAGES AND/OR                29
RESTITUTION & DECL. RELIEF , JURY DEMAND

1

DATED: March 16, 2006                    CALIFORNIA ELECTRICITY OVERSIGHT
2                                         BOARD

3

4                                         By: /s/ Steven Russo (as authorized on March 16,
                                              2006)
5                                             STEVEN RUSSO

6                                         Attorney for the California Electricity Oversight Board

7

8    [COUNSEL OF RECORD]

9    ERIK N. SALTMARSH (CA BAR NO. 156919)
     STEVEN BENITO RUSSO (CA BAR NO. 104858)
10   CALIFORNIA ELECTRICITY OVERSIGHT BOARD
     770 L Street, Suite 1250
11   Sacramento, CA 95814
     Telephone: (916) 322-8601
12   Facsimile: (916) 322-8591
     Steven.Russo@eob.ca.gov
13   esaltmarsh@eob.ca.gov

14
     Attorneys for Plaintiff California Electricity Oversight Board
15

16

17

18

19

20

21

22

23

24

25

26

27

Heller
Ehrman LLP    28

     COMPLAINT FOR DAMAGES AND/OR              30
     RESTITUTION & DECL. RELIEF, JURY DEMAND