**EXHIBIT N**

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

**JUDGMENT IN A CIVIL CASE**

**SAN DIEGO GAS  ELECTRIC COMPANY,**

CASE NO: **2:06–CV–00592–MCE–KJM**

v.

**ARIZONA ELECTRIC POWER
COOPERATIVE, INC., ET AL.,**

_____

<u>XX</u> –– **Decision by the Court.** This action came to trial or hearing before the Court. The issues
   have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

   **THAT JUDGMENT IS HEREBY ENTERED IN ACCORDANCE WITH THE
   COURT'S ORDER OF 3/16/2007**

**Victoria C. Minor**
Clerk of Court

ENTERED:  **March 16, 2007**

by: _/s/ L. Reader_____
                Deputy Clerk

1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

11  PACIFIC GAS AND ELECTRIC
    COMPANY, SOUTHERN CALIFORNIA
12  EDISON COMPANY, CALIFORNIA
    ELECTRICITY OVERSIGHT BOARD
13                                        2:06-CV-0559-MCE-KJM
            Plaintiffs,
14                                        MEMORANDUM AND ORDER
        v.
15
16  ARIZONA ELECTRIC POWER
    COOPERATIVE, INC., CITY OF
17  ANAHEIM, CITY OF AZUSA, CITY
    OF BANNING, CITY OF BURBANK,
18  CITY OF GLENDALE, CITY OF LOS
    ANGELES, CITY OF PASADENA,
19  CITY OF RIVERSIDE, CITY OF
    SANTA CLARA, CITY OF SEATTLE,
20  CITY OF VERNON, EUGENE WATER
    AND ELECTRIC BOARD, LOS
21  ANGELES DEPARTMENT OF WATER
    AND POWER, MODESTO IRRIGATION
22  DISTRICT, NORTHERN CALIFORNIA
    POWER AGENCY, PUBLIC UTILITY
23  DISTRICT NO. 2 OF GRANT
    COUNTY, SACRAMENTO MUNICIPAL
24  UTILITY DISTRICT, SALT RIVER
    PROJECT AGRICULTURAL
25  IMPROVEMENT AND POWER
    DISTRICT, TURLOCK IRRIGATION
26  DISTRICT,

27          Defendants.

28  ──────────────────────────

                            1

1   SAN DIEGO GAS & ELECTRIC
  COMPANY,
2

3         Plaintiff,                   2:06-CV-0592-MCE-KJM
                                      RELATED CASE
4

5      v.

6   ARIZONA ELECTRIC POWER
  COOPERATIVE, INC., CITY OF
7   ANAHEIM, CITY OF AZUSA, CITY
  OF BANNING, CITY OF BURBANK,
8   CITY OF GLENDALE, CITY OF LOS
  ANGELES, LOS ANGELES
9   DEPARTMENT OF WATER AND POWER,
  CITY OF PASADENA, CITY OF
10   RIVERSIDE, CITY OF SANTA
  CLARA, CITY OF SEATTLE, CITY
11   OF VERNON, EUGENE WATER AND
  ELECTRIC BOARD, MODESTO
12   IRRIGATION DISTRICT, NORTHERN
  CALIFORNIA POWER AGENCY,
13   PUBLIC UTILITY NO. 2 OF GRANT
  COUNTY, SACRAMENTO MUNICIPAL
14   UTILITY DISTRICT, SALT RIVER
  PROJECT AGRICULTURAL
15   IMPROVEMENT AND POWER
  DISTRICT, and TURLOCK
16   IRRIGATION DISTRICT,

17
        Defendants.
18

19   _____

20
                 ----oo0oo----
21

22       Before the Court are numerous motions seeking dismissal of

23   the two above captioned cases.  The lead case, civil case no.

24   2:06-cv-0559, was filed on March 16, 2006, and its companion

25   case, civil case no. 2:06-cv-0592, was filed five (5) days later

26   on March 21, 2006.  These actions involve identical Defendants

27   and are based on same or similar allegations, same or similar

28   events and pose same or similar questions of fact and law.

1 Due to this marked similarity, the Court ordered the cases
2 related. *See* Civ. Case No. 2:06-cv-0559, Docket 15, March 28,
3 2006. The Motions to Dismiss filed in these actions seek
4 dismissal through virtually identical mechanisms. Given the
5 likeness of the Parties, the underlying factual predicate, and
6 the bases of the motions filed in both actions, the Court shall
7 herein dispose of all pending motions in both the lead case as
8 well as the member case (collectively, the "Action") as set forth
9 below.

10

11 **BACKGROUND**

12

13     The present Action was brought by Pacific Gas & Electric
14 ("PG&E"), Southern California Edison Company ("SCEC"), the
15 California Electricity Oversight Board ("CEOB") and San Diego Gas
16 & Electric ("SDGE") (collectively, "Plaintiffs") against twenty
17 separate non-public government entities including Arizona
18 Electric Power Cooperative, Inc. ("Arizona"), City of Anaheim
19 ("Anaheim"); City of Azusa ("Azusa"); City of Banning
20 ("Banning"); City of Burbank ("Burbank"); City of Glendale
21 ("Glendale"); City of Los Angeles ("Los Angeles"); City of
22 Pasadena ("Pasadena"); City of Riverside ("Riverside"); City of
23 Santa Clara ("Santa Clara"); City of Seattle ("Seattle"); City of
24 Vernon ("Vernon"); Eugene Water and Electric Board ("Eugene");
25 Los Angeles Department of Water and Power ("LA Water"); Modesto
26 Irrigation District ("Modesto"); Northern California Power Agency
27 ("NCPA"); Public Utility District No. 2 of Grant County
28 ("Grant"); Sacramento Municipal Utility District ("SMUD"); Salt

