**EXHIBIT O**

1  MARIE L. FIALA (Bar No. 79676)
   RUSSELL P. COHEN (Bar No. 213105)
2  CECILIA Y. CHAN (Bar No. 240971)
   HELLER EHRMAN LLP
3  333 Bush Street
   San Francisco, CA 94104-2878
4  Telephone: +1.415.772.6000
   Facsimile: +1.415.772.6268
5  marie.fiala@hellerehrman.com
   russell.cohen@hellerehrman.com
6  cecilia.chan@hellerehrman.com

7  Attorneys for Plaintiffs
   PACIFIC GAS AND ELECTRIC COMPANY
8
   [ADDITIONAL PARTIES AND COUNSEL
9  SHOWN ON SIGNATURE PAGE]

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 06 2007

John A. Clark, Executive Officer/Clerk
By _____, Deputy
    D. Garcia

10              SUPERIOR COURT OF CALIFORNIA

11                 COUNTY OF LOS ANGELES

12

13  Pacific Gas and Electric Company,              BC369141
    Southern California Edison Company,
14  San Diego Gas & Electric Company, and California   Case No.:
    Electricity Oversight Board,
15
                          Plaintiffs,
16
          v.                                        COMPLAINT FOR (1) BREACH OF
17                                                  CONTRACT, (2) ANTICIPATORY
    Arizona Electric Power Cooperative, Inc.;        BREACH OF CONTRACT, (3)
18  City of Anaheim;                                UNJUST ENRICHMENT, (4) MONEY
    City of Azusa;                                  HAD AND RECEIVED, AND (5)
19  City of Banning;                                DECLARATORY RELIEF
    City of Burbank;
20  City of Glendale;                               DEMAND FOR JURY TRIAL
    City of Los Angeles;
21  City of Pasadena;                               COMPLEX CASE DESIGNATION
    City of Riverside;                              REQUESTED PURSUANT TO LOCAL
22  City of Santa Clara;                            RULE 7.3(K)
    City of Seattle;
23  City of Vernon;
    Los Angeles Department of Water and Power;
24  Modesto Irrigation District;
    Northern California Power Agency;
25  Public Utility District No. 2 of Grant County;
    Sacramento Municipal Utility District; and
26  Turlock Irrigation District,

27                          Defendants.

28

Heller
Ehrman LLP

Plaintiffs Pacific Gas and Electric Company ("PG&E"), Southern California Edison Company ("SCE"), San Diego Gas & Electric Company ("SDG&E"), and the California Electricity Oversight Board ("EOB") (collectively, "the California Parties") allege:

## SUMMARY

1.    This is an action for damages and declaratory relief against the following defendants: Arizona Electric Power Cooperative, Inc.; City of Anaheim; City of Azusa; City of Banning; City of Burbank; City of Glendale; City of Los Angeles; City of Pasadena; City of Riverside; City of Santa Clara; City of Seattle (Seattle City Light Department); City of Vernon; Los Angeles Department of Water and Power; Modesto Irrigation District; Northern California Power Agency; Public Utility District No. 2 of Grant County; Sacramento Municipal Utility District; and Turlock Irrigation District (collectively, "the Governmental Entities"). PG&E, SDG&E, and SCE's (the "California IOUs") claims in this action arise out of their wholesale purchases of electric power and ancillary services (hereinafter "electric power") and the Governmental Entities' sales of electric power in the California wholesale electric power markets from May 1, 2000 through June 20, 2001. The California wholesale markets were operated by the California Independent System Operator Corporation ("ISO") and California Power Exchange Corporation ("PX") under tariffs filed with and approved by the Federal Energy Regulatory Commission ("FERC").

2.    The Governmental Entities' voluntary sales of electric power in the California wholesale markets pursuant to the ISO and PX Tariffs and pursuant to certain written agreements gave rise to binding contractual obligations that the Governmental Entities owed to the other market participants, including the California IOUs. The California IOUs are direct parties to and expressly intended beneficiaries of the Governmental Entities' contractual obligations. The Governmental Entities have breached their contractual obligations, entitling the California Parties to the relief requested in this Complaint.

3.    FERC has determined that all sellers in the California wholesale electric markets charged rates that were unjust, unreasonable, and unlawful. Pursuant to the ISO and PX Tariffs that govern those markets, FERC has corrected and reduced the rates that all sellers, including the

COMPLAINT

1    Governmental Entities, were entitled to charge for sales in those markets for the period October 2,

2    2000 through June 20, 2001 ("the Refund Period").  To remedy the harm caused by the sellers'

3    unlawful prices, FERC ordered all sellers in the California markets to pay refunds for their unlawful

4    overcharges.  On September 6, 2005, however, the United States Court of Appeals for the Ninth

5    Circuit ("Ninth Circuit") held that FERC's statutory refund authority did not extend to

6    Governmental Entities. *Bonneville Power Admin. v. Federal Energy Regulatory Comm'n*, 422 F.3d

7    908 (9th Cir. 2005).  As a result of the Ninth Circuit's order, the Governmental Entities now claim

8    they may uniquely receive refunds for the transactions in which they bought power while escaping

9    refund liability for their own unlawful overcharges on the transactions in which they sold power.

10   The Ninth Circuit noted, however, that market participants (such as the California IOUs) could

11   bring claims in court directly against the Governmental Entities to enforce the contractual

12   obligations created by the FERC tariffs and the related agreements under which the Governmental

13   Entities sold power into the ISO and PX markets. *Id.* at 925.  The Governmental Entities are now

14   contractually obligated to reimburse the California IOUs for the difference between the rates that

15   the Governmental Entities charged during the Refund Period and the lawful, corrected rates under

16   the tariffs.

17       4.    Amounts the California IOUs recover will ultimately benefit California ratepayers in

18   the manner the California Public Utilities Commission ("CPUC") determines.

19                                          **PARTIES**

20       5.    PG&E is a corporation formed under the laws of the State of California with its

21   principal place of business in San Francisco, California.  PG&E is a subsidiary of PG&E

22   Corporation.  PG&E is engaged in the purchase, transmission, distribution and sale of electric

23   power to the public at wholesale and retail within the State of California, and is a "public utility"

24   within the meaning of the California Public Utilities Code and the FPA.  PG&E provides retail

25   electric service to approximately 4.9 million customers in Northern and Central California.

26       6.    SCE is a corporation formed under the laws of the State of California with its

27   principal place of business in Rosemead, California.  SCE is a subsidiary of Edison International.

28

2

COMPLAINT

1    SCE is engaged in the purchase, transmission, distribution and sale of electric power at wholesale

2    and retail within the State of California, and is a "public utility" within the meaning of the

3    California Public Utilities Code and the FPA.  SCE provides retail electric service to approximately

4    4.6 million customers in a 50,000 square-mile area of Central, Coastal, and Southern California,

5    excluding the City of Los Angeles and certain other cities.

6           7.     SDG&E is a corporation formed under the laws of the State of California with its

7    principal place of business in San Diego, California.  SDG&E is engaged in the purchase,

8    transmission, distribution and sale of electric power at wholesale and retail within the State of

9    California, and is a "public utility" within the meaning of the California Public Utilities Code and

10   the FPA.  SDG&E provides natural gas and electric service to customers in San Diego and southern

11   Orange Counties.

12          8.     The EOB is an agency of the State of California and was created by statute to

13   oversee the ISO and PX, and to "investigate any matter related to the wholesale market for electric

14   power to ensure that the interests of California's citizens and consumers are served, protected, and

15   represented in relation to the availability of electric transmission and generation and related costs,

16   during periods of peak demand." Cal. Pub. Util. Code § 335.  The EOB oversees the California

17   ISO and PX and California electric markets statewide, acting on behalf of the State of California.

18   The EOB joins this action pursuant to its statutory authority to sue and to participate in all

19   proceedings relevant to the purposes of the electricity restructuring provisions in the California

20   Public Utilities Code, Cal. Pub. Util. Code §§ 330-398.5, in order to protect the interests of the

21   citizens of California in the subject of this litigation.

