**EXHIBIT 2**

97 FERC ¶ 61,275

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| San Diego Gas & Electric Company,<br>        Complainant,<br>v.<br>Sellers of Energy and Ancillary Services<br> Into Markets Operated by the California<br> Independent System Operator and the<br> California Power Exchange,<br>        Respondents | Docket Nos. EL00-95-001<br> EL00-95-004<br> EL00-95-005<br> EL00-95-006<br> EL00-95-007<br> EL00-95-010<br> EL00-95-011<br> EL00-95-019<br> EL00-95-039<br> EL00-95-046<br> EL00-95-047 |
| Investigation of Practices of the California<br> Independent System Operator and the<br> California Power Exchange | Docket Nos. EL00-98-001<br> EL00-98-004<br> EL00-98-005<br> EL00-98-006<br> EL00-98-008<br> EL00-98-010<br> EL00-98-011<br> EL00-98-018<br> EL00-98-037<br> EL00-98-043<br> EL00-98-044 |
| Public Meeting in San Diego, California | Docket No. EL00-107-002 |
| Reliant Energy Power Generation, Inc.,<br> Dynegy Power Marketing, Inc.,<br> and Southern Energy California, L.L.C.,<br>        Complainants,<br>v.<br>California Independent System Operator<br> Corporation,<br>        Respondent | Docket No. EL00-97-001 |

Docket No. EL00-95-001, et al.                    - 2 -

California Electricity Oversight Board,
                              Complainant,
                    v.
All Sellers of Energy and Ancillary Services          Docket No. EL00-104-001
  Into the Energy and Ancillary Services Markets
  Operated by the California Independent System
  Operator and the California Power Exchange,
                              Respondents


California Municipal Utilities Association,
                              Complainant,
                    v.
All Jurisdictional Sellers of Energy and Ancillary    Docket No. EL01-1-001
  Services Into Markets Operated by the California
  Independent System Operator and the
  California Power Exchange,
                              Respondents


CAlifornians for Renewable Energy, Inc. (CARE),
                              Complainant,
                    v.
Independent Energy Producers, Inc., and All           Docket No. EL01-2-001
  Sellers of Energy and Ancillary Services Into
  Markets Operated by the California Independent
  System Operator and the California Power
  Exchange; All Scheduling Coordinators Acting
  on Behalf of the Above Sellers; California
  Independent System Operator Corporation; and
  California Power Exchange Corporation,
                              Respondents


Puget Sound Energy, Inc.,
                              Complainant,
                    v.
All Jurisdictional Sellers of Energy and/or Capacity  Docket No. EL01-10-001
  at Wholesale Into Electric Energy and/or Capacity
  Markets in the Pacific Northwest, Including
  Parties to the Western Systems Power Pool
  Agreement,
                              Respondents

Docket No. EL00-95-001, et al.                – 3 –

| | |
|---|---|
| California Independent System Operator Corporation | Docket Nos. ER01-607-000 ER01-607-001 |
| California Independent System Operator Corporation | Docket Nos.  RT01-85-002 RT01-85-005 |
| Investigation of Wholesale Rates of Public Utility Sellers of Energy and Ancillary Services in the Western Systems Coordinating Council | Docket Nos. EL01-68-002 EL01-68-008 |
| California Power Exchange Corporation | Docket No. ER00-3461-001 |
| California Independent System Operator Corporation | Docket No. ER00-3673-001 |
| California Independent System Operator Corporation | Docket No. ER01-1579-001 |
| Southern California Edison Company and Pacific Gas and Electric Company | Docket Nos. EL01-34-000 EL01-34-001 |
| Arizona Public Service Company | Docket Nos. ER01-1444-001 |
| Automated Power Exchange, Inc. | Docket Nos. ER01-1445-001 |
| Avista Energy, Inc. | Docket Nos. ER01-1446-001 |
| California Power Exchange Corporation | Docket Nos. ER01-1447-001 |
| Duke Energy Trading and Marketing, LLC | Docket Nos. ER01-1448-002 |
| Dynegy Power Marketing, Inc. | Docket Nos. ER01-1449-002 |
| Nevada Power Company | Docket Nos. ER01-1450-001 |
| Portland General Electric Company | Docket Nos. ER01-1451-002 |
| Public Service Company of Colorado | Docket Nos. ER01-1452-001 |

Docket No. EL00-95-001, et al.                    - 4 -

Reliant Energy Services, Inc.                     Docket Nos. ER01-1453-001

Sempra Energy Trading Corporation                 Docket Nos. ER01-1454-002

Mirant California, LLC, Mirant Delta, LLC,         Docket Nos. ER01-1455-002
and Mirant Potrero, LLC

Williams Energy Services Corporation              Docket Nos. ER01-1456-002


ORDER ON CLARIFICATION AND REHEARING


Issued: December 19, 2001

TABLE OF CONTENTS

Introduction and Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
    A.    August 23 Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
    B.    November 1 Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
    C.    Amendment No. 33 Order (December 8, 2000) . . . . . . . . . . . . . . . . . . -10-
    D.    Qualifying Facilities (QF) Order (December 8, 2000) . . . . . . . . . . . . -11-
    E.    December 15 Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
    F.    Proceedings Concerning the Underscheduling Penalty . . . . . . . . . . . -13-
    G.    Subsequent Proceedings Arising from December 15 Order . . . . . . . . -14-
    H.    March 9 Refund Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-
    I.    Prospective Price Mitigation Orders (April 26 and June 19, 2001) . . . -15-
    J.    July 25 Refund Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
    K.    July 25 Order Granting Emergency Motion for Clarification . . . . . . . . -18-

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
    A.    Procedural Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
    B.    Rehearing of Issues Surrounding Level and Scope of Mitigated Prices
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-
            1.    Scope of Transactions Subject to Mitigation and Refund
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-
                a.    Applicability to Sales by Governmental Entities
                    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-
                b.    Applicability to QFs . . . . . . . . . . . . . . . . . -41-
                c.    Applicability to Marketers . . . . . . . . . . . . -44-
                d.    Applicability to DWR and OOM Transactions
                    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -50-
                e.    Applicability to Other Transactions . . . . . -54-
                f.    The October 2, 2000 Refund Effective Date
                    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -55-
                g.    Duration of Price Mitigation . . . . . . . . . . -60-
            2.    Calculation of Mitigated Prices . . . . . . . . . . . . . . . . . . . -63-
                a.    Use of Marginal Cost of Last Unit Dispatched
                    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -63-
                b.    Gas Costs . . . . . . . . . . . . . . . . . . . . . . . . . -68-
                 c.    Emissions Costs . . . . . . . . . . . . . . . . . . . -73-
                 d.    O&M Adder . . . . . . . . . . . . . . . . . . . . . . -79-
                 e.    Creditworthiness Adder . . . . . . . . . . . . . . -80-

Docket No. EL00-95-001, et al.                    - ii -

   f. Opportunity Costs, Scarcity Rents, Recovery of
    Fixed Costs and Justification of Higher Prices
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . -85-
  3. Other Refund Issues  . . . . . . . . . . . . . . . . . . . . . . . . -95-
   a. The July 25 Refund Methodology
    was Properly Applied to All Sales
    at Issue . . . . . . . . . . . . . . . . . . . . . . . -95-
   b. Applicability of Refunds to APX  . . . . . . . -99-
   c. Issues from December 15 Order  . . . . . . . . -99-
   d. Issues from June 19 Order  . . . . . . . . . . -104-
   e. Issues from July 25 Order  . . . . . . . . . . -108-
C. Rehearing of Remaining Issues from December 15 and Earlier Orders
  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -109-
  1. Buy/Sell Requirement  . . . . . . . . . . . . . . . . . . . . . -110-
  2. Underscheduling  . . . . . . . . . . . . . . . . . . . . . . . . . -114-
  3. QF Issues  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -116-
  4. Governance of the ISO  . . . . . . . . . . . . . . . . . . . . -118-
  5. Forward Contracting  . . . . . . . . . . . . . . . . . . . . . . -119-
  6. Issues of Procedure  . . . . . . . . . . . . . . . . . . . . . . . -121-
  7. Other Related Dockets  . . . . . . . . . . . . . . . . . . . . -122-
   a. ISO Amendment No. 33 (Docket Nos. ER01-
    607-000 and ER01-607-001)  . . . . . . . . . -122-
   b. Docket Number EL00-97-001  . . . . . . . . -130-
   c. Complaints in Docket Nos. EL00-104-001,
    EL01-1-001, and EL01-2-001  . . . . . . . . -132-
   d. Docket Nos. ER00-3461-001 and ER00-3673-
    001 . . . . . . . . . . . . . . . . . . . . . . . . . . . -135-
   e. ISO Amendment No. 30 ( Docket No. EL00-
    95-002)  . . . . . . . . . . . . . . . . . . . . . . . . -136-
   f. Compliance Filings in Docket Nos. EL00-95-
    007, et al.  . . . . . . . . . . . . . . . . . . . . . . -138-
D. Rehearing of Remaining Issues from March 9 Order  . . . . . . . . . . . -140-
  1. Treble Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . -140-
  2. Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -140-
  3. City of San Diego's Motion to Sequester Funds  . . . . . -141-
  4. Termination of ER Dockets  . . . . . . . . . . . . . . . . . . . -142-
E. Rehearing of Remaining Issues from June 19 Order  . . . . . . . . . . . -143-
  1. Outage Coordination  . . . . . . . . . . . . . . . . . . . . . . . . -143-
  2. Must-Offer Requirement . . . . . . . . . . . . . . . . . . . . . . -144-
   a. Available Generation  . . . . . . . . . . . . . . . -144-

Docket No. EL00-95-001, et al.                    - iii -

|   |   |   | b. | Extent of the Must-Offer |   |
|---|---|---|---|---|---|
|   |   |   |   | Requirement/Exemptions . . . . . . . . . . . | -145- |
|   |   |   | c. | Other Must-Offer Issues . . . . . . . . . . . . | -147- |
|   |   | 3. | | Demand Response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | -149- |
|   |   | 4. | | Continuation of Market-Based Rates and Limitation of |   |
|   |   |   |   | Mitigation to Spot Market Transactions . . . . . . . . . . . . | -150- |
|   |   | 5. | | Price Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | -153- |
|   |   | 6. | | Conditions on Market-Based Rate Authority . . . . . . . . | -156- |
|   |   | 7. | | Confidentiality of Data . . . . . . . . . . . . . . . . . . . . . . . . | -157- |
|   |   | 8. | | RTO Proposal and ISO Governance . . . . . . . . . . . . . . . | -158- |
|   |   | 9. | | West-Wide Implementation . . . . . . . . . . . . . . . . . . . . . | -159- |
|   |   |   | a. | Price Mitigation Outside of California . . . . . . . | -162- |
|   | F. | | | Rehearing of Remaining Issues from July 25 Order . . . . . . . . . . . . | -167- |
|   | G. | | | Pacific Northwest Complaint (EL01-10-001) . . . . . . . . . . . . . . . . | -170- |
|   | H. | | | Hearing Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | -174- |

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Pat Wood, III, Chairman;
                      William L. Massey, Linda Breathitt,
                      And Nora Mead Brownell.

| | |
|---|---|
| San Diego Gas & Electric Company,<br>                    Complainant,<br>            v.<br>Sellers of Energy and Ancillary Services<br> Into Markets Operated by the California<br>Independent System Operator and the<br>California Power Exchange,<br>                    Respondents. | Docket Nos. EL00-95-001<br> EL00-95-004<br> EL00-95-005<br> EL00-95-006<br>    EL00-95-007<br> EL00-95-010<br> EL00-95-011<br> EL00-95-019<br> EL00-95-039<br> EL00-95-046<br> EL00-95-047 |
| Investigation of Practices of the California<br> Independent System Operator and the<br> California Power Exchange | Docket Nos. EL00-98-001<br> EL00-98-004<br> EL00-98-005<br> EL00-98-006<br> EL00-98-008<br> EL00-98-010<br> EL00-98-011<br> EL00-98-018<br> EL00-98-037<br> EL00-98-043<br> EL00-98-044 |
| Public Meeting in San Diego, California | Docket No. EL00-107-002 |
| Reliant Energy Power Generation, Inc.,<br> Dynegy Power Marketing, Inc.,<br> and Southern Energy California, L.L.C.,<br>                    Complainants,<br>            v.<br>California Independent System Operator<br> Corporation,<br>                    Respondent. | Docket No. EL00-97-001 |
| California Electricity Oversight Board, | |

Docket No. EL00-95-001, et al.                    - 2 -

                          Complainant,
                  v.

