Docket No. EL00-95-001, et al.                    - 143 -

discussed in the March 9 Order its methodology and the logic used to support its findings. Accordingly, we find no merit to the ISO's contention that the Commission erred when it failed to hold a trial-type evidentiary hearing.

      3.    <u>City of San Diego's Motion to Sequester Funds</u>

On March 13, 2001, the City of San Diego filed a motion for an order requiring sellers of wholesale power in California to sequester funds to satisfy refund obligations. Specifically, the City of San Diego requests that the Commission order these sellers to sequester any amounts collected from sales that are in excess of costs and maintain these amounts, with accumulating interest, adequate enough to pay potential refund obligations. The County of San Diego filed an answer in support of the City of San Diego's motion in which it argued that the Commission must protect the beneficiaries of potential refunds.

The Pinnacle West Companies, Duke, Williams, PPL Energy Plus, LLC, PPL Montana, LLC, Enron Power Marketing, Inc., and Reliant filed answers in opposition to the City of San Diego's motion to sequester funds. All of these parties contend that the City of San Diego's motion is premature and speculative in that there has been no showing that the sellers will be unable to pay any refunds, if they even exist. Enron, the Pinnacle West Companies, Duke, also argue that the City of San Diego is attempting to circumvent the Commission's policies or orders, such as the December 15 and March 9 orders, through the imposition of cost-based regulation. PPL Energy Plus, LLC and PPL Montana, LLC submit that the harms of the motion greatly outweigh any benefits and that the Commission should only grant the motion if the movant makes the same showing necessary to obtain a preliminary injunction.

<u>Commission Response</u>

The Commission has found that requiring escrow payments pending resolution of a dispute is a form of equitable relief that temporarily protects a party's rights.[362] This form of equitable relief has been found appropriate when a preliminary assessment of the merits of the underlying dispute demonstrate the potential for irreparable harm or that it would be in the public interest.[363] However, in this case, we agree that the City of San Diego's concern that the wholesale electric energy sellers will not have money to pay

---

[362]Public Service Company of New Hampshire v. New Hampshire Electric Cooperative, Inc., 55 FERC ¶ 61,028 at 61,079 (1991).

[363]<u>Id.</u>

Docket No. EL00-95-001, et al.                    - 144 -

potential refund amounts is speculative.[364]  The City of San Diego simply has not shown that these sellers are unable to pay.  Moreover, the City's request is particularly inappropriate in light of the large amounts that have not been paid to sellers for those sales; indeed, the ISO only recently invoiced purchasers for transactions in January 2001 and forward.[365]  Accordingly, we deny the City of San Diego's motion requesting that sellers of wholesale power in California sequester funds to satisfy potential refund obligations.

     4.    <u>Termination of ER Dockets</u>

The Commission finds that the following dockets, which were created upon the filing of the rehearing requests of the March 9 Order, are moot because of the Commission's issuance of the July 25 Order: ER01-1444-001, ER01-1445-001, ER01-1446-001, ER01-1447-001, ER01-1448-002, ER01-1449-002, ER01-1450-001, ER01-1451-002, ER01-1452-001, ER01-1453-001, ER01-1454-002, ER01-1455-002, and ER01-1456-002.  Accordingly, we will terminate these dockets herein.

E.    <u>Rehearing of Remaining Issues from June 19 Order</u>

     1.    <u>Outage Coordination</u>

Dynegy argues that the Commission ceded overly expansive control of generation outage schedules to the ISO.  Dynegy argues that the ISO's outage plans, as reflected in the proposed ISO Tariff language in its May 11 Compliance Filing, are flawed.  Dynegy alleges that the plans are too complex and lengthy; fail to foster outage cooperation; exclude specific objective procedures to allocate scarce outage time; attempt to dictate market outcomes through outage coordination by including market prices as an element to consider in outage coordination when reliability should be the sole governing factor; and usurp the Commission's power to approve procedures for coordination and outage control by granting the ISO authority to amend its outage coordination mechanism by posting changes on its home page.  Dynegy recommends instead the adoption of a PJM-like mechanism for outage coordination.

<u>Commission Response</u>

---

[364]<u>See</u> Duke Energy Moss Landing LLC and Duke Energy Oakland LLC, 86 FERC ¶ 61,187 at 61,657 (1999).

[365]See California Independent System Operator Corp., 97 FERC ¶ 61,151 (2001).

Docket No. EL00-95-001, et al.                  - 145 -

To ensure the availability of sufficient energy resources while also providing for reliable plant operation, the April 26 Order emphasized the importance of cooperation between the ISO and generators in scheduling generating unit maintenance and outages. Accordingly, the Commission gave the ISO a broad directive to propose a mechanism for control and reporting of generating unit outages by the ISO, and found that the ISO must be provided with the authority to achieve greater systematic control over all generating units that the ISO must dispatch, i.e., those units that have signed Participating Generator Agreements.[366]  As directed in the April 26 Order, the ISO submitted proposed tariff revisions related to outage coordination in its May 11 Compliance Filing.

In an order issued on October 23, 2001,[367] the Commission accepted and rejected in part the portion of the ISO's May 11 compliance filing related to its proposed outage coordination mechanism, and addressed a number of issues similar to those raised by Dynegy on rehearing of the June 19 Order.  The Commission found, in pertinent part, that the ISO's proposed outage coordination provisions are sufficiently detailed and that the ISO's existing provisions contain adequate alternative outage procedures to resolve incompatible outage requests.  The Commission rejected the ISO's use of market prices as a criterion for canceling scheduled generator maintenance outages without prejudice to the ISO refiling the proposal with further justification.  Furthermore, Dynegy's contention that granting the ISO authority to amend its outage coordination mechanism by posting changes on its home page usurps the Commission's power to approve procedures for coordination and outage control disregards the fact that any change to the procedures for maintenance and outage control would require a filing by the ISO under section 205 of the FPA.  Accordingly, we deny rehearing of the June 19 Order with respect to outage coordination.

2.    Must-Offer Requirement

a.    Available Generation

The April 26 Order required all utilities that own or control generation in California, as a condition of selling into the ISO markets which are subject to the Commission's exclusive jurisdiction, or of using the ISO-controlled interstate transmission facilities, to offer the ISO all of their capacity in real-time during all hours if

---

[366]April 26 Order at 61,355.

[367]San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services, et al., 97 FERC ¶ 61,066 (2001).

Docket No. EL00-95-001, et al.                  - 146 -

it is available and not already scheduled to run through bilateral agreements.[368]  The
Commission specified that "the must offer obligation is designed to ensure that the ISO
will be able to call upon available resources in the real-time market to the extent that
energy is needed."[369]  The June 19 Order applied this requirement to all generators in the
WSCC.

On rehearing, generators dispute what constitutes "available" generation subject to
the must-offer requirement.  Reliant contends that the Commission should not apply the
must-offer requirement to generating units with long start-up lead times or other
operational limitations.  Reliant requests that the Commission confirm that the must-offer
obligation is not a bid obligation, but rather an obligation to offer all generation that is
available for real-time delivery.  Reliant also requests clarification that the must-offer
obligation only apply to resources that are on-line or timely can be brought on-line such
that they are available to meet real-time needs of the ISO or West-wide real-time needs.
Williams urges the Commission to clarify the impact of the must-offer requirement on
units that are available but offline for economic reasons.  Williams also requests that the
Commission require the ISO to modify its bidding process to allow, as an option, time
for a unit to be brought online with payment for start-up costs and minimum load costs
or, alternatively, that the ISO be required to pay generators' minimum load costs to keep
units online.

Commission Response

The Commission grants rehearing that generators subject to the must-offer
requirement can recover their actual costs for complying with the ISO's instructions to
keep their units on-line at minimum load status to be available for dispatch instructions
issued by the ISO.  As the Commission explains more fully in the order addressing the
ISO's compliance filings issued concurrently with this order, the ISO must compensate a
generator for its actual costs during each hour when that generator is:  (1) not scheduled
to run under a bilateral agreement; (2) not on a planned or forced outage; and (3) running
in compliance with the must-offer requirement but not dispatched by the ISO.

b.      Extent of the Must-Offer Requirement/Exemptions

Numerous load serving entities (LSEs) contend that the Commission improperly
applies the same standards to merchant generators as it applies to LSEs, which neglects
the fundamental difference between generation primarily intended to meet retail load and

---

[368]April 26 Order at 61,355-56.

[369]April 26 Order at 61,355.

Docket No. EL00-95-001, et al.                    - 147 -

"merchant" generation intended for market sales only.[370]  LSEs also contend that the
June 19 Order expropriates the resources of LSEs which have responsibly contracted in
the forward markets and requires them to provide such resources without adequate
compensation to other retail customers who have not contracted in the forward market.[371]
To the extent that Southern Cities' resources are physically unable to respond to ISO
scheduling protocols and operating procedures, they request clarification that the must-
offer obligation does not apply in such circumstances.

    A number of parties argue that the June 19 Order does not address how generating
units outside of California are to deal with environmental limitations on their
operations.[372]  For example, Puget Sound argues that other states in the WSCC outside
California have not waived environmental restrictions on power plant operations as has
California.  Certain LSEs and QFs contend that they should be allowed to reasonably
conserve environmentally limited thermal resources to meet load-serving obligations.[373]

    Duke argues on rehearing that the must-offer requirement inadequately reflects the
myriad environmental restrictions imposed on generators, the opportunity costs
associated with those restrictions, and the uncertainty as to the applicability of the
exemption.  Duke adds that environmental constraints are often imposed in the form of
aggregate limits on production over a period of hours, days or even the entire year.  Duke
alleges that the June 19 Order fails to account for the reasonable prospect during a
pertinent period that, if a unit is required to provide energy at full capacity during any
requested hours, it will subsequently, within the pertinent period, violate a particular
restriction.  Duke states that if a must-offer requirement is retained at all for limited run
units, it must be conditioned to allow all generators to determine available capacity
taking into account the possible future applicability of a binding environmental
restriction on output.  Moreover, NCPA requests that the Commission clarify adequately
what constitutes a violation of a certificate with respect to resources that are energy
limited by reason of air emissions restrictions.

    Tri-State requests clarification, assuming the Commission intends that
environmentally-limited units must operate at full capacity notwithstanding commitments

---

    [370]See, e.g., Request for Rehearing of City of Redding, California.

    [371]See, e.g., Request for Rehearing of City of Redding, California.

    [372]See, e.g., Requests for Rehearing of Tri-State and Puget Sound.

    [373]See, e.g., Requests for Rehearing of Avista Utilities, NCPA, Puget Sound, and
Tri-State.

Docket No. EL00-95-001, et al.                − 148 −

under bilateral contracts, whether it is the buyer or the seller that is obligated to make up for the generation deficiencies after the permitted hours of operation are exhausted. Tri-State also requests clarification that where the output of a unit is committed under a bilateral contract, and the buyer does not otherwise schedule deliveries in a particular hour, it is the buyer that is responsible for meeting the must-offer requirement so that the seller does not violate the contract with the buyer.

Commission Response

We reject arguments that the June 19 Order expropriates the resources of LSEs which have contracted in the forward markets. LSEs buy in forward markets to ensure a supply of power at a known price, avoiding the uncertainty of spot markets. If LSEs do not need this power in real-time to serve their load, LSEs must resell the power, thus offsetting the sunk costs of serving their load. We have established a reasonable pricing approach for such sales, while requiring LSEs to offer available power in real-time as part of our remedy for the problems in these markets. LSEs facing a revenue shortfall for all jurisdictional sales may seek to justify additional revenue recovery. Thus, we see no reason to exempt LSEs from the must-offer obligation. In response to Southern Cities' request for clarification, to the extent that their resources are physically unable to respond to ISO scheduling protocols or operating procedures, they may seek exemption from the ISO of the must-offer obligation.

