# EXHIBIT 5

105 FERC ¶ 61,066
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Pat Wood, III, Chairman;
William L. Massey, and Nora Mead Brownell.

| | |
|---|---|
| San Diego Gas & Electric Company,<br>Complainant, | Docket Nos. EL00-95-081<br>EL00-95-074<br>EL00-95-086 |
| v.<br>Sellers of Energy and Ancillary Services<br>Into Markets Operated by the California<br>Independent System Operator and the<br>California Power Exchange,<br>Respondents | |
| Investigation of Practices of the California<br>Independent System Operator and the<br>California Power Exchange | Docket Nos. EL00-98-069<br>EL00-98-062<br>EL00-98-073 |

ORDER ON REHEARING

(Issued October 16, 2003)

1.    In this order, the Commission acts on requests for rehearing and clarification of an order issued on March 26, 2003 concerning refunds for California.[1]  This order benefits customers by further clarifying the method for calculating refunds for electricity purchases made in the organized spot markets in California during the period October 2, 2000 through June 20, 2001 (the Refund Period).

**Background**

2.    In the Refund Order, the Commission adopted in part and modified in part the presiding administrative law judge's Proposed Findings issued on December 12, 2002.[2]  We

---

[1] See San Diego Gas & Electric Company, et al., 102 FERC & 61,317 (2003) (Refund Order).

[2] See San Diego Gas & Electric Company, et al., 101 FERC & 63,026 (2002).

Docket Nos. EL00-95-081 et al                                                      - 2 -

also directed generators that wish to recover fuel costs above the MMCP for spot gas
purchases made during the Refund Period in the California Independent System Operator
Corporation (CAISO) and California Power Exchange (PX) markets to submit their actual
daily cost of gas information. The Commission also directed its staff to convene an on-the-
record technical conference, which its staff held on May 22, 2003, to address issues
concerning the information submitted on generators' fuel cost allowance submissions.

3.      The following parties filed timely motions for rehearing and/or clarification of the
Refund Order:  Arizona Electric Power Cooperative, Inc. (AEPCO); Automated Power
Exchange (APX); Bonneville Power Administration; CAISO; CA Generators;[3] CA
Parties;[4] Californians for Renewable Energy; Calpine Corporation; Cities of Anaheim,
Azusa, Banning, Colton and Riverside, California; City of Burbank, California; City of
Glendale, California;[5] City of Los Angeles Department of Water and Power; City of
Pasadena, California; City of Seattle, Washington; City of Redding, California; City of
Vernon, California; Competitive Supplier Group;[6] Coral Power, L.L.C.; El Paso Merchant
Energy, L.P.; Enron Power Marketing, Inc. and Enron Energy Services, Inc.; Modesto
Irrigation District; Morgan Stanley Capital Group, Inc.; Northern California Power
Agency; PacifiCorp; Powerex Corp.; PPL Montana, LLC and PPL EnergyPlus, LLC;
Public Utility District No. 2 of Grant County, Washington; Puget Sound Energy, Inc.;
Reliant Energy Power Generation, Inc. and Reliant Energy Services, Inc.; Sacramento
Municipal Utility District; Salt River Project Agricultural Improvement and Power

---

[3]The CA Generators is composed of subsidiaries of Duke, Dynegy, Reliant,
Mirant, and Williams.

[4]The CA Parties is composed of the California Attorney General, the California
Electricity Oversight Board, the California Public Utilities Commission, Southern
California Edison Company, and Pacific Gas & Electric Company.

[5]On April 28, 2003, the City of Glendale, California filed an errata to its timely
filed April 25, 2003 request for rehearing.

[6]The Competitive Supplier Group includes the following companies:  Portland
General Electric Company; Exelon Corporation (on behalf of Exelon Generation
Company, LLC, PECO Energy Company and Commonwealth Edison Company); Public
Service Company of New Mexico, Sempra Energy Trading Corp., IDACORP Energy
L.P.; BP Energy Corporation; Tractebel Energy Marketing Inc.; Avista Energy, Inc.;
Puget Sound Energy, Inc.; Powerex Corporation; PPL EnergyPlus, LLC; PPL Montana,
LLC; TransAlta Energy Marketing (California) Inc.; TransAlta Energy Marketing (U.S.)
Inc.; Constellation Power Source, Inc.; and Coral Power, L.L.C.

Docket Nos. EL00-95-081 et al                                                    - 3 -

District; San Diego Gas & Electric Company; Sempra Energy Trading Corp.; Silicon
Valley Power of the City of Santa Clara, California; State Water Contractors and the
Metropolitan Water District of Southern California; TransAlta Energy Marketing (U.S.)
Inc. and TransAlta Energy Marketing (California) Inc.; Tucson Electric Power Company;
Turlock Irrigation District; and Williams Energy Marketing & Trading Company
(Williams).

4.       On April 16, 2003, APX filed an answer to Coral's Motion for Clarification.  On
May 6, 2003, Avista Corporation d/b/a Avista Utilities filed a motion requesting that the
Commission consider its February 3, 2003 comments as an answer to the Sacramento
Municipal Utility District rehearing request.  On May 12, 2003, the CA Generators filed an
answer to the CAISO's request for clarification.  On May 12, 2003, the CAISO filed an
answer to the CA Generators and Williams motions for clarification or requests for
rehearing.  On May 12, 2003, the CA Parties filed an answer to the Williams motion for
clarification.

**Requests Denied on Procedural Grounds**

5.       Several parties raise arguments on rehearing that are identical to those they have
already raised and that the Commission has already thoroughly considered and rejected.[7]
Accordingly, we will deny rehearing of the following issues and reference the appropriate
portions of the presiding judge's proposed findings or the Refund Order:  (1) Seattle's
contention that the presiding judge should not have struck from the record the portion of
Seattle's testimony and evidence concerning Seattle's hourly transactions in California
outside the CAISO and PX markets;[8] (2) Powerex's and Vernon's arguments regarding the
method the PX proposed for handling congestion;[9] (3) Salt River Project's argument that
energy charges captured in neutrality charge types must be mitigated;[10] (4) arguments
concerning what units are eligible to set the MMCP for each 10-minute interval in the
Refund Period;[11] (5) Vernon's proposal to use net purchase or sale amounts for an hour
(rather than gross sales and purchases), where a participant has both sales and purchases

---

[7]In the March 26 Order, the Commission adopted many of the presiding judge's
proposed findings and explanations.

[8]See 101 FERC & 63,026 at paragraph 19 (2002).

[9]Id. at paragraphs 653-75.

[10]Id. at paragraphs 556-65.

[11]Id. at paragraphs 94-180.

'0031016-3036 Issued by FERC OSEC 10/16/2003 in Docket#: EL00-95-081

Docket Nos. EL00-95-081 et al                                                          - 4 -

within the same zone, within that same hour, and within the same market (e.g., PX Day-Ahead Market);[12] (6) Pasadena's arguments that the Commission should not have required it to allocate the cost of purchased emissions credits pro rata to all non-native load sales;[13] (7) Pasadena's argument regarding the opportunity cost of lost sales of emissions credits;[14] (8) CA Parties' arguments for bilateralization of refund obligations even though the CAISO and PX markets were not designed that way;[15] (9) CA Parties' arguments against the classification of certain BPA, Powerex, and Dynegy transactions as non-spot and, thus, exempt from mitigation;[16] (10) CA Parties' arguments regarding mitigation of energy exchange transactions;[17] (11) CA Parties' arguments to expand the scope of transactions subject to mitigation to include those with durations of up to one month;[18] (12) the arguments of LADWP, EPME, and Transalta that certain of their transactions should have been classified as long-term transactions exempt from mitigation;[19] (13) Competitive Supplier Group's arguments against the adoption of the presiding judge's criteria for determining units eligible to set the MMCP based in part on whether they were incrementally or decrementally dispatched;[20] (14) AEPCO's argument that CAISO and PX

---

[12]Id. at paragraphs 709-714.

[13]See 102 FERC & 61,317 at paragraph 113 (2003).

[14]Id.

[15]See 101 FERC & 63,026 at paragraphs 769-88 and 102 FERC & 61,317 at paragraphs 131-32.

[16]See 101 FERC & 63,026 at paragraphs 475-85, 491-92, and 512-17.

[17]See 102 FERC & 61,317 at paragraphs 153-54.  CA Parties also state that the Commission failed to address arguments concerning the CAISO's proposed accounting methodology for energy exchange transactions.  We clarify that the Commission's prior approval of the CAISO's accounting methodology for energy exchange transactions in Docket No. ER01-2886-000 was to be applied to all jurisdictional entities that are similarly situated, including those in this proceeding, for the reasons stated in paragraph 536 of the presiding judge's proposed findings.

[18]See San Diego Gas & Electric Company, et al., 97 FERC & 61,275 (2001) at 62,222.

[19]Id. at paragraphs 493-511.

[20]Id. at paragraphs 181-201.

J031016-3036 Issued by FERC OSEC 10/16/2003 in Docket#: EL00-95-081

Docket Nos. EL00-95-081 et al                                          - 5 -

refunds and obligations should be aggregated instead of treated separately;[21]
(15) Burbank's argument regarding its claimed NOx costs;[22] and (16) NCPA's argument
that market-priced Reliability-Must-Run contracts should not be mitigated.[23]

6.      We will also deny several parties' out-of-time rehearing requests that the
Commission reconsider its finding that out-of-market (OOM) sales, which these parties
allege were bilateral sales, are subject to mitigation and refund liability.  As we stated in
the July 25, 2001 Order in this proceeding,[24] spot market OOM transactions are subject to
refund and subject to the hourly mitigated price established in the ordered hearing.
Accordingly, we will deny these parties' requests for rehearing on this issue.

**MMCP Issues**

**Should average and/or incremental heat rate curves be used in determination of the
MMCP?**

<u>**Background**</u>

7.      The Commission directed the presiding judge to determine the marginal cost of the
last unit dispatched to meet load in California's real-time market in each hour of the
Refund Period and to set the MMCP at that marginal cost.  The Commission provided the
presiding judge with the following formula to calculate MMCP.[25]  MMCP=(Heat Rate x
Gas Price + $6 for O&M) x 1.1(creditworthiness adder beginning 1/6/01).