1   River Project Agricultural Improvement and Power District ("Salt

2   River"); and Turlock Irrigation District ("Turlock")

3   (collectively, "Defendants").[1]  Plaintiffs are seeking damages and

4   declaratory relief for sums allegedly owed as a result of

5   overpayment to Defendants for wholesale electricity and ancillary

6   services ("Energy") between May 1, 2000 and June 20, 2001.

7        Plaintiffs purchase Energy from a number of sources and

8   resell that Energy to consumers at retail prices.  The California

9   wholesale markets are operated by the California Independent

10  System Operator Corporation ("ISO") and California Power Exchange

11  Corporation ("PX") under tariffs filed with and approved by the

12  Federal Energy Regulatory Commission ("FERC").  The ISO and PX

13  are public utilities under the Federal Power Act ("FPA") and are,

14  therefore, subject to FERC's jurisdiction.

15       The ISO is generally the entity responsible for operating

16  and maintaining California's electric transmission grid,

17  including resolving transmission congestion and purchasing

18  electric power to maintain system reliability.  The PX acts as a

19  clearinghouse for daily and hourly markets and submitted

20  schedules of electric power to the ISO in which scheduled

21  generation for the following day equaled scheduled demand.

22  Pursuant to the PX Tariff, sellers in the PX market submitted

23  offers to sell electric power, and purchasers submitted demand

24  bids for the quantity of electric power that they wanted to buy.

25  ///

26

27       [1]Eugene and Salt River were voluntarily dismissed from this
    Action with prejudice on July 12, 2006 and May 12, 2006,
28  respectively.

4

The PX conducted day-ahead and same-day auctions that allowed
parties to adjust their hourly commitments based on changing
needs and availability.  Under its tariff, the PX was charged
with responsibility for, among other things, settling energy
trades between PX market participants and preparing and
distributing to PX market participants invoices reflecting the
amounts payable and receivable by them in connection with their
trading through the PX.

In general, the PX determined, for each hour in each of the
markets that it operated, a single market-clearing price that all
electric power suppliers were paid under the auction provisions
of the PX tariff.  The PX matched offers to buy and sell
beginning with the lowest-priced bids and continuing up to the
highest-priced bids until the amount of power accepted matched
the amount sought by purchasers at that price.  The price of the
last, and therefore the highest-priced, accepted bid set the
price for the entire market.  All sellers of electric power in a
given auction received the same market-clearing price, even if
the seller had offered to sell at a lower price.

In order to obtain sufficient electric power to maintain
reliability of California's electric grid, the ISO at times was
required to procure electric power through procedures other than
its regular auction.  During the period at issue, the ISO was
often forced to solicit such electric power, known as
"out-of-market" or "OOM" electric power, to meet California's
demand for electric power.

/ / /

/ / /

5

1   The ISO Tariff permitted the ISO to solicit this electric power

2   through extraordinary means, such as seeking Energy from OOM

3   electric power marketers and generators, including the

4   Defendants.  These purchases were subject to certain price caps

5   applicable in the ISO markets, which price caps varied during the

6   relevant period and were intended to prevent price gouging.

7   Despite these price caps, suppliers of OOM electric power

8   regularly demanded more than the FERC-approved price cap for such

9   sales to the ISO.  In order to maintain the reliability of

10  California's electric grid, the ISO procured the electric power

11  at whatever price it was offered, even if that price exceeded its

12  price caps, and then charged market participants, including the

13  Plaintiffs, herein, for the Energy purchased.

14      Plaintiffs allege that the ISO and PX Tariffs filed with

15  FERC contained the only terms and conditions, including the

16  pricing formulas, upon which transactions in the ISO and the PX

17  could lawfully be conducted.  Further, the Plaintiffs aver that

18  Defendants voluntary sale of Energy into the ISO and PX markets

19  render them charged with knowledge and acceptance of those terms

20  and conditions giving rise to contract remedies.  This assertion

21  is heavily disputed by Defendants.  As additional support for the

22  foregoing, Plaintiffs contend that the PX tariff required all PX

23  market participants to execute a PX Participation Agreement.

24  That Agreement provided, *inter alia*, that the PX market

25  participant "will abide by and will perform all of the

26  obligations under the PX tariff in respect of all matters set

27  forth therein including, without limitation, all matters relating

28  to the trading of Energy by it through the PX market."

PX Tariff Appendix A, Participation Agreement, § II(B).  The PX
Participation Agreement further provided that "[t]he PX Tariff is
incorporated herein and made a part hereof."  PX Tariff Appendix
A, Participation Agreement, § 8.