22          9.     Defendant Arizona Electric Power Cooperative, Inc. ("AEPCO") is a rural electric

23   generation and transmission cooperative incorporated in Arizona with its principal place of business

24   in Benson, Arizona.  AEPCO provides its generation and transmission services to member

25   distribution cooperatives located in Arizona and California, and is registered to do business in

26   California.

27

28

Heller
Ehrman LLP

                                                   3
COMPLAINT

10.   Defendants City of Anaheim; City of Azusa; City of Banning; City of Burbank; City of Glendale; City of Los Angeles; City of Pasadena; City of Riverside; City of Santa Clara; and City of Vernon are California cities.

11.   Defendant City of Seattle (Seattle City Light Department) is a city located in the State of Washington.

12.   Defendant Los Angeles Department of Water and Power ("LADWP") is a municipal utility and a proprietary department of the City of Los Angeles located in Los Angeles, California. LADWP is located within the Central District of the Los Angeles Superior Court.

13.   Defendant Modesto Irrigation District is a California irrigation district located in Modesto, California.

14.   Defendant Northern California Power Agency is a California agency located in Roseville, California that assists municipalities, rural electric cooperatives, irrigation districts, and other publicly owned entities with the purchase, aggregation, scheduling, and management of electric power.

15.   Defendant Public Utility District No. 2 of Grant County ("Grant County PUD") is a public utility district located in Ephrata, Washington.

16.   Defendant Sacramento Municipal Utility District is a municipal electric utility located in Sacramento, California.

17.   Defendant Turlock Irrigation District is a California irrigation district located in Turlock, California.

18.   All defendants sold electric power in California and, in particular, voluntarily elected to transact business in the ISO and PX markets during the relevant time period.

## PERSONAL JURISDICTION AND VENUE

19.   Personal jurisdiction is proper in this State over each Governmental Entity because each has made sales of electric power in this State, this controversy arises out of those sales, and each has consented to the jurisdiction of this Court in connection with this action pursuant to ISO Tariff § 20.7 and/or PX Tariff § 19.6.

Heller
Ehrman LLP

4

1   electric power to all retail customers that did not affirmatively elect to purchase electric power

2   elsewhere.

3       24.     AB 1890 provided for the creation of two new wholesale market institutions to

4   facilitate the buying and selling of electric power: the ISO and the PX, which are non-profit, public

5   benefit corporations organized under California law, and subject to FERC's exclusive regulatory

6   jurisdiction.

7       25.     Under rules that the CPUC promulgated and FERC approved, the California IOUs

8   were required, in general, to purchase through the ISO and the PX substantially all of the wholesale

9   electric power that they needed to provide service to their retail customers, including electric energy

10  and certain ancillary services. The ancillary services in this case consist of sales of electric power

11  generation supply to maintain the reliability of the transmission of electricity from generators to

12  customers. Other entities, including the Governmental Entities, were permitted voluntarily to buy

13  or sell electric power in the ISO and PX markets.

14      26.     The ISO and PX are "public utilities" under the FPA, and are therefore subject to

15  FERC's jurisdiction. During all relevant times, all sales and purchases in the ISO and PX markets

16  were required to be made pursuant to tariffs filed with and approved by FERC that prescribed the

17  terms and conditions of all transactions in these markets, and that contained formulas used to

18  establish prices for sales of energy in the ISO and PX auction markets. The ISO and PX Tariffs are

19  the legal equivalent of federal regulations and also establish contractual obligations among the

20  market participants, prescribing the rules, requirements and/or pricing formulas for all transactions

21  in the ISO and PX markets. The ISO and PX Tariffs are voluminous. Excerpts of key provisions of

22  the ISO and PX Tariffs are attached to this Complaint as Exhibit A and are fully incorporated

23  herein.

24      27.     The PX was created to function as California's principal power market. The PX

25  acted as a clearinghouse for daily and hourly markets and submitted schedules of electric power to

26  the ISO in which scheduled generation for the following day equaled scheduled demand. Pursuant

27  to the PX Tariff, sellers into the PX market — including the Governmental Entities — submitted

28  offers to sell electric power, and purchasers submitted demand bids for the quantity of electric

Heller
Ehrman LLP

6

COMPLAINT

1  power that they wanted to buy. The PX conducted day-ahead and same-day auctions that allowed

2  parties to adjust their hourly commitments based on changing needs and availability. Under its

3  tariff, the PX was charged with responsibility for, among other things, settling energy trades

4  between PX market participants and preparing and distributing to PX market participants invoices

5  reflecting the amounts payable and receivable by them in connection with their trading through the

6  PX.

7       28.    In general, the PX determined, for each hour in each of the markets that it operated,

8  a single market-clearing price that all electric power suppliers were paid, and that all purchasers

9  were charged, under the auction provisions of the PX Tariff. The PX matched offers to buy and sell

10  beginning with the lowest-priced bids and continuing up to the highest-priced bids until the amount

11  of power accepted matched the amount that purchasers sought at that price. The price of the last

12  accepted bid (and therefore the highest-priced bid) set the price for that entire auction market. *See,*

13  *e.g.,* PX Tariff § 3.8 (Market Clearing Price Determination); PX Tariff Schedule 3 (formula for

14  determining market clearing price); PX Tariff Appendix B, Master Definitions Supplement

15  ("Market Clearing Price"). All sellers of electric power in a given auction received, and all

16  purchasers paid, the same market-clearing price, even if some sellers had offered to sell at a lower

17  price. Thus, any distortions that inflated the market-clearing price also inflated the price received

18  by each and every seller in the market, including the Governmental Entities.

19       29.    Although the role of the ISO has changed over time, it was created as the entity

20  responsible for operating and maintaining California's electric transmission grid, including

21  resolving transmission congestion and purchasing electric power to maintain system reliability. To

22  meet these obligations, the ISO operated, and still operates, wholesale markets for real-time energy

23  purchases and ancillary services.

24       30.    In general, in operating its real-time market, the ISO set a single market-clearing

25  price based on bids submitted by sellers pursuant to the ISO Tariff. As in the PX market, every

26  seller in the ISO auction market received, and every purchaser paid, the same market-clearing price

27  that the ISO set for any given interval, even if some sellers had offered to sell at a lower price. *See*

28

Heller
Ehrman LLP

1  ISO Tariff § 2.5 (formulas for determining market clearing price in ISO auctions); ISO Tariff

2  Appendix A, Master Definitions Supplement ("Market Clearing Price").

3      31.    Thus, the PX operated day-ahead and day-of markets intended to supply the electric

4  power needed to meet projected electric power demand.  The ISO accepted the PX schedules and

5  then procured any electric power needed to make adjustments in real time to ensure that supply met

6  actual demand and the electric grid operated properly and safely.  The ISO charged market

7  participants, including the California IOUs, pursuant to its FERC-approved tariff.  Ultimately, as a

8  result of market dysfunction and manipulation, and resulting power shortages, vast quantities of

9  electric power were purchased and sold through the ISO market, rather than through the PX market,

10  during the relevant time period.

11      32.    Although the ISO obtained power primarily through its auction markets, the auction

12  markets did not always provide sufficient electric power to maintain the reliability of California's

13  electric grid.  Under such circumstances, the ISO Tariff permitted the ISO to solicit emergency

14  electric power, known as "out-of-market" or "OOM" electric power, through other methods, such

15  as telephone calls to electric power marketers or generators, including the Governmental Entities.