All Sellers of Energy and Ancillary Services          Docket No. EL00-104-001
  Into the Energy and Ancillary Services Markets
  Operated by the California Independent System
  Operator and the California Power Exchange,
                  Respondents.


California Municipal Utilities Association,
                  Complainant,
                  v.

All Jurisdictional Sellers of Energy and Ancillary    Docket No. EL01-1-001
Services Into Markets Operated by the California
  Independent System Operator and the
  California Power Exchange,
                  Respondents.


CAlifornians for Renewable Energy, Inc. (CARE),
                  Complainant,
                  v.

Independent Energy Producers, Inc., and All           Docket No. EL01-2-001
  Sellers of Energy and Ancillary Services Into
  Markets Operated by the California Independent
  System Operator and the California Power
  Exchange; All Scheduling Coordinators Acting
  on Behalf of the Above Sellers; California
  Independent System Operator Corporation; and
  California Power Exchange Corporation,
                  Respondents.


Puget Sound Energy, Inc.,
                  Complainant,
                  v.

All Jurisdictional Sellers of Energy and/or Capacity  Docket No. EL01-10-001
  at Wholesale Into Electric Energy and/or Capacity
  Markets in the Pacific Northwest, Including
  Parties to the Western Systems Power Pool
  Agreement,
                  Respondents.

Docket No. EL00-95-001, et al.                − 3 −

| | |
|---|---|
| California Independent System Operator Corporation | Docket Nos. ER01-607-000 ER01-607-001 |
| California Independent System Operator Corporation | Docket Nos. RT01-85-002 RT01-85-005 |
| Investigation of Wholesale Rates of Public Utility Sellers of Energy and Ancillary Services in the Western Systems Coordinating Council | Docket Nos. EL01-68-002 EL01-68-008 |
| California Power Exchange Corporation | Docket No. ER00-3461-001 |
| California Independent System Operator Corporation | Docket No. ER00-3673-001 |
| California Independent System Operator Corporation | Docket No. ER01-1579-001 |
| Southern California Edison Company and Pacific Gas and Electric Company | Docket Nos. EL01-34-000 EL01-34-001 |
| Arizona Public Service Company | Docket Nos. ER01-1444-001 |
| Automated Power Exchange, Inc. | Docket Nos. ER01-1445-001 |
| Avista Energy, Inc. | Docket Nos. ER01-1446-001 |
| California Power Exchange Corporation | Docket Nos. ER01-1447-001 |
| Duke Energy Trading and Marketing, LLC | Docket Nos. ER01-1448-002 |
| Dynegy Power Marketing, Inc. | Docket Nos. ER01-1449-002 |
| Nevada Power Company | Docket Nos. ER01-1450-001 |
| Portland General Electric Company | Docket Nos. ER01-1451-002 |
| Public Service Company of Colorado | Docket Nos. ER01-1452-001 |
| Reliant Energy Services, Inc. | Docket Nos. ER01-1453-001 |

Docket No. EL00-95-001, et al.                - 4 -

Sempra Energy Trading Corporation              Docket Nos. ER01-1454-002

Mirant California, LLC, Mirant Delta, LLC,      Docket Nos. ER01-1455-002
and Mirant Potrero, LLC

Williams Energy Services Corporation           Docket Nos. ER01-1456-002


ORDER ON CLARIFICATION AND REHEARING

(Issued December 19, 2001)


Introduction and Summary

        In this order the Commission acts on petitions for rehearing of four interrelated
orders issued in the above dockets to address mitigation of prices for power sold at
wholesale through centralized, single price auction spot markets operated by the
California Independent System Operator Corporation (ISO) and California Power
Exchange Corporation (PX), as well as mitigation of prices for power sold at wholesale
in bilateral (contractual) markets in the Western System Coordinating Council (WSCC).
Since August 2000, the Commission has issued a series of orders (nearly 75), including
the four orders addressed herein, dealing with various aspects of the recent electricity
crisis in California.  These orders have been aimed at correcting the market dysfunctions
which contributed to the California crisis and which are within our jurisdiction to correct,
and at stabilizing prices until the necessary corrections - - including correction of the
supply-demand imbalance in California - - can be made.  The four interrelated orders
addressed herein, issued December 15, 2000, March 9, 2001, June 19, 2001, and July 25,
2001, represent the major steps taken by the Commission to modify the ISO market rules
and adjust the pricing mechanisms used in California and the West, to ensure just and
reasonable rates in Western markets.[1]

        In exercising our responsibility under the Federal Power Act to ensure just and
reasonable rates for wholesale sales of electric energy, the Commission has been faced
with a very complex set of state and federal market rules affecting the California energy
markets as well as a set of rapidly changing market conditions over the past year.  The
Commission has adopted a measured approach to provide for market corrections and

---

[1]In addition, this order acts on petitions for rehearing and/or clarification of four
related orders issued on August 23, 2000, November 1, 2000, and two on December 8,
2000.

Docket No. EL00-95-001, et al.          - 5 -

price mitigation, attempting to balance the need to protect customers from high prices in the short-term with the need to ensure that power continues to flow and that incentives are provided to bring much needed power supply on-line for the longer term. While some have argued in these proceedings that the Commission has failed to fulfill its statutory obligations by not returning to a system of cost-of-service rates, we conclude that such action was, and is, neither necessary nor appropriate to protect customers in either the short or the long-term, and that such action would deprive customers of the benefits that a competitive market will yield once the market dysfunctions are fully corrected and sufficient new supply is brought to fruition. Accordingly, today's order denies the petitions for rehearing on this fundamental issue and, on other issues, grants limited rehearing or clarification to ensure that the rate corrections ordered by the Commission yield just and reasonable rates.

Procedurally, the Commission's actions separate into two general time frames. The first is the period from October 2, 2000 until June 20, 2001 (with a minor exception).[2]  For this time frame, the issue is whether refunds are owed by any sellers in the organized spot markets in California and, if so, how much. This issue is guided primarily by an order issued by the Commission on July 25, 2001.[3]  There, the Commission prescribed a formula for determining the amount of any refunds and instituted evidentiary procedures before an administrative law judge to make findings of fact applying the formula. The formula is based substantially on the approach adopted for mitigation prospectively, described below. The Commission recently deferred temporarily the evidentiary procedures before the administrative law judge. In today's order, we direct the resumption of those procedures. When those procedures are completed, the administrative law judge will certify findings of fact for the Commission's consideration.

The second time frame is from June 21, 2001 until September 30, 2002 (with the same minor exception). For this time frame, the Commission adopted a prospective market monitoring and mitigation program to ensure that rates for spot sales throughout the Western United States remain just and reasonable. This program was prescribed in Commission orders issued on April 26 and June 19, 2001.[4]

---

[2]See infra, n.163.

[3]San Diego Gas & Electric Co., et al., 96 FERC ¶ 61,120 (2001), reh'g pending on some issues (July 25 Order).

[4]San Diego Gas & Electric Co., et al., 95 FERC ¶ 61,115 (April 26 Order), order on reh'g, 95 FERC ¶ 61,418 (2001) (June 19 Order).

Docket No. EL00-95-001, et al.                - 6 -

Elements of the plan previously adopted include:

- Enhancing the ability of the California Independent System Operator (ISO) to coordinate and control planned outages during all hours.

- Requiring sellers, including governmental entity[5] generators that voluntarily make sales into FERC-regulated markets or use FERC-regulated interstate transmission facilities (with the exception of hydroelectric power), to offer all their available power in real time during all hours.

- Establishing conditions, including refund liability, on public utility sellers' market-based rate authority to prevent anticompetitive bidding behavior in the real-time market during all hours.

- Establishing a mechanism for price mitigation for all sellers bidding into the ISO's real-time market during a reserve deficiency, i.e., when reserves in California fall below 7 percent. Under this mechanism, the Commission established a formula (based on gas-fired generation) that the ISO can use to establish the market clearing price when mitigation applies (mitigated reserve deficiency MCP).[6] Higher bids were permitted if they could be justified.

- Applying that clearing price as a maximum price for sales outside the ISO's single price auctions (bilateral sales in California and the rest of the WSCC), with sellers outside the single price auction receiving the prices they negotiate up to this maximum price.

- Using eighty-five percent of the highest ISO hourly mitigated reserve deficiency MCP established during the hours of the last Stage 1 alert for the mitigated non-reserve deficiency Market Clearing Price (mitigated non-reserve deficiency MCP) for subsequent non-reserve deficiency hours.

---

[5]Our prior discussions regarding governmental entities imprecisely labeled them "non-public utilities." Use of that term is somewhat misleading, as many governmental entities fit within the definition of a "public utility." See FPA sections 201(e) and 3(7). Accordingly, our discussions regarding governmental entities will use the term "governmental entities" rather than "non-public utilities."

[6]The mitigated reserve deficiency MCP is the marginal cost of the last unit dispatched to serve the last increment of load during a period of reserve deficiency. The marginal cost of each unit calculated by the ISO based on Commission prescribed inputs is referred to as the "Proxy Price."

Docket No. EL00-95-001, et al.                    - 7 -

- Instructing bidders to invoice the ISO directly for the cost to comply with emissions requirements and for start-up fuel costs, which are too varied to be standardized in a single market clearing price.

- Allowing sellers other than marketers the opportunity to justify bids or prices above the maximum prices.

In today's order, we make only minor changes to this approach. For example, we now exclude governmental entities and cooperatives from price mitigation with respect to bilateral transactions outside of the ISO spot market, and with respect to the must-offer requirement outside of California. We also eliminate an "underscheduling" penalty imposed earlier. We state that marketers, load serving entities and hydroelectric generators may submit evidence that the refund method results in a total revenue shortfall in the organized California spot markets for their transactions during the refund period, after the conclusion of the refund hearing. These and other changes adopted today are described fully below. In all other respects, we affirm the approach adopted previously. In addition, we require the ISO to file a revised congestion management plan and a plan for the creation of a day-ahead energy market in California, both of which are to be filed by May 1, 2002.

Background

In May 2000, the costs of electric energy in California's wholesale market began to rise and the Commission instituted a nationwide investigation in July and an investigation on California matters in August. On November 1, 2000, the Commission released for public comment its staff's report on the reasons for the price increase. For the last year, the Commission has worked to correct the market dysfunction, and possible exercise of market power, that it believes are the cause of the price increases. As explained below, we have mitigated prices to ensure they are no higher than those that would result in a competitive market, i.e., at a price no higher than the cost of the least efficient generating unit needed to meet load, for the period October 2, 2000 through September 30, 2002, when we predict conditions to be adequate to revert to pricing based on market prices without regulatory price intervention.

We have used our experience and expertise to fashion, and modify as appropriate, our remedy to ensure that rates are just and reasonable under the limitations which Congress has enacted. While the past 18 months have caused many to question the wisdom of setting rates based on market forces, we continue to believe that market forces can ensure that wholesale rates remain just and reasonable, with proper regulatory oversight. The experience in the natural gas industry continues to convince us that our

Docket No. EL00-95-001, et al.                - 8 -

initial and subsequent decisions to authorize market-based rates in situations in which sellers lack market power is appropriate and in the long-term interests of customers.

We have recently taken steps to ensure that sellers lack market power, or cannot benefit from any market power they may temporarily possess. Besides the West-wide temporary price mitigation we have ordered and confirm today, as modified, we are in the process of: (1) completing the work of separating operation of transmission and generating facilities; (2) ensuring that sellers with market-based rates cannot benefit from engaging in anticompetitive behavior; and (3) standardizing wholesale market rules. We believe these steps will ensure that wholesale rates for the sale of electric energy in interstate commerce remain just and reasonable under the changing conditions we confront in the electric utility industry.