We deny rehearing concerning the effect of environmental restrictions on the ability of thermal generators to comply with the must-offer obligation. The July 25 Clarification Order specifies two ways that a generator could be exempted from the must-offer requirement due to environmental restrictions if certain evidentiary standards were met. First, a generator must demonstrate that running its unit violates a permit, would result in a criminal or civil violation or penalties, or would result in that QF units violating their contracts or losing their QF status. Second, a generator may obtain a declaratory order from an appropriate court finding that the generator's compliance with the must-offer requirement will result in a violation of its permit.[374] We clarify that the mechanism set forth in the July 25 Clarification Order for waiver of the must-offer requirement applies to all generators in the WSCC.

We deny Duke's request for compensation of opportunity costs incurred in operating under environmental restrictions. Duke has not provided any method for determining how these opportunity costs would be recovered nor suggested adequate procedures for review of these costs by the ISO and the Commission.

_____

[374]July 25 Clarification Order at 61,448.

Docket No. EL00-95-001, et al.                - 149 -

    We reject Tri-State's requests for clarification on the obligations of the buyer or
the seller in meeting the must-offer requirement where the output of a unit is committed
under a bilateral contract.  As discussed in another section of this order, the must-offer
and price mitigation requirements will no longer apply to governmental entities and
RUS-financed cooperatives transacting solely in bilateral markets throughout the WSCC.

        c.    Other Must-Offer Issues

    On rehearing, IEP argues that the June 19 Order fails to articulate why the ISO
should have the authority to cut export schedules in light of uniform price restrictions.
IEP asserts that the cutting of export schedules yields commercial uncertainty for existing
bilateral arrangements of the type otherwise generally encouraged by the Commission.

    Dynegy argues that generators should not be required to sell power to parties that
cannot meet basic requirements of creditworthiness.

    Dynegy argues that the must-offer requirement should be limited to emergency
conditions or to peak months.

    Avista Energy, Avista Utilities, Puget Sound, and NRECA argue that the
Commission's must-offer requirement is inconsistent with the authority vested
exclusively in the Secretary of the Department of Energy by section 202(c) of the Federal
Power Act,[375] as amended by the Department of Energy Organization Act,[376] to declare
emergencies and impose must-offer obligations.

_____

[375]FPA §  202(c), as amended, states that:

        During the continuance of any war in which the United States is
        engaged, or whenever the [Secretary of Energy] determines that an
        emergency exists by reason of a sudden increase in the demand for
        electric energy, or a shortage of electric energy or of facilities for the
        generation or transmission of electric energy, or of fuel or water for
        generating facilities, or other causes, the [Secretary of Energy] shall
        have authority, either upon its own motion or upon complaint, with
        or without notice, hearing, or report, to require by order such
        temporary connections of facilities and such generation, delivery,
        interchange, or transmission of electric energy as in its judgment
        will best meet the emergency and serve the public interest.

[376]42 U.S.C. §§ 7157, 7172; 10 C.F.R. ¶ 205.370.

Docket No. EL00-95-001, et al.                    - 150 -

Commission Response

IEP's argument that the June 19 Order did not address the ISO's curtailment authority disregards the fact that the June 19 Order did not change the existing provisions in the ISO's Tariff regarding curtailment of export schedules in the event of an emergency. Therefore, IEP's argument is not properly on rehearing before the Commission. In any event, unless a party can establish discernible harm, the Commission is not persuaded at this time to change the ISO's curtailment authority.[377]

As stated above, the Commission is considering in separate proceedings issues related to selling power to creditworthy parties. Dynegy's concerns regarding selling power to a non-creditworthy party will be addressed in conjunction with the Commission's determination in those proceedings. In an order issued on November 7, 2001, the Commission provided, in part, that the ISO must enforce the creditworthiness requirement of its Tariff and prior Commission orders regarding creditworthiness by requiring a creditworthy party to back transactions.[378] The Commission explained that "[t]he must-offer requirement assumes a matching must-pay requirement."[379]

The Commission denies Dynegy's rehearing request to limit the must-offer requirement to emergency conditions or to peak months. The Commission will continue to apply the must-offer requirement in all hours to ensure that all available energy is in the market and to prevent physical and economic withholding in order for the ISO to call upon available resources in the real-time market to the extent that energy is needed.

While section 202(c) of the FPA, as amended, grants authority to the Secretary of the Department of Energy to institute certain emergency measures, that provision does not conflict with the Commission's implementation of the must-offer requirement. The Commission instituted the must-offer requirement to prevent physical and economic withholding and thereby ensure that the ISO will be able to call upon available resources in the real-time market to the extent that energy is needed. In concert with the other components of the Commission's mitigation plan, we continue to believe that the must-

---

[377]See June 19 Order at 62,554.

[378]California Independent System Operator Corporation, 97 FERC ¶ 61,151 (2001).

[379]Id. at 61,659.

Docket No. EL00-95-001, et al.                 - 151 -

offer requirement is necessary to  ensure just and reasonable rates in the WSCC as
required under section 206 of the FPA.[380]

    3.    Demand Response

On rehearing, several generators contend that the Commission erred in failing to
compel demand response measures to provide price responsiveness in the ISO and
WSCC markets or to establish a timetable for implementing such measures.[381]

Commission Response

As the Commission has stated in prior orders, a demand response mechanism is a
critical component in developing a robust market, which relevant state authorities should
actively promote.[382]  Due to technical impracticalities, the Commission did not address
the demand response requirement in the June 19 Order, but indicated its intention to hold
a staff technical conference.[383]  The Commission remains committed to the creation of a
healthy demand response mechanism in wholesale electricity markets, and has scheduled
a conference on this topic, co-sponsored with the U.S. Department of Energy, on
February 14, 2002.  This conference should fulfill the purpose of the staff technical
conference proposed in the June 19 Order.

The proliferation of demand response programs in California in 2001- from the
utilities, the California Energy Commission, and the ISO- appears to have led to some
degree of customer confusion and limited participation.  Therefore, we encourage
California to plan early and coordinate its demand response offerings for maximum
customer participation and effectiveness.  In addition, because of the interdependence of
the Western electric market, we encourage California to work with other Western state
regulators and utilities to develop a coordinated and complementary set of demand
response programs to serve customers and moderate markets across the entire
marketplace.

---

[380]  See also FPA § 309, 16 U.S.C. § 825h ("The Commission shall have power to
perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders,
rules, and regulations as it may find necessary or appropriate to carry out the provisions
of this Act.").

[381] See, e.g., Requests for Rehearing of Reliant, Dynegy, and Mirant.

[382] See December 15 Order at 61,982; June 19 Order at 62,555.

[383] June 19 Order at 62,555.

Docket No. EL00-95-001, et al.                    - 152 -

4.    Continuation of Market-Based Rates and Limitation of Mitigation to Spot
      Market Transactions

Some parties argue that the Commission's investigation should encompass all
public utility sales for resale pursuant to market-based rate authority and all transactions
of less than one year, including California wholesale bilateral transactions.[384]  APPA also
recommends that the Commission impose price mitigation capping on all short term non-
firm energy sales by public utilities at 85 percent of the mitigated reserve deficiency
MCP for the applicable region.  Similarly, several parties argue that the Commission
should mitigate prices for forward contracts entered into before the Price Mitigation
Orders became effective.[385]  The Nevada Attorney General argues that not applying
prospective price mitigation to forward contract sales unreasonably and arbitrarily
penalizes forward contract customers, including Nevada customers.  Nevada
Commission contends that the mitigation plan rewards entities that rely on the spot
market while working to the disadvantage of those who have minimized reliance on the
spot market.

APX requests clarification that the price mitigation applies only to spot market
transactions in the WSCC, i.e., transactions whose duration is no more than the 24-hour
period immediately before delivery.  Enron requests clarification that option agreements
exercised for spot-market sales are not themselves spot sales, and Duke requests
clarification of the term "spot market" or "24-hour sales" in the context of sales
scheduled for delivery over or following a weekend.  The ISO also requests clarification
of the spot transactions subject to price mitigation.

Allegheny Energy argues that the mitigation plan eliminates the ability of private
parties to freely sell under next-day bilateral contracts and that it fails to recognize the
fundamental differences between the day-ahead and real-time markets by grouping them
both as "spot markets" subject to the same pricing.  Specifically, Allegheny Energy states
that price caps in the day-ahead, same-day and real-time markets will not foster forward
contracts because market participants enter into forward contracts to hedge the risk of
price volatility.  Allegheny Energy asserts that market mitigation eliminates this volatility
and creates a disincentive to contract on a forward basis.  Allegheny Energy seeks

_____

[384]See, e.g., Requests for Rehearing of APPA, Southern California Water
Company.

[385]See, e.g., Requests for Rehearing of City of San Diego, City of Seattle, Sierra
Pacific Power and Nevada Power, Southern California Water Company.

Docket No. EL00-95-001, et al.                    - 153 -

clarification that the functionally different day-ahead market is exempted from the market mitigation plan.

Puget Sound argues that the Commission should specify that price mitigation measures, and refunds from such measures, that are not applied to or followed by all sellers (including municipal utilities and Bonneville) are unjust and unreasonable.

Commission Response

The Commission denies clarification or rehearing regarding the limitation of mitigation measures solely to spot markets. Applying mitigation to spot market transactions results in mitigation of generation market power in forward markets by creating a kind of competitive "standard offer" service for customers. If sellers attempt to charge excessive, non-competitive prices in forward markets, customers can avoid them by waiting to purchase in the real-time market. This puts market pressure on sellers to offer competitive prices in the forward markets. In turn, when sellers offer competitive forward prices, many buyers will prefer to purchase in the forward markets in order to gain price certainty.[386]

Allegheny Energy's objection to mitigation of prices in the day-ahead is not timely. This Commission has treated day-ahead, day-of, and real-time energy sales similarly since the inception of this proceeding and has found that the market structure and market rules in California caused and continue to have the potential to cause unjust and unreasonable rates in all of these short-term markets.[387] Therefore, we reject this argument. We agree, however, with Allegheny Energy's point that the real-time and day-ahead markets are functionally different in some respects, and we believe that a well-functioning day-ahead energy market would relieve some of the current California scheduling problems. Accordingly, we will direct the ISO to propose a plan for the creation of a day-ahead energy market; this submission must be filed by May 1, 2002, and should be integrated with the revised congestion management plan that is also to be filed on that date, as discussed elsewhere in this order.

---

[386] See AEP Power Marketing Inc., et al., 97 FERC ¶ 61,219 at 61,972 (2001).

[387] See, e.g., November 1 Order, 93 FERC at 61,349.

Docket No. EL00-95-001, et al.                  - 154 -

The Commission denies requests to extend price mitigation measures to forward contracts. The Commission instituted the price mitigation measures based on a finding that rates in spot markets are unjust and unreasonable.[388]

The Commission disagrees with Nevada Commission's contention that the mitigation plan works to the disadvantage of those who have minimized reliance on the spot market because the mitigation measures do not apply for sales over 24 hours, i.e., sales that help minimize reliance on the spot market.

The June 19 Order defined "spot markets" or "spot market sales" as sales that are 24 hours or less and that are entered into the day of or day prior to delivery.[389] We will continue to apply this definition for transactions within California and throughout the WSCC.