8.      In the Refund Order, the Commission adopted the presiding judge's selection of the
incremental heat rate approach as being the best means of replicating a competitive market
outcome.  The Commission also found no basis in the record to treat Pasadena differently
from all other sellers and, thus, directed that incremental heat rate data be used for
Pasadena's gas turbine.  However, the Commission also adopted the presiding judge's

---

[21]<u>Id.</u> at paragraph 789.

[22]<u>Id.</u> at paragraphs 742-45 and Refund Order at paragraph 111.

[23]<u>Id.</u> at paragraphs 640-45.

[24]<u>See</u> San Diego Gas & Electric Company, <u>et al.</u>, 96 FERC & 61,120 at 61,515
(2001).

[25]<u>See</u> July 25 Order.

Docket Nos. EL00-95-081 et al                                                    - 6 -

finding that AEPCO's mixed average and incremental heat rate data for its out-of-state units were acceptable for use in setting the MMCP.

## Comments

9.    CA Generators, Competitive Supplier Group, Modesto Irrigation District, and Calpine request rehearing of the Commission's decision to adopt the use of incremental heat rates in the determination of MMCP.[26] CA Generators argue that the Refund Order's stated objective of attempting to replicate a competitive market outcome is a conclusory standard that sheds no light on the choice between average and incremental heat rates.  CA Generators argue that the marginal generator would in fact bid its energy based on its average heat rate and that the Refund Order did not demonstrate why this would not be true.

10.    CA Generators also argue that incremental heat rates exclude minimum load fuel costs, which means that prices developed through use of incremental heat rates will be insufficient for the marginal generator to recover its full fuel cost.  CA Generators also point out that the choice need not be between all-average or all-incremental heat rates because they have shown at hearing that a mixed approach, based on individual circumstances, may be a better approach.  Under this approach, which CA Generators championed before the presiding judge, average heat rates would be used for units that would not have run in the interval but for the CAISO dispatch instruction, while incremental heat rates would be used for units that merely changed output levels in response to the CAISO dispatch.  They contend that the mixed heat rate approach is appropriate because, according to them, the record demonstrates that minimum load fuel costs are a marginal cost when the decision at issue is whether to turn a unit on or off, but are not marginal costs when the decision at issue is whether to change a unit's output level.

11.    Finally, CA Generators contend that the Refund Order appears to contradict itself.  They contend that while the Refund Order rejects recovery of minimum load fuel costs through the MMCP, it appears to accept the proposition that generators should recover their minimum load fuel costs.  This is because in the discussion of the fuel cost allowance the order states that the allowance ". . . provides a means to directly reimburse generators for their fuel costs. . ."[27] Moreover, since the April 22 Order clarified that the fuel cost allowance is also calculated based on incremental heat rates, CA Generators assert that the Commission has prevented even that avenue of full fuel cost recovery.

---

[26]Calpine adopts the arguments of CA Generators without further elaboration.

[27]Refund Order at P14.

Docket Nos. EL00-95-081 et al                                                    - 7 -

12.     Modesto Irrigation District makes similar points and also argues that the
Commission did not acknowledge one of its arguments from its initial comments to the
presiding judge's proposed findings.  That argument was that the incremental heat rate
methodology errs by treating the CAISO's real time market and the PX's day-ahead and
hour-ahead markets as if they were the same.  Since the markets are dispatched separately,
Modesto Irrigation District argued that there is no guarantee that the same units will be
dispatched in each market.  Accordingly, Modesto Irrigation District argued that real-time
incremental heat rates are an unreliable factor for determining an accurate MMCP for all
energy consumed during any time period.[28]  AEPCO and Competitive Supplier Group
make similar arguments.

13.     Regarding the Pasadena gas turbine heat rates, CA Generators argue that the
Commission erred by not adopting the presiding judge's proposed finding.  CA Generators
opine that the Commission may have misunderstood the nature of the dispute between the
CAISO and Pasadena.  The dispute, according to CA Generators, was not over
abandonment of incremental heat rates.  Rather, it appears that the CAISO and Pasadena
had different views as to how the incremental heat rate should be determined.  Since
Pasadena's gas turbines have only one operating level above zero, and move from zero to
that operating point within one ten-minute interval, Pasadena believed that the CAISO's
attempt to define an intermediate operating point to use as the starting point for the
incremental heat rate calculation was unsupported.  Accordingly, Pasadena defined its
incremental heat rate based on the change from zero output to the full operating level,
which happens to be the same as its average heat rate at full operating level.  According to
CA Generators, this is what the presiding judge approved.  CA Generators therefore
request that the Commission, on rehearing, accept Pasadena's proposed heat rate as the
appropriate incremental heat rate for its gas turbines.

14.     Pasadena, itself, makes similar arguments on rehearing.  CA Parties, on the other
hand, request clarification that the Commission intended for the CAISO's incremental heat
rates to be used for Pasadena's gas turbines.

15.     CA Parties continue to argue for rejection of AEPCO's heat rate data for the same
reasons that they expressed before issuance of the Refund Order but now offer two
additional arguments.  The first new argument is that a key assumption used by AEPCO in
order to determine which unit made a sale to the CAISO or PX, according to CA Parties
has been rendered invalid by certain "admissions" AEPCO made in its responses to the
Commission's data request in Docket No. PA02-2.  The assumption in question involved
AEPCO's assertion that the state requirement to serve its native load at least-cost meant

---

[28]Modesto Irrigation District Request for Rehearing at 3.

Docket Nos. EL00-95-081 et al                                        - 8 -

that in any given interval in which it made an off-system sale to the CAISO, its CAISO sales were served by its highest cost generation. CA Parties contend that in PA02-2, AEPCO admitted that it occasionally made off-system sales to others besides the CAISO and occasionally purchased power to serve off-system sales instead of generating it in-house.

16.    The second new argument is that the Commission's handling of the AEPCO issue has violated CA Parties' due process rights. As noted at paragraph 46 of the Refund Order, the presiding judge initially struck testimony and exhibits dealing with this issue pursuant to the Commission's December 19 Order that did not permit out-of-state generators to set the MMCP. However, following issuance of the May 15 Rehearing Order, the presiding judge restored this material to the record, set an abbreviated schedule for parties to file simultaneous briefs, and denied motions for discovery and to file additional rebuttal briefs. The Refund Order also noted at footnote 18 that (1) Trial Staff and CAISO each filed rebuttal testimony prior to the presiding judge's decision to strike; (2) testimony was subsequently restored to the record; and (3) CA Parties elected not to file such testimony prior to the May 15 Rehearing Order.

**Discussion**

17.    Most of the rehearing arguments against the use of incremental heat rates to set the MMCP were previously made before the presiding judge, then considered and rejected by him. In adopting his findings, the Commission adopted his reasoning as to those arguments and we see nothing in the requests for rehearing that invalidates that reasoning. Accordingly, we need only address the new arguments raised on rehearing.

18.    Regarding the contention that the Refund Order contradicts itself, we disagree. Incremental heat rates were adopted as the best means of replicating a competitive market outcome and the fuel cost allowance was not in any way meant to reimburse alleged costs that may not be recovered as a result of using incremental heat rates. Rather, the fuel cost allowance was adopted because in most cases generators paid the California spot gas index price.[29]  There is no contradiction. The Commission offered separate solutions for the separate problems identified.

19.    Regarding the argument that the use of incremental heat rates in the new fuel cost allowance mechanism will not allow generators to recover their actual fuel costs, we will address this concern in a subsequent order.

--------

[29]See Refund Order at paragraph 61.

Docket Nos. EL00-95-081 et al                                    - 9 -

20.     Regarding Modesto Irrigation District's renewed argument that real-time incremental heat rates are an unreliable factor for determining an accurate MMCP for all energy consumed during any time period, we find the argument unpersuasive and possibly inappropriate at this stage of the proceeding.  Even if we were to accept Modesto Irrigation District's argument that the incremental heat rate of the marginal unit in the real-time market may not be appropriate because different units may be on the margin in the different markets during any given interval, we can find no reason why Modesto Irrigation District's argument would not apply equally well to the average heat rate of the same real-time marginal unit.  In both cases, under Modesto Irrigation District's argument, the heat rate characteristics of the marginal unit in the real-time market would not necessarily be representative of the heat rate characteristics of the marginal units in the other markets at issue.  Accordingly, on its face Modesto Irrigation District's argument does not support its contention that use of average heat rates will result in more accurate MMCPs than use of incremental heat rates.  Accordingly, we will reject this aspect of Modesto Irrigation District's request for rehearing.

21.     Regarding Pasadena's gas turbines, we will grant rehearing.  The arguments on rehearing have convinced us that we were operating under a mistaken impression as to how the CAISO defined the intermediate operating points it proposed to use for Pasadena's gas turbines.  Where a unit can move from zero output to full output in one ten-minute interval, and was essentially either off or dispatched to its full output level during the Refund Period, we see no justification for any attempt to artificially subdivide the unit's operating range by defining additional intermediate operating levels.  We believe that output changes from zero to full output in one ten-minute interval are essentially instantaneous.  Accordingly, we agreed with the presiding judge's proposed finding that Pasadena's gas turbines had only one operating point besides zero and, thus, that the average heat rate should be the same as the incremental heat rate for Pasadena's gas turbines.  In contrast, most other units require more time to respond, especially for start-up from zero output, and frequently operate at intermediate output levels for extended periods of time.  Pasadena's gas turbines, therefore, are distinguishable from other units at issue here.  Accordingly, while as discussed above we will uphold our adoption of the CAISO's incremental heat rate approach in general, we will reverse our prior decision regarding Pasadena's gas turbines and adopt the presiding judge's exception to allow use of Pasadena's heat rate data for its gas turbines.