Similarly, the ISO Tariff contemplated that each market
participant, including the Defendants, would execute an ISO
Scheduling Coordinator Agreement.  That Agreement was prescribed
by the ISO tariff and provided, *inter alia*, that the ISO
Scheduling Coordinator "will abide by, and will perform all of
the obligations under the ISO Tariff placed on Scheduling
Coordinators in respect of all matters set forth therein
including, without limitation, all matters relating to the
scheduling of Energy and Ancillary Services on the ISO controlled
grid, ... [and] billing and payments ...."  ISO Tariff Appendix
B, Scheduling Coordinator Agreement, § 2(B).  The Scheduling
Coordinator Agreement further provided that "[t]he ISO Tariff is
incorporated herein and made a part hereof."  ISO Tariff Appendix
B, Scheduling Coordinator Agreement, § 8.

Beginning in May 2000, the prices demanded by sellers in the
ISO and PX markets rose dramatically and sellers continued to
demand those unprecedented prices for over a year.  As a result
of the auction provisions of the ISO and PX Tariffs, these
extremely high prices were charged by all Energy sellers in the
markets, even if individual sellers had offered to sell their
power in the auctions at lower prices.

As a result of these unprecedented prices, SDG&E filed a
complaint with FERC under the FPA against Energy sellers subject
to FERC's jurisdiction.  August 2, 2000, FERC Docket No. EL00-95.

1    PG&E, SCE, and the EOB intervened on August 14, 2000.  In that

2    proceeding, the complaining parties requested that FERC

3    investigate the justness, reasonableness, and lawfulness of rates

4    being charged in the California ISO and PX markets and that FERC

5    order refunds to the extent that FERC determined that sellers had

6    charged unjust, unreasonable, or otherwise unlawful rates.

7         Following the foregoing proceeding, FERC immediately

8    initiated an investigation into the pricing charged in the

9    wholesale Energy markets.  In a November 1, 2000, Order, FERC

10   found that the California market structure and rates were

11   seriously "flawed" and proposed fundamental modifications to the

12   wholesale market. 93 FERC ¶ 61,121, at 61,370 (2000).

13        On December 15, 2000, FERC issued an order eliminating the

14   requirement that the Plaintiffs purchase all of their needed

15   electric power through the PX.  The Order included proposed price

16   mitigation measures and refund liability of public utility

17   sellers.  93 FERC ¶ 61,294, at 61,997 (2000).  As a result of its

18   findings, FERC also terminated the PX wholesale rate schedule and

19   outlined a complex web of mitigation measures.  *Id.* at 61,997.

20   Specifically, the Commission proposed to limit the single-price

21   auction by refunding prices in excess of a "break-point" price.

22   *Id.* at 61,983.

23        The power crisis ultimately ended on June 19, 2001, when

24   FERC imposed "must offer" requirements on electric power

25   generators prohibiting them from withholding generation, and

26   imposed price caps on wholesale sellers of electric power across

27   all western states effective June 21, 2001 ("June 19, 2001,

28   Order").

1   *San Diego Gas & Electric Co., et al.*, 95 FERC ¶ 61,418 at 62,558,

2   62,569 (2001).

3       On July 25, 2001, FERC ordered both public and non-public

4   utilities to refund those sums charged in excess of the price it

5   had deemed to be just and reasonable for the period beginning

6   October 2, 2000, and ending June 20, 2001 ("Refund Period").  96

7   FERC P 61,120, at 61,499 (2001) ("July Order").  This Order

8   caused much upheaval as it directed non-public utilities that had

9   universally been deemed outside FERC's jurisdiction to pay

10  refunds for the Refund Period.  Not surprisingly, the non-public

11  utilities sought review of FERC's July Order from the Ninth

12  Circuit Court of Appeal.  *See Bonneville Power Admin. v. FERC*,

13  422 F.3d 908, 913 (9th Cir. 2005).

14      The *Bonneville* Court unanimously concluded that FERC

15  exceeded its jurisdiction when it ordered non-public utilities

16  that sold Energy into the California market during the relevant

17  period to pay refunds.  The Ninth Circuit explained that FERC

18  derives its refund authority from the FPA and specifically from

19  Section 201(f) thereof.  *Id.* at 915.  The court further clarified

20  that governmental entities (non-public utilities), like

21  Defendants herein, are not subject to the provisions of

22  subchapter II of the FPA unless otherwise specifically provided.

23  *Id.*  Accordingly, the court remanded the action for further

24  proceedings.

25  ///

26  ///

27  ///

28  ///

1                                **STANDARD**

2

3           Federal Courts are presumptively without jurisdiction over

4    civil actions, and the burden of establishing the contrary rests

5    upon the party asserting jurisdiction.  *Kokkonen v. Guardian Life*

6    *Ins. Co. of America*, 511 U.S. 375, 114 S. Ct. 1673, 128 L. Ed. 2d

7    391 (1994).  Lack of subject matter jurisdiction is never waived

8    and may be raised by either party or the court at any time.

9    *Attorneys Trust v. Videotape Computer Products, Inc.*, 93 F.3d.

10   593, 594-95 (9th Cir. 1996).  Lack of subject matter jurisdiction

11   may be raised by the district court *sua sponte*: "Nothing is to be

12   more jealously guarded by a court than its jurisdiction."  *In re*

13   *Mooney*, 841 F.2d. 1003, 1006 (9th Cir. 1988).

14          In moving to dismiss for lack of subject matter jurisdiction

15   pursuant to Rule 12 (b)(1), the challenging party may either make

16   a facial attack on the allegations of jurisdiction contained in

17   the complaint or can instead take issue with subject matter

18   jurisdiction on a factual basis.  *Thornhill Publ'g Co. v. Gen.*

19   *Tel. & Elect. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).