16  *See* ISO Tariff § 2.3.5.1.5 (permitting such purchases).  These purchases were subject to certain

17  price caps applicable in the ISO markets, which price caps varied during the relevant period; but

18  suppliers of OOM electric power regularly demanded more than the FERC-approved price cap for

19  such sales to the ISO.  OOM transactions were contemplated in the ISO Tariff as a backstop to the

20  ISO's auction market. *Pub. Utils. Comm'n of Cal. v. FERC*, 462 F.3d 1027, 1052-53 (9th Cir.

21  2006) ("*CPUC*").  Prices for these sales were closely linked to the prices in the ISO single-price

22  auction market. *Id.*  Because the ISO purchased OOM power in order to maintain the reliability of

23  California's electric grid, the ISO procured the electric power at whatever price it was offered, even

24  if that price exceeded applicable price caps, and then charged market participants, including the

25  California IOUs, for this electric power.

26      33.    The PX Tariff required each PX market participant, including the Governmental

27  Entities, that participated in that market to execute a PX Participation Agreement.  The PX

28  Participation Agreement was prescribed by the PX Tariff and provided that, inter alia, the PX

1  market participant "will abide by and will perform all of the obligations under the PX Tariff in

2  respect of all matters set forth therein including, without limitation, all matters relating to the

3  trading of Energy by it through the PX markets . . . [and] billing and payments." PX Tariff

4  Appendix A, Participation Agreement, § II(B). The PX Participation Agreement further provided

5  that "[t]he PX Tariff is incorporated herein and made a part hereof." PX Tariff Appendix A,

6  Participation Agreement, § 8.

7      34.    Governmental Entities that participated in the PX market also agreed to abide by the

8  terms of the PX's Operating Manual. PX Tariff § 1.4 ("Participation in the PX Markets pursuant to

9  this Tariff shall obligate the PX Participant to conform to all applicable provisions of the PX

10  Operating Manual").

11      35.    The ISO Tariff contemplated that each ISO market participant, including the

12  Governmental Entities, that participated in that market would execute an ISO Scheduling

13  Coordinator Agreement. A Scheduling Coordinator is an entity certified to trade in the ISO Market.

14  The Scheduling Coordinator Agreement was prescribed by the ISO Tariff and provided that, *inter*

15  *alia,* the ISO Scheduling Coordinator "will abide by, and will perform all of the obligations under

16  the ISO Tariff placed on Scheduling Coordinators in respect of all matters set forth therein

17  including, without limitation, all matters relating to the scheduling of Energy and Ancillary

18  Services on the ISO Controlled Grid, . . . [and] billing and payments . . . ." ISO Tariff Appendix B,

19  Scheduling Coordinator Agreement, § 2(B). The Scheduling Coordinator Agreement further

20  provided that "[t]he ISO Tariff is incorporated herein and made a part hereof." ISO Tariff

21  Appendix B, Scheduling Coordinator Agreement, § 8.

22      36.    The ISO and PX Tariffs filed with FERC contained the only terms and conditions,

23  including the pricing formulas, upon which transactions in the ISO and the PX could lawfully be

24  conducted. By voluntarily electing to transact in the ISO and PX markets, the Governmental

25  Entities are charged with knowledge and are deemed to have accepted the terms of the Tariffs,

26  which set forth the mutual rights and obligations among market participants. The terms of the ISO

27  and PX Tariffs create enforceable contractual obligations binding on the Governmental Entities.

28  *See, e.g.,* ISO Tariff § 17 ("[o]bligations and liabilities under this ISO Tariff" are binding on

Heller
Ehrman LLP

1    parties' successors and assigns); PX Tariff § 17 (same); ISO Tariff § 14.3, PX Tariff § 14.3

2    (indemnity provisions); ISO Tariff § 20.7, PX Tariff § 19.6 (choice-of-law, venue clauses); ISO

3    Tariff § 15, PX Tariff § 16.1 (provisions covering consequences of uncontrollable force); PX Tariff

4    § 16.2 (duty to mitigate).  Market participants may enforce these obligations against one another.

5        37.    During the period at issue, the ISO and PX calculated on a monthly basis the total

6    amount of electric power that each market participant supplied and purchased, including the

7    Governmental Entities.  The ISO and the PX then issued individual billing statements, invoices, and

8    supporting data, specifying amounts due to or from each market participant. *See* ISO Tariff § 11.2

9    ("The ISO shall calculate, account for and settle [charges for ancillary services and imbalance

10    energy] in accordance with this ISO Tariff"); PX Tariff § 6.2 ("The PX shall settle with each PX

11    Participant for Energy traded in the PX Markets in the manner set forth in Schedule 6 ('PX Market

12    Settlements')").

13        38.    The California IOUs, as market purchasers, are counterparties to the Governmental

14    Entities' sales in the ISO and PX markets and have standing to enforce the Governmental Entities'

15    contractual obligations under the ISO and PX Tariffs and related agreements. *See, e.g.,* ISO Tariff

16    § 2.2.1 ("the ISO will not act as a principal but as agent" for Scheduling Coordinators); PX Tariff

17    § 3.1 ("[t]he PX will not be, and shall not be deemed to be, a counterparty to any trade transacted

18    through the PX Markets").  The ISO and the PX were not themselves counterparties to any market

19    transactions, and, instead, operated as revenue-neutral clearinghouses. *Id.*

20        39.    Under their respective tariffs, the ISO and the PX pass through liability for market

21    shortfalls to market participants, including the California IOUs, that bought or sold power in the

22    markets during the period for which there is a shortfall of funds.  A market shortfall may result if

23    one market participant defaults on a payment or refuses to pay amounts owing, causing a shortage

24    of total funds collected by either the ISO or PX for distribution to the other market participants.  An

25    entity that fails or refuses to pay its bill becomes responsible for a market shortfall, and is deemed

26    an "ISO Debtor" or a "PX Debtor."  An entity that is owed money because of the market shortfalls

27    is deemed an "ISO Creditor" or "PX Creditor," with the right to enforce its contractual right to

28    payment against an ISO or PX Debtor. *See* ISO Tariff Appendix A (Master Definitions

Heller
Ehrman LLP

COMPLAINT

1    Supplement); PX Tariff Appendix B (Master Definitions Supplement). Thus, under the ISO and

2    PX Tariffs, financial obligations created by market transactions were owed by one market

3    participant to another, rather than to the ISO or PX.

4         40.    To ensure that market participants are financially capable of satisfying obligations

5    running to each other from these transactions, the ISO and PX Tariffs require market participants to

6    meet certain creditworthiness and collateral requirements, and require the ISO and PX to maintain

7    financial reserve accounts funded by participants and held in trust for their benefit. *See, e.g.,* PX

8    Tariff Schedule 2, §§ 1.1, 2 (noting various creditworthiness and collateral requirements); ISO

9    Tariff § 2.2.3.2 (same); ISO Tariff § 11.8.3 (all ISO accounts to be operated by ISO in trust for ISO

10   Creditors); PX Tariff Schedule 2, § 6.1 (same for PX and PX Creditors). The Tariffs empower the

11   ISO and PX to draw on these accounts or collateral to satisfy the financial obligations running from

12   a defaulting market participant to other, non-defaulting participants. *See, e.g.,* ISO Tariff

13   § 11.8.2.2; PX Operating Manual (PSABP) §§ 2.1.2, 5.7.1, 5.7.2.

14        41.    Under the terms of the ISO and PX Tariffs, a shortfall of funds in the ISO or PX

15   "clearinghouse" caused by the default of one market participant must be paid by non-defaulting

16   market participants, rather than by the ISO or PX. *See, e.g.,* ISO Tariff §§ 11.16.1 (if ISO cannot

17   satisfy a market shortfall from a Reserve Account or by enforcing collateral, it shall reduce

18   payments to all ISO Creditors to cover amounts owed to them by defaulting ISO Debtor); 11.2.9

19   (ISO may levy charges on market participants to cover any financial shortfall); PX Tariff, Schedule

20   2, §§ 5.2.4, 5.3 (describing method by which PX Debtor's residual liabilities will be allocated to

21   non-defaulting PX Participants); PX Operating Manual (PSABP) § 5.7.3 (if PX cannot satisfy a

22   market shortfall from Reserve Account, collateral, or other methods, it shall reduce payments to PX

23   Creditors to cover amounts owed to them). Indemnity provisions further insulate the ISO and PX

24   from risk. *See* ISO Tariff § 14.3; PX Tariff § 14.3.