A.    August 23 Order

On August 2, 2000, in response to significant increases in prices for energy and Ancillary Services in California, San Diego Gas & Electric Company (SDG&E) filed a complaint in Docket No. EL00-95-000. This complaint, filed against all sellers of energy and Ancillary Services into the ISO and PX markets subject to the Commission's jurisdiction, requested that the Commission impose a $250 price cap for sales into those markets. The Commission denied this request in an order issued August 23, 2000, on the grounds that SDG&E had not provided sufficient evidence to support an immediate seller's price cap.[7] However, in that order, the Commission instituted formal hearing procedures under section 206 of the Federal Power Act (FPA) to investigate the justness and reasonableness of the rates of public utility sellers into the ISO and PX markets, and also to investigate whether the tariffs, contracts, institutional structures and bylaws of the ISO and PX were adversely affecting the wholesale power markets in California. The Commission established a refund effective date of 60 days after publication of notice in the Federal Register of the Commission's intent to institute a proceeding.[8]

In the order, the Commission also directed the ISO to immediately institute a more forward approach to procuring its resources. In response, the ISO filed on September 1, 2000 proposed Tariff Amendment No. 30 to provide it with the authority to forward contract.

---

[7]San Diego Gas & Electric Company, et al., 92 FERC ¶ 61,172 at 61,606 (2000) (August 23 Order).

[8]Id. at 61,608.

Docket No. EL00-95-001, et al.                  - 9 -

Southern California Edison Company (SoCal Edison) and Pacific Gas and Electric Company (PG&E) sought rehearing of the August 23 Order arguing that the Commission should have established an earlier refund effective date, October 2, 2000, which was 60 days following SDG&E's complaint filing. The utilities also sought immediate action by the Commission on the complaint, and argued for refunds prior to the refund effective date. Dynegy Power Marketing, Inc., El Segundo Power, LLC, Long Beach Generation LLC, Cabrillo Power I LLC, and Cabrillo Power II LLC (Dynegy) and Duke Energy North America LLC, Duke Energy Trading and Marketing, LLC, and Duke Energy Merchants, LLC (Duke) filed answers to the rehearing requests.

B.    November 1 Order

The Commission issued an order on November 1, 2000 proposing measures to remedy problems identified in the ISO and PX markets.[9] In the November 1 Order, the Commission proposed remedies intended to reduce over-reliance on spot markets in California, and attempted "to balance, on the one hand, holding overall rates to levels that approximate competitive market levels for the benefit of consumers, with, on the other hand, inducing sufficient investment in capacity to ensure adequate service for the benefit of consumers."[10] The order proposed, effective 60 days after the date of the order, to: (1) eliminate the requirement that the investor-owned utilities (IOUs) must buy and sell power through the PX, (2) require market participants to schedule 95 percent of their transactions in the Day-Ahead markets or be subjected to a penalty charge; (3) replace the existing PX and ISO stakeholder boards with independent non-stakeholder boards; and (4) require the filing of generator interconnection procedures.

The order also identified longer-term structural reforms of ISO and PX markets that must be addressed, and urged state officials to take certain actions within their exclusive jurisdiction. Also, to ensure reasonable prices while various market reforms were being put in place, the order proposed additional temporary measures to mitigate prices, including modification of the single price auction so that bids above $150/MWh could not set the market clearing price that is paid to all bidders and imposition of certain reporting and monitoring requirements for transactions and bids above the $150/MWh breakpoint, as well as the retention of a refund obligation for sales into the ISO and PX markets for the period October 2, 2000 through December 31, 2002. The Commission explained that a paper hearing would be adequate to resolve the matters before it, established a period for the submission of comments and supporting evidence, and

---

[9]San Diego Gas & Electric Company, et al., 93 FERC ¶ 61,121 (2000) (November 1 Order).

[10]Id.

Docket No. EL00-95-001, et al.                - 10 -

announced its intent to issue a final order adopting and directing remedies for California's markets before the end of the calendar year.

The November 1 Order granted rehearing in part of the August 23 order by changing the refund effective date from 60 days after publication of notice in the Federal Register (October 29, 2000) to 60 days after the date of SDG&E's complaint (October 2, 2000). Finally, the Commission rejected proposed tariff amendments filed by the PX and the ISO in Docket Nos. ER00-3461-000 and ER00-3673-000, respectively, requesting or extending price caps for their markets.

Numerous parties sought rehearing of the November 1 Order, primarily objecting to certain proposed remedies or the proposed timing of their implementation, or the lack of other measures that were not included in the order. Parties also raised arguments about procedural aspects of the November 1 Order, including that the Commission should exercise its discretion to order refunds for periods prior to October 2, 2000, and requested various clarifications. The California Commission and the Oversight Board objected to the rejection of the ISO and PX price cap proposals.

C.    Amendment No. 33 Order (December 8, 2000)

Beginning in mid-November, the ISO experienced numerous occasions of insufficient reserve margins and emergency conditions forcing it to serve increasingly large portions of its total Control Area load through its real-time Imbalance Energy market. On December 8, 2000, the Commission accepted for filing Amendment No. 33 to the ISO Tariff, which the ISO had submitted earlier that same day in Docket No. ER01-607-000.[11] Amendment No. 33 made three changes to the ISO Tariff. First, the existing $250/MWh purchase price cap on bids in the ISO's real-time Imbalance Energy Market was converted into a $250/MWh breakpoint, similar to the one described in the November 1 Order. Second, generators who failed to comply with an ISO emergency dispatch order became subject to a penalty. Third, a Scheduling Coordinator with unscheduled demand or undelivered generation became liable for the cost the ISO incurred to obtain electricity through bids above the $250/MWh breakpoint or through out-of-market dispatches.

After issuance of the Amendment No. 33 Order, numerous entities filed motions to intervene along with various requests for clarification, modification, or rehearing; entities seeking intervention are listed in Appendix B. Several parties complain that the

---

[11]California Independent System Operator Corporation, 93 FERC ¶ 61,239 (2000) (Amendment No. 33 Order).

Docket No. EL00-95-001, et al.                - 11 -

Commission violated due process by not affording the public any notice or opportunity to comment on Amendment No. 33. With regard to the $250/MWh breakpoint, the California Commission, PG&E, and SDG&E state that the Commission should not have allowed the ISO to remove the purchase cap. PG&E argues that the $250/MWh breakpoint was too high; Dynegy argues that it was too low. Several parties state that the $250/MWh breakpoint in the ISO market had unintended consequences in the PX markets. Dynegy states that it is unfair to impose penalties on generators who fail to respond to ISO emergency dispatch orders and offers several arguments to support that statement. With regard to the assessment of costs for unscheduled load and undelivered generation, PG&E claims that assessing costs for underscheduled demand will give sellers unfair leverage. Dynegy argues that the ISO has failed to offer adequate justification for assessing costs for undelivered generation.

D.    Qualifying Facilities (QF) Order (December 8, 2000)

        Also on December 8, 2000, the Commission issued an order waiving certain efficiency and fuel use regulations pertaining to QFs, effective for the period December 8 through December 31, 2000.[12] The waiver allowed certain QFs to sell their excess production to load located in California through negotiated bilateral contracts to supplement the inadequate generation resources in California.

        SoCal Edison filed a request for immediate modification of the order, claiming that permitting sales of excess production interfered with existing contractual relationships, created uncertainty between the parties, and was unworkable given the short time period for the waiver (less than a month). SoCal Edison requests that the Commission limit its order to waiving efficiency and fuel use standards, and that the Commission allow the parties to determine how the waiver would impact their contractual rights and obligations, including whether a contract amendment should be negotiated.

E.    December 15 Order

        The Commission adopted many of the proposed remedies presented in the November 1 Order in an order issued December 15, 2000.[13] The December 15 Order focused on the need to reduce reliance on spot markets while balancing the need for

---

[12]San Diego Gas & Electric Co., et al., 93 FERC ¶ 61,238 (2000) (December QF Order).

[13]San Diego Gas & Electric Co., et al., 93 FERC ¶ 61,294 (2000), reh'g pending on some issues (December 15 Order).

Docket No. EL00-95-001, et al.                     - 12 -

incentives for sellers to sell into California and for investment in generation and transmission facilities, with the overall goal of alleviating the extreme high prices being borne by Californians. The specific remedial measures adopted included: (1) eliminating the requirement that the IOUs sell all of their generation into and buy all their energy needs from the PX so as to terminate the over reliance on spot markets (which in turn required termination of the PX's wholesale rate schedules, as of the close of the April 30, 2001 trading day); (2) adopting an advisory benchmark for assessing prices of long-term electric supply contracts in order to provide guidance for market participants to evaluate the reasonableness of long-term prices; (3) requiring market participants to preschedule 95 percent of their load prior to real time and penalizing those who do not, so as to eliminate market participants' chronic underscheduling with the ISO; (4) establishing an interim modification of the single price auction as proposed in the November 1 Order and reporting requirements for transactions and/or bids over $150/MWh; and (5) requiring the ISO stakeholder governing board to resign and be replaced by a board independent of market participants. The order provided that, unless the Commission issued written notification to a seller that a transaction above the $150 breakpoint was still under review, refund potential on that transaction would close after 60 days.

Other actions taken in the order included: (1) extending the waiver of certain QF regulations granted in the December QF Order through April 30, 2001; (2) accepting for filing the ISO's tariff Amendment No. 30 (Docket Nos. EL00-95-002 and EL00-98-002); (3) rejecting the complaints filed in Docket Nos. EL00-97-000, EL00-104-000, EL01-1-000, EL01-2-000, and EL01-10-000; and (4) requiring the ISO, PX and IOUs to submit compliance filings.

SoCal Edison and PG&E filed emergency requests for rehearing on December 18 and 20, 2000, respectively. The companies detailed their weakening financial situations. According to SoCal Edison, between May and November 2000, it paid a total of $5.69 billion for wholesale electricity but collected billions less from its customers. Unless the California Commission ended its retail rate freeze, allowing recovery of wholesale costs in retail rates, and this Commission ordered a return to cost-based rates, SoCal Edison explained, it would not be able to meet its January financial obligations. The companies also warned that without immediate relief on their rehearing requests, they would seek action in federal courts.[14]

---

[14]SoCal Edison later filed a petition for writ of mandamus. The D.C. Circuit denied the petition. In re: Southern California Edison Co., No. 00-1543 (D.C. Circuit filed January 5, 2001).

Docket No. EL00-95-001, et al.                    - 13 -

The PX filed a request for rehearing and emergency motion for stay of the December 15 Order on December 26, 2000. The PX requested that the Commission stay three aspects of the order: (1) the prohibition against the IOUs selling into the PX's spot markets and forward markets, allowing instead voluntary participation; (2) the termination of its block forward markets rate schedule; and (3) implementation of the $150/MWh breakpoint, which the PX stated was impossible to accomplish by January 1, 2001. The PX also sought rehearing of these aspects of the order, and in addition challenged the termination of its tariff governing its core markets. The PX cited the chilling effect of the December 15 Order on forward contracts calling for delivery after April 30, 2001, and stated that the order threatened to destroy it.[15]

Many other parties subsequently filed rehearing requests. Generally, generators and marketers argue that the Commission erred in finding rates were not just and reasonable during certain periods, that the Commission should eliminate or modify the $150/MWH breakpoint, and that the Commission erred in determining that opportunity costs could not be used to justify bids over the breakpoint. Others (e.g., municipals, IOUs, state government entities) ask for reconsideration of cost-based regulation and favor regional price mitigation, offering various proposals on how to implement both of these goals, and urge prompt determination of past overcharges and provision of refunds. Rehearing is sought in each of the related complaint dockets that were rejected, and regarding ISO Tariff Amendment Nos. 30 and 33.

F.    Proceedings Concerning the Underscheduling Penalty

In the December 15 Order, the Commission adopted a penalty for any utility that underscheduled its load. This penalty was necessary since utilities' underscheduling of load jeopardized reliable system operations by forcing the ISO to satisfy far more load in real time than the market was intended to supply (i.e., approximately five percent). Therefore, the December 15 Order required all market participants to preschedule their load and imposed penalties when real-time load exceeded more than five percent of an entity's scheduled load.

Following the downgrade of SoCal Edison's and PG&E's credit and debt ratings in January 2001 and the PX's notification to the Commission that it had suspended the operation of its core markets, SoCal Edison and PG&E filed a request in Docket No. EL01-34-000 for immediate suspension of the underscheduling penalty. These utilities

---

[15]The PX later filed a petition for writ of mandamus, which the Ninth Circuit denied. In re: California Power Exchange Corp., No. 01-70031 (9th Cir. filed April 11, 2001).