To the extent Duke is requesting that the Commission clarify that sales scheduled for delivery over or following a weekend constitute spot-market sales, we will deny the request. Only those transactions that are entered into the day of or the day prior to the sale are subject to mitigation. Similarly, with respect to Enron's request for clarification that option agreements exercised for spot-market sales are not themselves spot-market sales, we clarify that such sales are entered into for future periods and therefore are not subject to mitigation.

5.    Price Mitigation in All Hours

Generators generally contend on rehearing that the Commission failed to provide a sufficient basis to extend price mitigation to all hours, in all spot markets, throughout the WSCC region. Mirant argues that this decision is inconsistent with the Commission's own findings and that the Commission's change in position is not supported by any new evidence, while Duke states that the reserve deficiency market mitigation is premised on dysfunctional market rules operating during periods of tightened reserves, and not on findings that any seller exercised market power. Generators also continue to oppose mitigation measures that cap prices below the true market price because they will

---

[388]See id. (The Commission found that the electric market structure and market rules "in conjunction with an imbalance of supply and demand in California, have caused, and continue to have the potential to cause, unjust and unreasonable rates for short-term energy (Day-Ahead, Day-of, Ancillary Services and real-time energy sales) under certain conditions.").

[389]June 19 Order at 62,545 n.3; See also July 25 Order at 61,515.

Docket No. EL00-95-001, et al.              - 155 -

discourage investment and delay development of competitive markets.[390] EPSA argues that: (1) the complex proxy price approach set out in the April 26 and June 19 Orders have created uncertainty and confusion; (2) price caps will lead to a sub-optimal mix of generating units, favoring base-load plants when peaking units may be needed; (3) below-market price caps will discourage demand-side management by dampening price signals and discouraging the development of much-needed risk management tools. Avista Utilities contends that the price mitigation scheme will discourage forward market transactions to cover load obligations.

A number of parties seek rehearing of the Commission's decision to base mitigation in non-reserve deficiency hours on 85 percent of the last Stage 1 price, contending that it establishes artificial limits and brings regulatory uncertainty and instability to the markets.[391] Generators argue that setting prices in non-reserve deficiency hours at 85 percent of the last mitigated reserve deficiency MCP subjects prices to manipulation by the ISO to reduce them to lower and lower levels;[392] that it violates section 206 of the FPA because the Commission never found rates during non-reserve deficiency periods to be unjust and unreasonable;[393] that the mechanism is unclear and inconsistent with the Commission's stated intent and its own findings and that it is unsupported by new evidence or evidence in the record;[394] and that such mitigation has skewed price signals when supplies are plentiful.[395]

Some parties argue that the mitigated non-reserve deficiency MCP leads to excessive rates that are unjustified, and contrary to the Commission's mandate to ensure just and reasonable rates.[396] Oversight Board recommends that the Commission implement a marginal cost proxy price methodology similar to that utilized in calculating the mitigated non-reserve deficiency MCP for non-reserve deficiency hours.  PG&E

---

[390]See, e.g., Requests for Rehearing of EPSA, PPL, Nevada IEC/CC Washington and City of Vernon.

[391]See, e.g., Request for Rehearing of BP Energy.

[392]See, e.g., Request for Rehearing of Dynegy.

[393]See, e.g., Request for Rehearing of Enron.

[394]See, e.g., Requests for Rehearing of Duke, Enron, IEP and Mirant.

[395]See, e.g., Request for Rehearing of Allegheny.

[396]See, e.g., Request for Rehearing of City of San Diego and Southern California Water Co.

Docket No. EL00-95-001, et al.                  - 156 -

recommends that the Commission require the ISO to submit monthly reports of hourly market clearing prices to prevent excessive pricing in non-emergency hours. SMUD recommends that the Commission adjust the heat rate in the proxy price calculation for the mitigated non-reserve deficiency MCP to the equivalent of the last unit dispatched during the preceding reserve deficiency period, so that participants are aware before the fact of the mitigated non-reserve deficiency MCP.

Duke and Reliant request clarification that the mitigated non-reserve deficiency MCP should be 85 percent of the highest ten minute mitigated reserve deficiency MCP when a Stage 1, 2 or 3 emergency is in effect, not the hourly average of prices.

Commission Response

We continue to believe that it is appropriate to mitigate prices in all hours and will deny rehearing. In the November 1 and December 15 Orders, the Commission found that the California market structures and rules for wholesale sales of electric energy in California were seriously flawed, and that in conjunction with an imbalance of supply and demand in California, these rules and structures had caused and had the potential to continue to cause unjust and unreasonable rates for short term energy in certain conditions. Moreover, the Commission's dysfunctional market finding was not limited to reserve deficiency periods. In response to these findings, the Commission has sought to intervene in markets in as limited a manner as possible consistent with its responsibilities to ensure just and reasonable rates under the FPA, to rely on market principles whenever it can, and to balance carefully the need for price relief against the need for price signals to attract critical supply entry.[397]

Consistent with that approach, among other things, the December 15 Order eliminated the mandatory buy-sell requirement and the PX rate schedule to remove the California IOUs' over-reliance on spot markets and instituted a soft price breakpoint as an interim mitigation measure. In the March 9 and April 26 Orders the Commission implemented price mitigation for reserve deficiency hours.[398]

The ISO-declared emergency stages when extreme supply shortages led to reserve deficiencies that exceeded critical levels. However, even where reserves were above the

---

[397]June 19 Order at 62,545.

[398]In the March 9 Order, the Commission defined reserve deficiency hours requiring mitigation as when the ISO declared a Stage 3 emergency. In the April 26 Order, the Commission expanded its definition to include periods when the ISO declared a Stage 1 emergency.

Docket No. EL00-95-001, et al.                    - 157 -

threshold levels required to avoid an ISO-declared emergency, the ISO still required sufficient available supply to call upon to meet the real-time market requirements. To assure adequate supply when it is needed, the April 26 Order added to the Commission's arsenal the must-offer requirement during all hours if it was available and not already scheduled to run through bilateral agreements. At that point, the Commission believed that limiting price mitigation to emergency conditions would be sufficient because (1) during non-emergency conditions, a supplier has less of an incentive to bid a high price since it cannot be sure it will be dispatched when other suppliers might offer lower bids; and (2) suppliers have less incentive to withhold capacity in other than emergency conditions, since they would risk forcing an emergency condition in which price mitigation would apply.[399]

Despite the additional, incremental steps taken in the April 26 Order to ensure just and reasonable rates and adequate supply, the Commission became concerned that markets remained dysfunctional in all hours. For example, during March 2001, there were indications that prices in non-emergency periods did not reflect competitive markets.[400] As noted above, the Commission had previously believed that suppliers would have less incentive to bid high prices in non-emergency periods since they risked not being dispatched. However, during non-emergency periods where there were no excess supplies in the market and all suppliers would be dispatched, the incentive to bid high prices remained. Accordingly, in the June 19 Order, the Commission expanded the market monitoring and mitigation plan to produce spot market prices in all hours that are just and reasonable and emulate those that would be produced in a competitive market.[401] As the Commission explained, extending price mitigation to all hours would: (1) provide added protection to customers and the economies of the Western States, (2) permit all energies and attention to be focused on the tasks of adding new supply, upgrading energy infrastructure, transitioning California's markets to a balanced portfolio of short, medium and long-term supply arrangements, and (3) protect neighboring states from undue harm.[402]

Furthermore, the Commission exercised its discretion in setting the mitigated non-reserve deficiency MCP at 85 percent of the last Stage 1 price in order to ensure just and reasonable rates, i.e., rates that fall within a zone of reasonableness. Under competitive

---

[399] April 26 Order at 61,361.

[400] See Request for Rehearing of the Oversight Board filed May 29, 2001.

[401] June 19 Order at 62,558.

[402] June 19 Order at 62,547.

Docket No. EL00-95-001, et al.              - 158 -

conditions, the market is expected to clear at a lower price during non-reserve deficiency hours, as opposed to reserve deficiency hours, because there would be excess generation available to serve the load. Accordingly, the Commission set the mitigated non-reserve deficiency MCP to provide a structure that will minimize potential market power abuses, thereby lowering customer rates, while also encouraging adequate supply in the market for the immediate future.[403] Thus, the arrangement seeks to simulate the results of a competitive market, where prices will be lower when supply is higher relative to demand. Therefore, we deny requests for rehearing and clarification regarding the Commission's price mitigation mechanism in all hours.

We will deny requests by Duke and Reliant for clarification that the mitigated non-reserve deficiency MCP should be 85 percent of the highest ten minute mitigated reserve deficiency MCP because West-wide markets are hourly markets. Furthermore, Duke and Reliant do not provide a sufficient basis to switch from using an hourly average of prices.

        6.      Conditions on Market-Based Rate Authority

Dynegy and Reliant request rehearing or clarification of the provisions in the June 19 Order prohibiting anticompetitive bidding practices. Dynegy requests clarification of the types of bids generators can submit. Dynegy and Reliant claim that there are valid operational justifications for "hockey-stick" bids and bids reflecting scarcity, so they should not be prohibited. For example, Reliant states that "hockey-stick" bids reflect the potential replacement costs that would be incurred as a result of a unit outage where the seller bids the last available megawatts from a unit or portfolio and thereby exposes itself to a replacement cost risk. Reliant also claims on rehearing that the Commission erred in placing vague conditions on sellers' market-based rate authority in the absence of specific findings of market power abuse or unjust and unreasonable rates. In addition, Pinnacle West seeks reassurance that a filing to justify a bid in excess of the mitigated Market Clearing Prices will not be treated as inappropriate behavior that threatens an entity's market-based rate authority.

Commission Response

The Commission denies rehearing or clarification. To ensure that sellers do not engage in certain anticompetitive behavior, we will continue to condition sellers' market-based rates. As explained in the April 26 and June 19 Orders, behavior such as "hockey

---

[403]See June 19 Order at 62,559.

Docket No. EL00-95-001, et al.                    - 159 -

stick" bidding and related bidding is prohibited.[404]  Sellers violating these conditions
would have their rates subject to increased scrutiny by the Commission and potential
refunds.  We reject Reliant's argument regarding "hockey-stick" bids, since the June 19
Order directed the ISO to eliminate from its Tariff the replacement cost penalty which
Reliant cites to justify such bids.[405]  In addition, the Commission seeks to reassure
Pinnacle West that filing to justify a bid in excess of the mitigated Market Clearing
Prices will not be treated as inappropriate behavior.

　　　7.　　Confidentiality of Data

　　　The Oversight Board claims on rehearing that the June 19 Order's failure to
require disclosure of data submitted by sellers to justify bids above the mitigated MCP to
the Oversight Board and other public entities is contrary to law and violates due process.
The Oversight Board asserts that reviewing and challenging the sufficiency of the
attempted justifications is essential to any check on the authority and performance of the
Commission.

　　　Commission Response

　　　We deny the Oversight Board's request to require disclosure of data by sellers that
wish to justify bids above the mitigated MCP because the Oversight Board has no
authority to evaluate wholesale rates.  As discussed earlier in this order,  we have
previously determined that the Oversight Board's role is limited to matters within state
jurisdiction.[406]

　　　8.　　RTO Proposal and ISO Governance

　　　A number of sellers contend that the Commission has afforded too much authority
to the ISO in implementing the mitigation plan, given its lack of independent governance

---

[404]See April 26 Order at 61,360; June 19 Order at 62,565.