22.     Regarding AEPCO's heat rate data, we will deny rehearing.  The presiding judge undertook a reasoned, fact-specific analysis on this issue and AEPCO's general responses in Docket No. PA02-2 provide no basis to question that fact-specific analysis.  Furthermore, the arguments that due process was not served are belied by the fact that two parties submitted rebuttal testimony and exhibits on this issue that were considered by the

Docket Nos. EL00-95-081 et al                                      - 10 -

presiding judge. Those two parties, trial staff and the CAISO, chose to file this rebuttal testimony under the trial schedule that applied to this issue. The CA Parties simply chose not to avail themselves of the opportunity to file rebuttal testimony under the trial schedule. Accordingly, CA Parties' due process rights were not impaired.

**What is the proper use of gas price indices for the calculation of the MMCP for each interval?**

## Background

23.    In light of findings from the Staff Final Report that the prices established in the California spot gas markets were not solely the outcome of fundamental supply and demand forces, the Commission modified the mitigated market-clearing price formula in the California refund proceeding to use producing-area prices plus a tariff rate transportation allowance (including a fuel compression charge allowance) instead of California spot gas prices.

24.    The Commission also followed the Staff Final Report's recommendation to establish a fuel cost allowance mechanism to ensure that generators are able to recover their actual fuel costs, but found that a modification to Staff's proposal was necessary. To verify that generators paid spot gas prices, the Commission required each generator to base its fuel cost allowance on its actual daily cost of gas incurred to make spot power sales in the PX and CAISO spot markets. The Commission required that generators assign their shortest term gas purchases to their spot power sales by ranking their gas supplies by term and allocating those gas supplies to spot power fuel requirements starting with the shortest term gas supply, proceeding sequentially to the next shortest term supply, until the generator's spot power demand for gas is met. The average cost of this portion of the generator's gas supply portfolio would serve as the cost of gas for the additional fuel cost allowance.

25.    As recommended in the Staff Final Report, the Commission found that this cost allowance for generators should not be included in the MMCP, but should be separate.

## Comments

26.    A broad cross-section of sellers requested rehearing of this change to the MMCP

:0031016-3036 Issued by FERC OSEC 10/16/2003 in Docket#: EL00-95-081

Docket Nos. EL00-95-081 et al                                             - 11 -

methodology.[30] Their main argument is that the Commission violated due process by
adopting staff recommendations that were not addressed in the hearing in this case and
about which the parties had no meaningful opportunity to respond or rebut. In this regard,
Competitive Supplier Group argues that the Commission must vacate its reliance on the
Staff Final Report and establish evidentiary procedures that provide the parties full due
process rights under the FPA and APA, if it wishes to modify the MMCP methodology.

27.    Additionally, sellers argue that the conclusions of the Staff Final Report were not
well supported and, thus, should not have been relied upon by the Refund Order. In this
respect, Reliant's rehearing request includes a substantial analysis purporting to
demonstrate why its gas marketing activities, as discussed in Chapter II of the Staff Final
Report, were not only appropriate but had no effect on market prices. First, Reliant argues
that gas market price volatility led to increased trading by Reliant, not the reverse as the
Staff Final Report concluded. Reliant contends that the phenomenon of price volatility
leading to increased trading is common across commodity markets, and that its own
analysis prove that Reliant's trading trailed the increase in volatility. Reliant also argues
that it did not benefit from the increase in gas prices because it was not insulated from
such increases. Reliant also asserts that the staff analysis of the impact of Reliant's trading
activities on gas price indices was flawed in its construction because the model only
included one variable, "churn" trading, out of the many variables that could have impacted
price. Reliant's alternative analysis, which purports to correct this alleged deficiency,
concludes that Reliant's trading activities had insignificant impact. Further, Reliant argues
that its trading activities did not meet the criteria, or screens, established to prove market
manipulation in any commodity or securities market.

28.    Meanwhile, CA Generators contend that the discussion and findings in Chapter III
of the Staff Final Report regarding published natural gas price indices are based on an
"enormous leap of logic" and, in any event, do not support the change in MMCP
methodology. According to CA Generators, the leap of logic is that Chapter III appears to
assume that the cited misreporting would have skewed prices higher. CA Generators
argue that Staff's evidence actually shows that misreported prices were just as likely to be
lower as higher. CA Generators next argue that the Staff Final Report inappropriately
relied on data from outside the West and outside of the Refund Period without proving that
this data was relevant in the West. Furthermore, according to CA Generators, staff's
analysis of the difference between published index prices and actual prices is flawed

───────────────────

[30]Specifically, rehearing of this issue was requested by CA Generators, BPA,
LADWP, Powerex, El Paso, Silicon Valley Power, Competitive Supplier Group,
Redding, AEPCO, Turlock, Burbank, Glendale, NCPA, Calpine, PUD2 Grant, and
Anaheim.

Docket Nos. EL00-95-081 et al                                              - 12 -

because it focused inappropriately on only one component (fixed-price contracts) of
generators' gas purchases and ignored the fact that actual trading occurs over a range of
prices on any given day (or month), not at the midpoint reported by the trade press. CA
Generators also assert that staff's contention that the generators paid $0.30/MMBtu less
than the California index prices during the period cannot serve as justification for a change
in proxy price that reduces gas costs by $5.60/MMBtu.

29.     CA Generators also contend that Chapter VII, which addressed wash trading, is of
limited usefulness because it does not indicate what impact, if any, such alleged trading
had on gas prices. In addition, CA Generators argue that Staff's reliance on the California
State Senate committee hearing testimony of Ms. Michele Markey was unwarranted since
none of her supporting documents was ever made public and she was never subject to
cross-examination. With that said, CA Generators note that even if her testimony is
acceptable, it supports CA Generators position, not staff's, because it actually shows that
misreported prices were just as likely to be lower as higher.

30.     CA Generators also argue that the Staff Final Report never addressed their
October 15, 2002, comments that included arguments that the system of gas-price
reporting is nearly identical to reporting systems used for all commodity markets and that
sources that use substantially different data collection methodologies than those
questioned by staff confirm the accuracy of the reported California delivery point index
prices at issue. Competitive Supplier Group makes a similar argument that the
Commission ignored its evidence that California gas markets have a long history of
deviating from prices in the production basins.

31.     Sellers also take issue with Staff's conclusion that the effects of scarcity cannot be
separated from the effects of market and price manipulation. In this regard, CA
Generators contend that this argument is an insufficient basis to "ignore the evidence that
demonstrates that scarcity drove prices up, and instead to attribute increases in price to
manipulation[.]"[31] Furthermore, CA Generators argue that the Commission's reliance on
this idea in the Refund Order is inconsistent with prior Commission orders, such as Order
No. 637,[32] in which the Commission emphasized the crucial role that pricing plays in
signaling economic scarcity and ensuring that gas moves to those that value it the most.
CA Generators argue that evidence submitted by Dynegy on October 15, 2002, proves that

_____

[31]CA Generators' request for rehearing at 14.

[32]Order No. 637, FERC Stats. & Regs. & 31,091, on reh'g, Order No. 637-A,
FERC Stats. & Regs. & 31,099 (2000), aff'd in relevant part, Interstate Natural Gas Ass'n
of America v. FERC, 285 F.3d 18 (D.C. Cir. 2002).

Docket Nos. EL00-95-081 et al                                           - 13 -

the California delivery point index prices reflected reasonable scarcity rents and market
behavior and that, therefore, there was no basis for the Commission to adopt staff's
recommended basin plus transportation gas proxy.  AEPCO goes further, stating that the
Commission's revised MMCP approach sweeps away all scarcity effects in both the gas
and electric markets and pretends that the scarcity never existed.  BPA, meanwhile, argues
that even if there are issues with gas price manipulation, the Commission's remedy should
have been aimed solely at manipulators, not at all sellers subject to the MMCP.  Turlock,
Burbank, and Glendale make similar points.  Grant and Joint Cities[33] argue that the Staff
Final Report, in essence, inconsistently holds that manipulation should be remedied even if
it cannot be quantified but scarcity and all other legitimate issues that likely impacted gas
prices should be discounted completely if they cannot be quantified.

32.      CA Generators and NCPA also contend that the fuel cost allowance mechanism
will not make generators whole for the actual prices they paid and will not be sufficient to
encourage new entry of generation into the California market.  In this regard, CA
Generators take issue with certain aspects of the Staff Final Report's analysis of generators'
gross operating profits during the Refund Period.  CA Generators contend that a longer
period than the Refund Period must be analyzed in order to determine whether prices
provide sufficient fixed cost recovery.  Pointing to the long-run marginal cost analysis of
Dynegy's witness, Dr. William Heironymous, CA Generators argue that, because prices
were quite low in the first two years after restructuring and returned to these low levels
after the Refund Period, the revised gas proxy prices result in long-run prices below long-
run marginal cost levels.[34]  NCPA, on the other hand, focuses on the idea that the fuel cost
allowance will not address purchased power and hydro replacement costs where NCPA's
mitigated sales were made from these resources.  Joint Cities have similar concerns about
purchased power resellers.

33.      Tucson asks the Commission to reconsider its determination to impose an
alternative, substantially lower spot gas price to determine the MMCP based on the
findings and recommendations made in an investigative report issued by the Commission's
Staff on the same day as the Refund Order.  Tucson states that the Commission should
reinstate the original average spot gas price formulation adopted in earlier Commission
orders.  Additionally, Tucson states that it was an error for the Commission to fail to
confirm and address with specificity the forum for sellers to demonstrate that the effect of

---

[33]Joint Cities are the Cities of Anaheim, Azusa, Banning, Colton, and Riverside,
California.

[34]CA Generators request for rehearing at 22.

Docket Nos. EL00-95-081 et al                                      - 14 -

the Commission's Refund Order would be to deprive them of an adequate opportunity to recover their costs.

34.    Additionally, CA Generators argue that the Commission was jurisdictionally barred from modifying the MMCP methodology because that issue was already before the U.S. Court of Appeals.  CA Generators argue that FPA Section 313(b), 16 U.S.C. ' 825l(b) vests the U.S. Court of Appeals with exclusive jurisdiction to modify a Commission order once the Commission has filed the record with the appellate court.[35]

35.    AEPCO contends that the Commission's MMCP methodology violates the Commission's intention to replicate the outcome of a competitive market for several reasons including the following:  retroactively changing the rules that govern the market and failure to reflect scarcity, capital/capacity costs, or pre-January 6, 2001 creditworthiness risks.