20          If the motion constitutes a facial attack, the Court must

21   consider the factual allegations of the complaint to be true.

22   *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981);

23   *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3rd

24   Cir. 1977).  If the motion constitutes a factual attack, however,

25   "no presumptive truthfulness attaches to plaintiff's allegations,

26   and the existence of disputed material facts will not preclude

27   the trial court from evaluating for itself the merits of

28   jurisdictional claims."  *Thornhill*, 594 F.2d at 733.

1    If the Court grants a motion to dismiss a complaint, it must

2  then decide whether to grant leave to amend.  Generally, leave to

3  amend should be denied only if it is clear that the deficiencies

4  of the complaint cannot be cured by amendment.  *Broughton v.*

5  *Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980).

6

7                              **ANALYSIS**

8

9  **I.    Subject Matter Jurisdiction**

10

11    Plaintiffs seek to invoke federal question jurisdiction

12  based on 28 U.S.C. § 1331.  Specifically, paragraph 1 of PG&E's

13  Complaint provides as follows:

14        Plaintiffs' claims require resolution of a disputed and
          substantial issue of federal law in that plaintiffs'
15        claims arise out of defendants' sales of electric power
          in wholesale electricity markets that are within the
16        Federal Energy Regulatory Commission's ("FERC")
          exclusive regulatory jurisdiction, and plaintiffs are
17        suing to recover for defendants' breaches of their
          contractual obligations contained in tariffs filed with
18        and regulated by FERC.

19
*See* PG&E Complaint, ¶ 1; *see also* SDG&E Complaint, ¶ 1.
20
Plaintiffs, in their papers, go on to argue that while this case
21
seeks to interpret what is essentially a state law matter rather
22
than a federal matter, the Supreme Court has "recognized ... that
23
in certain cases federal question jurisdiction will [also] lie
24
over state-law claims" that require the resolution of a disputed
25
and substantial issue of federal law.  *See* Plf.s' Opp'n., p. 47
26
(citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
27
125 S. Ct 2363, 2366-67 (2005)).
28

                                  11

1  More precisely, Plaintiffs salient contention is that subject

2  matter jurisdiction exists in the present action as the federal

3  ISO and PX Tariffs filed with FERC contained the only terms and

4  conditions, including the pricing formulas, upon which

5  transactions in the ISO and the PX could lawfully be conducted.

6  Accordingly, the interpretation of those federal tariffs will be

7  necessary to assess the merits of Plaintiffs' claims.  Further,

8  Plaintiffs aver that Defendants voluntary sale of Energy into the

9  ISO and PX markets render them charged with knowledge and

10 acceptance of those terms and conditions giving rise to contract

11 remedies under federal law.  Defendants controvert Plaintiffs'

12 allegations by clarifying that Plaintiffs' claims do not truly

13 arise under a federal statute nor is there exclusive federal

14 jurisdiction over the subject matter.

15     As noted above, district courts are courts of limited

16 jurisdiction.  They possess only that power authorized by the

17 United States Constitution and statute.  *Exxon Mobil Corp. v.*

18 *Allapattah Servs., Inc.*, 125 S. Ct. 2611, 2616 (2005) (internal

19 quotation marks and citation omitted).  As a general matter,

20 federal courts have subject matter jurisdiction over civil

21 actions "arising under the Constitution, laws, or treaties of the

22 United States."  28 U.S.C. § 1331.[2]  In order to be heard in this

23 forum, Plaintiffs must satisfy the Court that jurisdiction

24 exists.

25 ///

26

27      [2]To the extent jurisdiction could be based on 28 U.S.C. §
28 1332, the Court shall address that issue in Section II.C. of this
   Order.

**A.    Arising Under Federal Jurisdiction**

As an initial matter, the Parties and the Court agree that this case does not present a federal question of the first kind; namely one created under federal law.  Rather, this is a purely state based contract action implicating certain language contained in a federal tariff.  Plaintiffs seek to persuade the Court that this chiefly federal issue is merely played out against the backdrop of a state law contract claim.  Defendants, predictably, claim the federal tariffs, while admittedly crafted pursuant to federal law, play but a bit role in an entirely state law contract action.  In fact, this case poses the "litigation-provoking problem" of a federal issue embedded in a state-created cause of action.  *See Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 809-10 (1986).  More precisely, the question before this Court is whether the incorporation by reference of federal regulations into a purely state law contract is sufficient to confer federal subject matter jurisdiction.  *See* 28 U.S.C. § 1331.

As a general matter, the Supreme Court has explained that the "vast majority" of cases brought under the federal-question jurisdiction of the federal courts are those in which federal law creates the cause of action.  *Merrell Dow*, 478 U.S. at 808.  That said, the Court has nonetheless recognized a case may arise under federal law "where the vindication of a right under state law necessarily turned on some construction of federal law."  *Id.* (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9 (1983).

13

1    The cases that instruct the resolution of this

2   jurisdictional quandary begin with the seminal case *Merrell Dow*

3   adjudged in 1986.  There, the complainants alleged that the

4   misbranding of Benedictin resulted in pregnant women ingesting

5   the drug which caused birth defects to their children.