25        42.    Tariff provisions also contemplate that market participants will pursue non-payers

26   for payment defaults. ISO Tariff Section 11.19 expressly recognizes market participants' rights to

27   bring suit against one another to enforce rights and obligations created by the Tariffs resulting from

28   sales transactions. ISO Tariff § 11.19 (in event of payment default, "[e]ach ISO Creditor shall give

Heller
Ehrman LLP

COMPLAINT

1   notice to the ISO before instituting any action or proceedings in any court against an ISO Debtor to

2   enforce payments due it"); *see also* ISO Tariff § 11.20.1 ("Without prejudice to the right of any

3   Scheduling Coordinator to bring such proceedings as it sees fit it connection with matters related to

4   the recovery of amounts owed to it," ISO may bring proceedings on behalf of those Scheduling

5   Coordinators that have indicated to ISO their willingness for ISO to act first); ISO Tariff § 11.20.2

6   (ISO shall, on request, certify in writing the amounts owed by ISO Debtor that remain unpaid and

7   ISO Creditors to whom such amounts are owed; ISO certificate given under this section may be

8   used as prima facie evidence of the amount due by ISO Debtor to ISO Creditors in any legal

9   proceedings). Under the PX Tariff, where unpaid amounts are charged back to other market

10  participants, the PX shall "identify the defaulting Participant"—who otherwise would have

11  remained anonymous—"to all other affected PX Participants by the most expeditious means

12  available." PX Tariff, Schedule 2, § 5.5.

13      43.    In summary, the ISO and PX Tariffs provided the mechanisms through which

14  market participants bought and sold electric power, with the ISO and the PX acting as

15  clearinghouses for such transactions, holding collateral for market participants, and settling the

16  accounts of all market participants. Financial obligations created by market transactions, however,

17  were owed by one market participant to another, and could be enforced against one another.

18          **FERC's Exclusive Jurisdiction Over the ISO and PX Tariffs**

19      44.    Because the ISO and the PX are "public utilities" under the FPA, 16 U.S.C.

20  § 824(e), the tariffs under which they operate were filed with and approved by FERC, and are

21  subject to FERC's exclusive jurisdiction, continual oversight and regulation. These tariffs were

22  subject to amendment or revision by FERC, and, in fact, FERC repeatedly revised them during the

23  relevant time period.

24      45.    As entities regulated by FERC, the ISO and the PX were not permitted to act on any

25  terms or conditions other than those contained in the ISO and PX Tariffs. The ISO and PX Tariffs

26  required each participant in the ISO and PX markets to comply with all rules, conditions, and

27  provisions of the ISO and PX Tariffs.

28

Heller
Ehrman LLP

COMPLAINT

46.     Pursuant to the FPA, FERC has exclusive authority to regulate wholesale sales of electric power to ensure, among other things, that the rates charged are just, reasonable, and lawful. FERC thus has exclusive authority to regulate the rates, terms, and conditions of sales made under the ISO and PX Tariffs and to recalculate and correct such rates, terms, and conditions if FERC determines that they are not just, reasonable, and lawful. The ISO and PX Tariffs recognize FERC's authority to regulate the tariffs. *See, e.g.*, ISO Tariff § 18.1 (Tariff "shall become effective on the date it is permitted to become effective by the FERC"); PX Tariff § 18.1 (same); ISO Tariff § 13.1.1 (referring to "rights of any party to file a complaint with FERC"); ISO Tariff § 13.2.4 (disputes may be referred "directly to FERC").

47.     The ISO and PX Tariffs provide that parties retain the right to petition FERC to exercise its power under FPA Section 206 to review rates charged under the tariffs and provide for recalculation of charges and resettlement of the accounts of buyers and sellers under the tariffs in the event that FERC determines that any rates charged under the tariffs were unjust, unreasonable, or otherwise unlawful, and thus subject to correction. *See* ISO Tariff § 19; PX Tariff § 13; *see also* FPA § 206, 16 U.S.C. § 824e(a) (2000). ISO Tariff Section 19 states in part:

> Nothing contained in this ISO Tariff or any [Scheduling Coordinator] Agreement shall be construed as affecting the ability of any Market Participant receiving service under this ISO Tariff to exercise its rights under Section 206 of the FPA and FERC's rules and regulations thereunder.

ISO Tariff § 19. *See* PX Tariff § 13 (parallel provision).

48.     Under the ISO and PX Tariffs, the amount due to each seller is always subject to revision, and settlements can be re-run, if necessitated by disputes, errors, FERC directives, or for other good cause, at any time. ISO Tariff § 11.6.3 (ISO authorized to perform Settlement Statement re-runs; request to perform Settlement Statement re-run may be made at any time by Scheduling Coordinator); PX Operating Manual (PSABP) §§ 5.3.1 – 5.3.5 (PX authorized to perform Settlement Statement re-runs; request to perform Settlement Statement re-run may be made at any time by PX Participant).

49.     By voluntarily electing to sell electric power in the ISO and PX markets, the Governmental Entities agreed to be bound by the provisions of the ISO and PX Tariffs and any

1    modifications thereof, including FERC's orders correcting the rates that sellers could lawfully

2    charge for sales governed by those tariffs. Almost all of the Governmental Entities also executed

3    written contracts, including ISO Scheduling Coordinator Agreements, and/or PX Participation

4    Agreements, and/or other agreements with the ISO or PX, expressly agreeing to abide by the

5    provisions of the ISO and/or PX Tariffs.

6          50.    The California IOUs are direct parties to and expressly intended beneficiaries of the

7    Governmental Entities' contractual obligations. Because the Tariffs are subject to FERC's

8    exclusive jurisdiction, all market participants, including the Governmental Entities, recognized that

9    FERC would exercise its regulatory authority over the Tariffs. If the price charged by sellers was

10   found by FERC to be unjust and unreasonable or otherwise unlawful, all market sellers were

11   contractually bound to refund or credit to purchasers the difference between the price initially

12   charged and the lawful, corrected rate determined by FERC. Thus, all market participants were

13   contractually bound to honor the terms and conditions of the Tariffs, as revised by FERC, and these

14   terms and conditions can be contractually enforced by the market participants against one another.

15   The Governmental Entities' obligation to refund or credit their unlawful overcharges is the same

16   obligation owed by all sellers in the ISO and PX markets, although, as public utilities, the

17   California IOUs' obligations for their purchases of electric power in the ISO and PX markets

18   remain under FERC's exclusive jurisdiction.

19                              **The Power Crisis**

20         51.    Beginning in May 2000, the prices demanded by sellers in the ISO and PX markets

21   rose dramatically and sellers continued to demand unprecedented high prices for over a year,

22   resulting in rates far in excess of those charged in prior and later periods. As a result of the auction

23   provisions of the ISO and PX Tariffs, these extremely high prices were charged by all sellers in the

24   markets, even if individual sellers had offered to sell their power in the auctions at lower prices.

25   These artificially inflated prices also affected OOM sales, which were closely intertwined with the

26   ISO single-price auction market. *See CPUC,* 462 F.3d at 1053. The power crisis had severe

27   negative effects on the stability and financial integrity of the California IOUs, and ultimately

28

1 imposed billions of dollars in additional costs on ratepayers, including business and residential

2 customers throughout California.

3    52.    The first ratepayer impacts of these extraordinarily high prices were felt in the San

4 Diego area because SDG&E's rates in the summer of 2000 provided for immediate, direct pass-

5 through to ratepayers of the increased wholesale electric power costs.  By January 2001, PG&E and

6 SCE had amassed crippling debt in order to finance the costs of buying electric power, costs that

7 they were not permitted to pass through immediately to their customers.  PG&E and SCE became

8 unable to pay the PX in January 2001.

9    53.    The surge in electric power prices also affected the reliability of the electric grid.

10 On June 14, 2000, electric power consumers in Northern California experienced their first wave of

11 rolling blackouts.  These blackouts foreshadowed the rolling blackouts and near-continuous power

12 emergencies that California electric customers experienced over the next year.

13    54.    The crisis did not subside with the arrival of cooler weather in the Fall of 2000.

14 Although California's peak electric power usage historically declines by roughly 25 to 33 percent

15 during the cooler months, and declined in the Fall of 2000, prices continued to rise throughout the

16 last quarter of 2000 and the first part of 2001.

17    55.    By January 2001, these events led to the collapse of reliable electric service in

18 California.  At times in January 2001, the ISO ordered rolling blackouts throughout large areas of

19 California in order to maintain the reliability of the transmission grid.  The crisis became a state of

20 emergency, threatening the safety and welfare of California citizens.