Docket No. EL00-95-001, et al.                - 14 -

argued that the PX's suspension of the operation of certain markets and their credit and supply problems made it impossible for them to expand their forward purchases. SoCal Edison and PG&E maintained that, given these circumstances, the underscheduling penalty would not provide an incentive to their procurement strategy and instead amounts to an additional tax on their already expensive energy purchases. The Commission explained, however, that it needed further information on the market situation prior to considering whether to grant the utilities' request. Accordingly, on April 6, 2001, the Commission deferred action on the utilities' request to suspend the underscheduling penalty, pending the receipt of market information from the ISO.[16] The ISO filed the requested data on April 23, 2001.

Subsequently, the ISO filed Tariff Amendment No. 38 in Docket No. ER01-1579-000, proposing, in pertinent part, tariff amendments that would suspend the underscheduling penalty effective from January 1, 2001 through May 31, 2001. The Commission rejected the ISO's proposal due to its ongoing consideration of the issue in Docket No. EL01-34-000.[17] The Oversight Board and SoCal Edison filed requests for rehearing arguing that the Commission erred in rejecting the ISO's filing, which, they contend, was shown to be just and reasonable. In addition, SoCal Edison asserts that the Commission must make a finding on the merits of the filing, and moved to consolidate the docket with Docket No. EL01-34-000.

G.    Subsequent Proceedings Arising from December 15 Order

As required by the December 15 Order, staff convened a technical conference on January 23, 2001 to explore options for a prospective mitigation and monitoring plan to be in place in May 2001. Staff issued its recommended plan on March 9, 2001, and sought comments from market participants.

H.    March 9 Refund Order

Also on March 9, the Commission issued an order addressing above-breakpoint transactions that occurred in January, directing refunds from sellers for certain transactions, or alternatively, requiring sellers to submit additional cost or other

---

[16]Southern California Edison Co. and Pacific Gas and Electric Co., 95 FERC ¶ 61,025 (2001).

[17]California Independent System Operator Corp., 95 FERC ¶ 61,199 (2001).

Docket No. EL00-95-001, et al.                    - 15 -

justification for those transactions.[18]    Numerous parties requested rehearing and/or clarification of the March 9 Order.  These parties fell into three main categories: sellers of energy, California state entities, and the California IOUs.  The principal issues the parties raise are the propriety of the Commission's adoption of a proxy price screen in place of either market-based or cost-based rates, the Commission's choice of factors in calculating the proxy price screen, the Commission's adoption of an as-bid option with refund liability, and the Commission's method in applying the refund liability.  On May 24, 2001, PG&E and SoCal Edison filed a supplemental request for rehearing and motion to lodge the April 26 Order in the record for the March 9 proceeding.

I.      Prospective Price Mitigation Orders (April 26 and June 19, 2001)

        On April 26, 2001, the Commission issued a prospective mitigation and monitoring plan for wholesale sales through the organized real-time markets operated by the ISO,[19] and established an inquiry in Docket No. EL01-68-000 into whether a price mitigation plan should be implemented throughout the Western Systems Coordinating Council (WSCC).  Elements of the plan included:

*       Enhancing the ISO's ability to coordinate and control planned outages during all hours.

*       Requiring sellers with Participating Generator Agreements (PGAs), as well as governmental entity generators located in California that voluntarily make sales through the ISO's markets or use the ISO's interstate transmission grid (with the exception of hydroelectric power), to offer all their available power in real time during all hours.

*       Establishing conditions, including refund liability, on public utility sellers' market-based rate authority to prevent anticompetitive bidding behavior in the real-time market during all hours.

---

[18]San Diego Gas & Electric Co., et al., 94 FERC ¶ 61,245 (2001) (March 9 Refund Order).  The Director of the Office of Markets, Tariffs and Rates issued notices specifying similar transactions for the months of February, March, and April 2001 on March 16, April 16, and May 14, respectively.

[19]The April 26 Order also required the ISO to submit a compliance filing.  The submission, filed on May 11, 2001 in Docket No. EL00-95-034, et al., is addressed in a separate order to be issued concurrently with this order.

Docket No. EL00-95-001, et al.                    - 16 -

- Establishing a mechanism for price mitigation for all sellers (excluding out-of-state generators) bidding into the ISO's real-time market during a reserve deficiency, i.e., when reserves fall below 7 percent. Under this mechanism, the Commission established a formula (based on gas-fired generation) that the ISO can use to establish the market clearing price when mitigation applies (mitigated reserve deficiency MCP).[20]  Higher bids were permitted if they could be justified.

The Commission acted on requests for rehearing and clarification of the April 26 Order on June 19, 2001, modifying and expanding the mitigation plan in significant aspects.  In the same order, the Commission instituted an investigation pursuant to section 206 of the FPA into public utility rates for spot markets sales in the WSCC.[21] Key elements of the mitigation plan, to be in effect from June 21, 2001 through September 30, 2002, include:

- Retaining the use of a single market clearing price with must-offer and marginal cost bidding requirements for sales in the ISO's spot markets in reserve deficiency hours (i.e.,when reserves fall below 7 percent).

- Applying that clearing price as a maximum price for sales outside the ISO's single price auctions (bilateral sales in California and the rest of the WSCC), with sellers outside the single price auction receiving the prices they negotiate up to this maximum price.

- Using eighty-five percent of the highest ISO hourly mitigated reserve deficiency MCP established during the hours of the last Stage 1 alert for the mitigated non-reserve deficiency Market Clearing Price (mitigated non-reserve deficiency MCP) for subsequent non-reserve deficiency hours.

- Instructing bidders to invoice the ISO directly for the cost to comply with emissions requirements and for start-up fuel costs, which are too varied to be standardized in a single market clearing price.

_____

[20]The mitigated reserve deficiency MCP is the marginal cost of the last unit dispatched to serve the last increment of load during a period of reserve deficiency.  The marginal cost of each unit calculated by the ISO based on Commission prescribed inputs is referred to as the "Proxy Price."

[21]San Diego Gas & Electric Co., et al., 95 FERC ¶ 61,418 (2001), reh'g pending on some issues (June 19 Order).

Docket No. EL00-95-001, et al.                 - 17 -

- Allowing sellers other than marketers the opportunity to justify bids or prices above the maximum prices.

- Requiring all utilities who own or control generation in California to offer power in the ISO's spot markets, and requiring all utilities in the remainder of the WSCC to offer in the spot market of their choosing any non-hydroelectric resource to the extent its output is not already committed ("must-offer requirement").

Finally, the Commission announced that it would establish a settlement conference before an Administrative Law Judge in order to resolve refund issues for sales through the ISO and PX spot markets for past periods, among other things.[22]

Among other issues, parties sought rehearing and/or clarification of the California must-offer and price mitigation revisions, the extension of price mitigation to all hours, the bid justification provisions, the revised emissions cost collection procedures, the creditworthiness adder, and the scope, price mitigation and must-offer provisions under the West-wide investigation.

The Commission's Chief Judge convened a settlement conference as directed in the June 19 Order, and issued a report and recommendation regarding a refund methodology on July 12, 2001.[23]

J.    July 25 Refund Order

On July 25, 2001, the Commission issued an order establishing the scope of and methodology for calculating refunds related to transactions in the spot markets operated by the ISO and the PX. The Commission found that transactions subject to refund are limited to the period October 2, 2000 through June 20, 2001, but include sales by all sellers into the spot markets operated by the ISO and the PX. The Commission further found that the refund requirements apply to ISO OOM purchases, but not to spot purchases by DWR or ISO purchases made pursuant to DOE orders.

The refund methodology adopted most of the criteria of the June 19 price mitigation plan, modified as to be appropriate for a past, rather than a future, period.

_____

[22]In addition, the order required the ISO to submit a compliance filing. The submission, filed on July 10, 2001 in Docket No. EL00-95-040, et al., is addressed in a separate order to be issued concurrently with this order.

[23]San Diego Gas & Electric Co., et al., 96 FERC ¶ 63,007 (2001) (Chief Judge's Report).

Docket No. EL00-95-001, et al.                – 18 –

Under the methodology, refunds would be determined by the difference between prices charged and a competitive market base-line calculated for each hour of the refund period. Hourly mitigated prices would be developed using the marginal costs of the last unit dispatched to meet load in the ISO's real-time market using:

- Northern and Southern California zone specific spot gas prices, based on a composite of published market prices;
- a $6.00 per MWh adder for non-fuel O&M costs;
- a 10 percent creditworthiness adder for transactions after January 5, 2001;
- interest to be assessed on both refunds and receivables past due.

In addition, suppliers may net demonstrable emissions costs from their refund liability.

The order also established an evidentiary hearing proceeding in order to further develop the factual record so that refunds could be calculated. In addition, the order granted rehearing in part and denied rehearing in part of limited portions of earlier orders.

Finally, the order established a preliminary evidentiary proceeding to explore whether there may have been unjust and unreasonable charges for spot market sales in the Pacific Northwest and to determine the calculation of any refunds associated with such charges. An administrative law judge presided over the proceeding and issued recommendations and proposed findings of fact on September 24, 2001.

Parties seek rehearing of each aspect of the scope and calculation of refunds. They also challenge the adequacy and appropriateness of the evidentiary hearing proceeding and the preliminary evidentiary hearing in the Puget Sound proceeding in Docket No. EL01-10-000. On September 20, 2001, PG&E filed a motion to submit newly obtained evidence in support of its rehearing request. California Generators filed an answer in opposition to the motion on October 5, 2001, and PG&E subsequently responded.

K.    July 25 Order Granting Emergency Motion for Clarification

On July 25, 2001, the Commission granted Mirant's emergency motion for clarification of the April 26 and June 19 Orders. The Commission found that Mirant presented an adequate showing under those Orders to excuse Mirant from the requirement that it offer all of its available capacity from certain of its units located at the Potrero Power Plant, because doing so would violate environmental operating limitations set forth in Mirant's permit. The Commission also provided guidance to other suppliers

Docket No. EL00-95-001, et al.                    - 19 -

that may be concerned about penalties or damages resulting from citizen suits if they exceed operating limitations in order to comply with the must-offer requirement.

NCPA sought rehearing of the July 25 Clarification Order, claiming that the Commission's guidance does not provide viable alternatives.

Discussion

A.    Procedural Matters

A number of entities filed late motions to intervene in this proceeding. The Commission ordinarily does not permit late interventions after an order has been issued, particularly for the purpose of requesting rehearing.[24] However, over the course of the SDG&E proceeding, the Commission has expanded the scope of its focus from just California to include the entire Western interconnect and also to implicate wholesale spot market transactions of governmental entities and cooperatives and bilateral spot market transactions. We find good cause, therefore, to grant the untimely, unopposed motions to intervene in Docket No. EL00-95-000 filed by Nevada Independent Energy Cooperative and Cogeneration Coalition of Washington (jointly) (Nevada IEC/CC Washington) and Tri-State Generation and Transmission Association that were both filed on May 17, 2001, and the untimely, unopposed motions to intervene of Public Utility District No. 1 of Chelan County, Washington (Chelan County), RAMCO, Deseret Generation and Transmission Cooperative (Deseret), Truckee Donner Public Utility District (Truckee Donner), Utah Associated Municipal Power System (Utah AMPS), Public Utility Commission of Oregon and Oregon Office of Energy (jointly), and Sunrise Power Company LLC and Harbor Cogeneration Company (jointly) (Sunrise and Harbor), which were filed on July 19 or July 20, 2001.[25]

These intervenors must accept the record as it had developed as of the date of their intervention, and their participation in this proceeding is limited to the issues that arose after the date each requested to participate in these proceedings. Thus, the requests for rehearing of the June 19 Order filed by Chelan County, Deseret, RAMCO, Sunrise and

---

[24] See, e.g., Southern Company Services, Inc., 92 FERC ¶ 61,167 (2000); Consolidated Edison, Inc. and Northeast Utilities, 92 FERC ¶ 61,014 (2000), order denying reh'g, 94 FERC ¶ 61,079 (2001).

[25] Arizona Electric Power Cooperative, Inc. (AEPCO) filed a motion to intervene out-of-time on August 24, 2001. AEPCO is already a party in this proceeding by virtue of its intervention request granted by Chief Judge Wagner; therefore, we need not address its subsequent motion to intervene.

Docket No. EL00-95-001, et al.                    - 20 -

Harbor, Truckee Donner, and Utah AMPS will be dismissed because they were not parties as of the date that order was issued. The July 25 Order granted the intervention of Attorney General of California as of July 17, 2001 (the date it requested intervention). Therefore its request for rehearing of the June 19 Order will likewise be dismissed, as it was not a party on June 19, 2001. Similarly, APPA's request for rehearing of the March 9 Refund Order will be dismissed because it had not requested intervention prior to the date that order was issued.