[405]June 19 Order at 62,553.

[406]See California Power Exchange Corporation, et al., 85 FERC ¶ 61,263 at
62,067-69 (1998), reh'g denied, 86 FERC ¶ 61,114 (1999); California Electricity
Oversight Board, 88 FERC ¶ 61,172, at 61,576 (1999), reh'g denied, 89 FERC ¶ 61,134
(1999), dismissed sub nom. Western Power Trading Forum and Coalition of New Market
Participants v. FERC, No. 99-1532 (D.C. Cir. filed April 10, 2001).

Docket No. EL00-95-001, et al.                    - 160 -

and its position as a market participant.[407]   Mirant recommends that the Commission
establish a timetable for development of a regional RTO and that the ISO be required to
reconstitute its governing Board.  Pinnacle West urges the Commission to condition
implementation of the mitigation plan on actual reform of the ISO Board and to
scrutinize the ISO's declarations of Stage 1, 2, and 3 emergencies to ensure that they are
in accordance with WSCC reserve deficiency triggers.  PSColorado requests that the
Commission adopt measures to correct problems arising from the ISO having control
over setting the mitigated reserve deficiency MCP while lacking independence.  Duke
states that the ISO's July 10 Compliance Filing indicates that the ISO will use its
discretion in calling system emergencies and requests clarification that the mitigated
reserve deficiency MCP will only be recalculated when there is a reserve deficiency of
less than 7 percent.

        Commission Response

        As noted earlier in this order, in light of more recently filed proceedings, the
Commission will address issues related to the ISO's current governance structure and the
extent of its independence in a future order.  Sellers' arguments and concerns raised
herein concerning the ISO's governance and independence will be addressed at that time.

        We grant Duke's request for clarification that the recalculation of the mitigated
reserve deficiency MCP will only be triggered when reserves in California fall below 7
percent.  The April 26 and June 19 Orders specified that we will use a single market
clearing price derived from must-offer and marginal cost bidding requirements for
reserve deficiency hours, i.e., a recalculation of the mitigated prices would be triggered
when reserves in California fall below 7 percent.[408]  Prior to the April 26 Order, the
Commission granted discretion to the ISO to declare system emergencies based on
various factors; however, the declaration of a system emergency did not trigger new
prices through the mitigation plan.  For reasons identified in the compliance order issued
concurrently with this order, this discretion is no longer warranted during the duration of
the mitigation plan.  Thus, in the order addressing the ISO's compliance filing issued
concurrently with this order, we direct the ISO to modify its Tariff regarding the
declaration of system emergencies to reflect a definition of a Stage 1 system emergency
as when reserves fall below 7 percent, whereupon a new mitigated reserve deficiency
MCP must be calculated.  Therefore, we grant Duke's request for clarification that the

_____

        [407]See, e.g., Requests for Rehearing of Allegheny Energy, Avista Energy, Avista
Utilities, EPSA, IEP, Pinnacle West, and PSColorado.

        [408]See April 26 Order at 61,361-62; June 19 Order at 62,555-56.

Docket No. EL00-95-001, et al.                  - 161 -

single market clearing price auction mitigation will be triggered when reserves in California fall below 7 percent.

     9.     West-Wide Implementation

     Numerous sellers seek rehearing of the decision to extend mitigation to the remainder of the WSCC outside of California.[409] They argue that: the Commission exceeded its authority under section 206;[410] the Commission failed to provide notice of its intention to extend its price mitigation measures to the WSCC spot markets outside of California during hours of reserve sufficiency and to provide an adequate hearing with respect to the extension of price mitigation measures to the WSCC spot markets outside of California during both reserve contingencies and hours of reserve sufficiency;[411] the Commission has failed to provide a reasoned basis for extending price mitigation measure to the entire WSCC;[412] the Commission's decision to impose price mitigation for the entire WSCC is unsupported by evidence in the record that prices are unreasonable in that region;[413] California mitigation measures such as must offer are ill suited for the entire WSCC;[414] and the price mitigation methodology will discourage critically needed investment in infrastructure in the WSCC.[415]

     Southern Cities argues that the assertion of jurisdiction over all transactions utilizing interstate transmission facilities in the WSCC goes beyond the targeted application of the Commission's conditioning authority in the Order No. 888 series and that it is legally deficient.

---

     [409]See, e.g., Requests for Rehearing of Avista Energy, Bonneville, Avista Utilities, Mirant, Pinnacle West, Mirant, Morgan-Stanley, Nevada IEC/CC Washington, PPL, PSColorado, Nevada Commission, and Reliant.

     [410]See, e.g., Requests for Rehearing of Avista Energy and Avista Utilities.

     [411]See, e.g., Requests for Rehearing of Avista Energy and Avista Utilities.

     [412]See, e.g., Requests for Rehearing of Mirant and Morgan Stanley.

     [413]See, e.g., Requests for Rehearing of Nevada IEC/CC Washington and Nevada Commission.

     [414]See, e.g., Request for Rehearing of Nevada Commission.

     [415]See, e.g., Request for Rehearing of Avista Energy.

Docket No. EL00-95-001, et al.                    - 162 -

The ISO contends on rehearing that the June 19 Order fails to provide for monitoring and enforcement of the West-wide mitigation requirements.  The ISO recommends that the Commission monitor compliance with the must-offer requirement by requiring all non-hydroelectric generators in the West to file weekly reports with the Commission.  In addition, the ISO suggests that to monitor compliance with spot price mitigation, the Commission should require all buyers and sellers of spot energy to submit weekly reports to the Commission.  The ISO also requests that the Commission clarify the definition of spot markets in the WSCC.

On rehearing, Bonneville asserts that the Commission has no authority to apply the West-wide mitigation plan and the must-offer requirement to Bonneville because the Commission lacks jurisdiction over Bonneville.  Bonneville states that sections 7(a)(2) and 7(k) of the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act)[416] give the Commission limited jurisdiction over review of Bonneville's power rates.  Bonneville also states that the Commission's assertion of conditioning authority over Bonneville is not supported by statute and cannot override the limitation on its jurisdiction under the FPA and the Northwest Power Act.

APX seeks clarification that because the ISO will calculate the mitigated price after the hour in which it applies and this mitigated price will apply throughout the WSCC, the Commission should indicate that the ISO has an obligation to publish such prices immediately and in a way readily accessible to all market participants.

Commission Response

---

[416]Sections 7(a)(2) and 7(k) of the Northwest Power Act, 16 U.S.C. § 839e(a)(2), provide that the Commission shall approve Bonneville's rates upon finding that such rates:

(A)    are sufficient to assure repayment of the Federal investment in the Federal Columbia River Power System over a reasonable number of years after first meeting the Administrator's other costs,

(B)    are based upon the Administrator's total system costs, and

(C)    insofar as transmission rates are concerned, equitably allocate the costs of the Federal transmission system between Federal and non-Federal power utilizing such system.

Docket No. EL00-95-001, et al.                    - 163 -

The April 26 Order instituted an investigation under section 206 of the FPA into the reasonableness of the rates for wholesale sales in the spot markets in the Western Systems Coordinating Council (WSCC). In order to ensure that rates for sales for resale in spot markets in California and the rest of the WSCC continued to fall within a zone of reasonableness, the June 19 Order expanded price mitigation in California and throughout the remainder of the WSCC during all hours.[417]

The Commission has recognized in prior orders that the California market is integrated with those of other states in the WSCC and that regional solutions are a necessary part of any long-term restructuring of the western marketplace. Furthermore, a staff investigation report analyzing power markets in the Northwest in November and December 2000 found that the high prices and power crisis in California in the summer of 2000 reflected underlying problems in wider regional markets, and impacted the entire Northwest.[418] Based upon the continued need to ensure that rates throughout the Western region remain within a zone of reasonableness, the Commission will continue to apply its mitigation measures throughout the WSCC.

Although the Commission has not found that markets outside of California are dysfunctional, prices in California tend to draw supplies from, and increase prices in, other parts of the WSCC. Under the mitigation plan, spot market prices outside California can be lower than those in California markets, but they are essentially limited to no more than the mitigated Market Clearing Prices determined by the California spot market. This is appropriate because gas prices tend to be higher in California than in other parts of the West. Therefore, the Commission will deny rehearing on the implementation of the Commission mitigation plan throughout the WSCC.

With respect to the ISO's suggestion that the Commission should monitor compliance with the must-offer requirement and price mitigation by reviewing weekly reports submitted by generators in the West, the Commission is not persuaded that such reports are needed at this time. However, we will continue to require each marketer and independent power producing entity to post available capacity on a daily basis on its own web site and on the WSPP web site.[419] If a compliance problem arises, parties may file a complaint with the Commission.

_____

[417]June 19 Order at 62,546.

[418]See Staff Report to the Federal Energy Regulatory Commission on Northwest Power Markets in November and December 2000 at 11.

[419]See June 19 Order at 62,569.

Docket No. EL00-95-001, et al.                - 164 -

    We deny Bonnevilles request for rehearing regarding the limits imposed by the
FPA and the Northwest Power Act over the Commission's jurisdiction over Bonneville's
rates and exercise of conditioning authority.  The FPA and the Northwest Power Act do
not affect the Commission's ability to require governmental entities, including
Bonneville, that make sales into the ISO's markets over which the Commission has
exclusive jurisdiction to abide by the same conditions that are applicable to public
utilities.[420]

    We reject arguments that the Commission did not provide an adequate hearing
with respect to extending price mitigation measures to the WSCC spot markets outside of
California during reserve and non-reserve deficiency hours because the necessary
determinations were made on the basis of a written record developed with paper hearing
procedures.  The necessary determinations were made on the basis of a written record
developed with paper hearing procedures.  Similarly, we reject arguments that the
Commission failed to provide notice of its intention to expand its price mitigation
measures to the WSCC spot markets during non-reserve deficiency hours.  The June 19
Order explained the reasons for our decision to expand price mitigation measures.
Parties have addressed those reasons in their rehearing requests and presented their
countervailing arguments.  Since those arguments have been fully considered and
addressed in this order, no further procedure is necessary to addressthese issues.

    a.    Price Mitigation Outside of California

    A number of sellers argue that the prices in California are inappropriate for the
remainder of the WSCC.[421]  They argue that: using California's market dynamics to
establish maximum prices outside of California fails to recognize important regional
demand variations;[422] seasonal differences and the existence of transmission constraints
means that there will be periods when prices and reserve conditions in California have
relatively little relationship to prices and reserve conditions in the Pacific Northwest;[423]
there is no record support for the Commission's finding that the California market is an

_____

    [420]April 26 Order at 61,356; June 19 Order at 62,551.

    [421]See, e.g., Requests for Rehearing of Dynegy, IEP Nevada IEC/CC Washington,
Portland General, PPL, PSColorado, Nevada Commission, Puget Sound, Sierra Pacific
and Nevada Power.

    [422]See, e.g., Request for Rehearing of IEP.

    [423]See, e.g., Request for Rehearing of Avista Utilities.