36.    Silicon Valley Power argues that the MMCP methodology should be abandoned because the MMCPs published thus far by CAISO show anomalous, and thus according to Silicon Valley Power, inaccurate results.  Silicon Valley Power points to examples where off-peak MMCPs are higher than on-peak MMCPs at the same delivery point.  Silicon Valley Power also appears to argue that since the MMCP is based on the marginal costs of the marginal unit in the real-time market, all generators should be guaranteed full cost recovery in every hour.  However, Silicon Valley Power argues, costs can not be the same for all delivery points within California in any given hour.  Thus, according to Silicon Valley Power, since there is only a single MMCP in each hour, the MMCP methodology can not permit all sellers to recover their costs.

**Discussion**

37.    As an initial matter, we find no merit to the sellers' argument that the Commission violated due process when it adopted its staff's recommendations concerning the change to the MMCP methodology.  Sellers had the opportunity to comment on the Commission staff's August 13, 2002, Initial Staff Report that recommended a change to the MMCP methodology.  In fact, most of the sellers making this argument that they were not given the opportunity to respond, including Dynegy, Reliant, Mirant, AEPCO, BPA, Redding, El Paso, Anaheim, PUD2, Powerex, Williams, and the Competitive Supplier Group, filed comments to this Initial Staff Report.  Furthermore, CA Generators incorrectly characterize the finding in Chapter III of the Staff Final Report as concluding that the manipulation of published natural gas indices necessarily skewed prices higher.  Staff

---

[35]CA Generators' request for rehearing at 26-7.

Docket Nos. EL00-95-081 <u>et al</u>                                                    - 15 -

determined, in both the Initial Report and the Final Report, that the manipulation uncovered in the investigation created published indices that were "not sufficiently reliable to be used in the California refund proceeding for purposes of calculating the MMCP and resultant refunds".[36] CA Generators also argue that Staff's use of testimony by Michelle Markey was unwarranted because it was non-public and not subject to cross examination but even if it was acceptable, it supports their claim that the misreported prices were just as likely to be low as high. Again, Staff's use of Ms. Markey's testimony was to show a further example of why the indices were unreliable. The Commission agrees with Staff's conclusion that the published indices were not sufficiently reliable to be used for purposes of calculating the MMCP.

38.     CA Generators also argue that the Staff Final Report inappropriately relied on data from outside the West and outside of the Refund Period without proving that this data was relevant in the West. The fact that the Report describes activity outside of the West as well as the West does not diminish its findings regarding the West.

39.     Staff found numerous examples of significant energy traders deliberately manipulating the published natural gas price indices in order to favor their trading positions. Whether the price reporting process is similar to that in other commodity markets, as argued by CA Generators, is irrelevant. The fact that the Staff Report raised such serious questions and found direct evidence of manipulation and attempted manipulation of the published price indices shows that the indices are not sufficiently reliable for use in calculating the MMCP.

40.     CA Generators; AEPCO; Turlock, Burbank and Glendale; and Grant and Joint Cities argue that the Final Report fails to consider the effect of scarcity in its MMCP calculation and resultant refunds. We disagree. The refund calculations allow for scarcity in the recovery of legitimate costs borne by generators. We agree that generators should not pay for the manipulation of the published natural gas price indices, but nor should California electricity customers. The refund calculation method proposed by Staff in the Final Report and adopted by the Commission is consistent with the need to give refunds to customers without penalizing the generators.

41.     We also disagree that Reliant's alternative analysis supports a different conclusion from Chapter II. We find most telling Reliant's attempt to define away the problem by using a measure of churn that only captures offsetting buys and sells in the same five minute increment. Since Reliant frequently bought early and sold late in the 90 minute trading day, these metrics are blind to the precise activity they are supposed to analyze.

---

[36]Final Report at III-1.

Docket Nos. EL00-95-081 et al                                              - 16 -

42.    Regarding Reliant's Topock argument, as noted above, the Commission primarily found that the indices are not sufficiently reliable for use in calculating the MMCP because of the serious questions and direct evidence of manipulation and attempted manipulation of the published price indices detailed in the Staff Report.  Accordingly, the Commission would have adopted the Staff recommendations in the absence of Chapter II of the Final Report.  The lack of liquidity at Topock and the effect of Reliant's trading on prices at that location was only one of the factors relied upon.  The Staff Final Report explains a number of problems with the published price data including that they were unreliable, could not be verified and were subject to manipulation due to the total lack of internal controls for reporting.  Staff also cited excessive basis differentials and that the California spot gas market was dysfunctional due to the influence of the electric spot market dysfunctions.  The Staff report concludes that due to the influence of Enron Online (EOL) and the other problems described above, the natural gas market in California was itself one of the forces driving the meltdown of the California electricity market.

43.    Accordingly, the Commission denies rehearing of our decision to change the gas price indices used to calculate MMCP in this proceeding.

44.    Additionally, at the May 22, 2003 technical conference, Commission staff heard a presentation and comments concerning the basin plus transportation gas price proxy data series the CA Parties submitted in Exhibit No. CA-16, Appendices N and O, from the CA Parties' March 3, 2003 filing in these proceedings.  The Commission finds this gas price proxy data series to be reasonable and accurate.  Accordingly, the Commission directs that the CAISO and the PX use this gas price proxy data series as an input into the calculation of the MMCP and that suppliers use this data series as the baseline over which their fuel cost allowance claims will be calculated.

45.    Finally, the arguments by AEPCO and Silicon Valley Power against the MMCP concept in general are misplaced at this stage of the proceeding.  The decision to use an MMCP was made earlier in this proceeding and was not a live issue before the presiding judge.

**Continued Existence of Alternative to MMCP**

**Background**

46.    In the December 19 and May 15 Orders, the Commission provided marketers with the opportunity to demonstrate that their portfolio costs exceeded their cost recovery under the MMCP methodology.

Docket Nos. EL00-95-081 et al                                      - 17 -

**Comments**

47.    Coral and SMUD request clarification that nothing in the Refund Order changes marketers' rights to make that showing.

**Discussion**

48.    We hereby grant clarification on this issue.  After final MMCPs are calculated, marketers will still have the right to submit cost evidence, on a portfolio-wide basis, demonstrating that their overall costs would not be recovered, as provided in our past orders.

**Mitigation of Replacement Reserves**

**Background**

49.    Replacement Reserves are an ancillary service involving capacity that is dedicated to the CAISO.  The units providing this capacity can change to a CAISO-designated operating level within sixty minutes and can maintain that level for at least two hours.  In prior orders, the Commission has directed that sellers of energy in the real-time market who also sold the associated capacity ahead of time as Replacement Reserves should receive either the capacity payment for Replacement Reserves or the energy payment but not both.[37]  This change became effective January 2, 2001.  Prior to that date, such sellers received both payments.

**Comments**

50.    CA Parties note that they presented evidence during this proceeding that called into question the CAISO's separate mitigation of Replacement Reserves and associated energy. They argued that the capacity payment and associated energy payment should instead be summed and the total mitigated by the MMCP.  CA Parties state that after the presiding judge granted a motion to strike this testimony, they resubmitted it as an offer of proof and urged the Commission to reverse the presiding judge on this issue in their initial comments.  Since the Refund Order did not address this issue, CA Parties renew their argument that the Commission should require the capacity payment and associated energy payment to be summed and the total mitigated by the MMCP.

_____

[37]See 93 FERC & 61,121 at 61,362 and 93 FERC & 61,294 at 62,002 (2000).

Docket Nos. EL00-95-081 et al                                          - 18 -

**Discussion**

51.     We find that the presiding judge was correct to strike testimony on this issue as being outside the scope of matters set for hearing.  That said, upon consideration of the arguments raised by CA Parties here and by other parties before the presiding judge,[38] we believe that the issue does merit clarification by this Commission.  Having reviewed the arguments, we believe that the CAISO's position correctly reflects the collective results of our prior orders as summarized above.  As recorded in the hearing transcript,[39] the CAISO argued that the approved terms of the CAISO Tariff should be followed in addressing this issue.  Accordingly, the CAISO argued that prior to January 2001 there should be a mitigated payment for capacity plus a mitigated payment for energy and after that there should be just one mitigated payment.  We agree.  This is consistent with the actual CAISO Tariff terms and the filed rate as approved during the period.[40]

**Mitigation of Energy Imports**

**Background**

52.     The CAISO originally proposed to mitigate the price of energy imports using ten-minute intervals even though WSCC rules require the imports to be sold for a minimum of one hour.  The presiding judge found that energy imports should instead be mitigated using hourly average MMCPs and the Refund Order adopted this finding.

**Comments**

53.     Competitive Supplier Group requests clarification that the hourly average MMCP will be used to mitigate the hourly average price of the imported energy and not each ten-minute price of that energy during the hour.  If such clarification is not granted,

---

[38]See Tr. at 3782-96.

[39]Id at 3792.

[40]We note that prior to the strike of this issue, some parties argued that Replacement Reserve payments should be mitigated separately because the December 19 Order found that there had been no justification given why Replacement Reserves should be treated differently from other ancillary services.  However, we agree with CA Parties that the December 19 Order was responding to a different proposal; i.e., that Replacement Reserve payments should simply be refunded in their entirety.  See 97 FERC ¶ 61,275 at 62,215-16 (2001).

Docket Nos. EL00-95-081 et al                                                    - 19 -

Competitive Supplier Group seeks rehearing.

**Discussion**

54.    For purposes of mitigation, as we stated in the discussion of this issue in the Refund Order,[41] there is no basis to treat Energy Imports differently from other types of energy. Under the CAISO's rules and procedures, the only difference in how Energy Imports are treated involves accommodation in the CAISO's dispatch process of the fact that Energy Imports must be dispatched for a minimum of one hour under WSCC rules.  However, beyond pre-dispatching an accepted Energy Import bid for each interval in the pertinent hour, the Energy Import receives no special treatment.  Its eligibility to set the BEEP Interval Price in each interval, and the Hourly Ex Post Price if the next resource is not dispatched, is no different from the price-setting rights of any dispatched resource. Accordingly, our adoption of the presiding judge's finding on this issue simply reflected that Energy Imports should be mitigated just like all other types of energy.  No further clarification is needed and the alternate request for rehearing is denied.