6   Plaintiffs sought redress on grounds of negligence, breach of

7   warranty, strict liability, fraud, and gross negligence.  As part

8   of their cause of action, however, plaintiffs alleged the

9   misbranding, in violation of the Federal Food, Drug, and Cosmetic

10  Act ("FDCA"), was negligence per se.  Defendants sought to have

11  the case heard in a federal forum based on the existence of a

12  federal issue embedded in the state law claims.  The Supreme

13  Court concluded that federal jurisdiction was lacking.  In

14  explaining its' finding, the Supreme Court stated that

15          "a complaint alleging a violation of a federal statute
            as an element of a state cause of action, when Congress
16          has determined that there should be no private, federal
            cause of action for the violation, does not state a
17          claim 'arising under the Constitution, laws, or
            treaties of the United States.'"

18

19  *Merrell Dow*, 478 U.S. at 817.

20      The foregoing holding had been interpreted by some courts as

21  standing for the proposition that absent a private right of

22  action, federal jurisdiction cannot exist.  In fact, that reading

23  was later disapproved by the Court in a case entitled *Grable &*

24  *Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S 308, 125 S. Ct.

25  2363, 162 L. Ed. 2d 257 (2005).  There, petitioner Grable brought

26  a state quiet title action, claiming the respondent's title to a

27  piece of land was invalid because the Internal Revenue Service

28  had improperly noticed a tax seizure under 26 U.S.C. § 6335.

14

1  In upholding the lower court's determination that federal

2  question jurisdiction did, in fact, exist, the Supreme Court

3  wrote:

4          [W]hether Grable was given notice within the meaning of
         the federal statute is thus an essential element of its
5          quiet title claim, and the meaning of the federal
         statute is actually in dispute; it appears to be the
6          only legal or factual issue contested in the case. The
         meaning of the federal tax provision is an important
7          issue of federal law that sensibly belongs in a federal
         court.

8

9  *Grable*, 545 U.S. at 314.  Significantly, the fact that the

10 federal statute in *Grable* did not create a private cause of

11 action was not controlling.  In discussing the issue, the Court

12 explained that *Merrell Dow* should be read in its entirety as

13 treating the absence of a federal private right of action as

14 "evidence relevant to, but not dispositive of, the sensitive

15 judgments about congressional intent that § 1331 requires."  *Id.*

16 at 308.  The Court went on to explain that the absence of a

17 private right of action should be considered an indicator of

18 substantiality of the federal issue at stake and, more

19 importantly, as an indicator of congressional intent regarding

20 the scope of jurisdiction to be exercised under § 1331.  *Id.*  The

21 *Grable* Court further found the missing cause of a private right

22 of action not as "a missing federal door key, always required,

23 but as a missing welcome mat."  *Id.*

24      Most recently, the Court considered a case rather on point

25 with the case presently before this Court; *Empire HealthChoice*

26 *Assur., Inc. v. McVeigh,* 126 S. Ct. 2121 (2006).

27 ///

28 ///

1  *Empire* involved a dispute about the meaning of terms in a federal

2  health insurance contract between a federal agency and a private

3  insurance carrier that set forth the details of a federal health

4  insurance program created by federal statute and covering eight

5  million federal employees. *See Id.* at 2138 (dissent by Justice

6  Breyer).  In *Empire*, it was undisputed that the statute at issue

7  was federal in character, the program that created the statute

8  was federal, the beneficiaries of the program were federal

9  employees, and the premiums paid under the relevant policies were

10  federal.  *Id.*  Yet, the Court concluded that subject matter

11  jurisdiction did not exist.  The *Empire* Court characterized the

12  *Grable* decision as belonging to a "slim" category of cases as it

13  presented a nearly pure issue of law that could be settled once

14  and for all and thereafter would govern numerous tax sale cases.

15  *Id.* at 2137.  The Court was persuaded that the contract

16  interpretation at issue in *Empire* was sufficiently fact-bound and

17  situation-specific that it did not fall within the very narrow

18  category of cases *Grable* exemplifies.  *Id.*

19       In sum, an embedded federal issue in a state law claim

20  will qualify for a federal forum only if federal jurisdiction is

21  consistent with congressional judgment about the sound division

22  of labor between state and federal courts governing the

23  application of § 1331.  Indeed, the Supreme Court has been

24  careful not to articulate a "single, precise, all-embracing" test

25  for jurisdiction over federal issues embedded in state-law claims

26  between non-diverse parties.  Rather, the Court has instructed

27  that when addressing this issue, a number of factors are to be

28  considered.

1   Ultimately, however, it is clear that unless a state law claim
2   necessarily raises a stated federal issue, actually disputed and
3   substantial, which does not disturb any congressionally approved
4   balance of federal and state judicial responsibilities, federal
5   jurisdiction cannot lie.  The Court believes that such is the
6   case here.
7        First, the lack of a private right of action, as explained
8   above, speaks in part to whether Congress envisioned that claims
9   arising under a particular piece of federal legislation would
10  properly be heard in a federal forum.  *Merrell Dow*, 478 U.S. at
11  812.  The federal laws at issue here are the Federal Power Act
12  and the federal tariffs promulgated thereunder.  As Defendants
13  repeatedly explain, they are expressly exempt from the reaches of
14  the refund authority granted to FERC under the FPA.  *See*
15  *Bonneville*, 422 F.3d at 926.  This express exemption evinces, at
16  least at some level, congressional intent that these non-public
17  utilities not be subject to federal jurisdiction.  This is true
18  at least with respect to the reach of the federal agency charged
19  with the administration of refunds pursuant to the FPA.  It bears
20  mention that the federal judiciary is not to "engraft a remedy on
21  a statute, no matter how salutary, that Congress did not intend
22  to provide."  *California v. Sierra Club*, 451 U.S. 287, 297
23  (1981).  The Plaintiffs sought refunds from the Defendants
24  through a FERC proceeding.  That proceeding resulted in an order
25  for the payment of refunds to Plaintiffs by the non-public
26  utility Defendants.  Later, the *Bonneville* court found that FERC
27  had no jurisdiction to order such refunds based on federal law.
28  ///