21    56.    On December 15, 2000, FERC issued an order eliminating the requirement that the

22 California IOUs purchase all of their needed electric power through the PX, and the PX ceased

23 operations of its core markets on January 30, 2001.  On or about January 5, 2001, the credit ratings

24 of PG&E and SCE fell below investment grade, making PG&E and SCE ineligible to purchase

25 power through the ISO and PX.  The State of California was forced to step in as the buyer of last

26 resort to buy electric power on behalf of the California IOUs to ensure continued service to retail

27 customers throughout the territories that the California IOUs served.  Unrelenting high prices

28 caused PG&E and SCE to become insolvent.

Heller
Ehrman LLP

COMPLAINT

57.     The power crisis finally ended when FERC, on June 19, 2001, imposed "must-offer" requirements on electric power generators prohibiting them from withholding generation, and imposed price caps on wholesale sellers of electric power across all western states effective June 21, 2001 ("June 19, 2001 Order"). *San Diego Gas & Electric Co., et al.*, 95 FERC ¶ 61,418 at 62,558, 62,569 (2001).  The remedies in the June 19, 2001 Order put an end to the rolling blackouts, catastrophically high prices, and near-continuous power emergencies.

58.     The bulk of the crippling costs of the crisis have been passed through to, and paid by, the residential and commercial ratepayers of the California IOUs.  These costs are included in current rates assessed to PG&E and SCE's customers, and will continue to be included in their rates until the costs of the crisis have been paid off.  By this Complaint, the California IOUs are seeking to recover from the Governmental Entities the amounts that each Governmental Entity received in excess of the lawful rates for its wholesale sales of electric power to the California IOUs in the ISO and PX markets.  Amounts the California IOUs recover will ultimately benefit California ratepayers in the manner the CPUC determines.

### The California Parties Sought Relief From FERC

59.     On August 2, 2000, when it became clear that the extremely high wholesale prices were not returning to the lower levels that had prevailed historically, SDG&E filed a complaint with FERC under the FPA against all sellers of energy and ancillary services into markets operated by the ISO and PX.  FERC Docket No. EL00-95.  PG&E, SCE, and the EOB intervened in that proceeding on August 14, 2000.  The Governmental Entities were also parties to that proceeding.  In that proceeding, the California Parties requested that FERC investigate the justness, reasonableness, and lawfulness of rates being charged in the California ISO and PX markets and that FERC order refunds to the extent that FERC determined that sellers had charged unjust, unreasonable, or otherwise unlawful rates.

60.     In response to SDG&E's complaint, FERC commenced its own investigation into the sellers' rates, which it consolidated with SDG&E's complaint.  Collectively, the associated proceedings are referred to as the "Remedy Proceeding."  In an order issued July 25, 2001 (the "July 25, 2001 Order"), FERC ruled that sellers of electric power in the ISO and PX markets

1   (including the Governmental Entities) had sold electric power at unjust, unreasonable, and unlawful

2   rates, and that the rates charged in the ISO and PX markets should be corrected for the Refund

3   Period. FERC Docket No. EL00-98-000. *See San Diego Gas & Electric Co.*, 96 FERC ¶ 61,120

4   (2001).

5       61.    In the July 25, 2001 Order, FERC held: "Our action here establishes a revised

6   method for calculating the just and reasonable clearing prices to be applied in those markets for the

7   period beginning October 2, 2000. This is pursuant to the Commission's authority under FPA

8   section 206 to fix the just and reasonable rate. Our action thus revises the market clearing prices

9   that all market participants previously agreed to accept for their sales." July 25, 2001 Order, 96

10  FERC at 61,512.

11      62.    FERC also concluded that, on the record before it, its statutory mandate did not grant

12  it authority to order refunds for the Summer Period (i.e., May 1, 2000 through October 1, 2000),

13  and thus denied relief for the Summer Period. *See* July 25, 2001 Order, 96 FERC at 61,504; *see*

14  *also CPUC*, 462 F.3d at 1043. FERC also refused to correct the rates for "energy exchange"

15  transactions (in which blocks of electric power were sold to the ISO for payment in-kind) and sales

16  to the ISO or PX of greater than twenty-four hours (i.e., "multi-day" sales under FERC's definition)

17  made during the Refund Period. *See* July 25, 2001 Order, 96 FERC at 61,499; *see also San Diego*

18  *Gas & Electric Co.*, 102 FERC ¶ 61,317 at P 154 (2003); *CPUC*, 462 F.3d at 1059.

19      63.    To remedy the unlawful prices charged in the market during the Refund Period,

20  FERC has, in a series of orders beginning with the July 25, 2001 Order, adopted a methodology to

21  recalculate, on a market-wide basis, the just and reasonable prices that all sellers should have

22  received under the ISO and PX Tariffs. In lieu of the auction pricing mechanism previously

23  provided in the ISO and PX Tariffs, which resulted in unlawful prices, FERC's methodology

24  effectively revised the ISO and PX Tariffs to determine the corrected, maximum rates that could be

25  charged under those Tariffs. These corrected, maximum rates were called the "Mitigated Market

26  Clearing Price," or "MMCP." FERC ordered the ISO and PX to apply the MMCP to sales during

27  the Refund Period, including to OOM sales, so as to recalculate the charges that all sellers should

28  have received for each interval during the Refund Period in place of the previous unlawful prices.

Heller
Ehrman LLP

17

COMPLAINT

64.    FERC ordered the ISO and PX to calculate the amounts that sellers were required to refund or credit to buyers under the July 25, 2001 Order. July 25, 2001 Order, 96 FERC at 61,516. Pursuant to FERC's direction, the ISO and the PX have recalculated the accounts of all sellers and buyers in the ISO and PX markets to reflect the corrected rates for the Refund Period in accordance with the July 25, 2001 Order and the subsequent related FERC orders.

65.    The California Parties petitioned the Ninth Circuit for review of the July 25, 2001 Order and subsequent FERC rehearing orders on the ground, *inter alia*, that FERC was also required to correct the rates for sales made during the Summer Period. The California Parties also appealed the July 25, 2001 Order on the ground that FERC was required to correct the rates for energy exchange transactions and multi-day sales made during the Refund Period. A number of electricity sellers petitioned the Ninth Circuit seeking to overturn, *inter alia*, FERC's determination that OOM transactions were subject to price mitigation.

66.    On August 2, 2006, the Ninth Circuit issued its decision in *CPUC*. In that decision, the Court upheld FERC's determination that ISO OOM transactions should be subject to refund in the Remedy Proceeding. *CPUC*, 462 F.3d at 1052. The Ninth Circuit noted that the "Remedy Proceedings were not limited to the Cal-ISO and CalPX single-price auction markets," and that, with respect to refund liability, "there was no meaningful distinction to be drawn between the in- and out-of-market transactions." *Id.* at 1052-1053.

67.    In the same opinion, the Ninth Circuit overturned FERC's categorical rejection of potential relief for the Summer Period and for multi-day and energy exchange transactions, finding FERC's rulings on these points to be arbitrary, capricious, an abuse of discretion, and unsupported by the record, and remanded those issues to FERC. *CPUC*, 462 F.3d at 1051, 1058-1061.

68.    The question of relief for the Summer Period and other non-mitigated Refund Period transactions was also at issue in a second FERC proceeding, separate from the Remedy Proceeding. In a petition to the Ninth Circuit for review of orders in that separate FERC proceeding, the Ninth Circuit held that FERC had erred by concluding that it lacked authority to order refunds for the Summer Period transactions and for other non-mitigated transactions during the Refund Period, and remanded the case so that FERC, "in the first instance," could reconsider whether refunds are

1   appropriate for those transactions. *California ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1016-18

2   (9th Cir. 2004), *petition for cert. filed.*

### Market Dysfunction Resulted in Overcharges by All Sellers

4   69.    FERC recognized early on that market dysfunction could have negatively affected

5   the California markets.  On November 1, 2000, FERC noted that "there is clear evidence that the

6   California market structure and rules provide the opportunity for sellers to exercise market power

7   when supply is tight and can result in unjust and unreasonable rates under the [Federal Power Act]."