On November 23, 2001, the Institute for Legal Reform of the Chamber of Commerce of the United States (Institute) moved to intervene for the limited purpose of filing a brief concerning developments in California state court proceedings involving allegations of state antitrust violations that could purportedly affect the implementation of the Commission's market mitigation plan. The Institute states that the issues can be resolved on the existing record, that there will be no prejudice to or burden on other parties, and that its proposed relief will not require any delay in the proceeding. The People of the State of California, ex rel. Bill Lockyer (Attorney General of California) and the City of Tacoma, Washington and the Port of Seattle, Washington oppose the Institute's intervention on the grounds that its intervention will disrupt the proceeding and that the interests the Institute represents are already adequately represented. We find, contrary to the Attorney General's assertions, that the Institute's late intervention for the purpose of filing its brief will not prejudice or place additional burdens upon the existing parties, that it will not disrupt the proceeding, and that the Institute's interest is not adequately represented by other parties in the proceeding. Therefore, we will grant the Institute's untimely motion to intervene. We find, however, that the Institute's arguments need not be resolved here; we will address this pleading in a future order.

Section 313(a) of the FPA requires an aggrieved party to file a request for rehearing within thirty days after the issuance of the Commission's order, in the case of the June 19 Order, by July 19, 2001. Because the 30-day deadline for requesting rehearing is statutorily based, it cannot be extended, and the requests for rehearing of Truckee Donner, and Utah AMPS filed on July 20, 2001 (dismissed above because they lacked party status) are also dismissed as untimely.[26] Further, requests for rehearing of the July 25 Order were required to be filed by August 24, 2001, and, therefore,

---

[26]We will, however, grant these parties' late motions to intervene, as of the dates their motions were filed, because of lack of procedural clarity about the deadline for interventions. Further, we will treat comments submitted without a formal motion to intervene as intervention requests, because of the potentially confusing procedural stance of Docket No. EL01-68-000. Thus, Avista Utilities is a party in this proceeding as of the date its comments were filed, May 7, 2001.

Docket No. EL00-95-001, et al.                    - 21 -

TransAlta's request for rehearing filed on August 27, 2001 (dismissed above because it lacked party status) is also dismissed as untimely.

Portland General and the City of Seattle seek clarification of their party status in Docket No. EL01-68-000. Both had timely intervened in Docket No. EL00-95-000, et al., but had not intervened separately in Docket No. EL01-68-000. We will clarify that these two entities, and any others who intervened in Docket No. EL00-95-000, et al., are entitled to full party status in Docket No. EL01-68-000, regardless of whether they filed a motion to intervene. Likewise, for the same reasons, any entities who have intervened in Docket No. EL01-68-000 are entitled to full party status in Docket No. EL00-95-000, et al., as of the date of their intervention requests in Docket No. EL01-68-000.[27]

Cities/M-S-R seek to correct the Appendices to the June 19 Order, which listed "M-S-R Public Power Agency, et al." as the entity seeking rehearing of the April 26 Order, to reflect that the Cities of Santa Clara and Redding, California also sought rehearing, and to reflect correctly which entities had filed comments and intervened in Docket No. EL01-68-000. We acknowledge that Santa Clara and Redding requested rehearing of the April 26 Order jointly with M-S-R. The relief provided above permitting all intervenors in Docket No. EL00-95-000, et al., to have party status in Docket No. EL01-68-000 should resolve Cities/M-S-R's other concerns.

On May 24, 2001, SoCal Edison and PG&E filed a supplement to their request for rehearing of the March 9 Order, or alternatively a motion to lodge the April 26 Order in that rehearing proceeding. We will reject these companies' request to supplement their requests for rehearing as we have no authority to accept materials in support of rehearing if such materials are filed after the 30-day statutory deadline for submitting materials in support of rehearing.[28] Further, the Commission is already fully considering the April 26 Order and its effect on prior orders. Accordingly, we deny the alternative motion.

On September 30, 2001, PG&E filed a motion to submit newly obtained evidence in support of its request for rehearing of the July 25 Order. We will reject this request to supplement PG&E's request for rehearing because we have no authority to accept materials in support of rehearing if such materials are filed after the 30-day statutory

---

[27]Thus, Chelan County has intervenor status in Docket No. EL00-95-000 by virtue of its motion to intervene in Docket No. EL01-68-000 filed on July 19, 2001, and its request for rehearing of the July 25 Order will therefore be accepted.

[28]See, e.g., Southern Company Services, Inc., 57 FERC ¶ 61,093 at 61,344 and n.79 (1991); and Public Service Company of New Hampshire, 65 FERC ¶ 61,105 at 61,403 and n.16 (1991).

Docket No. EL00-95-001, et al.               - 22 -

deadline for submitting materials in support of rehearing.[29]  We will also reject California Generators' filing in opposition to the motion, and PG&E's response.

Pursuant to Rule 713 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.713, answers to requests for rehearing normally are prohibited. Accordingly, we will reject Dynegy's and Duke's answers to the rehearing requests of the August 23 Order, the ISO's answer to rehearing requests of the July 25 Order, and Powerex's answer to the Oversight Board's request for rehearing of the July 25 Order.

In view of the early stage of the proceeding in Docket No. EL01-34-000 and the absence of any undue prejudice or delay, we will grant the motion to intervene out-of-time of Dynegy Power Marketing, Inc., El Segundo Power LLC, Long Beach Generation, LLC, Cabrillo Power I LLC and Cabrillo Power II LLC (collectively, Dynegy).  As the Commission is considering both Docket No. ER01-1579-000 and Docket No. EL01-34-000 in this order, and the proceedings are not being set for hearing, there is no need to consolidate the dockets; thus, we will deny Dynegy's motion to consolidate.  Similarly, we will deny Dynegy's motion to lodge its motion to intervene and protest that was filed in Docket No. ER01-1579-000 in the record for Docket No. EL01-34-000.

While, for organizational purposes, we may address the issues raised on rehearing of different orders in separate sections of this order, our discussions and holding in any section regarding a specific issue also raised on rehearing of another order or orders apply to all rehearings on that specific issue.

B.    Rehearing of Issues Surrounding Level and Scope of Mitigated Prices

1.    Scope of Transactions Subject to Mitigation and Refund

a.    Applicability to Sales by Governmental Entities

Requests for Rehearing

---

[29]See id. and CMS Midland, Inc., 56 FERC ¶ 61,177 at 61,623 (1991) (rejecting pleadings even when filed in support of timely-filed requests for rehearing).

Docket No. EL00-95-001, et al.            - 23 -

Several governmental entities[30] contend that the Commission erred in ordering them to make refunds regarding their sales in the FERC-regulated ISO and PX markets. They argue that: the Commission's rate and refund authority under FPA sections 205 and 206 applies only to "public utilities;" that FPA section 201(f) expressly exempts governmental entities from FERC jurisdiction unless the statute specifically provides otherwise; the Commission does not have subject matter jurisdiction over governmental entities' sales into the FERC-regulated PX and ISO markets because section 201(f) overrides the more general statutory provision in section 201(b); the refund holding here nullifies FPA section 201(f); and FPA subject matter jurisdiction is determined solely by whether the seller is subject to jurisdiction under the FPA.

Governmental entities further assert that: the Commission cannot indirectly exercise jurisdiction over governmental entities because it cannot directly do so; the public interest cannot override FPA jurisdictional limitations; the finding that the underlying goals of the FPA are promoted by placing all sellers in these markets on the same footing for refund purposes is inapposite and unconvincing; if the Commission has jurisdiction here, governmental entities would have been subject to full jurisdiction under the FPA merely by using public utilities' transmission systems to make sales for resale; governmental entities will be forced to choose between subjecting themselves to FERC regulation or not selling into certain markets, rendering FPA 201(f) superfluous; any regulatory gap that exists regarding governmental entities was intentional on Congress' part; and no regulatory gap exists because the rates for power sold by governmental entities are regulated by local authorities.

Moreover, governmental entities argue that: ordering governmental entities to make refunds is contrary to Commission and court precedent; the Commission changed its policy regarding governmental entities without providing a reasonable basis for doing so; they did not and could not waive the Commission's lack of subject matter jurisdiction when they made sales in the FERC-regulated ISO and PX markets; basing the Commission's jurisdictional finding on the ISO and PX tariffs and certain agreements executed by governmental entities violated the filed rate doctrine because those documents do not expressly require governmental entities to make refunds; they had no

---

[30]See, e.g., Requests for Rehearing of Bonneville Power Administration (Bonneville) at 2-18, DSI Companies (adopting Bonneville's arguments), NCPA at 9-17, APPA at 2-9, Turlock at 5-20, Burbank (virtually identical to Turlock), Imperial (virtually identical to Turlock), LADWP at 5-7, 10-12, Southern Cities at 3-12, Pasadena at 3-7, PUD No. 2 (virtually identical to Southern Cities), Metropolitan at 4-13, Cities/M-S-R at 6-10, Modesto (adopting the arguments raised by Cities/M-S-R), CMUA at 3-15 and AEPCO at 3, 7-14.

Docket No. EL00-95-001, et al.                - 24 -

notice that their power sales in the FERC-regulated ISO and PX markets were subject to refund; and the Commission cannot create jurisdiction by placing parties on notice that it intends to exercise jurisdiction or by approving a particular market structure.

Additionally, governmental entities assert that: most governmental entities did not execute the pro-forma scheduling coordination agreements; the Commission failed to provide adequate notice that sales of electricity by governmental entities in the ISO or PX would be subject to refund, violating due process (i.e., the right to notice and a meaningful opportunity to be heard); the refund holding regarding governmental entities is inconsistent with the holding regarding refunds for the period prior to October 2, 2000; even if the Commission could condition governmental entities' sales into these FERC-regulated markets on their agreement to assume refund liability, no such condition was imposed; and the equities do not support refunds on sales by certain governmental entities.

Salt River agrees with the refund result of the July 25 Order, but disagrees with the order's rationale for the same reasons given by the governmental entities that oppose the refund order.  Salt River suggests that the Commission should focus more narrowly on the specific terms and conditions of the FERC-regulated PX and ISO Tariffs that governmental entities voluntarily and explicitly agreed to abide by, including provisions that authorize the recalculation and issuance of revised settlement statements.

Commission Response

                    i. Statutory Framework

It is undisputed that the Commission has personal jurisdiction over the PX and ISO, and that they operate pursuant to FERC-approved tariffs and wholesale rate schedules.[31]  Moreover, the PX and ISO are public utilities under FPA section 201(e).[32] The Commission's subject matter jurisdiction includes wholesale sales (defined as "sale[s] of electric energy to any person for resale"[33]) of electric energy in interstate

---

[31]FPA § 201(b).

[32]In re California Power Exchange Corporation, 245 F.3d 1110, 1114 (2001); Pacific Gas & Electric Co., 77 FERC ¶ 61,204 (1996), reh'g denied, 81 FERC ¶ 61,122 (1997).

[33]FPA § 201(d).

Docket No. EL00-95-001, et al.                – 25 –

commerce.[34]  As all of the electric energy sales into the FERC-regulated PX or ISO spot markets are wholesale sales of electricity in interstate commerce, they all fall within the Commission's subject matter jurisdiction.[35]

The exemption for governmental entities in FPA section 201(f)[36] does not require a different result regarding sales by governmental entities in the PX and ISO spot markets.  While that provision exempts governmental entities generally from Commission jurisdiction under Part II of the FPA, it does not do so under the specific circumstances here.  Here, governmental entities and others sold energy in a centralized, single clearing price auction market under which all sellers received the same price for a given sale, pursuant to market rules set by this Commission and administered by public utilities (the California PX and ISO) subject to this Commission's jurisdiction.  The involvement of the PX and ISO, whose roles are central in these California spot markets, along with the nature of the interstate wholesale sales, give us subject matter jurisdiction entirely independent of the jurisdictional nature of the entities selling into the markets at issue.[37]  Thus, FPA section 201(f) does not change the analysis or the result in determining whether we have subject matter jurisdiction over the sales at issue.[38]

Moreover, governmental entities that made sales in the PX and ISO spot markets waived any exemption they otherwise may have had from the Commission's personal jurisdiction regarding those sales.[39]  Because the markets did not exist prior to FERC authorization and operate according to FERC rules, all those who participated in them reasonably had to recognize the controlling weight of FERC authority.  The PX and ISO operated under FERC-approved tariffs, which set forth all rates, charges, classifications,

_____

[34]July 25 Order, 96 FERC at 61,511 (citing FPA § 201(b)).