Docket No. EL00-95-001, et al.                    - 165 -

appropriate proxy for the rest of the WSCC;[424] that there is no record support for the
Commission's finding that 85 percent of the highest price in the California market during
the last stage 1 emergency is an appropriate proxy price for non-emergency hours; that
the Commission's remedy is based on an unreasonable assumption that prices will be
lower throughout the WSCC when there is not a reserve deficiency in California;[425] that
the Commission erred in precluding the recovery of legitimate opportunity costs and
scarcity rents as well as credit premiums from buyers outside of California having
insufficient credit;[426] that it creates harmful incentives against siting new generation or
generation upgrades, against using forward contracts (where real-time prices are lower),
and to prefer California markets due to the limitation of the creditworthiness adder to
California markets;[427] and that it may adversely affect Nevada customers because
Nevada utilities will have lower spot revenues to use to pay for their own fuel and
purchased power costs, which they would have to recover through increased rates in
Nevada.[428]

Bonneville claims on rehearing that the June 19 Order raises the potential for the
price of power to be capped at an artificially high level, resulting in Bonneville
customers paying unnecessarily high prices for power.  Bonneville seeks clarification so
that the June 19 Order takes into account the fact that California and Pacific Northwest
experience their peak demands at different times of year.

PSColorado requests clarification that utilities in the WSCC outside of California
may recover costs that California generators may recover, including start-up fuel and
emissions costs, and other incurred costs such as purchased power and transmission
costs.

Commission Response

In the November 1 Order, the Commission found that the "electric market
structure and market rules for wholesale sales of electric energy in California are
seriously flawed and that these structures and rules, in conjunction with an imbalance of

---

[424]See, e.g., Request for Rehearing of Nevada IEC/CC Washington.

[425]See, e.g., Request for Rehearing of Nevada IEC/CC Washington.

[426]See, e.g., Request for Rehearing of PPL.

[427]See, e.g., Request for Rehearing of Nevada Commission.

[428]See, e.g., Request for Rehearing of Nevada Commission.

Docket No. EL00-95-001, et al.                    - 166 -

supply and demand in California, have caused, and continue to have the potential to
cause, unjust and unreasonable rates for short-term energy . . . under certain
conditions."[429]  The Commission noted that, although the record did not support findings
of specific exercises of market power, there was "clear evidence that the California
market structure and rules provide the opportunity for sellers to exercise market power
when supply is tight and can result in unjust and unreasonable rates under the FPA."[430]

     The December 15 Order reiterated the earlier findings that the market structures
and rules for wholesale sales of electric energy in California were seriously flawed and
that these structures and rules, in conjunction with an imbalance of supply and demand in
California, had caused, and continued to have the potential to cause, unjust and
unreasonable rates for short-term energy under certain conditions.  Accordingly, the
Commission adopted a number of the proposed remedies presented in the November 1
Order.

     The April 26 Order adopted a prospective monitoring and mitigation plan for
wholesale sales through the organized real-time markets operated by the ISO.  The April
26 Order also established an inquiry into whether a price mitigation plan similar to the
one for the California ISO's organized spot markets should be implemented in the
WSCC.  Recognizing the "critical interdependence among the prices in the ISO's
organized spot markets, the prices in the bilateral spot markets in California and the rest
of the West, and the prices in forward markets,"[431] the June 19 Order expanded the price
mitigation plan to include bilateral spot market sales throughout the WSCC.  Based on
the need for uniform pricing throughout the Western region, the June 19 Order proposed
changes to the WSCC that would mirror the measures to be applied to California.
Consistent with our earlier efforts to modify the existing market structure throughout the
West to minimize the potential for market power abuse, thereby protecting against
possible unjust and unreasonable rates, while also maximizing incentives for increased
supply in the entire Western region, we believe that price mitigation is necessary outside
of California.  Therefore, we deny requests for rehearing of the application of price
mitigation outside of California.

     With regard to PSColorado's request for clarification that sellers in the WSCC
outside of California may recover costs that California sellers may recover, including
start-up fuel and emissions costs, and other incurred costs such as purchased power and

---

[429]November 1 Order at 61,349.

[430]November 1 Order at 61,350.

[431]June 19 Order at 62,547.

Docket No. EL00-95-001, et al.            - 167 -

transmission costs, PSColorado does not specify whether it is referring to transactions
through the ISO or through bilateral contracts.  We clarify that sellers in the WSCC
outside of California that engage in transactions through the ISO will be treated like
sellers in California.  Accordingly, as with sellers in California, we will allow sellers
outside of California transacting through the ISO to invoice the ISO for their start-up fuel
and emissions costs.  Sellers will receive these costs over and above the MCP.  In
addition, as with sellers in California, we will not allow sellers in the WSCC outside
California transacting through the ISO to justify higher-than-mitigated prices based on
purchased power and transmission costs.  Furthermore, we will not allow sellers in the
WSCC transacting outside of California through bilateral contracts to recover start-up
fuel and emissions costs, or any other incurred costs.  Such sellers can freely negotiate to
recover these costs in their contracts.

    10.    <u>Applicability to Governmental Entities and Cooperatives</u>

    Numerous parties seek rehearing of the application of the must-offer requirement
and price mitigation plan to governmental entities.[432]  They contend that the must-offer
requirement and price mitigation plan cannot be applied to municipal utilities that have
not signed Participating Generator Agreements (PGAs) with the ISO;[433] that it violates
sections 201(f),[434] 205 and 206 of the FPA;[435] and that the Commission cannot indirectly
impose requirements on governmental sellers by conditioning their use of the interstate
grid that they cannot impose directly under the FPA.[436]  Furthermore, LADWP contends
that by reaching generation and transmission owned by LADWP, the Commission is
taking the property of LADWP.  PSColorado requests clarification that the must-offer
requirement is limited to confirmed sales on an as-available basis and that it allows
utilities decide the amount of energy available to sell in the short-term wholesale
markets.  APPA suggests that the Commission should consider the establishment of a

---

[432]<u>See</u>, <u>e.g.</u>, Requests for Rehearing of APPA, CMUA, Southern Cities, City of
Burbank, California, Imperial Irrigation District, LADWP, PSColorado, Chelan County,
WA PUD, Grant County, SMUD and Salt River.

[433]<u>See</u>, <u>e.g.</u>, Requests for Rehearing of APPA and CMUA.

[434]<u>See</u>, <u>e.g.</u>, Requests for Rehearing of APPA, Bonneville, City of Burbank,
CMUA and Imperial Irrigation District.

[435]<u>See</u>, <u>e.g.</u>, Requests for Rehearing of APPA, City of Burbank, NRECA and Salt
River.

[436]<u>See</u>, <u>e.g.</u>, Requests for Rehearing of CMUA and SMUD.

Docket No. EL00-95-001, et al.                    - 168 -

"safe harbor" framework for voluntary power sales by governmental entities similar to the safe harbor framework established by the Commission for the voluntary provision of open access transmission service in Order No. 888.

Cooperatives also seek rehearing of the applicability of the must-offer requirement to them.[437] NRECA argues that the Commission should recognize that there are differences between cooperatives and municipal utilities and that cooperatives face unique issues. NRECA requests clarification that cooperatives are released from the must-offer requirement if such sales would force the cooperatives to violate (1) the requirement to maintain their tax exempt status that 85 percent of their annual income must come from their members or (2) Rural Electrification Act (REA) requirements by forcing cooperatives to sell capacity that may be available into the market on a short-term basis making such capacity unavailable for their members at a time when their members desperately need the power (i.e., during a reserve deficiency period).

Commission Response

Parties have raised numerous issues regarding the applicability of the June 19 Order's must-offer and price mitigation requirements to governmental entities and cooperatives in the WSCC bilateral markets. Circumstances at that time appeared to indicate that we could not assure just and reasonable rates and reliable service in bilateral markets throughout the WSCC without those requirements. For example, the general consensus among experts in the Spring of 2001 predicted that California would suffer extensive rolling blackouts throughout the entire summer.[438] Those predictions in fact did not come true. In addition, since the June 19 Order, conditions affecting the electric energy markets in the WSCC began to improve (i.e., favorable temperatures, increased rainfall, and higher levels of gas storage).[439]

We find that, in light of these changes, our decision to apply the June 19 Order's must-offer and price mitigation requirements to governmental entities and RUS-financed

---

[437]See, e.g., Requests for Rehearing of NRECA and AEPCO.

[438]See, e.g., North America Electric Reliability Council May 2001 Summer Special Report on Reliability of the Bulk Electric Supply in North America.

[439]See, e.g., United States Department of Energy's Energy Information Administration, U.S. Natural Gas Storage By State, available at

http://www.eia.doe.gov/pub/oil_gas/natural_gas/data_publications/natural_gas_monthly/current/pdf/table_14.pdf.

Docket No. EL00-95-001, et al.                  - 169 -

cooperatives in order to assure just and reasonable rates and reliable service in bilateral markets throughout the WSCC proved to be unnecessary. Accordingly, we grant rehearing by vacating application of those June 19 Order requirements to governmental entities and RUS-financed cooperatives.[440]

F.    Rehearing of Remaining Issues from July 25 Order

California Parties argue that the Commission should determine just and reasonable cost-based rates that should have been in effect throughout the refund effective period and should order refunds, with interest, of amounts in excess of cost-based rates. PG&E similarly argues that the July 25 Order's refund methodology should be replaced by a cost-of-service based refund methodology. City of San Diego also believes refunds should be based on sellers' cost of service. It contends that determining refunds is necessarily backward-looking and requires after-the-fact review and believes that use of proxy input prices to determine the marginal generator's actual running costs is unsupported and overstates actual costs. San Diego asserts that when actual cost data is readily available, there is no need to adopt a proxy methodology.

The ISO argues that the calculation methodology does not account for real-time congestion. Otherwise, generators in the lower priced zone would get the benefit of the mitigated Market Clearing Prices in the higher priced zone during times when there was real congestion, even though they actually would have received only the mitigated Market Clearing Prices of their own zone because there was insufficient transmission capability to allow prices in the zones to equalize.

Suppliers object to the procedures established leading up to the Chief Judge's recommendation and the Commission's use of the record developed in the settlement proceeding.[441] PSNM, Reliant and the Marketer Group contend that the Commission violated due process and its regulations by permitting the Chief Judge to act in an advisory capacity and by relying on his recommendations. Others allege that the Commission cannot rely on the Chief Judge's recommendation as support for the July 25 Order because it was based on an inadequate record and was procedurally

---

[440]For the reasons previously discussed in this and other orders in these proceedings, however, it remains necessary to apply price mitigation and must-offer requirements to governmental entities and RUS-financed cooperatives to the extent that they participate in the ISO spot markets.

[441]See, e.g., Requests for Rehearing of Marketer Group, Nevada IEC/CC Washington, CAC.

Docket No. EL00-95-001, et al.                    - 170 -

impermissible.[442]  Reliant argues that requiring refunds based on a methodology derived from confidential settlement proceedings and a perfunctory record violates sellers' rights to due process.  Similarly, PG&E argues that the order's conclusions regarding the use of daily spot gas prices were based on oral testimony with no opportunity for discovery and urges the Commission to return to using monthly averages or to provide parties with additional process and data.

Duke argues that the Commission violated due process by constraining the period for the refund hearing and denying the opportunity for suppliers to present evidence of actual costs.  Others point out that they had no opportunity to test purchasers' allegations or to present their own evidence, thus the procedures did not permit them to demonstrate that their rates were just and reasonable.[443]  Burbank asserts that the 45-day limit on the refund hearing will not afford parties an adequate opportunity to present their cases and, thus, violates their due process rights.