**Section 202(c) Issues**

**What transactions were conducted pursuant to Section 202(c) of the Federal Power Act?**

**Background**

55.    In a July 26, 2001 Order, the Commission excluded from refund liability those transactions entered into under orders (DOE Orders) issued by the Secretary of Energy (Secretary).[42]  The Commission stated that "rates for transactions entered into under Section 202(c) in compliance with the Secretary's orders are outside the scope of this refund proceeding."[43]  Consistent with this direction, the presiding judge held a hearing to determine whether and to what extent the participants made transactions under Section 202(c) during the Refund Period and, thus, were not subject to the Commission's mitigated pricing methodology.

---

[41]Refund Order at paragraph 79.

[42]See San Diego Gas & Electric Company, et al., 96 FERC & 61,120 (2001) (July 25 Order), order on clarification and reh'g, 97 FERC & 61,275 (2001).

[43]See Id. at 61,516.

)031016-3036 Issued by FERC OSEC 10/16/2003 in Docket#: EL00-95-081

Docket Nos. EL00-95-081 et al                                          - 20 -

56.    In the Refund Order, we summarily adopted the presiding judge's findings
regarding most 202(c) issues.  Specifically, the presiding judge identified certain eligibility
criteria and applied those criteria to identify transactions that were made under
Section 202(c).  The presiding judge also determined at paragraph 273 that the burden of
proof to show that a transaction qualifies as a Section 202(c) exclusion lies with those who
are claiming 202(c) status because they are seeking an exemption from the mitigated
market pricing and refund liability required by the Commission's July 25 and December 19
Orders.  As such, the presiding judge found, each seller is the proponent of a claim and,
under the Administrative Procedure Act of 1946, 5 U.S.C. ' 552 et. seq., as well as the
Federal Power Act, has the burden of establishing a prima facie case in support of its
claim, and the ultimate burden of persuasion.  In most instances, he found that this burden
had not been met.  In the Refund Order, the Commission found that those who meet the
criteria applied by the presiding judge to establish which transactions qualify as Section
202(c) transactions have met the burden of proof.  Those that cannot meet this criteria, did
not meet the burden of proof.

57.    The presiding judge also found that transactions claimed by Coral on December 13
and 14, 2000, which were not days on which the CAISO certified an emergency (one of
the identified criteria), were not shown to have been made in response to a request of the
CAISO under the DOE Orders.  Accordingly, he found that they are subject to mitigation
and refund.

58.    Regarding Coral's claimed transactions on December 13 and 14, 2000, under the
December 14, 2000 DOE Order, since Attachment A entities were not required to deliver
energy until 12 hours after the CAISO had filed a certification of emergency with DOE,
which it did not do until December 20, the Commission agreed with the presiding judge's
strict interpretation of the DOE Orders.  While the Commission was sensitive to arguments
that the Secretary's December 13 announcement may have confused the issue prior to
release of his December 14 Order, the fact remained that no legal obligation on generators
could attach before that order was actually issued, and under the DOE order itself, no legal
obligation on generators attached until 12 hours after the CAISO filed a certification of
emergency with DOE.  On balance, the Commission found that the presiding judge's
proposed finding on this issue was reasonable and adopted it.

**Comments**

59.    Coral makes the following arguments on rehearing:  (1) the Commission abused its
discretion and failed to engage in reasoned decision-making in failing to find that Coral's
sales to the CAISO were made pursuant to FPA Section 202(c); (2) the Commission's
decision that no legal obligation on generators attached until 12 hours after the CAISO
filed a certification of emergency with DOE is not based on substantial evidence, and is

Docket Nos. EL00-95-081 et al                                      - 21 -

unlawful under the FPA because it delegates to the CAISO, a non-governmental third-party, the decision whether to require that sales be made to the CAISO; (3) the Commission has retroactively imposed a new standard governing Coral's sales in violation of the filed rate doctrine; (4) the Commission's decision not to exempt from mitigation these sales Coral made to the CAISO is unreasonable and bad public policy; (5) the Commission failed to engage in reasoned decision-making when it did not adhere to its policy of taking into account equitable considerations when adopting remedies; and (6) because Coral will underrecover its costs for its sales to the CAISO on December 14, 2000, the Commission's reasoning was irrational when it found that mitigating Coral's December 14, 2000 sales did not harm Coral.

60.     Generally, other parties, including City of Burbank, State Water Contractors and the Metropolitan Water District of Southern California, City of Pasadena, City of Glendale, Modesto Irrigation District, and Southern Cities state that the Commission erred in summarily adopting the presiding judge's proposed findings concerning Section 202(c) transactions for the following reasons:  (1) the presiding judge failed to determine that specific transactions were made pursuant to Section 202(c); (2) the post hoc imposition of documentation requirements to establish Section 202(c) eligibility is an unfair penalty because these suppliers had no reason to believe that documentation of each transaction would be necessary; (3) the overly restrictive criteria for determining Section 202(c) eligibility will have a detrimental effect on the CAISO's ability to obtain power supplies in a future crisis; and (4) the "proponent of a claim," as described in the Administrative Procedures Act to establish which party has the burden of proof, is not the seller because the CA Parties filed the request for a rate change.

**Discussion**

61.     In the Refund Order, the Commission, in summarily adopting the presiding judge's proposed findings concerning most of the Section 202(c) issues, relied on the extensive hearing testimony and written submissions in the record.  Most of the issues that the parties raise on rehearing, including all of those concerning the eligibility of specific transactions to be exempt under Section 202(c), were considered by the presiding judge. In adopting these findings as its own, the Commission found in the Refund Order and again finds on rehearing that the presiding judge's consideration of all of the evidence concerning specific transactions was thorough and correct.  Accordingly, we will deny rehearing concerning the Commission's findings on whether specific transactions were made pursuant to Section 202(c).

62.     We do not agree that the presiding judge's establishment of criteria for Section 202(c) eligibility creates an unfair penalty because suppliers had no reason to believe that documentation of each transaction would be necessary or that these criteria

Docket Nos. EL00-95-081 et al                                        - 22 -

will have a detrimental effect on the ability of the CAISO to obtain power supplies in a future crisis. The presiding judge determined and the Commission adopted his findings that specific requirements were "central" to each DOE Order. Accordingly, since we agree with the presiding judge that these criteria are reasonable interpretations of the DOE Orders, we will deny rehearing on these issues.

63.    In the Refund Order, the Commission agreed with Trial Staff that the issue of burden of proof is a "red herring" because sellers are the class of respondents in this proceeding. If a seller argues that it is not a respondent in this proceeding, the burden of proof falls on that seller to show that it is outside the scope of this proceeding. For this reason, the Commission found that those sellers whose transactions meet the presiding judge's criteria for exemption from mitigation under Section 202(c) have met the requisite burden of proof. Accordingly, we find no merit to the rehearing arguments concerning burden of proof and we will deny rehearing on this issue.

64.    We find that Coral is incorrect when it states that the Commission's decision concerning Section 202(c) transactions delegates to the CAISO, a non-governmental third-party, the decision whether to require that sales be made to the CAISO. In fact, as stated in the Refund Order, under the December 14, 2000 DOE Order, Attachment A entities were not required to deliver energy until 12 hours after the CAISO had filed a certification of emergency with DOE. The DOE Secretary's imposition of a requirement for the CAISO to file a certification with the DOE is not equal to delegating authority to the CAISO. Since the authority to decide whether to require that sales be made to the CAISO under Section 202(c) originated and remains with the DOE, not the CAISO, we will deny Coral's request for rehearing on this issue.

65.    Furthermore, we find that Coral is incorrect that the Commission has retroactively imposed a certification requirement governing Coral's December 14, 2000 sales to the CAISO in violation of the filed rate doctrine. As we stated in the Refund Order, under the DOE Order itself concerning the December 14, 2000 sales, no legal obligation on generators attached until 12 hours after the CAISO filed a certification of emergency with DOE. Accordingly, we will deny Coral's request for rehearing concerning this issue.

66.    In the Refund Order, the Commission stated that there is no reason that its findings concerning Coral's transactions should act as a deterrent against sellers taking emergency actions because the Commission decisions will not harm Coral. Coral states that this statement is irrational because it will underrecover its costs for its sales to the CAISO on December 14, 2000. As we stated in the Refund Order, Coral's sales on December 13 and 14 will be mitigated to a just and reasonable price; i.e., a price that strikes the appropriate balance between buyers' and sellers' interests. While Coral claims that it may underrecover its costs, on balance, the Commission finds that the mitigated price Coral

Docket Nos. EL00-95-081 et al                                                - 23 -

will receive for these transactions is just and reasonable. Additionally, as noted above, after final MMCPs are calculated, Coral will still have the right to submit cost evidence, on a portfolio-wide basis, demonstrating that its overall costs would not be recovered, as provided in our past orders.

### Rerun-Related Issues

### Did the PX properly apply the $150/MWh breakpoint for January 2001 transactions?

#### Background

67.    In the Refund Order, the Commission adopted the presiding judge's finding that the PX properly applied the $150/MWh breakpoint for January 2001 transactions as directed by a May 15, 2002 Order, but directed the PX to ensure that suppliers' transactions, including those of Coral Power, are properly mitigated. The Commission's May 15, 2002 Order clarified that for bids accepted above the $150/MWh breakpoint during Period 2, which included January 2001 transactions, the refund methodology should use the lower of the bid or the MMCP.

#### Comments

68.    Generally, several parties contend that the Commission should not have applied the $150/MWh breakpoint to January 2001 calculations because they allege that the Commission's July 25, 2001, and December 19, 2001 Orders in this docket superceded the breakpoint methodology and determined that the breakpoint does not apply in instances, such as January 2001, when it was not triggered. Specifically, these parties state that the Commission, in its December 19, 2001 Order, affirmed that the Commission's July 25, 2001 refund methodology applied to all hours during the Refund Period and expressly superceded the $150/MWh breakpoint methodology. Furthermore, these parties state that if the Commission's May 15, 2002 Order found that the $150/MWh breakpoint methodology applies to January 2001 PX transactions, then the Commission's finding was inconsistent with its past orders and it failed to apply the requisite conditions established in the May 15, 2002 Order.