17

1    Congress has spoken that it does not intend these Defendants to

2    be subject to governance by the federal agency charged with

3    administration of the federal law at issue.  This Court is not

4    free to supplement the foregoing congressional answer.  The Court

5    finds Congress intended to limit the scope of jurisdiction vis-a-

6    vis these Defendants in precisely this type of claim.

7         With respect to the substantial nature of the federal

8    interests at stake, they do not rise to the level of warranting

9    federal question jurisdiction.  The federal tariffs that have

10   been incorporated by reference into the contracts at issue are to

11   be interpreted and governed solely by California law rather than

12   by federal law.  Specifically, the ISO tariff provides as

13   follows: "This ISO Tariff shall be governed by and construed in

14   accordance with the laws of the State of California."  ISO

15   Tariff, § 20.7.  The PX Tariff provides substantially the same.

16   Given that the very language at issue, the contract terms

17   provided by the federal tariffs, is to be expressly construed in

18   accord with California law rather than federal law, the Court

19   finds the federal interests to be considerably muted.  Any

20   interpretation by a federal court of the language of the tariffs

21   will only speak to how those tariffs should be construed in this

22   state.  Accordingly, the reach of any such adjudication will not

23   have federal reverberation.  In addition, to the extent federal

24   interests are implicated, the state court is quite competent to

25   apply the language of the tariffs and is certainly well

26   positioned to do so where, as here, the tariff language is to be

27   construed in accord with state law.

28   ///

1        In sum, the Court concludes both that the lack of a private

2    right of action evinces congressional intent to foreclose a

3    federal forum and that the federal interests at stake are muted

4    given that the federally imported language is to be accorded

5    meaning consistent with this state's laws.  However, even had the

6    Court found the presence of a substantial disputed federal issue

7    and the ostensible importance of a federal forum, those finding

8    are not necessarily dispositive.  *Grable*, 545 U.S. at 314.  In

9    fact, there must always be an assessment of any disruptive

10   portent in exercising federal jurisdiction.  *Id.*

11       In assessing the potential disruption of the sound division

12   of labor between state and federal courts envisioned by Congress,

13   it is instructive to once again consider the seminal Supreme

14   Court cases of *Grable* and *Merrell Dow*.  In *Grable*, the Court saw

15   little danger in accepting jurisdiction of the state title

16   dispute because it would "portend only a microscopic effect on

17   the federal-state division of labor."  *Id.* at 315.  In contrast,

18   recognizing a substantial federal question when a violation of

19   federal law furnished the basis for a negligence claim, as in

20   *Merrell Dow*, would severely impact the "the concern for

21   'practicality and necessity' that *Franchise Tax Board* advised for

22   the construction of § 1331 when jurisdiction is asserted because

23   of the presence of a federal issue in a state cause of action."

24   *Merrell Dow*, 478 U.S. at 811-12.  Accepting jurisdiction in that

25   case "would have attracted a horde of original filings and

26   removal cases raising other state claims with embedded federal

27   issues" and likely would "have heralded a potentially enormous

28   shift of traditionally state cases into federal courts."

19

1 | *Grable*, 545 U.S. at 319.

2 |     The Court views the circumstance presented by this case as
3 | more parallel to the paradigm expressed in *Merrell Dow* than the
4 | paradigm articulated in *Grable*. Specifically, excepting
5 | diversity cases from the equation, the bulk of contract disputes
6 | in the United States are conducted by the state courts. This
7 | balance would be upset drastically if state contract claims could
8 | become a matter of substantial federal interest by the simple
9 | expedient of incorporating by reference the terms of a federal
10 | law or regulation. The Court believes such a dramatic shift
11 | would distort the division of judicial labor assumed by Congress
12 | under section 1331.

13 |     Given the foregoing concerns, and following the analytical
14 | methodology laid down by recent Supreme Court precedent, the
15 | Court finds that this state-law contract action incorporating by
16 | reference federal tariffs does not present a sufficient federal
17 | question over which this Court may exercise "arising under"
18 | jurisdiction pursuant to 28 U.S.C. § 1331.

19 |

20 | **B.**    **Sparta/Dynegy Exclusive Jurisdiction Exception**

21 |

22 |     The Parties vigorously argue over the applicability of an
23 | exception to the general rule that state law claims cannot be
24 | alchemized into federal causes of action by incidental reference.
25 | *See Sparta Surgical Corp. v. NASD,* 159 F.3d 1209 (9th Cir. 1998)
26 | (citing *Easton v. Crossland Mortg. Corp.,* 114 F.3d 979, 982
27 | (1997).