8   San Diego Gas & Electric Co., 93 FERC ¶ 61,121 at 61,350 (2000).

9   70.    FERC initially refused attempts to obtain discovery and introduce into the Remedy

10  Proceeding evidence of sellers' market manipulation and tariff violations, but in May 2002, acting

11  in a separate non-public docket, FERC released memoranda that described how Enron and other

12  sellers had manipulated the ISO and PX markets in order to increase prices throughout the power

13  crisis.

14  71.    On August 23, 2002, the Ninth Circuit directed FERC to allow evidence of sellers'

15  market manipulation and tariff violations to be adduced in the Remedy Proceeding.  FERC's

16  investigation concluded that bid prices at certain times "were excessively elevated for the sole

17  purpose of raising prices" in violation of the Cal ISO and Cal PX tariffs. *CPUC*, 462 F.3d at 1049

18  (citation omitted).

19  72.    As the Ninth Circuit explained, certain traders in the markets developed a number of

20  purely artificial means of market manipulation, such as shutting down power plants when electric

21  demand was high in order to destabilize the electric grid and to increase prices.  In order to

22  maximize profit, certain traders engaged in anomalous bidding practices, including "hockey-stick

23  bidding," in which an extremely high price is demanded for a small portion of supplied power in

24  order to inflate prices for the entire market in the single-price auction, and "round trip trades," in

25  which an entity creates the appearance of trading activity at high prices through artificial and off-

26  setting sales and purchases. *See CPUC*, 462 F.3d at 1039. Entities such as Enron allegedly

27  engaged in additional "gaming" schemes designed to inflate market prices and maximize profits.

28  *Id.* at 1040.

73.    Because all sellers in the ISO and PX auctions received the same market-clearing prices set by those auctions, the artificially inflated prices benefited all sellers in the ISO and PX markets, including those that did not engage in market manipulation.  These artificially inflated auction prices also affected OOM sales, which were closely intertwined with the ISO single-price auction market.  *See CPUC*, 462 F.3d at 1053.  FERC's July 25, 2001 Order and subsequent orders have ameliorated the effects of market manipulation on the transactions that they addressed by correcting the pricing under the ISO and PX Tariffs to reduce the prices that all sellers were authorized to retain for those sales.

### The Ninth Circuit's *Bonneville* Decision

74.    FERC ruled in a series of decisions that its power to enforce sellers' payment of refunds under the FPA extended to governmental entities and rural electric cooperatives, such as the Governmental Entities here.  As FERC explained in the July 25, 2001 Order: "[W]e see no reason to treat [governmental entities] differently [from other non-governmental entity sellers], as they are receiving the same price, the just and reasonable market clearing price established pursuant to market rules approved by this Commission, that they expected to obtain for their wholesale sales in the centralized ISO and PX spot markets."  July 25, 2001 Order, 96 FERC at 61,512.  Certain Governmental Entities appealed this decision to the Ninth Circuit.  On September 6, 2005, the Ninth Circuit ruled that FERC lacked statutory authority directly to enforce the Governmental Entities' refund obligations under the ISO and PX Tariffs.  *Bonneville Power Admin. v. Federal Energy Regulatory Comm'n*, 422 F.3d 908 (9th Cir. 2005).  The Court noted, however, that market participants may have, as an alternative remedy, the ability to bring claims in court directly against the Governmental Entities to enforce the contractual obligations created by the operative tariffs and related agreements.  *Bonneville*, 422 F.3d at 925-926.

75.    The Ninth Circuit observed that the governmental entities' agreement to abide by the ISO and PX Tariffs "[serves] to demonstrate that the remedy, if any, may rest in a contract action, not a refund action.  Such an approach is not novel . . . ."  *Id.* at 925 (citing *Alliant Energy v. Neb. Pub. Power Dist.*, 347 F.3d 1046, at 1050-51 (8th Cir. 2003)).  The Ninth Circuit quoted with approval the Eighth Circuit's holding in *Alliant Energy* that "[w]hen a contract provides that its

Heller
Ehrman LLP

1  terms are subject to a regulatory body, all parties to that contract are bound by the actions of the

2  regulatory body . . . . As a result, we are not enforcing the FERC order; instead, we are enforcing

3  an agreement, which [the Governmental Entity] freely entered."). *Bonneville*, 422 F.3d at 926

4  (quoting *Alliant Energy*, 347 F.3d at 1050). The Ninth Circuit has not yet issued the mandate in

5  *Bonneville.*

6      76.    By this Complaint, the California Parties seek to enforce the Governmental Entities'

7  contractual obligations to refund the amounts they charged in excess of the lawful corrected rates,

8  as suggested by the Ninth Circuit in *Bonneville*.

9      77.    Prior to the Ninth Circuit's *Bonneville* order, which was issued on September 6,

10  2005, FERC asserted and exercised exclusive jurisdiction over claims for refunds from all sellers,

11  including the Governmental Entities. Thus, in accordance with the July 25, 2001 Order and under

12  FERC's rulings and Ninth Circuit authority, the FERC proceedings were the exclusive forum for

13  the California IOUs' refund claims, including claims for refunds from the Governmental Entities.

14  No claim accrued and no limitations period commenced to run prior to September 6, 2005, when

15  the Ninth Circuit ruled, for the first time, that FERC did not, in fact, have jurisdiction to enforce the

16  Governmental Entities' refund liability.

17      78.    On December 2, 2005, without conceding that they were required to take such action

18  at that time, the California Parties complied with state claims-presentment statutes by serving

19  written claims on all California-resident defendants, providing them with notice of the California

20  Parties' present claims for relief. Cal. Gov't Code § 910. On the same date, the California Parties

21  also served claims on the City of Seattle and Grant County PUD, in light of ambiguity as to whether

22  the California Parties were required to present these claims under Washington law. Rev. Code.

23  Wash. 4.96.010-020. The Arizona claims presentment statutes do not apply to RUS-financed

24  cooperatives; consequently, no notice of claim was presented to AEPCO. Ariz. Rev. Stat. 12-821-

25  01. Beginning on December 22, 2005, the Governmental Entities denied all claims or the claims

26  were deemed denied by operation of law.

27      79.    PG&E, SCE, and EOB filed a complaint in the United States District Court for the

28  Eastern District of California on March 16, 2006, within six months of the earliest denial and in a

1   timely manner against all Governmental Entities named in this Complaint. SDG&E filed a similar

2   complaint on March 21, 2006. The claims pleaded in these two complaints (the "Eastern District

3   Complaints") were based on the same facts that were at issue in the Remedy Proceeding and in the

4   various Ninth Circuit appeals from the Remedy Proceeding: the sellers' (including the

5   Governmental Entities') receipt and retention of rates for sales of wholesale electric power in the

6   ISO and PX markets that are unlawful and unauthorized under the ISO and PX Tariffs. On March

7   16, 2007, the Eastern District Complaints were dismissed for lack of federal-question jurisdiction.

8       80.    The California Parties have at all times acted promptly, reasonably, and in good faith

9   in seeking relief against all sellers in the California markets, including the Governmental Entities.

10  The Governmental Entities were active parties to the FERC Remedy Proceeding, and have had

11  notice throughout the FERC proceedings of the need to gather and preserve relevant evidence.

12  Following the Ninth Circuit's *Bonneville* decision, the California Parties acted expeditiously to

13  present claims to the Governmental Entities and to commence proceedings in the Eastern District of

14  California. This Complaint is based on the same facts and asserts the same claims against the same

15  defendants as the Eastern District Complaint. To the extent that any limitations period had

16  commenced to run on the California Parties' right to sue in a court to enforce the Governmental

17  Entities' refund obligations prior to the *Bonneville* order, which the California Parties deny, the

18  limitations period was tolled, at a minimum, from the time the California Parties initiated refund

19  proceedings at FERC on August 2, 2000, through the time the Ninth Circuit issued its decision in

20  *Bonneville* on September 6, 2005, and from March 16, 2006 through March 16, 2007 (for PG&E,

21  SCE, and EOB) or from March 21, 2006 through March 16, 2007 (for SDG&E), while the claims

22  alleged in the Eastern District were pending.