[35]FPA § 201(b).

[36]FPA § 201(f) provides that "[n]o provision in this Part [of the FPA] shall apply to, or be deemed to include, the United States, a State or any political subdivision of a state, or any agency, authority or instrumentality of any one or more of the foregoing . . . unless such provision makes specific reference thereto."

[37]United Distribution Companies v. FERC, 88 F.3d 1105 (D.C. Cir. 1996) (UDC).

[38]As the Commission can directly regulate the sales at issue regardless of who made the sales, this is not a case of the Commission indirectly exercising jurisdiction over governmental entities when it cannot do so directly.

[39]See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473 n.14 (1985).

Docket No. EL00-95-001, et al.                    - 26 -

practices, rules, regulations or contracts for or in connection with all sales made in their markets.[40] The tariffs established spot market auction mechanisms that made clear that all sellers, including governmental entities, would receive the same FERC-regulated market clearing price for any given sale. That price, under the FPA, could not exceed the just and reasonable rate. All sellers were on notice that those clearing prices, and the market rules that set the clearing prices, were subject to change and refund if they were found to be unjust and unreasonable.

    We made clear in our order authorizing establishment of the PX and the ISO that, "[o]nce filed, the rate schedules and related contracts, rules and protocols will be subject to the exclusive jurisdiction of the Commission under sections 205 and 206 of the FPA, 16 U.S.C. sections 824d, 824e (1994)."[41] Thus, all sellers in the PX and ISO markets, including governmental entities, were on notice that if they participated in those markets, they would do so subject to the terms of the ISO and PX tariffs and concomitant FERC jurisdiction. Our order authorizing the PX and ISO to operate provided further notice that the same rules and obligations applied to all sellers and sales made in the PX and ISO spot markets. For example, the order established that all PX and ISO rules, protocols, procedures and standards applied to all entities selling energy in the PX and ISO markets.[42] Furthermore, the December 15 Order discussed refunds as applying to "all sellers into the markets operated by the ISO and the PX."[43]

    Governmental entities or their agents entered into various arrangements that explicitly acknowledged the Commission's jurisdiction regarding their sales in the PX and the ISO. For example, many governmental entities[44] accepted a FERC-approved pro-forma Scheduling Coordinator Agreement that explicitly acknowledges their obligation "to comply with the terms and conditions of the ISO Tariff and ISO

---

[40]See FPA § 205(c); 18 C.F.R. §§ 35.1(a) and (e), 35.2(a) and (b) and n.1; Pacific Gas & Electric Co., 77 FERC ¶ 61,204 at 61,804 (1996).

[41] Pacific Gas & Electric Co., 77 FERC at 61,804.

[42]Pacific Gas & Electric Co., 81 FERC ¶ 61,122 at 61,580-87 (1997).

[43]December 15 Order, 93 FERC at 62,011. The Commission's deviation from this in the November 1 Order, by using the term "public utility sellers" in the title of the section discussing potential refund liability, does not negate that governmental entities had notice that their sales in the PX and ISO spot markets could be subject to refunds.

[44]These sellers included the Cities of Anaheim and Riverside and DWR.

Docket No. EL00-95-001, et al.                - 27 -

Protocols."[45]  Moreover, numerous governmental entities[46] executed the FERC-approved pro-forma PX Participation Agreement, which "establishes the basis and terms upon which entities shall receive service through the PX, in accordance with the PX Tariff and Protocols."[47]  In approving the pro-forma PX Participation Agreement, we found that it and "the services provided under the PX Tariff are jurisdictional" and needed to be filed with the Commission in accordance with FPA section 205(c).[48]

    We reiterate our finding that, by participating in the FERC-regulated centralized PX and ISO spot markets, all sellers, including governmental entities, agreed to accept the same clearing price for any given sale under the single price auction mechanism approved by FERC.  We further reiterate that all entities, including governmental, that sold in the PX and ISO spot markets were on notice that they were subject to,[49] and are in fact subject to, FERC jurisdiction regarding the rates to be received for those sales, including FERC rate and refund orders.  In the July 25 Order, we acted appropriately pursuant to our authority under FPA section 206 to fix the just and reasonable rate by revising the method for calculating the FERC-regulated PX and ISO spot market clearing prices as of October 2, 2000.  In doing so, we simply revised the market clearing prices that all market participants previously agreed to accept for their sales, and ordered refunds to effectuate that revision.  Thus, we deny rehearing of the claims that we erred in ordering governmental entities to make refunds regarding their sales in the FERC-regulated ISO and PX markets.

    Our refund order does not violate the filed rate doctrine.  As our refund authority derives from the FPA, the filed rate doctrine does not require that the ISO and PX tariffs

_____

[45]See Pacific Gas and Electric Co., 82 FERC ¶ 61,326 at 62,283 (1998).

[46]Those entities include the Arizona Electric Power Cooperative (AEPCO), Bonneville, DWR, the Cities of Anaheim and Riverside, LADWP, Modesto, and NCPA. See PX January 25, 2001 letter filing, Docket No. ER98-2095-000 (index of parties who executed the Participation Agreement as of December 31, 2000).

[47]California Power Exchange Corp., 83 FERC ¶ 61,186 at 61,770 (1998).

[48]Id. at 61,771.

[49]The March 9 Order at 7 incorrectly indicated that we have no authority to order governmental entities to make refunds here.  That statement has no bearing on governmental entities' general notice regarding their sales being subject to FERC jurisdiction under the FPA's just and reasonable standard, including the potential for refund liability.

Docket No. EL00-95-001, et al.                  - 28 -

or the agreements executed by governmental entities include an express refund provision. Moreover, because authority for the refund order derives from the Commission's FPA subject matter jurisdiction over the sales themselves, the Commission was not required to condition governmental entities' sales into the FERC-regulated PX and ISO spot markets on their agreement to assume refund liability. The only filed rates in this case consisted of the ISO and PX tariffs, both of which were subject to the SDG&E complaint and the Commission's section 206 investigation instituted on August 23, 2000, and thus subject to our refund authority.

We are not relying on the public interest to "override" FPA jurisdictional limitations and thus doing indirectly that which we cannot do directly. Rather, the subject matter of the sales here provides us with jurisdiction.[50] As a separate matter, by selling in the PX and ISO spot markets, the governmental entities waived any personal jurisdictional limitations.

ii. Precedent

Including governmental entities in our refund order is not contrary to Commission precedent. Our determination that all sellers, including governmental entities, in the PX and ISO spot markets are liable for refunds is limited to the specific circumstances before us in this case: sales made in FERC-jurisdictional (PX and ISO) spot markets in which all sellers received the same prices for sales of electric energy for resale in interstate commerce determined by FERC-jurisdictional entities under a single price auction format. None of the cases cited as contravening our holding here presented similar circumstances.

Rather, the cited cases involve much broader factual scenarios, and stand for the unexceptional proposition that FPA section 201(f) generally exempts governmental entities from our jurisdiction.[51] For example, in New West, a governmental entity sought

––––––––––––––

[50]The legislative history indicates that Congress never contemplated a market scenario such as the one here. See, e.g., To Provide for the Control in the Public Interest of Public Utility Holding Companies Using the Mails and the Facilities of Interstate Commerce, to Regulate the Transmission and Sale of Electric Energy and Natural Gas in Interstate and Foreign Commerce, and for Other Purposes, 1935: Hearings on H.R. 5423 Before the House of Representatives Committee on Interstate and Foreign Commerce, 74th Cong. 2160 (1935) (statement of Mr. DeVane, Solicitor of the Federal Power Commission).

[51]E.g., Prairieland Energy, Inc., 92 FERC ¶ 61,139 (2000); Mid-Continent Area
(continued...)

Docket No. EL00-95-001, et al.                    - 29 -

general Commission authorization under FPA section 205 to engage in wholesale electric sales at market-based rates as a power marketer. We rejected the request, finding that the governmental entity was exempt from Commission FPA section 205 rate regulation by virtue of FPA section 201(f). New West is inapposite to our holding here, as that order did not involve a centralized market or single price auction for the sale of electric energy in interstate commerce operated by a public utility subject to our exclusive rate jurisdiction, but rather addressed only the much broader issue of whether the Commission can assert jurisdiction over a governmental entity's interstate wholesale sales as a general matter, regardless of the circumstances under which those sales are made.[52]

Other Commission precedent cited by those seeking rehearing supports our refund holding here. For example, in Order No. 888,[53] we required governmental entities that receive open access transmission service from a public utility to offer comparable service in return. We explained that:

> While we do not have the authority to require non-public utilities to make their systems generally available, we do have the ability, and the obligation, to ensure that open access transmission is as widely available as possible and that this Rule does not result in a competitive disadvantage to public utilities. . . . [W]e will not permit [non-public utilities] open access to

———————————

[51](...continued)
Power Pool, 92 FERC ¶ 61,229 (2000); New West Energy Corp., 83 FERC ¶ 61,004 (1998); Sacramento Municipal Utility District v. Pacific Gas and Electric Co., 37 FERC ¶ 61,323 (1986).

[52]It also should be noted that we also did not analyze the jurisdictional issues in the cited cases in light of UDC. Similarly, the court precedent cited by those requesting rehearing neither involved the limited specific circumstances present here nor considered the jurisdictional matters at issue in light of UDC.

[53]Promoting Wholesale Competition Through Open Access Nondiscriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, Order No. 888, FERC Stats. & Regs. ¶ 31,036 at 31,760-62 and 31,857, 61 Fed. Reg. 21,540 (1996), clarified, 76 FERC ¶ 61,009 and 76 FERC ¶ 61,347 (1996), on reh'g, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, 62 Fed. Reg. 12,274, clarified, 79 FERC ¶ 61,182 (1997), on reh'g, Order No. 888-B, 81 FERC ¶ 61,248, 62 Fed. Reg. 64,688 (1997), on reh'g, Order No. 888-C, 82 FERC ¶ 61,046 (1998), aff'd sub nom. Transmission Access Policy Study Group v. FERC, 225 F.3d 667 (D.C. Cir. 2000), cert. denied in pertinent part, 69 U.S.L.W. 3574 (U.S. Feb. 26, 2001).

Docket No. EL00-95-001, et al.                    - 30 -

jurisdictional transmission without offering comparable service in return.[54]

In City of Vernon, California,[55] we held that "the Commission does have the authority to evaluate non-jurisdictional activities to the extent they affect the Commission's jurisdictional activities." In that case, we required modification of certain rates of a governmental entity that wanted to become a participating transmission owner in the FERC-jurisdictional California ISO. We reviewed the governmental entity's proposed rates "as a means of ensuring that the costs ultimately charged by the ISO are just and reasonable. The Federal Power Act requires us to ensure the justness and reasonableness of the ISO's rates, and we cannot reach this result if we absolve from our review the portion of the ISO's costs incurred with respect to "this governmental entity."[56] The same reasoning applies to the sales at issue here. As here, "the approach we took [in City of Vernon] properly balances our duty to ensure the justness and reasonableness of the ISO's rates with the fact that [the governmental entity] itself [may not be] jurisdictional for purposes of FPA Section 205 [or 206]."[57]

In short, we have been consistent in our approach regarding the activities of governmental entities as they affect matters subject to our jurisdiction, and have applied it to the specific limited factual scenario presented here.

Our refund holding regarding governmental entities is not inconsistent with our holding regarding refunds for the period prior to October 2, 2000. The subject matter of the sales, in the specific circumstances presented,[58] makes all sellers in the PX and ISO spot markets subject to refunds in accordance with FPA section 206. All sellers in those markets reasonably were on notice that their sales were subject to refund, and that, in accordance with FPA section 206, their refund liability would begin no "earlier than the date 60 days after the filing" of a complaint. Sellers were not reasonably on notice that

_____

[54]Order No. 888 at 31,761-62.

[55]93 FERC ¶ 61,103 at 61,285(2000), reh'g denied, 94 FERC ¶ 61,148 (2001).

[56]94 FERC at 61,564.

[57]Id.

[58]Sales made in FERC-jurisdictional (PX and ISO) spot markets in which all sellers received the same prices for sales of electric energy for resale in interstate commerce determined by FERC-jurisdictional entities under a single price auction format.