With respect to the refund hearing, Dynegy argues that certain issues are properly raised in other forums.  It states that there will be some disputes relating to the ISO settlement process that affect the refunds owed by suppliers which, under the ISO Tariff, must be resolved by arbitration if they are not settled.  It also argues that the Commission lacks jurisdiction to adjudicate commercial disputes about amounts owed to suppliers, some of which are pending in the PG&E bankruptcy proceeding.  Dynegy suggests that no purpose would be served by requiring resolution of those issues here and that it could take the parties and the Judge months or years to complete such an effort.  Dynegy suggests that the better course is as follows.  It would leave "baseline" data to be resolved in other proceedings where appropriate.  The refund proceeding would resolve the issue of whether refunds are owed to suppliers, and if so, what amount.  Then the parties should take at face value claims about amounts owed to suppliers or a range for each supplier, and those claims would be subject to adjustment in other proceedings and not finally decided at the Commission.  If a supplier ends up owing net refunds, payments can be made at that time.

The Marketer Group and Mirant request clarification that, for purposes of the refund hearing, offsets to supplier refund liability include amounts owed to suppliers by the PX, as well as by the ISO.

Salt River requests clarification that the scope of the refund hearing includes:  (1) the settlement statements recalculated by the PX and ISO; and (2) the offset of refund

---

[442]See, e.g., Requests for Rehearing of Mirant, Duke.

[443]See, e.g., Requests for Rehearing of EPSA, PSColorado, PacifiCorp.

Docket No. EL00-95-001, et al.                    - 171 -

amounts owed by a supplier to the PX and ISO against refund amounts owed to the
supplier by the PX and ISO.

Commission Response

Our prior orders have addressed at length the benefits of relying on market
solutions and market mechanisms to mitigate prices.  Parties have raised no new
arguments on rehearing of the July 25 Order that convince us otherwise.

Constraining the period for the refund hearing was appropriate because of the
limited scope of the hearing.  No purpose would be served by allowing the presentation
of actual costs in the hearing, because they would not be relevant to the determination
of the mitigated price in each hour of the refund period pursuant to the refund methodology,
nor to refunds owed or amounts past due.  Nevertheless, we recognize that sellers have
never had an opportunity to present evidence of their marginal costs, and also that the
true impact of the refund formula on sellers' bottom lines will not be known until the
conclusion of the refund hearing.  Therefore, in order to assure adequate process, the
Commission will  provide an opportunity after the conclusion of the refund hearing for
marketers and those reselling purchased power or selling hydroelectric power to submit
evidence as to whether the refund methodology results in an overall revenue shortfall for
their transactions in the ISO and PX spot markets during the refund period.  For the
Commission to consider any adjustments, a seller must demonstrate that the rates were
inadequate based on consideration of all costs and revenues, not just certain transactions.

The Commission's use of the Chief Judge's recommendation was entirely
appropriate.  The Commission's regulations do not prohibit a settlement judge from
issuing a recommendation to the Commission after conclusion of settlement talks, and
this approach is a legitimate hybrid dispute resolution procedure.  The Commission relied
on the Chief Judge's recommendation in formulating a refund methodology because of
his familiarity with the issues presented, yet made its own findings as to each aspect of
the formula and modified the recommendation where needed.  The one exception was the
use of daily spot gas prices, where the Commission relied in part on record evidence
gathered by the Chief Judge.  This issue has been addressed earlier in this order, where
the Commission determined that, even without the evidence relied upon in the July 25
Order, the determination was reasonable.[444]

We will reject the ISO's suggestion to take congestion into account in the refund
formula.  The ISO has presented no evidence that electricity customers would be better

---

[444]See supra, section B.2.b.

Docket No. EL00-95-001, et al.                  - 172 -

off if separate mitigated Market Clearing Prices were calculated for each congestion zone. We take note that no other parties have requested rehearing on this issue, and we decline to impose an additional layer of calculations into an already complicated refund formula.

We do not believe that Dynegy's concerns require any action by the Commission. We agree that certain disputes about amounts owed to suppliers, such as those pending in PG&E's bankruptcy proceeding, are best resolved in other forums. Such circumstances will be addressed on a case-by-case basis as they arise in future proceedings.

We will clarify for the Marketer Group and Mirant that offsets to supplier refund liability should include amounts owed to suppliers by the PX as well as by the ISO. We recognize that the PX may not be able to pay amounts past due because of its pending bankruptcy. Nevertheless, we will expect suppliers to pay net refunds, or offset amounts that they owe to the PX from amounts the PX owes them. On another matter, we note that the November Creditworthiness Order requires the ISO to create a schedule for payment of amounts overdue by DWR so that amounts past due will be paid by February 2002. Thus, these amounts will not be offset against refunds owed by sellers.

We will grant Salt River's request and clarify that the settlement statements recalculated by the PX and ISO and the calculation of offsets are within the scope of the refund hearing.

G.    Pacific Northwest Complaint  (EL01-10-001)

On October 26, 2000, Puget Sound filed a complaint petitioning the Commission for an order capping the prices at which sellers subject to the Commission's jurisdiction, including sellers of energy and capacity under the Western Systems Power Pool Agreement, may sell energy or capacity in the Pacific Northwest's[445] wholesale power markets. Specifically, Puget Sound sought an order that prospectively capped the prices for wholesale sales of energy or capacity into the Pacific Northwest at a level equal to the lowest cap on prices established, ordered, permitted by the Commission for wholesale purchases in, or wholesale sales of energy or capacity to or through the markets operated by the ISO or the PX.

---

[445]Puget Sound indicated that, as used in its complaint, the term "Pacific Northwest" has the meaning set forth in the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. § 839a(14) (1994).

Docket No. EL00-95-001, et al.                    - 173 -

        The December 15 Order declined to implement a region-wide price cap because it
found that such a pricing methodology was impracticable given the market structure in
the Northwest and because the burden of proof had not been met to justify such an
action.[446]

        On rehearing, a number of parties contend that the Commission erred in rejecting
Puget Sound's request for a price cap throughout the Northwest region.  Puget Sound
sought rehearing of the order urging the Commission to impose "a price cap for short-
term (same day or day ahead) wholesale sales by jurisdictional sellers of power in the
Western Interconnection that is equivalent to the 'soft cap' of $150 per MWh" for the ISO
and PX spot markets.[447]  In addition, other parties reiterate intervenors' comments that
the Commission should expand such a cap throughout the entire WSCC.  Several
California parties (e.g., CMUA) argue that the December 15 Order's rejection of the
regional price cap proposal was arbitrary and does not reflect the fact that the adverse
market conditions discussed in the December 15 Order are not limited to California but
are in fact regional in nature.[448]  In addition, the Washington Utilities and Transportation
Commission (Washington Commission) filed comments supporting Puget Sound's
rehearing request and urging the Commission to consider how its actions to stabilize
California's markets could be applied to stabilize conditions throughout the Western
region.

        On June 22, 2001, Puget Sound filed a motion to dismiss its complaint and a
notice of withdrawal of its complaint and its subsequent rehearing request.  Puget Sound
explains that the June 19 Order satisfies its complaint because it implements price
mitigation measures throughout WSCC.  Several parties filed answers to the motion.
Bonneville states that the Commission must fully resolve the issues raised in the
complaint regardless of whether it grants Puget Sound's motion, arguing that the focus on
spot markets in the June 19 Order is not appropriate outside of California, where utilities
rely on forward contracts.  The City of Tacoma and Port of Seattle jointly filed an answer
opposing the motion on the basis that dismissal would unduly prejudice parties outside of
California that relied on the existence of the complaint, and arguing that the issues raised
in the complaint are an integral part of market issues that the Commission is addressing
in the SDG&E proceeding.

_____

        [446]December 15 Order, 93 FERC at 62,019.

        [447]Request for Rehearing of Puget Sound filed January 12, 2001, at 10.

        [448]See, e.g., Requests for Rehearing of California Commission, City of Seattle,
CMUA, County of San Diego, Oversight Board, Puget Sound, and SMUD.

Docket No. EL00-95-001, et al.                    - 174 -

The City of Seattle (Seattle) and the Attorney General of Washington (Attorney General) filed motions to intervene out-of-time in Docket No. EL01-10-000 and motions opposing Puget Sound's notice. The City of Tacoma and the Port of Seattle filed a joint answer opposing the notice but without moving to intervene. Bonneville and the Washington Commission filed responses not explicitly opposing Puget Sound's pleading but urging the Commission to recognize that issues impacting the Pacific Northwest remain, regardless of the status of Puget Sound's complaint. Finally, Pinnacle West filed a response in support of Puget Sound's pleadings. On July 24, 2001, Puget Sound filed a motion to strike the motions of Seattle and Attorney General, and a motion in opposition to their requests to intervene.

As described above, the Commission established a preliminary evidentiary proceeding in the July 25 Order to facilitate development of a factual record on whether there may have been unjust and unreasonable charges for spot market bilateral sales in the Pacific Northwest. The proceeding was intended to help the Commission "determine the extent to which the dysfunctions in the California markets may have affected decisions in the Pacific Northwest."[449]

On rehearing, public utilities in the Northwest object to the Commission's establishment of a preliminary evidentiary proceeding, claiming that the docket was terminated as a matter of law by Puget sound's withdrawal[450] and that the Commission is without jurisdiction to consider sales in the Pacific Northwest.[451] Others contend that the earliest refund effective date that may be used is July 2, 2001, the refund effective date applicable to the West-wide proceeding in EL01-68-000,[452] or even 60 days after July 25, 2001.[453] A number of parties complain that the procedures for investigating the refund issues were unreasonable, violating the due process rights of the parties,[454] and Salt River warns that the proceeding is spiraling out of control and urges the Commission

_____

[449] July 25 Order at 61,520.

[450] See, e.g., Requests for Rehearing of Puget/Avista; BP, Pinnacle West.

[451] See, e.g., Request for Rehearing of PSColorado.

[452] See, e.g., Requests for Rehearing of BP, PSColorado, PSNM, Marketer Group, Nevada IEC/CC Washington, CAC.

[453] See, e.g., Request for Rehearing of Pinnacle West.

[454] See, e.g., Requests for Rehearing of PSColorado, Marketer Group, Nevada IEC/CC Washington, CAC.

Docket No. EL00-95-001, et al.                    - 175 -

to reverse its decision to hold such a proceeding or to narrowly limit its scope. PacifiCorp states that the Northwest parties had not asked for an opportunity to pursue claims against each other, but rather wanted to limit further harm to the Northwest by offsetting costs of purchased power contracts against any refund liability.  Duke asks that the Commission clarify the scope and purpose of the hearing.

Governmental entities challenge the order to the extent it extends section 206 refund jurisdiction to their sales in the Pacific Northwest.[455]  BP argues that the Commission erred in proposing to broaden the definition of a spot market sale.  Pinnacle West and Puget/Avista contend the order is arbitrary and capricious because the Commission failed to define the transactions potentially subject to refund.  Finally, Puget/Avista claim the Commission erred by granting late motions to intervene filed by Seattle and Washington Attorney General.

The Presiding Judge closed the record of the preliminary evidentiary proceeding on September 6, 2001 and issued recommendations and proposed findings of fact on September 24, 2001.  Among the proposed findings of fact are that the preponderance of the evidence establishes the lack of exercise of market power by sellers in the Pacific Northwest, and that parties failed to show that market-based prices were unjust and unreasonable.  Thus, the judge concludes "[t]he record demonstrates that the [Pacific Northwest] market for spot sales of electrical energy was at all times between December 25, 2000 to June 20, 2001 competitive and functional."[456]  The judge also concludes that refunds would have a negative impact on markets in the Pacific Northwest.  Regarding procedural issues, the Judge concludes that allowing intervenors to prosecute a refund claim beyond the scope of the initial complaint "and beyond the procedural path of that Complaint, including its withdrawal" would be improper.[457]  In sum, the Judge recommends that the proceeding be terminated by affirming the December 15 Order's rejection of the complaint and allowing Puget Sound to withdraw its rehearing request.