#### Discussion

69.    As an initial matter, we find that the presiding judge correctly determined that the part of the Commission's May 15, 2002 Order in this docket that clarified the breakpoint

Docket Nos. EL00-95-081 et al                                                    - 24 -

methodology applies to both the PX and the CAISO.[44]  While the Commission generally referred to a CAISO filing in the section entitled, "Mitigated Market Clearing Prices as Cap During Refund Period," we intended that our clarification concerning the application of breakpoints to the refund calculations be consistent with our earlier orders to encompass all spot market transactions.[45]  Accordingly, this issue is governed by the terms of the CAISO and PX Tariffs and has not been modified by this proceeding.

70.    The commenting parties are incorrect that the Commission created "conditions precedent" in the May 15, 2002 Order for the breakpoint methodology to be applied. These parties contend that the Commission's May 15, 2002 Order created the following three requirements that must be met prior to finding that the $150/MWh breakpoint applies to PX transactions:  (1) the breakpoint must have been implemented when the market was operating; (2) the breakpoint must have been actually triggered while the market was operating, and (3) while operating, the market must not have generated a single market clearing price (emphasis added).  In the orders issued in this proceeding since November 2000, including the December 15, 2000 Order in this proceeding when we first directed that the breakpoint methodology be applied to January 2001 transactions in the PX markets, the Commission put all transacting parties on notice that, to attain just and reasonable prices, we would require mitigation measures.  In the Refund Order, when the Commission summarily adopted the presiding judge's finding that the PX properly applied the breakpoint methodology for January 2001 transactions, the Commission, in essence, found that the PX⁼s application of the breakpoint methodology satisfied our requirement that just and reasonable prices be obtained through mitigation measures.  The Commission did not suddenly impose new conditions for application of the breakpoint methodology.  In the May 15 Order, the Commission did not state that the PX could only employ the breakpoint methodology if triggering conditions were met, especially since the PX participants were on notice that mitigation measures were necessary to attain just and reasonable prices during this time period.  Accordingly, since we find that the PX properly applied the breakpoint for January 2001, we will deny these parties' requests for rehearing on this issue.

---

[44]See also, California Power Exchange Corporation v. Pacific Gas and Electric Company, et al., 245 F.3d 1110 at 1117-19 (2001).

[45]See May 15 Order at 61,654-56.

Docket Nos. EL00-95-081 et al                                        - 25 -

**Charge Types 401 and 481 B How Should Charge Types 401 and 481 be mitigated or adjusted, if at all?**

## Background

71.    A charge type (CT) is a code that describes a particular activity for which a scheduling coordinator is charged or credited.  CT 401 is associated with the cost of instructed imbalance energy; that is, energy produced when the CAISO instructs a scheduling coordinator to deviate from its forward schedule and change a resource's output.[46]  CT 481 is associated with the excess cost of instructed imbalance energy.  In other words, all costs for instructed energy up to the MCP were classified as CT 401 and any costs in excess of the MCP were classified as CT 481.  Thus the "dividing line" between the two CTs is the MCP.  The CAISO accounts for these two components of instructed energy costs separately because ultimately, through a process described in the proposed findings at paragraph 577, the CAISO allocates these costs to different customers; CT 401 is allocated to all customers while CT 481 is ultimately allocated to entities who under-scheduled, and thus contributed to the need for instructed imbalance energy.

72.    The presiding judge found that the CA Generators' proposal to leave unchanged the allocation of CAISO costs for transactions exempt from mitigation by maintaining the MCP as the dividing line between Charge Types 401 and 481, rather than changing the dividing line to the MMCP, achieves a just and reasonable result.  In the Refund Order, the Commission disagreed with the presiding judge's proposed finding on this issue.  The Commission found that the CAISO properly followed its tariff by using the clearing price as the dividing line for apportioning instructed imbalance energy costs between CT 401 and 481.  During the Refund Period, as a result of this proceeding, the clearing price was the MMCP, not the MCP.  The Commission therefore directed the CAISO to use the MMCP as the dividing line for apportioning costs between CT 401 and 481.

## Comments

73.    The CA Generators argue that the Commission erred in the Refund Order when it did not adopt the presiding judge's proposed finding that the CAISO should have used the historical MCP instead of the MMCP stating that it is inappropriate to shift costs associated with non-mitigated transactions as a result of applying the MMCP.  The CA Generators state that in order to avoid "inappropriate subsidization" through the refund

_____

[46]December 12 Proposed Findings at paragraph 574.

Docket Nos. EL00-95-081 et al                                           - 26 -

process, the Commission should have adopted the presiding judge's proposed finding to rely on the MCP as the dividing line between CT 401 and 481.

**Discussion**

74.    We find no merit to the CA Generators' contention that the Commission erred in not adopting the presiding judge's proposed finding that the MCP should be the dividing line between CT 401 and 481. The CA Generators are incorrect in stating that an "inappropriate subsidization" will occur as a result of the Commission's decision. As the Commission stated in paragraph 83 of the Refund Order, we find that the CAISO properly followed its tariff when it used the clearing price, which during the Refund Period was the MMCP, as the dividing line for apportioning instructed imbalance energy costs between CT 401 and 481. In making this finding, the Commission did not direct that any party "subsidize" another party. We simply clarified the accounting for the payment of a charge pursuant to the CAISO Tariff. Accordingly, we will deny the CA Generators' request for rehearing on this matter.

**Charge Type 485 -- Were Charge Type 485 penalties properly mitigated or adjusted and, if not, how should these penalties be adjusted and calculated?**

**Background**

75.    CT 485 is associated with penalties assessed to participating generators who failed to respond to CAISO dispatch instructions during system emergencies. The penalty is primarily based on twice the highest price paid for energy in each hour by the CAISO to any other entity, applied to each MWh of deviation from the dispatch instruction.[47]

76.    For purposes of this proceeding, the CAISO reduced all Charge Type 485 penalties to twice the MMCP in each hour. Other parties argued that, under its tariff, it should have reflected the highest cost energy it purchased, whether in or out of the mitigated market. Accordingly, they argued that CERS and 202(c) purchase prices should have been incorporated into the CT 485 penalty calculation whenever they were higher than the MMCP.

77.    The presiding judge found that the CAISO Tariff does not require the calculation of the CT 485 penalties to incorporate either Section 202(c) or CERS transactions that are

---

[47]However, if the CAISO is required to call for involuntary curtailment of firm load during the system emergency, an additional charge of $1,000/MWh will be applied to each MWh of deviation from the dispatch instruction.

Docket Nos. EL00-95-081 <u>et al</u>                                                                    - 27 -

exempt from mitigation. Regarding CERS transactions, the presiding judge found that they were not actually sales to the CAISO. Rather, they actually involved CERS serving its own load as a scheduling coordinator. Since the CAISO never actually purchased CERS energy, he found that the CERS transactions were clearly irrelevant to the calculation of penalties (paragraph 610). Regarding 202(c) transactions, the presiding judge relied on the fact that rates for these transactions are outside the scope of this proceeding.

78.    In the Refund Order, the Commission found that the CAISO incorrectly reduced all CT 485 penalties to twice the MMCP in each hour. The CAISO Tariff requires the calculation of the penalty amount to be based on "twice the highest price for Energy, per MWh, paid in each hour by the [CA]ISO to any other entity." Since the CAISO Tariff does not limit the calculation of the penalty amount to a price obtained solely from the types of spot market transactions that are mitigated in this proceeding, the Commission found that 202(c) transactions should be incorporated into the calculation of CT 485 penalties. However, we adopted the presiding judge's finding that CERS transactions were not sales to the CAISO and thus should not be incorporated into this calculation.

## Comments

79.    The CA Generators argue that the Refund Order improperly overturned the presiding judge's conclusion that the CAISO appropriately excluded 202(c) transactions from the calculation of CT 485 penalties during the Refund Period. The CA Generators argue that the 202(c) transactions were outside the scope of this proceeding and are irrelevant to the calculations of penalties for refund purposes.

80.    In contrast, the CA Parties request clarification concerning whether the calculation of CT 485 penalties should include non-spot transactions that had a duration longer than 24 hours. Additionally, CA Parties and SDG&E request that the Commission clarify how CT 485 penalties will be allocated back to the buyers in the various California markets.

## Discussion

81.    As noted in the Refund Order, the methodology for the calculation of CT 485 penalty amounts is described in the CAISO Tariff and is based on "twice the highest price for Energy, per MWh, paid in each hour by the [CA]ISO to any other entity." CA Generators' arguments that 202(c) transactions are outside the scope of this proceeding are simply inapplicable to this issue. While 202(c) transactions are exempt from price mitigation by the MMCP, other terms of the CAISO Tariff are unaffected by this proceeding. In particular, the methodology for computation of CT 485 penalties is controlled by the CAISO Tariff and is not modified by this refund proceeding.

Docket Nos. EL00-95-081 et al                                    - 28 -

Accordingly, the prices of 202(c) transactions should be incorporated into the calculation of CT 485 penalties as appropriate, and we will deny this portion of the CA Generators' rehearing request.

82.    We also find that the tariff provision referring to the "highest price" the CAISO paid in each hour to any other entity includes payments under non-spot transactions that had a duration longer than 24 hours and we believe that the CAISO's procedures already provide for the allocation of penalties to customers. In particular, we find that the CAISO Tariff in Settlement and Billing Protocol Section 3.1.1(b) allocates amounts collected from penalties to the Scheduling Coordinators who traded on that trading day pro rata to their metered demand (including exports) in MWh of energy for that trading day.