28 | ///

This exception was first set out in the seminal case of *Sparta*
*Surgical Corp. v. NASD* ("*Sparta*") and later examined in *Lockyer*
*et al. v. Dynegy, et al.* In *Sparta*, the Ninth Circuit confronted
the question of subject matter jurisdiction over a variety of
state common-law claims that alleged, in part, a violation of the
rules contained in the Securities and Exchange Act ("Exchange
Act"). 159 F.3d 1209. The plaintiffs in *Sparta* brought their
claims in a state court. Thereafter, the defendants removed the
case alleging "arising under" federal jurisdiction based on a
claimed violation of the Exchange Act. The Ninth Circuit found
federal jurisdiction proper based on the exclusive jurisdiction
provision contained in the Exchange Act itself. The court
explained its ruling as follows: "the rule that state law claims
cannot be alchemized into federal causes of action by incidental
reference ... has no application when relief is partially
predicated on a subject matter committed exclusively to federal
jurisdiction." *Id.* at 1212-13. The court ultimately found that
the state law claims arose under the exclusive jurisdiction
provision of the Exchange Act rather than under 28 U.S.C. § 1331.
*Id.* at 1212.

Later, in *Lockyer v. Dynegy*, the Ninth Circuit confronted a
similar case where the plaintiffs sought federal jurisdiction
over a state law unfair competition claim, Cal. Bus. & Prof. Code
§ 17200, *et seq.*, alleging an underlying violation of the precise
tariffs at issue here. 375 F.3d 831 (9th Cir. 2004). Like in
*Sparta* itself, the plaintiffs in *Dynegy* brought their claim in
the state Superior Court. The defendants promptly removed the
action to a federal forum.

21

1   Plaintiffs thereafter sought remand and the Ninth Circuit, citing

2   *Sparta*, concluded the federal court properly retained

3   jurisdiction given the existence of an exclusive jurisdiction

4   provision contained in the FPA.  *Id.*

5        Plaintiffs in the present action rely heavily on the *Dynegy*

6   case.  That is, Plaintiffs rely on the Ninth Circuit's conclusion

7   that the tariffs promulgated by FERC pursuant to its authority

8   under the FPA are the equivalent of a federal regulation and,

9   therefore, an examination of those tariffs to assess the merits

10  of the present claim raises a federal question.  *See Id.* at 840.

11  Plaintiffs further contend that this case is analogous to *Dynegy*

12  where the Ninth Circuit plainly found federal jurisdiction

13  because, as in *Dynegy* itself, here the merits of the claim turn,

14  in part, on an examination of the tariffs.  Defendants contend,

15  rather convincingly, that the *Dynegy* case is distinguishable from

16  the case at bar.  The Court agrees.

17       As an initial matter, the *Dynegy* plaintiffs were seeking

18  relief on the ground that the defendants violated California's

19  unfair competition law.  *See Cal. Bus. & Prof. Code* § 17200 *et*

20  *seq.*  Generally, that law proscribes unlawful business practices

21  by borrowing violations of other laws and treating them as

22  independently actionable under Section 17200.  *Cel-Tec Commc'ns,*

23  *Inc. V. L.A. Cellular Tel. Co.,* 20 Cal. 4th 163, 180 (1999).

24  Accordingly, an essential element of the *Dynegy* plaintiffs' claim

25  was, necessarily, a violation of the federal tariffs themselves.

26  Absent such a violation, no state law liability could have

27  survived.

28  ///

22

1  Given that fact, it is no surprise the court concluded the relief

2  sought was predicated on a matter committed exclusively to

3  federal jurisdiction because the state lawsuit turned "entirely[]

4  upon the defendant's compliance with a federal regulation."

5  *Dynegy*, 375 F.3d at 841.

6      Here, in contrast, the Plaintiffs are seeking to enforce a

7  private contract between private parties which will afford relief

8  only if the contract terms, from wherever drawn, are found to

9  have been breached.  Unlike in *Dynegy*, it is not the federal

10  tariff itself, standing as the law, that will give life to the

11  merits of Plaintiffs' claim.  It is the contract language,

12  standing only as a representation of the agreement between the

13  Parties, that will inform the resolution of this matter.

14      While the Court believes the foregoing to be the correct

15  analysis of the jurisdictional issue at bar, an argument may be

16  advanced that the subject matter of the contract, i.e. the sale

17  of Energy from the Defendants to the Plaintiffs, is the exclusive

18  domain of federal jurisdiction irrespective of the sweeping

19  exception for these Defendants.  At first blush, this averment

20  appears meritorious.  Indeed, a broad reading of the *Dynegy* case

21  arguably supports this argument to the extent that *Dynegy* finds

22  an interpretation of the federal tariffs at issue a matter

23  committed exclusively to federal jurisdiction.  *See* 375 F.3d at

24  843.  However, the Court finds the later decided *Bonneville* case

25  dispels the notion that the broad grant of authority under the

26  FPA's exclusive jurisdiction provision ensnares all matters,

27  however arising, respecting the sale of Energy.  *See* 422 F.3d at

28  916.

1      To be sure, the FPA applies to "the transmission of electric

2  energy in interstate commerce and to the sale of electric energy

3  at wholesale." 15 U.S.C. § 824(b). More importantly, however,

4  the FPA provides:

5  > The District Courts of the United States ... shall have
   > exclusive jurisdiction of violations of this chapter or

6  > the rules, regulations, and orders thereunder, and of
   > all suits in equity and actions at law brought to

7  > enforce any liability or duty created by, or to enjoin
   > any violation of, this chapter or any rule regulation

8  > or order thereunder.