23              ### CAUSES OF ACTION

24              ### FIRST CAUSE OF ACTION

25              **By the California IOUs Against All Defendants
                for Breach of Contract**

26

27      81.    The California Parties incorporate by reference the allegations set forth above.

28

82. All sellers in the ISO and PX markets, including the Governmental Entities, were charged with knowledge that the market prices, and the formulas and/or market rules that set the prices, were subject to correction if FERC found that they contravened the requirements of the FPA. By voluntarily choosing to sell electric power at wholesale in the ISO and PX markets, and/or by executing ISO Scheduling Coordinator Agreements, PX Participation Agreements, or other agreements with the ISO or PX, the Governmental Entities contractually agreed to be bound by the provisions of the ISO and PX Tariffs, which incorporate FERC's power to correct prices that it determines to be unjust, unreasonable, or unlawful.

83. Pursuant to its authority under the FPA, FERC revised the Tariffs and corrected the prices that market participants were entitled to receive for their sales during the Refund Period by adopting the MMCP. Upon FERC's correction of the rates charged by sellers, including the Governmental Entities, in the ISO and PX markets, the corrected rates became the only lawful and authorized rates for those sales under the applicable Tariffs.

84. The Governmental Entities are now contractually obligated to reimburse the California IOUs for the difference between the rates that the Governmental Entities initially charged for their sales in the ISO and PX markets and the MMCP. The California Parties have demanded, and the Governmental Entities have refused to refund, and continue to refuse to refund, to the California IOUs the amounts that they received in excess of the MMCP during the Refund Period.

85. The Governmental Entities' conduct constitutes a breach of their contractual obligations to the California IOUs, entitling the California IOUs to judgment against the Governmental Entities for all amounts that each Governmental Entity received in excess of the lawful rate attributable to its wholesale sales of electric power to the California IOUs in the ISO and PX markets during the Refund Period, plus associated interest. The California Parties estimate the Governmental Entities' liability for damages to be in excess of $100 million.

## SECOND CAUSE OF ACTION

### By the California IOUs Against All Defendants
### for Anticipatory Breach of Contract

86.     The California Parties incorporate by reference the allegations set forth above.

87.     This Cause of Action is pleaded in the alternative to the First Cause of Action. If it is determined that the date by which the Governmental Entities would be obligated under the applicable contracts to refund to the California IOUs the amounts that they received in excess of the MMCP during the Refund Period has not yet occurred, the Governmental Entities have nonetheless become obligated to make such refunds immediately, and in advance of such date, because they have wrongfully denied and repudiated any legal duty to so repay the California IOUs. Specifically, the Governmental Entities have repudiated, in the FERC proceedings, in appeals from FERC orders, and by their denials of the California IOUs' duly-presented claims, their contractual obligations to the California IOUs, including their obligation to comply with the revised tariff provisions by refunding their unlawful overcharges.

88.     Upon the Governmental Entities' repudiation of their contractual obligations, the California Parties became entitled to sue for breach of contract. The Governmental Entities' conduct constitutes an anticipatory breach of their contractual obligations to the California IOUs, entitling the California IOUs to judgment against the Governmental Entities for all amounts that each Governmental Entity received in excess of the lawful rate attributable to its wholesale sales of electric power to the California IOUs in the ISO and PX markets during the Refund Period, plus associated interest. The California Parties estimate the Governmental Entities' liability for damages to be in excess of $100 million.

## THIRD CAUSE OF ACTION

### By the California IOUs Against All Defendants
### for Unjust Enrichment Arising from Contract

89.     The California Parties incorporate by reference the allegations set forth above.

90.     By accepting and retaining prices that are now unlawful under the ISO and PX Tariffs, and by denying their obligations to refund or credit overcharges to buyers in the ISO and

1 PX markets, the Governmental Entities have unjustly enriched themselves at the expense of market

2 purchasers, including the California IOUs and, ultimately, the IOUs' customers, who paid inflated

3 and unlawful prices for electric power. The Governmental Entities' retention of those unlawful

4 prices violates their contractual duty to abide by the provisions of the ISO and PX Tariffs.

5      91.   In addition, the Governmental Entities' retention of prices in excess of the MMCP

6 that are unauthorized under the tariffs is inequitable and unfair. For transactions where they were

7 buyers, the Governmental Entities are seeking refunds from other sellers of prices they paid in

8 excess of the lawful, corrected rate. By contrast, for transactions where they were sellers, the

9 Governmental Entities deny any obligation to pay refunds, and seek to retain the windfall benefits

10 of the original unlawful prices they charged other market participants.

11      92.   The Governmental Entities have been unfairly enriched, entitling the California

12 IOUs to judgment against each Governmental Entity for all amounts that each Governmental Entity

13 received in excess of the lawful rate attributable to its wholesale sales of electric power to

14 California IOUs in the ISO and the PX markets during the Refund Period, plus associated interest.

## FOURTH CAUSE OF ACTION

### By the California IOUs Against All Defendants
### for Money Had and Received

18      93.   The California Parties incorporate by reference the allegations set forth above.

19      94.   By accepting and retaining prices that are unlawful under the ISO and PX Tariffs,

20 and by denying their obligations to refund or credit overcharges to those buyers in the ISO and PX

21 markets, the Governmental Entities have accepted the benefit of illegal profits that rightfully belong

22 to purchasers in the ISO and PX markets, including the California IOUs, that were harmed by the

23 unlawful prices. Any overcharges received by a Governmental Entity from the California IOUs as

24 a result of unlawful prices rightfully belong to and should be returned to the California IOUs.

25      95.   The Governmental Entities are accordingly liable to the California IOUs for all

26 amounts each Governmental Entity received in excess of the lawful rate attributable to its wholesale

27 sales of electric power to the California IOUs in the ISO and PX markets during the Refund Period,

28 plus associated interest.

Heller
Ehrman LLP

## FIFTH CAUSE OF ACTION

**By All Plaintiffs Against All Defendants
for Declaratory Relief (Refund Period)**

96.    The California Parties incorporate by reference the allegations set forth above.

97.    A controversy has arisen in that the Governmental Entities have denied any liability to the California IOUs for overcharges associated with transactions during the Refund Period for which FERC has ordered relief. The California Parties seek a declaratory judgment that the California IOUs are contractually entitled to recover from the Governmental Entities all amounts that each Governmental Entity charged in excess of the lawful rate attributable to its sales to the California IOUs in the ISO and PX markets during the Refund Period.

## SIXTH CAUSE OF ACTION

**By All Plaintiffs Against All Defendants
for Declaratory Relief (Energy Exchanges and/or Multi-Day Sales)**

98.    The California Parties incorporate by reference the allegations set forth above.

99.    A controversy has arisen in that the Governmental Entities have denied that they will have any liability to the California IOUs to refund their overcharges associated with energy exchanges and/or sales found by FERC to be "multi-day" sales, at such time as FERC corrects the prices for these transactions. Pursuant to the Ninth Circuit's decision in *CPUC*, FERC's decision not to provide relief for energy exchanges and multi-day sales during the Refund Period has been reversed. The California Parties seek a declaratory judgment that at such time as FERC corrects the rates charged by sellers for energy exchanges or multi-day sales, the California IOUs will be entitled to recover from the Governmental Entities the difference between the rates the Governmental Entities initially charged and the lawful rates as ultimately determined by FERC, plus associated interest.

## SEVENTH CAUSE OF ACTION

**By All Plaintiffs Against All Defendants
for Declaratory Relief (Summer Period)**

100.    The California Parties incorporate by reference the allegations set forth above.

101.    A controversy has arisen in that the Governmental Entities have denied that they will have any liability to the California IOUs to refund their overcharges associated with their sales during the Summer Period at such time as FERC corrects the prices for the Summer Period. Pursuant to the Ninth Circuit's decision in *CPUC*, FERC's decision not to provide relief for the Summer Period has been reversed. The California Parties seek a declaratory judgment that at such time as FERC corrects the rates charged by sellers during the Summer Period, the California IOUs will be entitled to recover from the Governmental Entities the difference between the rates that the Governmental Entities initially charged and the lawful rates as ultimately determined by FERC, plus associated interest.

### EIGHTH CAUSE OF ACTION

**By All Plaintiffs Against All Defendants**
**for Declaratory Relief (Contractual Liability for Market Shortfall)**

102.    The California Parties incorporate by reference the allegations set forth above.

103.    Because the ISO and PX are revenue-neutral entities, the Governmental Entities' refusal to honor their repayment obligations will result in a shortfall of funds needed to settle the accounts of ISO and PX participants. Under the terms of the ISO and PX Tariffs, other market participants, including the California IOUs, may therefore be required to pay for any resulting market shortfall.

104.    Any reductions in the California IOUs' accounts to pay for any market shortfall caused by the Governmental Entities' refusal to honor their contractual repayment obligations will constitute amounts due and owing by the Governmental Entities, as ISO Debtors and PX Debtors, to the California IOUs, as ISO Creditors and PX Creditors. A controversy has arisen in that the Governmental Entities have denied that they have any obligation to refund amounts they received in excess of the lawful rate. The California IOUs, as market participants, are entitled under the ISO and PX Tariffs to bring proceedings directly against the Governmental Entities to recover these amounts owed.

105.    The California Parties seek a declaratory judgment that the Governmental Entities will be contractually liable to the California IOUs for any amount assessed against the California

1  IOUs' accounts due to the Governmental Entities' refusal to honor their repayment obligations, as

2  well as for all additional costs and expenses incurred by the California IOUs as a result of the

3  Governmental Entities' refusal to honor their repayment obligations.

### NINTH CAUSE OF ACTION

**By All Plaintiffs Against All Defendants
for Declaratory Relief (ISO and PX Accounts)**

7      106.    The California Parties incorporate by reference the allegations set forth above.

8      107.    This Cause of Action is pleaded in the alternative to the First through Eighth Causes

9  of Action.

10     108.    A controversy has arisen in that the Governmental Entities have denied that they

11  have any liability to the California IOUs to refund their overcharges associated with their sales

12  during the Refund Period, and that they will have any liability to the California IOUs to refund their

13  overcharges associated with energy exchanges and multi-day sales and sales during the Summer

14  Period at such time as FERC corrects the prices for those transactions.  The California Parties seek

15  a declaration that the Governmental Entities are contractually obligated to permit their accounts at

16  the ISO and PX to be adjusted to reflect all pricing changes resulting from FERC's determination of

17  the corrected, maximum rates under the ISO and PX Tariffs and the recalculation by the ISO and

18  PX pursuant to FERC's direction of the prices charged under the ISO and PX Tariffs during the

19  relevant time periods, and are contractually obligated to pay any refunds and to otherwise honor the

20  invoices reflecting the refunds associated with all affected transactions.

### PRAYER FOR RELIEF

WHEREFORE, the California Parties pray for relief against the Governmental Entities as

follows:

1.  For judgment against the Governmental Entities in favor of the California IOUs for

all amounts that each Governmental Entity charged in excess of the lawful rate

attributable to its sales to the California IOUs in the ISO and PX markets during the

Refund Period;

2.  For a judgment declaring that the California IOUs are entitled to recover from the Governmental Entities all amounts that each Governmental Entity charged in excess of the lawful rate attributable to its sales to the California IOUs in the ISO and PX markets during the Refund Period;

3.  For a judgment declaring that at such time as FERC finds that the rates charged by sellers for energy exchanges or multi-day sales during the Refund Period were unlawful, the California IOUs will be entitled to recover from the Governmental Entities the difference between the rates that each Governmental Entity charged and the lawful rates as ultimately determined by FERC;

4.  For a judgment declaring that at such time as FERC finds that the rates charged by sellers during the Summer Period were unlawful, the California IOUs will be entitled to recover from the Governmental Entities the difference between the rates each Governmental Entity charged and the lawful rates as ultimately determined by FERC;

5.  For a judgment declaring that at such time as the Governmental Entities' refusal to honor their repayment obligations results in a shortfall of funds necessary to settle the California IOUs' accounts, the Governmental Entities will be liable to the California IOUs for any amount assessed against the California IOUs' accounts, and all additional costs and expenses incurred by the California IOUs, as a result of the Governmental Entities' refusal to honor their repayment obligations;

6.  In the alternative, for a judgment declaring that the Governmental Entities are contractually obligated to permit the Governmental Entities' accounts at the ISO and PX to be adjusted to reflect all pricing changes resulting from FERC's determination of the corrected, maximum rates under the ISO and PX Tariffs and the recalculation by the ISO and PX pursuant to FERC's direction of the prices charged under the ISO and PX Tariffs during the relevant time periods, and that the Governmental Entities are contractually obligated to pay any refunds and to

Heller
Ehrman LLP

otherwise honor the invoices reflecting the refunds associated with such transactions;

7. For an award of pre-judgment and post-judgment interest;

8. For recoverable costs of suit and other expenses; and

9. For such further relief as the Court may deem just and proper.

Heller
Ehrman LLP

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: 4/6 , 2007                    HELLER EHRMAN LLP

By: _Marie L. Fiala_____
        MARIE L. FIALA

                            Attorney for Pacific Gas and Electric Company

[ADDITIONAL COUNSEL OF RECORD]

MARK PATRIZIO (CA BAR NO. 108051)
PACIFIC GAS AND ELECTRIC COMPANY
77 Beale Street, MailCode B30A
San Francisco, CA 94105
Telephone: (415) 973-6344
Facsimile: (415) 973-5520
MDP5@pge.com

Attorneys for Plaintiff
Pacific Gas and Electric Company

1  DATED: ____, 2007                        STEPTOE & JOHNSON LLP

2

3                                           By: _____

4                                               LAWRENCE P. RIFF

5                                               Attorney for Plaintiff Southern California Edison
                                                Company
6

7

8  [COUNSEL OF RECORD]

9  LAWRENCE P. RIFF (CA BAR NO. 104826)
   JAY E. SMITH (CA BAR NO. 162832)
10 STEPTOE & JOHNSON LLP
   633 West Fifth Street, Seventh Floor
11 Los Angeles, CA 90071
   Telephone: (213) 439-9400
12 Facsimile: (213) 439-9599
   lriff@steptoe.com
13 jsmith@steptoe.com

14 RUSSELL C. SWARTZ (CA BAR NO. 078360)
   LEON BASS, JR. (CA BAR NO. 127403)
15 SOUTHERN CALIFORNIA EDISON COMPANY
   2244 Walnut Grove Avenue
16 Rosemead, CA 91770
   Telephone: (626) 302-6967
17 Facsimile: (626) 302-3990
   russell.swartz@sce.com
18 leon.bass@sce.com

19 Attorneys for Plaintiff Southern California Edison Company

20

21

22

23

24

25

26

27

28

COMPLAINT

DATED: April 9, 2007

HENNIGAN BENNETT & DORMAN LLP

By: _LAURA LINDGREN_

Attorney for Plaintiff San Diego Gas & Electric Company

[COUNSEL OF RECORD]

J. MICHAEL HENNIGAN (CA BAR NO. 59491)
LAURA LINDGREN (CA BAR NO. 82332)
ROBERT W. MOCKLER (CA BAR NO. 200200)
HENNIGAN BENNETT & DORMAN LLP
865 S. Figueroa Street, Suite 2900
Los Angeles, CA 90017
Telephone:  (213) 694-1200
Facsimile:  (213) 694-1234

Heller
Ehrman LLP

COMPLAINT

DATED: April 9, 2007                    CALIFORNIA ELECTRICITY OVERSIGHT BOARD

By: 
    STEVEN BENITO RUSSO

Attorney for Plaintiff California Electricity
Oversight Board

[COUNSEL OF RECORD]

ERIK N. SALTMARSH (CA BAR NO. 156919)
STEVEN BENITO RUSSO (CA BAR NO. 104858)
CALIFORNIA ELECTRICITY OVERSIGHT BOARD
770 L Street, Suite 1250
Sacramento, CA 95814
Telephone: (916) 322-8601
Facsimile: (916) 322-8591
Steven.Russo@eob.ca.gov
esaltmarsh@eob.ca.gov

Attorneys for Plaintiff California Electricity Oversight Board

Heller
Ehrman LLP