Docket No. EL00-95-001, et al.                - 31 -

their refund liability would begin prior to October 2, 2000, the date we previously determined would be the refund effective date.[59]

Our interpretation of UDC and our action here does not eviscerate the section 201(f) exemption. We reiterate that our ruling here is limited to the specific circumstances presented during a past time period in the California PX and ISO spot markets during which all sellers received the same price for a given transaction. That price was determined by FERC-jurisdictional entities (the PX and ISO) in FERC-jurisdictional markets under a single price auction format, as originally set and later modified by FERC, for sales of electric energy for resale in interstate commerce.

The sales that fall within the scope of the July 25 Order amount to a small fraction of all sales made by governmental entities. The Commission has not scrutinized any non-spot market sales by those entities and does not intend to start such scrutiny now. Similarly, governmental entities have not been, and will not now be, subject to filing and other requirements unrelated to the PX and ISO spot markets that attach to non-exempt public utilities. Thus, the Commission is not seeking to expand its jurisdiction to include entities exempted by FPA section 201(f). Rather, in the limited circumstances involved in the California PX and ISO spot markets, the Commission is using its subject matter jurisdiction over those sales to assure compliance by all sellers in those markets with the regulatory regime established by FERC to assure just and reasonable rates for those sales.

Several governmental entities argue that, even if the Commission has jurisdiction to order refunds from them, it should not do so for what they term "policy or 'fundamental fairness' considerations."[60] Among the arguments raised are: governmental entities, as purchasers, had to pay higher electricity prices which negated any benefit of their sales to the ISO or PX spot markets;[61] that they are price takers, not price gougers,

---

[59] It is true that the Commission's authority to institute investigations of rates, terms or conditions of jurisdictional service under section 206 applies only to public utilities. However, the ISO and PX are two of the public utilities whose rates were made subject to investigation in our August 23 Order, and because the ISO and PX set a single market clearing price for all sellers, both governmental and non-governmental, that sold through their markets, all sellers' rates accordingly were made subject to potential refund as of the October 2, 2000 refund effective date.

[60] AEPCO at 13.

[61] CMUA at 14-15; AEPCO at 14-15 (but also recognizing the potential for refund recovery under the Commission refund proposal).

Docket No. EL00-95-001, et al.                    - 32 -

and thus could not cause unjust and unreasonable rates;[62] the Commission should focus
on those who have misused the system and limit refunds to divestiture of "ill-gotten
gains";[63] and, ordering refunds creates hardships for governmental entities and their
customers.[64]

     The FPA grants the Commission discretion in ordering refunds.[65] The
Commission's practice has been to order full refunds of any amounts collected above the
just and reasonable level, absent contrary equitable considerations.[66] Refunds are
restitutionary, rather than punitive, relief.[67] Because the statutory goal of refunds is
customer restitution, the Commission does not set refund levels based on a degree of
culpability regarding overcollections. Rather, our refund task in this and other cases is to
determine objectively the amount of overcollections that should be returned to
customers. Here, that means resetting the auction prices to just and reasonable levels that
apply to all sellers in that single price auction market. Accordingly, we decline the
governmental entities' invitation to determine refunds based on some unidentified
measure of blameworthiness.

               iii.  Reliance on UDC

     Some parties challenge the Commission's reliance on UDC[68] as providing
guidance on whether governmental entities could be included in the refund plan for the
California PX and ISO spot markets. Among the arguments raised by those parties is
that such reliance ignores the fact that the Natural Gas Act (NGA), at issue in UDC,

---

[62] APPA at 8-9; NCPA at 15-16.

[63] NCPA at 15.

[64] AEPCO at 14; CMUA at 15; APPA at 9.

[65]Both FPA § 205(e), 16 U.S.C. § 824d(e) and FPA § 206(b), 16 U.S.C. §
824e(b), indicate the Commission "may"order refunds. See also FPA § 309, 16 U.S.C. §
825h.

[66]E.g., Western Resources, Inc. v. FERC, 9 F.3d 1568, 1581 (D.C.Cir. 1993).

[67]Towns of Concord, et al. v. FERC, 955 F.2d 67, 75-76 (D.C.Cir. 1992).

[68]88 F.3d 1105.

Docket No. EL00-95-001, et al.                    - 33 -

"includes no equivalent to FPA section 201(f)."[69]  Another argument contends that as
UDC dealt with FERC authority over transportation, it offers no guidance as to the
Commission's authority to regulate rates.[70]

    Parties also contend that the result here was driven by a policy decision to fill in a
gap without regard to the statutory limitations on the Commission's authority.[71]  On a
related point, several parties point to our prior orders disclaiming jurisdiction over
governmental entities as demonstrating that the July 25 Order breaks with decades of
prior practice in implementing the FPA.[72]

    We have given careful consideration to all the arguments raised concerning the
alleged inapplicability of the approach taken in UDC to the instant situation.  In our
view, that approach does apply here and is consistent with the FPA's statutory plan, and
with controlling precedent.  Under the specific circumstances presented by the California
PX and ISO spot markets in the time period at issue, our decision to make all sellers
liable for possible refunds for their sales fulfills our statutory obligation.  Accordingly,
we deny all requests for rehearing on this point.

    Several parties seek to distinguish the applicability of UDC on grounds that it
"involved terms and conditions of jurisdictional pipelines' transportation service, not
non-jurisdictional sales of gas."[73]  In UDC, however, the court was asked to deal only
with the clause in NGA section 1(b) addressing transportation of natural gas in interstate
commerce.[74]  Thus, the limitation in the UDC litigation to the transportation clause
resulted from its factual context, not from a statutory restriction.  Nothing in UDC
suggests that the court would have reached a different conclusion had the issue related to

---

[69]See Requests for Rehearing of Bonneville at 6; Turlock at 18; Southern Cities at
7; MWD at 7; LADWP at 11; M-S-R at 6.

[70]See Requests for Rehearing of Bonneville at 6; Metropolitan at 8-9; LADWP at
9.

[71]See, e.g., Requests for Rehearing of Bonneville at 12-13; AEPCO at 9; Southern
Cities at 11-12.

[72]See, e.g., Request for Rehearing of Southern Cites at 11.

[73]See, e.g., Request for Rehearing of LADPW at 9 (emphasis in original).

[74]88 F.3d at 1151.

Docket No. EL00-95-001, et al.                    - 34 -

jurisdictional sales of gas.[75] As the very next clause of NGA section 1(b) addresses the sale of natural gas for resale in interstate commerce, it seems impossible that the court would not have found such sales to fall within the Commission's subject matter jurisdiction, just as interstate transportation does.

As the July 25 Order stated, the court ruled "the Commission's jurisdiction attaches to the subject of the capacity release transaction:  interstate transportation rights," regardless of whether the Commission had jurisdiction over the particular participants in the transactions.[76] The comparable provision to NGA section 1(b) is FPA section 201(b)(1), which defines FERC jurisdiction as extending "to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce."

Here, the subject of the California PX and ISO spot market transactions, the sale of electric energy at wholesale in interstate commerce, is likewise a matter explicitly within the Commission's jurisdiction under FPA section 201(b)(1).  Accordingly, the Commission can act to assure that the just and reasonable standard is applied to the market clearing prices for all transactions in those markets, as such protection lies at the heart of the Commission's ratemaking responsibilities under the FPA.  Under UDC, all sellers, including governmental entities, into those markets were subject to and had to abide by FERC regulation of those prices (as well as all other aspects of the rates and conditions affecting them) because the sales are within our FPA jurisdiction.

The payment of refunds cannot be differentiated analytically from other rate conditions that limited the manner in which all sellers could transact sales in those markets.  Refunds, under FPA section 206(b), are, like other rate conditions, a means to limit the prices that can be charged consistent with the just and reasonable standard.  All rate conditions imposed by the Commission in the California spot markets limited the amount of money that any seller could retain from a sale into those markets.[77]  All sellers

––––––––––––––––––––

[75]The Commission disagrees with LADWP's characterization of the sales in the instant matter as non-jurisdictional.

[76]96 FERC at 61,512 (citing 88 F.3d at 1152).

[77]For example, the markets originally used a single price auction system under which the highest price bid and accepted set the clearing price for all sellers.  The Commission then instituted a $150/MW breakpoint above which any sales would not set a market clearing price.  "The $150 breakpoint thus represents a limitation on the single price auction format of the CalPX spot markets."  California Power Exchange Corp., 345

(continued...)

Docket No. EL00-95-001, et al.                - 35 -

in those markets, both governmental and non-governmental, accepted without challenge other rate conditions, as originally established and subsequently modified, that limited the terms under which those sales could be made. It follows that all sellers in those markets must comply with our refund conditions.

Parties try to distinguish UDC on grounds that "the NGA does not have a specific, express exemption for municipalities like that in Section 201(f) of the FPA."[78] Others suggest that our prior rulings finding governmental agencies not subject to our jurisdiction preclude reliance on UDC. Again, we find no support for these views in that case. The court in UDC accepted the municipalities' statement that they "are exempt from the Commission's jurisdiction under the NGA."[79] In addition, the court recognized that the Commission had "twice rejected the suggestion that it should invoke its transportation jurisdiction over municipalities."[80] Thus, as presented, the underlying issue in UDC is essentially identical to the issue presented here despite the difference in statutory language.

As the court stated, "notwithstanding" the statutory exemption and prior agency decisions to the contrary, "FERC may, consistent with the NGA, require municipalities to comply with the capacity release regulations."[81] The key factor again was that "FERC's transportation jurisdiction extends as a separate matter over capacity release given the involvement of interstate pipelines."[82] Likewise, here, the involvement of jurisdictional public utilities (the PX and ISO), whose role, like the pipelines' role in UDC, "is absolutely central, and the transaction itself controls access" to the interstate wholesale sale of electric energy in the California spot markets at issue, gives us subject matter jurisdiction "entirely independent of the jurisdictional nature" of the entities selling into

---

[77](...continued)
F.3d 1110, 1118 (9th Cir. 2001).

[78]See, e.g., Request for Rehearing of Bonneville at 18; see also Request for Rehearing of M-S-R at 6 (same).

[79]88 F.3d at 1153 (emphasis added).

[80]Id.

[81]88 F.3d at 1154.

[82]Id. (first emphasis added; second in original).

Docket No. EL00-95-001, et al.                - 36 -

the markets at issue.[83]  Thus, the presence of FPA section 201(f) does not change the analysis or the result in addressing whether we have subject matter jurisdiction over all sales involved.

It is asserted that the "issue in this case is the Commission's rate authority under sections 205 and 206 of the FPA," not jurisdictional issues as was true in UDC.[84]  But this fails to acknowledge the importance of a threshold jurisdictional ruling.  If we lack jurisdiction under FPA section 201(b)(1), then the issue of the Commission's rate authority under sections 205 and 206 never arises.  In any event, the substantive statutory provision in the UDC case, like that in this case, concerned the Commission's ratemaking authority.[85]

It is also asserted that reliance on UDC is nothing more than an effort to avoid a regulatory gap[86] or to effectuate policy based on equitable considerations.  In this respect, it is charged that avoiding a regulatory gap "is a subject for Congress, and not the Commission . . . to address," and that policy determinations are irrelevant to the statutory question at hand.[87]  That is not the teaching of the case law, which "counsels inquiry into the necessary consequences of [whether otherwise nonjurisdictional sales should be subject to the federal plan] in terms of the scope of federal and state regulatory authority in the premises."[88]

_____

[83]Id.

[84]See Request for Rehearing of Bonneville at 5-6.

[85]See UDC, 88 F.3d at 1154 n. 65 ("in instituting the capacity release program, the Commission legitimately invoked its authority under NGA section 5," which is the counterpart of FPA section 206).

[86] In this respect, we wish to clear up a potentially confusing statement in the July 25 Order, 96 FERC at 61,512, where it was stated that California "declined to regulate California non-public utilities' sales in the California centralized ISO and PX spot markets."  California is, of course, free to regulate or not to regulate sales within its jurisdiction.  The sales at issue, however, are sales for resale in interstate commerce via a single price auction that is implemented by public utilities pursuant to tariffs within this Commission's exclusive jurisdiction.

[87]See Requests for Rehearing of AEPCO at 9; Southern Cities at 11.

[88]FPC v. Louisiana Power & Light Co., 406 U.S. 621, 632 (1972).  See also, e.g.,
(continued...)

Docket No. EL00-95-001, et al.                    - 37 -

iv.     Retroactivity

With regard to the July 25 Order's discussion of retroactivity, various parties challenge the relevance of the retroactivity principle to the instant situation, as well as the Commission's application of the five-part test for determining whether an adjudicatory ruling should be applied retroactively.[89]

As stated in the July 25 Order, under the retroactivity principle, adjudications are to be given retroactive effect for similarly situated parties.[90]  It is argued that the principle is irrelevant here because similarly situated parties are not involved.  According to Bonneville, the retroactivity principle would apply if in one case, the Commission announced a new rule of law that a "governmental seller" must pay a refund, then in another pending case, that new rule could be applied to a different "governmental seller."[91]  But, here, "there is no particular litigant before the Commission," and thus the principle does not apply.[92]  That analysis ignores a basic point we have repeatedly made: sales through the markets operated by the jurisdictional ISO and PX, not parties, are the subject matter of this proceeding.

In the July 25 Order, the Commission found that all sales priced above certain levels in the ISO and PX spot markets were unjust and unreasonable, and ordered refunds to remedy receipt of amounts above the just and reasonable level.  Viewed from

---

[88](...continued)
West v. Gibson, 527 U.S. 212, 218 (1999)("Words in statutes can enlarge or contract their scope as other changes, in the law or in the world, require their application.").

[89]See, e.g., Requests for Rehearing of AEPCO at 10-13; LADWP at 12-15; Bonneville at 18-20.

[90]96 FERC at 61,513 (citing Harper v. Va. Dept. of Taxation, 509 U.S. 86, 94-95 (1993) ("the fundamental rule of retrospective operation that has governed judicial decisions for near a thousand years")).  See James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 537 (1991) ("selective prospectivity also breaches the principle that litigants in similar situations should be treated the same"); see also Nat'l Fuel Gas Supply Corp. v. FERC, 59 F.3d 1781, 1789 (D.C. Cir. 1995)(same).

[91]Request for Rehearing of Bonneville at 20.

[92]Id. at 21.  Bonneville also claims the proceeding "partakes more of rulemaking than adjudication," and thus can be applied only prospectively.  Id.  As was discussed in the July 25 Order, 96 FERC at 61,513-14, and again below, this case is an adjudication.

Docket No. EL00-95-001, et al.                    - 38 -

this perspective, all sales for resale in the California PX and ISO spot markets are similarly situated, regardless of whether they were made by governmental or non-governmental sellers. Under the single price auction method, where all sellers received the highest price bid and accepted, it would be impossible to reach any other conclusion. In some cases, we assume that the price received by all sellers under the auction format resulted because a non-governmental seller bid the highest price accepted. In other cases, we assume the price received by all sellers resulted because a governmental seller bid the highest bid accepted. In other words, the amount of the highest bid accepted, not the identity of the bidder, controlled the price received by all sellers.

In those circumstances, all sales are similarly situated, as are all sellers with regard to what price they received in any individual sales transaction.[93]  Given this similarity, there is no reason for selective prospectivity with governmental sellers being free from refund obligations related to sales for which they received the exact same prices as did non-governmental sellers when those prices have been determined, as here, to be unjust and unreasonable. Accordingly, the retroactivity principle counsels that refund obligations apply to all sellers.

Another set of challenges contends that under a test for determining if retroactivity is appropriate that retroactive application to governmental entities fails on all five counts.[94]  Those challenges largely hinge on whether the situation presents a case of first impression, as found in the July 25 Order.

The challengers claim this is not a case of first impression, resting on a view that "Congress decided the matter in 1935,"[95] or that the Commission "overlooks a history of

---

[93] Bonneville's example might be apt if there were two markets operating. In one, only governmental sellers participated, while in the other only non-governmental sellers participated, and the two markets showed wholly different pricing patterns. In that hypothetical, a finding that prices in the non-governmental market were unlawful might not be immediately applicable to the governmental market. But the California PX and ISO spot markets did not consist of separate markets for governmental and non-governmental sellers; rather, both types of sellers transacted under the same set of rules and received the same price for a particular sale.

[94] See, e.g., Request for Rehearing of LADWP at 12. See Williams Natural Gas Co. v. FERC, 3 F.3d 1544, 1553-55 (D.C.Cir. 1993).

[95] See Request for Rehearing of LADWP at 13.

Docket No. EL00-95-001, et al.                - 39 -

more than 50 years,"[96] or a history of "over thirty years,"[97] during which the Commission did not assert jurisdiction over governmental entities.  To reiterate, the July 25 Order asserts jurisdiction over sales for resale in interstate commerce that occurred during the relevant time period in the California PX and ISO spot markets, not over governmental entities.  But that aside, the challenges reflect a view that the FPA is static and rigid, rather than dynamic and flexible, in the face of new factual circumstances.  That is not the law.

The July 25 Order found this to be a case of first impression because "the Commission had never dealt with market-wide refunds in a single price auction for widespread centralized spot purchases of wholesale electricity in interstate commerce."[98] The challengers' assertion that this situation did "not suddenly convert this question into one of first impression,"[99] ignores the teaching from the earliest cases that agencies must be able "within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances."[100]  Thus, the particular circumstances present here are critical to determining how the FPA should be applied.

Defining the appropriate regulatory response cannot be divorced from the particular circumstances facing the Commission.[101]  More recently, the Ninth Circuit looked at the particular circumstances facing the Commission in the California markets to find that while "FERC's termination of CalPX's rate schedules was perhaps unprecedented, we are not convinced that FERC lacks authority under section 206(a) of the FPA to address the structural flaws of a market-based rate regime through the

---

[96]See Request for Rehearing of Bonneville at 21.

[97]See Request for Rehearing of AEPCO at 11.

[98]96 FERC at 61,514.

[99]See Request for Rehearing of Bonneville at 21.

[100]FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 586 (1942)(emphasis added).

[101]See, e.g., Permian Basin Area Rate Cases, 390 U.S. 747, 774-77 (1968) (rejecting challenges that adoption of area rates exceeded the Commission's NGA authority, was inconsistent with the statutory language, and prior Court decisions on grounds that Congress gave adequate authority "to achieve with reasonable effectiveness the purposes" underlying the statutory grant).

Docket No. EL00-95-001, et al.                    - 40 -

termination of a public utility's wholesale tariff and rate schedules in circumstances such as these."[102]

Thus, the FPA cannot be interpreted in a vacuum, but must be adapted to fulfill its purposes as specific circumstances require. As the Commission has never interpreted how the FPA should be adapted to fulfill its purposes in the particular circumstances here, which reflect a new ratemaking paradigm, this case is one of first impression.

On the second criterion, the challengers claim that the July 25 Order represents an abrupt departure from well-settled law, rather than an effort to fill a void in an unsettled area of law.[103] But, as noted above, the Commission has never addressed the legal question of how refunds should apply in these particular circumstances, and thus the ruling is properly seen as an effort to fill a void in an unsettled area. All challengers point to our March 9 Order, which stated, "[t]he Commission has no authority to order [governmental] sellers to make refunds" as well as to the acknowledgment in the July 25 Order of similar statements. In the context of this case, the March 9 Order does not constitute well-settled law. Not only was the Order subject to numerous rehearing requests, but also it was in place for only four months before issuance of the July 25 Order, which, upon further analysis and consideration, changed many other aspects of the March 9 Order's refund proposal.

The challengers place the remaining criteria together to claim that they reasonably relied on "sixty-six plus years of unbroken precedent,"[104] and that they were "not subject to Commission regulation."[105] But, again, the Commission is not asserting jurisdiction over them, but only over the interstate sales for resale that they made in the California PX and ISO spot markets, which were established and regulated entirely under Commission FPA authority. As early as the August 23 Order responding to complaints that sales in those markets might exceed the just and reasonable standard, and well before the October 2 refund effective date, governmental and non-governmental sellers were aware that possible remedies for all sales violating that standard in those markets included refund liability.

---

[102]California Power Exchange, 245 F.3d at 1122 (emphasis added).

[103]See, e.g., Request for Rehearing of LADWP at 13.

[104]See Request for Rehearing of LADWP at 14.

[105]See Request for Rehearing of Bonneville at 23.

Docket No. EL00-95-001, et al.                − 41 −

We see no reason that reliance on generalized statements related to wholly different situations should prevail over a clear indication of what our course would be in the particular circumstances at issue. Likewise, it is not an undue burden for governmental sellers to refund amounts received over and above the just and reasonable prices allowed by the Commission for these sales. Under the single price auction format, governmental sellers could expect no higher price than what all other sellers received for the same transactions, and under the FPA, that price could not exceed the just and reasonable standard. Selective prospectivity, as the challengers propose, flies in the face of the FPA's primary statutory interest of preventing exploitation of consumers. Accordingly, retroactive application of refund obligations for all sellers is favored here.

vi.    Adjudication v. Rulemaking

Several governmental entities contend that this proceeding, as it relates to governmental entities, is more of a rulemaking than adjudication.[106] For example, NCPA argues that the July 25 Order represented a significant departure from an established policy. NCPA asserts that such a shift in policy, without notice or opportunity for affected parties (e.g., municipals) to comment, violated the rulemaking requirements of the Administrative Procedure Act. It contends that the jurisdictional expansion constitutes a rulemaking under 5 U.S.C. section 551(a), because it is an agency statement of general applicability and future effect designed to implement, interpret, or prescribe law or policy relating to future rates, valuations, and costs. NCPA also contends that the July 25 Order violates municipalities' procedural due process rights.

This case involves the extent to which refunds are owed for sales made in the California PX and ISO spot markets for a defined past period. In view of this, the case involves an adjudication, consistent with the terms of 5 U.S.C. § 551(6) and (7). The 1947 Attorney General's Manual on the Administrative Procedure Act (at 14) states that "adjudication is concerned with the determination of past and present rights and liabilities." Clearly, that is what is involved here.

In addition, our ruling here is based on specific past events in the California ISO and PX spot markets. It is highly unlikely that those same circumstances will be repeated or, if they are, that they will reoccur on a widespread basis. Accordingly, there is no reason for the Commission to formulate a policy to cover that eventuality. Nor do we see any due process problems with the approach that we have taken. The July 25 Order explained in detail the reasons for our decision. Parties have addressed those reasons in

---

[106]See, e.g., Requests for Rehearing of NCPA, Bonneville, APPA.

Docket No. EL00-95-001, et al.                − 42 −

their rehearing requests and presented their countervailing arguments. Those arguments have been fully considered and addressed in this order. No further procedure is needed to ventilate these issues.

Accordingly, the requests for rehearing based on claims that the issues presented must be resolved through rulemaking are denied.

      b.    Applicability to QFs

On rehearing of the June 19 Order, QFs oppose application of the price mitigation plan to QFs because it purportedly violates their statutory protections.[107] Nevada IEC/CC Washington maintain that the must-offer requirement conflicts with PURPA which established contracts governing the QF output sales, conflicts with prior Commission decisions which exempted QFs from regulation under section 206 of the FPA, conflicts with delivery obligations under QF purchase agreements with UDCs, and conflicts with QF obligations to thermal hosts.[108]

Several parties contend on rehearing of the June 19 Order that the must-offer requirement should not apply to QF capacity committed under a contract to a utility and that the requirement should not obligate a QF to breach its delivery obligations under an existing power purchase agreement.[109] Oversight Board also requests that the Commission clarify that a QF will be subject to the must-offer requirement only to the extent the QF's contract permits third-party sales.

On rehearing of the July 25 Order, NIEP and CCW argue that PURPA and the Commission's regulations implementing it reflect a legislative intent that QFs will be regulated through avoided cost rates and contracts approved by state commissions and not through traditional ratemaking regulation under section 206. Further, they contend that applying the mitigation plan to QFs would confuse or interfere with the QF's delivery obligation under power purchase agreements with their utility distribution company (UDC). NIEP and CCW argue that the June 19 Order was targeted at those generators who can decide when to generate, to whom to sell and at what price. They contend that those decisions are preempted in the case of QFs by their agreements with their thermal host and with their UDC. Assuming that QFs are covered by the June 19

_____

[107]See, e.g., Request for Rehearing of Nevada IEC/CC Washington.

[108]See Request for Rehearing of Nevada IEC/CC Washington. See also Request for Rehearing of Oversight Board.

[109]See, e.g., Requests for Rehearing of Calpine Corporation and Oversight Board.