The Commission issued a notice providing an opportunity for interested parties to comment on the Judge's recommendations and proposed findings of fact.  The notice specified that motions to intervene and comments could be filed on or before October 31, 2001.

―――――――――――――

[455]See, e.g., Requests for Rehearing of LADWP, Northwest PUDs, Chelan County.

[456]Recommendation, slip op. at 99.

[457]Id. at 189.

Docket No. EL00-95-001, et al.                    - 176 -

Commission Response

    Parties have filed numerous comments about the Presiding Judge's recommendations and proposed findings of fact. Once the Commission has had an opportunity to consider the comments, we will issue an order on the merits of the issues pending in that proceeding. Thus, we will defer acting on the requests for rehearing of the December 15 Order and the July 25 Order related to Puget Sound's complaint, as well as Puget Sound's motion to dismiss and notice of withdrawal.

H.    Hearing Procedures

    On December 6, 2001, the Commission issued an order deferring the hearing procedures before Judge Birchman pending issuance of this order.[458] The requests for rehearing and clarification granted in this order modify the refund methodology and will require recalculation of the mitigated prices applicable to each hour of the refund period. However, the Commission does not anticipate that significant changes to the formula(e) previously used by the ISO to generate this data will be needed. We will direct Judge Birchman to resume the hearing schedule, modified as needed, to permit the Judge to certify findings of fact to the Commission, without an initial decision, as soon as practicable after the date the ISO provides the hourly mitigated prices.

    On December 13, 2001, the ISO filed a motion requesting the Commission to clarify the refund hearing procedures in two respects. First, the ISO asks that, if the Commission maintains the requirement that a mitigated price be applied on an hourly or interval basis, the mitigated prices first be litigated to final Commission resolution (i.e., after the Commission addresses the Judge's findings of fact and parties have an opportunity to seek rehearing) before the ISO (and PX) be required to recalculate settlement statements. The ISO explains that these settlement reruns are extremely resource intensive and, until the point that no subsequent modifications will occur, requiring such an effort is a waste of resources. Further, the ISO argues, the premature calculation of settlement statements will not inform the consideration of the mitigated prices. Second, the ISO asks that the Commission provide an opportunity to the parties to submit comments and reply comments on the report that will be submitted by Judge Birchman at the conclusion of the refund hearing.

    On December 14, 2001, California Generators filed an answer opposing the ISO's motion, and California Parties filed in support thereof.

---

[458] San Diego Gas & Electric Company et al., 97 FERC ¶ 61,258 (2001).

Docket No. EL00-95-001, et al.                    - 177 -

Because all parties have not yet had a chance to comment on the ISO's motion, the Commission cannot determine the reasonableness of the change in sequencing of steps for this proceeding that the ISO seeks. Therefore, we will direct Judge Birchman to consider the request, along with any comments received thereon, and submit to the Commission a Report and Recommendation on the ISO's proposal by January 11, 2002.

We agree that parties should have an opportunity to comment on the Judge's findings of fact. Accordingly, we will permit any participant in the SDG&E proceeding to file comments on the findings of fact not later than 20 days after issuance thereof. Not later than 15 days after the comment date, any participant may file reply comments.

The Commission orders:

(A)     The Commission hereby denies rehearing of the issues from the August 23 and November 1 Orders not previously acted upon.

(B)     The Commission hereby denies rehearing of the Amendment No. 33 Order, as discussed in the body of this order.

(C)     The Commission hereby grants rehearing of the December 15 Order with respect to the imposition of the underscheduling penalty and denies rehearing of that order in all other respects, as discussed in the body of this order.

(D)     The Commission hereby dismisses as moot in part and denies in part requests for rehearing of the March 9 Order and terminates the following dockets: ER01-1444-001, ER01-1445-001, ER01-1446-001, ER01-1447-001, ER01-1448-002, ER01-1449-002, ER01-1450-001, ER01-1451-002, ER01-1452-001, ER01-1453-001, ER01-1454-002, ER01-1455-002, and ER01-1456-002.

(E)     The Commission hereby grants rehearing in part and denies rehearing in part of the June 19 Order, as discussed in the body of this order.

(F)     The Commission hereby grants rehearing in part and denies rehearing in part of the July 25 Order, as discussed in the body of this order.

(G)     The Commission hereby rejects the ISO's Tariff Amendment No. 38 filed in Docket No. ER01-1579-000 as moot and dismisses the requests for rehearing in Docket No. ER01-1579-001.

Docket No. EL00-95-001, et al.                    - 178 -

    (H)    The Commission hereby dismisses the complaint in Docket No. EL01-34-000 and EL01-34-001 as moot.

    (I)    The Commission hereby directs SoCal Edison to amend its market-based tariff, as discussed in the body of this order.

    (J)    CARE's request for administrative aid under section 319 of the Federal Power Act is hereby denied, as discussed in the body of this order.

    (K)    The Commission hereby directs Judge Birchman to recommence the refund hearing schedule, as discussed in the body of this order.

    (L)    The Commission hereby directs Judge Birchman to submit a Report and Recommendation regarding the timing for the ISO recalculation of its settlement statements by January 11, 2002, as discussed in the body of this order.

    (K)    The ISO is hereby directed to file by May 1, 2002 its revised congestion management proposal and a plan for implementation of a day-ahead market.

By the Commission.  Commissioner Massey dissented in part
                         with a separate statement attached.

( S E A L )

                                  Linwood A. Watson, Jr.,
                                  Acting Secretary.

Docket No. EL00-95-001, et al.                - 179 -

Appendix A

Comprehensive List of Parties in Docket Nos. EL00-95-000, et al. and/or EL01-68-000

AES Alamitos, LLC  *[intervention granted by Chief Judge Wagner]*
AES NewEnergy, Inc.
AES Pacific, Inc.
AES Southland, L.L.C.  *[intervention granted by Chief Judge Wagner]*
Alcoa Inc., Columbia Falls Aluminum Company, and Kaiser Aluminum & Chemical
        Corporation (jointly)
Allegheny Energy Supply Company, LLC  *[intervention granted by Chief Judge
        Wagner]*
American Association of Business Persons with Disabilities
American Forest & Paper Association  (AF&PA)
American Public Power Association (APPA) *[intervention granted in 7/25 order]*
Arizona Districts
Arizona Electric Power Cooperative (AEPCO)  *[intervention granted by Chief Judge
        Wagner]*
Arizona Public Service Company  *[respondent from 3/9 order]*
Arizona Residential Utility Consumer Office, New Mexico Attorney General, and
        the Colorado Office of Consumer Counsel (jointly)
Atofina Chemicals, Inc., Goldendale Aluminum Company, and Northwest Aluminum
        Company (jointly)
Attorney General for the State of Nevada, through its Bureau of Consumer Protection
        (Nevada BCP) *[intervention granted by Chief Judge Wagner]*
Automated Power Exchange, Inc.  (APX)
Avista Energy, Inc. *[party status clarified in 7/25 order; respondent from 3/9 order]*
Berry Petroleum Company  *[intervention granted in 7/25 order]*
Bonneville Power Administration  (Bonneville)
BP Energy Company  (BP Energy)
Caithness Energy, L.L.C. *[intervention granted in 5/16 order]*
California Air Resources Board *[intervention granted in 6/19 order]*
California Cogeneration Council *[intervention granted by Chief Judge Wagner]*
California Department of Water Resources   (DWR)
California Electricity Oversight Board   (Oversight Board)
California Hydropower Reform Coalition and Environment Defense (jointly)
California Independent System Operator Corporation   (ISO)
California Manufacturers and Technology Association
California Municipal Utilities Association   (CMUA)
California Power Exchange Corporation   (PX)

Appendix A                              - 180 -

California Small Business Association and California Small Business
        Roundtable (jointly)
California State Assembly *[intervention granted in 6/19 order]*
CAlifornians for Renewable Energy, Inc. (CARE) *[intervention granted by order issued
        8/13/01]*
Calpine Corporation    (Calpine)
Carson Cogeneration Company, LP; Mojave Cogeneration Company, LP; O.L.S.
        Energy-Camarillo; O.L.S. Energy-Chino; and PE Berkeley, Inc. (collectively, QF
        Petitioners) *[intervention granted in 7/25 order]*
CE Generation LLC    (CE Generation)
Cities of Anaheim, Azusa, Banning, Colton, and Riverside, California (jointly)
        (Southern Cities)
Cities of Redding, Santa Clara, and Palo Alto, California, and the M-S-R Public Power
        Agency (jointly)    (Cities/M-S-R)
City and County of San Francisco, California    (San Francisco)
City of Burbank  *[intervention granted in 6/19 order]*
City of Dana Point, California
City of Escondido, California
City of Glendale, California  *[intervention granted by Chief Judge Wagner]*
City of Oakland, California/Port of Oakland  *[intervention granted by Judge Birchman]*
City of Pasadena, California  *[intervention granted by Chief Judge Wagner]*
City of Poway, California
City of San Diego, California    (City of San Diego)
City of Seattle, Washington    (City of Seattle)
City of Tacoma, Washington  *[intervention granted by Chief Judge Wagner]*
City of Vernon, California (Vernon)
City of Vista, California
County of Los Angeles, California  *[intervention granted by Chief Judge Wagner]*
County of San Diego, California (County of San Diego)
Cogeneration Association of California and Energy Producers and Users
        Coalition (jointly)    (CAC/EPUC)
Constellation Power Source, Inc.
Consumer Federation of America  *[intervention granted in 6/19 order]*
Consumers First
Coral Power, L.L.C.
Duke Energy North America LLC, Duke Energy Trading and Marketing, LLC,
        and Duke Energy Merchants, LLC (jointly)    (Duke)
Dynamis, Inc. *[intervention granted in 5/16 order]*
Dynegy Power Marketing, Inc., El Segundo Power, LLC, Long Beach Generation LLC,
        Cabrillo Power I LLC, and Cabrillo Power II LLC (jointly)    (Dynegy)
EF Oxnard, Inc. *[intervention granted in 5/16 order]*

Appendix A                    - 181 -

El Paso Merchant Energy, L.P. (El Paso)

Electricity Consumers Resource Council, American Iron and Steel Institute, and
      American Chemistry Council (jointly)  (Elcon, et al.)

Electric Power Supply Association  (EPSA)

Enron Power Marketing, Inc., and Enron Energy Services, Inc. (jointly)  (Enron)

Exelon Corporation, on behalf of Exelon Generation Company, LLC, PECO Energy
      Company, and Commonwealth Edison Company  (Exelon) *[intervention
      amended by Judge Birchman]*

FPL Energy, LLC

H.Q. Energy Services (U.S.), Inc.

IdaCorp Energy, LP *[intervention granted by Chief Judge Wagner]*

Idaho Power Company *[intervention granted by Chief Judge Wagner]*

Imperial Irrigation District *[intervention granted in 6/19 order]*

Independent Energy Producers Association  (IEP)

Industrial Customers of Northwest Utilities

Internal Services Department of Los Angeles County

Los Angeles Dep't of Water and Power (LADWP) *[intervention granted in 6/19 order]*

Merced Irrigation District

Merrill Lynch Capital Services, Inc.

Metropolitan Water District of Southern California  (Metropolitan)

MG Industries  (MG)

Mirant California, L.L.C., Mirant Delta, L.L.C., and Mirant Potrero, L.L.C. (Mirant)

Mirant Americas Energy Marketing LP *[intervention granted in 5/16 order]*

Modesto Irrigation District  (Modesto)

Morgan Stanley Capital Group Inc. (Morgan Stanley)

Mr. Mark B. Lively

Multiple Intervenors

National Rural Electric Cooperative Association  (NRECA) *[intervention granted in
      6/19 order]*

Nevada Power Company *[intervention granted by Chief Judge Wagner; also,
      respondent from 3/9 order]*

New Mexico Regulation Commission *[intervention granted in 7/25 order]*

New West Energy Corporation  (New West)

New York Independent System Operator, Inc.

New York Mercantile Exchange  (NYMEX)

North Star Steel Company

Northern California Power Agency  (NCPA)

NRG Power Marketing, Inc.

Oregon Office of Energy *[intervention granted herein]*

Orion Power New York, Inc.

Pacific Gas and Electric Company  (PG&E)

Appendix A                              - 182 -

Pacific Gas and Electric National Energy Group  *[intervention granted by Chief Judge Wagner]*

PacifiCorp

PacifiCorp Power Marketing  *[intervention granted by Chief Judge Wagner]*

Peck Energy Company *[intervention granted by Judge Birchman]*

People of the State of California, ex rel. Bill Lockyer (Attorney General of California) *[intervention granted in 7/25 order]*

Pinnacle West Companies (Pinnacle West)

PJM Industrial Customer Coalition and Coalition of Midwest Transmission Customers (jointly)

Port of Seattle, Washington  *[intervention granted by Chief Judge Wagner]*

Portland General Electric Company (Portland General)

PPL EnergyPlus, LLC and PPL Montana, LLC (jointly)   (PPL)

Public Service Company of Colorado (PSColorado) *[intervention granted by Chief Judge Wagner; also, respondent from 3/9 order]*

Public Service Company of New Mexico (PSNM) *[intervention granted by Chief Judge Wagner]*

Public Service Electric and Gas Company, PSEG Energy Resources & Trade LLC, and PSEG Power LLC (jointly)

Public Utilities Commission of the State of California   (California Commission)

Public Utilities Commission of Nevada (Nevada Commission) *[intervention granted in 7/25 order]*

Public Utility Commission of Oregon *[intervention granted herein]*

Public Utility District No. 1 of Chelan County, Washington (Chelan County) *[intervention granted by Judge Birchman]*

Public Utility District No. 2 of Grant County, Washington (Grant County) *[intervention granted by Judge Birchman]*[459]

Puget Sound Energy, Inc.   (Puget Sound)

Reliant Energy Power Generation, Inc. and Reliant Energy Services, Inc. *[the latter, a respondent from 3/9 order]*   (Reliant)

Ridgewood Power LLC   (Ridgewood)

Sacramento Municipal Utility District   (SMUD)

Salt River Project Agricultural Improvement and Power District (Salt River) *[intervention granted by Chief Judge Wagner]*

---

[459]Grant County is joined by several other Public Utility Districts (PUDs) in its request for rehearing of the July 25 Order; collectively they are referred to as Northwest PUDs. The other PUDs have intervened only in Docket No. EL01-10-000. As only Grant County is a party in Docket No. EL00-95-000, et al, it alone has the legal status to challenge portions of the July 25 Order that relate to Docket No. EL00-95-000, et al.

Appendix A                          - 183 -

San Diego Gas & Electric Company   (SDG&E)
Secretary of the U.S. Department of Energy   (Department of Energy)
Sempra Energy Trading Corporation  *[intervention granted by Chief Judge Wagner; also, respondent from 3/9 order]*
Shell Energy Services Company, L.L.C.
Sierra Pacific Power Company  *[intervention granted by Chief Judge Wagner]*
South Coast Air Quality Management District  *[intervention granted in 6/19 order]*
Southern California Edison Company   (SoCal Edison)
Southern California Water Company (SoCal Water) *[intervention granted in 7/25 order]*
Southern Energy California, L.L.C., Southern Energy Delta, L.L.C., and Southern Energy Potrero, L.L.C. (jointly)   (Southern Energy) [became Mirant]
The Utility Reform Network   (TURN)
Tractebel Power, Inc. *[intervention granted in 5/16 order]*
TransAlta Energy Marketing, Inc. (TransAlta)  *[intervention granted by Judge Birchman]*
TransCanada Energy Ltd.  *[intervention granted by Judge Birchman]*
Transmission Agency of Northern California   (TANC)
Truckee Donner Public Utility District *[intervention granted herein]*
Turlock Irrigation District (Turlock) *[intervention granted in 6/19 order]*
Tucson Electric Power Company  *[intervention granted by Chief Judge Wagner]*
Universal Studios  *[intervention granted by Chief Judge Wagner]*
Unsecured Creditors Committee of Pacific Gas & Electric Company *[intervention granted by Chief Judge Wagner]*
Washington State Attorney General  *[intervention granted by Chief Judge Wagner]*
Washington Utilities and Transportation Commission (Washington Commission) *[intervention granted in 7/25 order]*
Watson Cogeneration Company
Western Power Trading Forum   (WPTF)
Williams Energy Marketing & Trading Company and Williams Energy Services Company  *[the latter, a respondent from 3/9 order]* (Williams)

Appendix B

Appendix B

Parties in Docket No. ER01-607-000

California Department of Water Resources
California Electricity Oversight Board
California Power Exchange Corporation
City of Redding, California  *
City of Santa Clara, California  *
Dynegy Power Marketing, Inc.
M-S-R Public Power Agency  *
Modesto Irrigation District  *
Pacific Gas and Electric Company
Public Utilities Commission of the State of California
Reliant Energy Power Generation, Inc.
Southern California Edison Company
Transmission Agency of Northern California  *
Western Power Trading Forum


*        Entities that filed collectively as Northern California Public Entities

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| San Diego Gas & Electric Company, | Docket Nos. EL00-95-001 |
|                 Complainant | EL00-95-004 |
|       v. | EL00-95-005 |
| Sellers of Energy and Ancillary Services | EL00-95-006 |
|   Into Markets Operated by the California | EL00-95-007 |
|   Independent System Operator and the | EL00-95-010 |
|   California Power Exchange, | EL00-95-011 |
|                 Respondents | EL00-95-019 |
| | EL00-95-039 |
| | EL00-95-046 |
| | EL00-95-047 |
| | |
| Investigation of Practices of the California | Docket Nos. EL00-98-001 |
|   Independent System Operator and the | EL00-98-004 |
|   California Power Exchange | EL00-98-005 |
| | EL00-98-006 |
| | EL00-98-008 |
| | EL00-98-010 |
| | EL00-98-011 |
| | EL00-98-018 |
| | EL00-98-037 |
| | EL00-98-043 |
| | EL00-98-044 |
| | |
| Public Meeting in San Diego, California | Docket No. EL00-107-002 |
| | |
| Reliant Energy Power Generation, Inc., | |
|   Dynegy Power Marketing, Inc., | |
|   and Southern Energy California, L.L.C., | |
|                 Complainants, | |
|       v. | Docket No. EL00-97-001 |
| California Independent System Operator | |
|   Corporation, | |
|                 Respondent | |

2

California Electricity Oversight Board,
                    Complainant,
          v.
All Sellers of Energy and Ancillary Services          Docket No. EL00-104-001
Into the Energy and Ancillary Services Markets
Operated by the California Independent System
Operator and the California Power Exchange,
                    Respondents


California Municipal Utilities Association,
                    Complainant,
          v.
All Jurisdictional Sellers of Energy and Ancillary          Docket No. EL01-1-001
Services Into Markets Operated by the California
Independent System Operator and the
California Power Exchange,
                    Respondents


Californians for Renewable Energy, Inc. (CARE),
                    Complainant,
          v.
Independent Energy Producers, Inc., and All          Docket No. EL01-2-001
Sellers of Energy and Ancillary Services Into
Markets Operated by the California Independent
System Operator and the California Power
Exchange; All Scheduling Coordinators Acting
on Behalf of the Above Sellers; California
Independent System Operator Corporation; and
California Power Exchange Corporation,
                    Respondents


Puget Sound Energy, Inc.,
                    Complainant,
          v.
All Jurisdictional Sellers of Energy and/or Capacity          Docket No. EL01-10-001
at Wholesale Into Electric Energy and/or Capacity
Markets in the Pacific Northwest, Including

3

Parties to the Western Systems Power Pool
Agreement,
                        Respondents

| | |
|---|---|
| California Independent System Operator Corporation | Docket Nos. ER01-607-000 ER01-607-001 |
| California Independent System Operator Corporation | Docket Nos. RT01-85-002 RT01-85-005 |
| Investigation of Wholesale Rates of Public Utility Sellers of Energy and Ancillary Services in the Western Systems Coordinating Council | Docket Nos. EL01-68-002 EL01-68-008 |
| California Power Exchange Corporation | Docket No.ER00-3461-001 |
| California Independent System Operation Corporation | Docket No. ER00-3673-001 |
| California Independent System Operator Corporation | Docket No. ER01-1579-001 |
| Southern California Edison Company and Pacific Gas and Electric Company | Docket Nos. EL01-34-000 EL01-34-001 |
| Arizona Public Service Company | Docket No. ER01-1444-001 |
| Automated Power Exchange, Inc. | Docket No. ER01-1445-001 |
| Avista Energy, Inc. | Docket No. ER01-1446-001 |
| California Power Exchange Corporation | Docket No. ER01-1447-001 |
| Duke Energy Trading and Marketing, LLC | Docket No. ER01-1448-002 |
| Dynegy Power Marketing, Inc. | Docket No. ER01-1449-002 |
| Nevada Power Company | Docket No. ER01-1450-001 |

4

| | |
|---|---|
| Portland General Electric Company | Docket No. ER01-1451-001 |
| Public Service Company of Colorado | Docket No. ER01-1452-001 |
| Reliant Energy Services, Inc. | Docket No. ER01-1453-001 |
| Sempra Energy Trading Corporation | Docket No. ER01-1454-002 |
| Mirant California, LLC, Mirant Delta, LLC, and Mirant Potrero, LLC | Docket No. ER01-1455-002 |
| Williams Energy Services Corporation | Docket No. ER01-1456-002 |

(Issued December 19, 2001)

MASSEY, Commissioner, dissenting in part:

This order essentially "stays the course" on our market mitigation program in the Western markets. The markets have behaved reasonably since our program was put in place, and I agree with staying the course. Today's order reaffirms many excellent aspects of our program, such as providing for refunds for some past sales, requiring most sellers in the WSCC to offer all available power in spot markets during all hours, conditioning market based rate authority to prevent anticompetitive behavior, and establishing price mitigation for all hours across the WSCC until September 2002. Thus there is a lot to like in this order.

Although I agree with the great bulk of the policy calls made in this order, there are some decisions regarding the refund program from which I dissented in our July 25 order.[1] Those decisions, reaffirmed here, are exercising jurisdiction over governmental entities to require refunds, refusing to deal with the generation withholding issue by basing refund calculations on the actual past dispatch instead of using some other means such as an "assumed economic dispatch," using spot gas prices in the refund calculation that are based on indices instead of on actual gas costs, and imposing a 10% creditworthiness adder in the refund calculations. I continue to disagree with these conclusions.

---

[1] San Diego Gas & Electric Co., et al., 96 FERC ¶ 61,120 (2001) at 61,521-61,523.

5

     For these reasons, I must respectfully dissent in part from an otherwise excellent, comprehensive and well-written order.


William L. Massey
Commissioner