**Block Forwards B How should Block Forward Transactions be handled and how, if at all, should that affect the mitigation of PX Day-Ahead Transactions?**

**Background**

83.    The presiding judge found that the PX properly excluded block forward transactions scheduled for delivery in its day-ahead market from the total day-ahead volumes as those transactions were long-term, non-spot transactions that are not subject to mitigation. In the Refund Order, the Commission affirmed the presiding judge's finding but also directed the PX, in its rerun of settlements and billing processes, to correct the acknowledged nine percent error identified by trial staff in the PX's calculations to exclude block forward transactions.

**Comments**

84.    The CA Generators seek clarification concerning the Commission's direction that the PX correct a nine percent error in its calculations of the total block forward volumes. The CA Generators state that the Commission should clarify on rehearing that the PX is to correct any identified errors in subtracting block forward volumes from the day ahead market, but that the actual percentage error may be less than the nine percent cited in the Refund Order.

85.    CA Parties, on the other hand, continue to argue that block forward transactions should not be excluded from the total day-ahead volumes for the same reasons they expressed before the presiding judge. SDG&E joins in this argument as well.

Docket Nos. EL00-95-081 <u>et</u> <u>al</u>                                                    - 29 -

**Discussion**

86.    Regarding CA Generators' concern, we clarify that our intention with the Refund
Order was not to direct any specific percentage adjustment to the block forward volumes.
Rather, we merely intended to refer to the errors identified by trial staff, and
acknowledged by the PX, in the most efficient manner possible.  Trial Staff identified
errors of seven percent associated with bilateral transactions, one percent associated with
Enron financial transactions, and one percent associated with volumes not bid into the PX
market to clear CTS volume.  In its reply comments the PX agreed that these errors should
be corrected.[48]  The Commission's goal is simply to correct these acknowledged errors no
matter what actual percentage impact results.

87.    Regarding CA Parties' renewed arguments, we will deny rehearing.  As they did
before the presiding judge, CA Parties continue to rely on provisions of the PX and CTS
Tariffs that provide that the PX markets and the block forward market operated and settled
separately as support for their argument that day-ahead volumes associated with block
forward transactions should not be considered long-term sales excluded from mitigation.
We continue to agree with the presiding judge that block forward transactions that cleared
through the PX day-ahead market and used the PX spot price as one input to the settlement
price are long-term, non-spot transactions that are not subject to mitigation.

**How should interest be calculated and applied?**

**Background**

88.    The presiding judge stated that the July 25 and December 19 Orders directed the
calculation of interest on refunds and amounts (receivables) past due using the
methodology for interest calculations described under Section 35.19a of the Commission's
rules and regulations.[49]  Accordingly, the presiding judge rejected proposals to calculate
interest different from the Commission's 35.19a methodology, consistent with the July 25
and December 19 Orders.  He also found that interest on unpaid balances should be
assessed from the date the payment was due.

--------------------------------------

      [48]PX February 3, 2003 Reply Comments at 31.

      [49]18 C.F.R. ' 35.19a(2002).  <u>See</u> July 25 Order at 61,157; and December 19 Order
at 62,223.  The Commission's interest rate is an average prime rate for each calendar
quarter.  The quarterly interest rates are posted on the Commission's website at
www.ferc.gov/gas/interest.htm.

Docket Nos. EL00-95-081 et al                                                    - 30 -

89.     In the Refund Order, the Commission adopted the presiding judge's proposed
finding that interest on both refunds and unpaid balances will be calculated in the manner
required by the Commission's July 25 Order; i.e., calculated under Section 35.19a of the
Commission's regulations.[50]

90.     Regarding arguments that actual interest should be used in place of 35.19a interest
in certain circumstances, the Commission disagreed.  The Refund Order stated that the fact
that the balances held by the PX for market participants have been earning some level of
interest is immaterial to the question of what interest rate applies to refunds and unpaid
balances under our Regulations and Orders.  Whatever interest has been earned on market
participants' behalf by the PX will serve to reduce the portion of their overall obligations
that they must raise themselves but the underlying obligation remains to pay the full
amount of interest that our Regulations require.  Accordingly, the Commission clarified
that actual interest earned on money held in the PX accounts at issue should be allocated to
market participants with positive balances in the accounts,[51] in proportion to the size of
those balances, for purposes of refund calculation.  Furthermore, to the extent that there is
a difference between the resulting amounts of interest and the total interest due for each
participant as calculated under Section 35.19a, the participant will be responsible for
making up this difference.

91.     The Commission also directed the PX to refund any interest collected from SoCal
Edison, associated with service during the Refund Period, in excess of the amount that
would have been collected under Section 35.19a of our Regulations.

92.     Further, the Commission adopted the presiding judge's findings that interest shall be
calculated separately for the CAISO and PX markets and shall not be recombined.  Lastly,
we adopted the presiding judge's holding that the CA Parties and PX proposals with regard
to the calculation of interest on PX chargeback amounts and settlement trust accounts were
beyond the scope of the issues set for hearing.

**Comments**

93.     CAISO seeks clarification that the interest methodology that it describes in its
request for clarification complies with the Commission's expectations in the Refund Order.
Specifically, CAISO proposes the following.  In order to determine unpaid balances, the

---

[50]See Id. at paragraph 800.

[51]Only those market participants with positive balances have contributed the
principal upon which actual interest has been earned.

Docket Nos. EL00-95-081 et al                                                            - 31 -

CAISO will start with the original monthly invoices that it issued to market participants including bankrupt entities during the Refund Period, but will adjust these amounts to exclude charges and credits traceable to transactions from outside of the Refund Period. As adjusted, these invoices will reflect the net of all transactions, purchases and sales, between the market participant and the CAISO for the month in question. The payment dates from these monthly invoices will serve as the start dates for any applicable interest.[52]

94.     The CAISO will determine unpaid balances, and how long those balances remained unpaid, by referring to its records of payments received. The CAISO will also remove from the applicable balances amounts reflecting interest assessed on late payments under the CAISO Tariff, since the Refund Order requires 35.19a interest to apply instead.

95.     Finally, the CAISO notes that it is possible for there to be a mismatch between accounts receivable from buyers and payable to sellers in certain months. This mismatch can result in a corresponding mismatch in the amounts of interest due from buyers and payable to sellers. Because the CAISO is revenue neutral and has no way to absorb shortfalls, the CAISO proposes to eliminate any differences through allocation. Where total interest due from debtors for unpaid balances exceeds interest payable to sellers in a month, the CAISO proposes to reduce the interest due from debtors pro rata to match the amount due to sellers. On the other hand, where total interest due for unpaid balances is less than interest due to sellers in a month, the CAISO proposes to lower the interest due to sellers pro rata to match the interest owed by debtors.

96.     Refund related interest will be calculated similarly.

97.     The CA Generators filed a response opposing CAISO's request for clarification. They argue that the CAISO's proposal is misplaced in a request for clarification and should be rejected until it can be fully addressed by all parties in the compliance phase of this proceeding. CA Generators argue that the compliance phase should be conducted in a transparent manner, under supervision of an Administrative Law Judge or through a technical conference, with all parties afforded full opportunity to assess and challenge on the record the CAISO's proposals.

98.     CAISO filed a response to this response stating that further hearing and discovery procedures would further delay this proceeding and offering instead a process to help market participants better understand the adjustments that it intends to make. First, prior

---

[52]Regarding adjustments to prior billings within the Refund Period that are reflected in a given monthly invoice, the CAISO proposes to use the payment date from the invoice where the adjustment occurs.

to completion of the preparatory rerun, the CAISO proposes to provide all parties with a comprehensive list and explanation of the adjustments to be made. Next, as adjustments are completed for each month, the CAISO will provide each party with both a revised settlement statement and the associated settlement detail files. Then, four weeks after the adjustment and preparatory rerun process is completed, the CAISO will host a telephone conference at which CAISO staff will respond to questions. Finally, the CAISO will extend the dispute resolution window relating to these issues from the standard eight days to fifteen days, through a waiver of the pertinent tariff provision.[53]

99.    The CA Generators also filed a separate request for rehearing in which they state that they previously took the position that the interest on payments due to sellers and the interest on refunds from sellers should both be computed based on the original trade date. In contrast, CA Generators believe that the CAISO intends to calculate interest associated with payments owed to sellers based on the invoice due date, while at the same time calculating interest associated with refunds due from sellers based on the actual trade date. CA Generators believe that such a double-standard would be unfair and, since the Refund Order did not squarely address the issue, they request rehearing.

100.    Regarding adjusted payments where the CAISO subsequently alters invoiced amounts as a result of adjustments to its underlying settlement records, the CA Generators state that, even if the CAISO is correct that its settlement system cannot assess interest on the adjusted balance based on the invoice due date of the revised bill, then CA Generators' original proposal to use the original trade date for assessing interest on both refunds and payments due to sellers should work.

101.    CA Parties and SDG&E seek clarification that buyers will not, under any circumstances, be required to pay greater interest than the Commission's interest rate as specified in Section 35.19a of the Commission's Regulations. CA Parties state that the confusion arises from certain language in the last sentence of paragraph 141 of the Refund Order. That sentence states, "[f]urthermore, to the extent that there is a difference between the resulting amounts of interest and the total interest due for each participant as calculated under Section 35.19a, the participant will be responsible for making up the difference."

---

[53]The proposal to extend the dispute resolution window is also reflected in the CAISO's proposed Amendment No. 51 which was filed in Docket No. ER03-746-000 and was conditionally approved and suspended subject to further Commission action. See 103 FERC & 61,331 (2003).

Docket Nos. EL00-95-081 et al                                             - 33 -

102.    On the other hand, in its rehearing request, Powerex seeks clarification that all market participants will be paid no less than the total interest due the participant as calculated pursuant to Section 35.19a.

**Discussion**

103.    Regarding CAISO's interest proposal, we will grant clarification. While we are sensitive to CA Generators' concerns that such methodologies should be fully reviewed by interested parties, we see value in providing some guidance at this stage and believe that the compliance phase will still ensure that parties have the opportunity to review and comment on the CAISO's methodology before we issue a final order after the compliance phase.

104.    With one exception, the CAISO's proposal appears to be a reasonable theoretical starting point. First, there seems little doubt that the CAISO's original monthly invoices for the Refund Period and its payment records are logical and necessary components of any analysis of what was charged, paid, and still owed from the Refund Period. Similarly, it is reasonable to adjust the amounts determined from the invoice and payment records to exclude charges and credits traceable to transactions from outside of the Refund Period and to eliminate any CAISO Tariff interest that may have been added to those outstanding balances.

105.    The portion of the CAISO's theoretical proposal that does not appear to us clearly reasonable involves mismatches between interest receivable and payable. The CAISO's discussion indicates that these mismatches occur for essentially structural reasons that are not primarily attributable to either debtors or creditors. Nevertheless, under the CAISO proposal, all positive mismatches (more interest due from debtors than to creditors) are allocated to debtors while all negative mismatches (less interest due from debtors than to creditors) are allocated to creditors. Since no evidence has been submitted that creditors are more responsible for the mismatches than debtors, or vice versa, for the structural defects that may lead to these mismatches, we see no reason why the mismatches, both positive and negative, should not be allocated pro rata among both debtors and creditors.

106.    Based on the information before us, we believe that the theoretical approach outlined by the CAISO and modified as discussed above, is appropriate. However, as the CAISO itself acknowledges, the specific methods that the CAISO will employ to accomplish these adjustments will certainly be of interest to parties. In fact CA Generators' separate rehearing request addresses some of the practical issues that arise and we discuss those issues below. We believe that the combination of the CAISO's proposed process for disseminating pertinent information to parties and our compliance proceeding

Docket Nos. EL00-95-081 et al                                                    - 34 -

where the CAISO will file its results together with appropriate support, will ensure that all parties' rights are protected.

107.    Regarding CA Generators' rehearing concerns, we will deny rehearing but grant clarification. Our regulations require interest to be computed from the date of collection.[54] In this case, the issue is somewhat complicated by the fact that a large portion of the payments due to sellers, from which refunds would be assessed, have not actually been paid to sellers. In other words, in many cases the sellers have not actually collected the overcharges. Consistent with our regulations, no interest should be assessed on overcharges that were never collected. On the other hand, overcharges that were collected must be assessed interest based on the date of collection. This would hold for adjusted payments as well. If the adjusted payment resulted in an overcharge collected on a certain date, that date must be the starting point for interest calculations associated with that overcharge. All of this is consistent with our regulations and, thus, our adoption of the presiding judge's finding that interest should be calculated under Section 35.19a of our regulations was an adoption of this scheme for interest calculation.

108.    Regarding interest on unpaid invoices, the presiding judge found that the invoice due date should be used. With clarification, this proposal appears reasonable and consistent with the above discussion. For unpaid invoices, the due date is exactly analogous to the collection date for refunds. It is the logical place to begin assessing interest because, prior to the due date, the invoice was in its grace period. Only after the due date passed without payment, did payment of the invoice become an outstanding obligation subject to interest just like the obligation to refund collected overcharges. The only point that requires clarification involves the portion of the unpaid invoice that would have been refunded under this proceeding if it had actually been paid. Since the refund associated with an uncollected overcharge will not include interest as discussed above, the portion of the unpaid invoice associated with the same overcharge should not include interest either.

109.    Regarding CA Parties' concerns, we will grant clarification. The sentence in question assumes that actual interest earned on amounts held by the PX was lower than the Section 35.19a interest rate that would have applied during the period. This was the situation described by parties in their pleadings. Accordingly, the sentence was intended to provide that the party who owed Section 35.19a interest would be responsible for any shortfall between the total interest owed and the actual interest earned at the PX. This would apply both to interest on unpaid balances and on refunds. We believe that this discussion addresses Powerex's concerns as well.

---

[54]18 CFR ' 35.19a(2).

Docket Nos. EL00-95-081 <u>et</u> <u>al</u>                                                                                - 35 -

**Accounting for CERS**

**Background**

110.    In his Proposed Findings, the presiding judge acknowledged that the CAISO did not properly handle CERS transactions in calculating CT 485 penalties.  The CA Generators argued that the CAISO's mishandling of CERS transactions affects far more than CT 485 penalties and therefore requested the Commission to order the CAISO to fully correct its accounting for CERS transactions so as to accurately reflect CERS as the Scheduling Coordinator for the IOU's net-short load.

111.    In the Refund Order, the Commission rejected the CA Generators' request relying on the CAISO's claim that treating CERS as it treats every other Scheduling Coordinator would require special treatment outside the CAISO's standard settlement process and that the separate invoicing process proceeding in Docket No. ER01-889 would address CA Generators' concerns.

**Comments**

112.    The CA Generators' argue that the Commission's decision in this regard is unfounded and should be modified on rehearing.  CA Generators also argue that the proceeding in Docket No. ER01-889 does not address all of their concerns because that proceeding will not address how CERS' activities in the CAISO market resulted in costs being allocated and invoiced to other Scheduling Coordinators under the CAISO Tariff.

**Discussion**

113.    Upon further consideration, we believe that our reliance on the CAISO's assurances was misplaced and our discussion was, thus, erroneous.  CA Generators are correct that the November 7 Order specifically found that CERS functioned as the Scheduling Coordinator for the IOU's net-short load and must, therefore, abide by the requirements of the CAISO Tariff and the Scheduling Coordinator Agreement with respect to that net-short load.[55]  Accordingly, the concept that the CAISO must correct its accounting for CERS transactions so as to accurately reflect CERS as the Scheduling Coordinator for the IOU's net-short load was a settled matter long before the Refund Order.  Under the November 7 Order, and for the reasons fully discussed therein, the CAISO must correct its accounting to reflect CERS as the scheduling coordinator for the IOU's net-short load and

---

[55]See California Independent System Operator Corp., 97 FERC & 61,151 at 61,659 (November 7 Order).

20031016-3036 Issued by FERC USEC 10/16/2003 in Docket#: EL00-95-081

Docket Nos. EL00-95-081 et al                                              - 36 -

the Refund Order should not have revised that requirement. Accordingly, we grant
rehearing on this issue.

**"Sleeve Transactions"**

Background and Comments

114.    During the Refund Period, a lack of creditworthy counter parties caused the CAISO
to have difficulties purchasing power in its role as provider of last resort. As a way to
address this problem, certain creditworthy entities purchased from sellers who would not
sell directly to the CAISO market, and resold to the CAISO market despite the lack of a
creditworthy counter party. Generally, these parties charged the CAISO their cost plus
some premium to reflect the credit risk. Such transactions have come to be called "sleeve
transactions." Through his ruling on a motion to strike, the presiding judge determined
that spot market sleeve transactions are subject to mitigation and refund just like all other
spot market sales. SMUD contended in its comments to the presiding judge's proposed
findings that SMUD should not be held liable for refunds related to sleeve transactions. In
the Refund Order, the Commission did not address the sleeving issue.

115.    The CA Generators state that while the Refund Order is silent on this issue, two
recent events warrant further consideration of the matter. First, the CA Generators argue
that since the issuance of the May 15 Order two Administrative Law Judges have
concluded that sleeve transactions should not be subject to refund.[56] Second, the CA
Generators state that the Refund Order changed the methodology for computing the fuel
cost component of the MMCP, which dramatically decreases the MMCPs over the Refund
Period, and consequently, increases the level of refunds. The CA Generators argue that
since the sleeve transactions were done at the behest of the CAISO, for the express benefit
of California, and provide little financial reward to the sleeving parties, they should not be
subject to mitigation and refund. SMUD requests that the Commission grant rehearing for
the purpose of addressing the sleeving issue, and determine that SMUD not be held liable
for refunds related to sleeve transactions. Similarly, the CA Parties contend that Powerex,
rather than SoCal Edison, should have refund liability for two sleeve transactions where
SoCal Edison performed the sleeving function. Finally, TransAlta argues that the
Commission erred in failing to accept TransAlta's Offers of Proof concerning its sleeve
transactions, its "incremental power supplies on behalf of the CAISO," and forgone
opportunities in order to make sales to the CAISO during the Refund Period.

_____

[56]See, PacifiCorp, et al., 102 FERC & 63,030 at paragraph 86 (2003) and Nevada
Power Company, et al., 101 FERC & 63,031 at 65,324 (2002).

Docket Nos. EL00-95-081 et al                                              - 37 -

**Discussion**

116.    As an initial matter, we note that the Commission did not address sleeve transactions in the Refund Order because we had already decided this matter in a May 15, 2002 Order in this proceeding.[57]  In that order, the Commission stated that we would not make exceptions for sleeving.[58]  We further clarify that sleeve transactions will not be given an exception that would allow these transactions to be excluded from mitigation and refund liability.

117.    Moreover, we find that the parties have raised nothing new to convince us to create an exception for these transactions.  Certain parties repeat statements that they "stood in the shoes" of the CAISO in CAISO negotiated transactions and that they were not "true sellers" because they simply agreed to use their credit to help the CAISO make energy purchases during a crisis.  We find that these parties assumed the risks associated with making these spot energy sales to the CAISO, including the risk of refund liability, just like any power marketer, because of the contractual relationship through the CAISO Tariff that these parties had with the CAISO.  Furthermore, we find that the CAISO acted only as a facilitator to the parties involved in these transactions and that these parties were ultimately responsible for negotiating their transactions with other power sellers,[59] and, in most cases, these parties received monetary consideration in the form of a risk premium for these transactions.  Accordingly, we will deny these parties' rehearing requests on this issue concerning sleeve transactions.

118.    However, as noted in the May 15, 2002 Order and paragraph 49 above, after final MMCPs are calculated, marketers will still have the right to submit cost evidence, on a portfolio-wide basis, demonstrating that their overall costs would not be recovered, as provided in our past orders.

---

[57]See San Diego Gas & Electric Co., et al., 99 FERC & 61,160 (2002).

[58]Id. at 61,652.  We also note that because the Commission already found that an exception would not be made for sleeving, there was no need to address TransAlta's Offers of Proof concerning its sleeve transactions and their impact on TransAlta.

[59]While the CAISO acted as a facilitator to these transactions, it was the responsibility of these parties that sold power to the CAISO to negotiate, agree to conditions and terms, and close on the final terms of these purchases and sales.