9  16 U.S.C. § 825p. In contrariety, the FPA provides the following

10 exemption:

11 > No provision in this subchapter shall apply to, or be
   > deemed to include, the United States, a State or any

12 > political subdivision of a State, or any agency,
   > authority, or instrumentality of any one or more of the

13 > foregoing,...unless such provision makes specific
   > reference thereto.

14

15 16 U.S.C. § 824(f).

16     The *Dynegy* plaintiffs sought to directly enforce the federal

17 tariffs as they applied to public utilities. Based on the

18 exclusive jurisdiction provision, the court found relief was

19 "predicated on a subject matter committed exclusively to federal

20 jurisdiction." 375 F.3d at 841 (citing *Sparta*, 159 F.3d at

21 1213). Later, in *Bonneville*, the court was tasked with

22 interpreting both the foregoing jurisdictional provisions to

23 determine if the federal commission tasked with implementing the

24 FPA could, as a matter of jurisdiction, order non-public

25 utilities to refund sums allegedly overcharged.

26 ///

27 ///

28 ///

1   The *Bonneville* court made clear that while the subject matter of

2   wholesale sales of Energy under the FPA is committed to FERC's

3   exclusive federal governance, the more narrow exclusionary

4   provision carves an exception to that general authority to govern

5   the sale of Energy at least with respect to these Defendants.

6   *See* 422 F.3d at 916.   That holding indicates to this Court that

7   the subject matter, as it applies to these defendants, is not a

8   matter committed exclusively to federal jurisdiction pursuant to

9   15 U.S.C. § 824(b).   Instead, federal jurisdiction in this case,

10  if any, would necessarily have to exist under 28 U.S.C. § 1331.

11  As explained in Section I.A. supra, the Court has already

12  determined this matter does not satisfy the factors giving rise

13  to jurisdiction thereunder nor does it meet the exception set

14  forth in the *Sparta/Dynegy* line of cases.

15      Finally, the exclusive jurisdiction provision of the FPA

16  provides that the District Courts shall have jurisdiction over

17  violations of the FPA, and of all suits in equity and actions at

18  law brought to enforce the FPA or the rules promulgated

19  thereunder.   These Defendants are simply not subject to the

20  relevant provisions of the FPA as a federal regulation.   Rather,

21  these Defendants may only be bound to comply with the language of

22  the tariffs purely as a matter of contract law.   On that same

23  note, this is not a suit alleging violations of the FPA itself or

24  of any rule or regulation thereunder.   Instead, this is a suit to

25  enforce a contract between private parties that has merely

26  incorporated by reference terms that are contained in a federal

27  regulation.

28  ///

1        In sum, to the extent FERC has no federal authority to order

2   refunds of these Defendants, Plaintiffs seek to substantively

3   characterize the contract terms as federal in character so as to

4   trigger federal question jurisdiction. Simultaneously, however,

5   to the extent garden variety contract terms do not give rise to a

6   federal question, Plaintiffs seek to jurisdictionally

7   characterize the tariffs as "federal regulations." The Court

8   finds these positions to be inapposite. Either, the tariffs

9   incorporated by reference into the contracts at issue are drawn

10  from and have their force under the FPA, in which case Congress

11  and relevant case law have indicated there is no federal

12  authority to enforce these tariffs against these Defendants (*See*

13  *Bonneville*, 422 F.3d 908); or, the tariffs are merely garden

14  variety contract terms incorporated into a private state law

15  contract, in which case there is no federal question (*See Empire*,

16  126 S. Ct. 2121). In either event, federal jurisdiction is

17  wanting. Accordingly, the Court hereby grants the Defendants'

18  Motion to Dismiss based on a lack of federal jurisdiction.

19

20      **C.    Diversity Jurisdiction**

21

22      There are three Parties to the present action that are

23  arguably non-diverse. Accordingly, as to those three Defendants,

24  the lack of federal question jurisdiction would not be fatal in

25  and of itself as jurisdiction could arguably be based on

26  diversity.

27  ///

28  ///

26

1  The principal federal statute governing diversity jurisdiction,

2  28 U.S.C. § 1332, gives federal district courts original

3  jurisdiction of all civil actions "between ... citizens of

4  different States" where the amount in controversy exceeds

5  $75,000.  28 U.S.C. § 1332(a)(1).  The statutory formulation

6  "between ... citizens of different States" has been construed to

7  require complete diversity between all plaintiffs and all

8  defendants.  *Lincoln Prop. Co. v. Roche*, 546 U.S. 81 (2005)

9  (citing *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996).

10     In the present action, fifteen (15) of the seventeen (17)

11  Defendants in this action are citizens of the State of California

12  while the remaining three (3) are not.  Accordingly, complete

13  diversity does not exist and jurisdiction cannot, therefore, be

14  conferred as to any of the remaining Defendants.

**CONCLUSION**

18     For the reasons set forth above, the Defendants' Motion to

19  Dismiss based on a lack of subject matter jurisdiction is

20  GRANTED.

21     IT IS SO ORDERED.

Dated: March 16, 2007

MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE