Case 3:07-cv-03243-JSW    Document 9-10    Filed 08/03/2007    Page 1 of 39

Docket Nos. EL00-95-081 et al                                                    - 38 -

**Identifying Mislogged Non-Congestion OOS Transactions and the Creation of a Pre-Mitigation Database that Combines all Transaction Records**

## Background

119.    Occasionally, bids in the BEEP Stack must be taken out of the merit order determined by the BEEP system in order to address reliability or intra-zonal congestion issues. Such transactions are called Out of Sequence (OOS) transactions. As the presiding judge noted at paragraph 124 his December 12 Findings, under the CAISO Operating Procedure M-403, OOS transactions to address reliability can set the MCP, while OOS transactions to address intra-zonal congestion cannot.

120.    In a related matter, the hearing included a discussion of an internal CAISO audit called Project X that indicated that the CAISO incorrectly logged certain OOS transactions as having occurred out of market (OOM). Under CAISO procedures, OOM transactions cannot set the MCP. Thus, Competitive Supplier Group and CA Generators argued that some OOS non-congestion transactions may have been inappropriately excluded from eligibility to set the MCP and, thus, the MMCP because of the mislogging.

121.    The presiding judge found that the CA Generators had failed to demonstrate that mislogging of OOS non-congestion transactions resulted in the CAISO establishing incorrect historical MCPs or would result in incorrect MMCPs. Accordingly, he found that there was no need to attempt to correct the logging of OOS transactions for purposes of MMCP calculation or to recalculate historical MCPs and create a revised pre-mitigation database.

122.    In the Refund Order, the Commission stated that we had already addressed this issue in the May 15 Rehearing Order[60] and found that any relevant mislogging (i.e., mislogged non-congestion OOS transactions) that had previously been identified in the CAISO's Project X audit must be corrected for purposes of both historical MCP and MMCP calculation and a revised historical MCP database must be created.

## Comments

123.    The CAISO continues to argue that a fully accurate determination of what transactions were actually mislogged is not possible and any attempt to make such a determination would require at least six additional weeks. If the Commission,

---

[60]99 FERC & 61,160 at 61,654 (2002) (May 15 Rehearing Order).

Docket Nos. EL00-95-081 et al                                                - 39 -

nevertheless, requires the CAISO to make such an attempt, the CAISO requests
clarification as to three points.

124.    First, the CAISO requests clarification that the Commission did not intend for it to
treat all transactions identified as mislogged in Project X as OOS transactions. Project X
primarily relied on the existence of a contemporaneous BEEP Stack bid for the same unit
whose transaction was logged as OOM to identify possibly mislogged transactions (termed
"GG exceptions"). However, the CAISO argues that the BEEP stack bid could have been
for a separate transaction, associated with a different portion of the unit's output, from the
transaction logged as OOM. Additionally, the CAISO states that it could have directed a
unit to run out of market for an extended period and subsequently received a bid in the
BEEP stack for the same output. In either of these cases, the CAISO argues that the
transaction would have been correctly logged as OOM.

125.    The CAISO's second request is that the Commission clarify that once an
appropriate universe of mislogged OOS transactions is identified as discussed above, the
CAISO should use the following methodology to determine which of the mislogged OOS
transactions are non-congestion OOS transactions that can set the MCP and MMCP. First,
the CAISO proposes to refer to its OSMOSIS data base that contains records of OOM and
OOS transactions and contains fields labeled "Reason" and "INSTR_TYPE" that are
supposed to contain codes indicating the purpose of the dispatch. However, since the
CAISO's employees may not have accurately maintained these field entries during the
Refund Period, the CAISO proposes to cross check transactions identified from OSMOSIS
records with its Scheduling and Logging (SLIC) Database that contains narrative log
entries describing operator events during each day.

126.    Finally, because the CAISO believes that the SLIC records may not be complete
either, the CAISO seeks clarification that any mislogged transactions identified as non-
congestion using OSMOSIS records, but not confirmed with SLIC records, should not be
considered OOS non-congestion transactions.

127.    The CA Generators, on the other hand, seek clarification that the full Project X
audit findings serve as the foundation for a comprehensive list of mislogged OOS
transactions that should be supplemented by considering other incidents of mislogging and
that only the OSMOSIS records should be used to determine which of those mislogged
OOS transactions are non-congestion transactions. Regarding the CAISO's argument that
some of the transactions identified in Project X may not have been mislogged because the
BEEP Stack bid may have been submitted subsequent to the CAISO's OOM call on the
same unit, CA Generators argue that the Commission has already rejected the CAISO's

Docket Nos. EL00-95-081 et al                                              - 40 -

argument that OOM calls will trump and disqualify that bid.[61]  Additionally, the CA
Generators request the Commission to clarify that it intended for the CAISO to create a
new database of complete transactions to be used by all parties to verify the CAISO's
refund calculations during the compliance phase.

## Discussion

128.    The Commission will provide clarification on this issue.  First, for purposes of this
proceeding, we find that the transactions identified in Project X as possibly mislogged
OOS transactions (GG exceptions) should all be considered OOS transactions.  As
correctly argued by CA Generators, it is already a settled matter that an OOM call will not
trump a bid properly made in the BEEP Stack under the terms of the CAISO Tariff, for
purposes of eligibility to set the clearing price, irrespective of the sequence of the bid and
OOM call.  Regarding the CAISO's argument that the BEEP Stack bid may not have been
associated with the same transaction that was logged as OOM, we find the argument
unpersuasive.  We believe that in general it should have been a very uncommon
occurrence for the CAISO to have made an OOM call from a unit that had
energy available to bid in the BEEP Stack.  OOM purchases are supposed to be made in
real time only if there are insufficient bids in the market to meet the CAISO's needs.

129.    That said, we believe that it is appropriate to direct that all of the transactions
known as "GG exceptions" should be considered OOS transactions.  On the other hand, at
this stage of the proceeding, we see no adequate support for CA Generators' request that
we direct the CAISO to attempt to expand the list of mislogged OOS transactions beyond
those identified in Project X.  Accordingly, the only question left is how to determine
which of those identified mislogged OOS transactions are non-congestion transactions
eligible to set the MCP and MMCP.

130.    In that regard, both sides agree that the OSMOSIS records are supposed to contain
the answer to that question.  The sides differ as to how accurate that answer will be.  As a
threshold matter, given that this issue involves admitted mislogging by the CAISO we
believe that there is no basis to assume that either the OSMOSIS records or the SLIC logs
were maintained any better than the logs that are the subject of this issue.  Accordingly, we
assume the opposite; the records probably do contain inaccuracies that will be difficult to
correct.

131.    However, this leads us to a different conclusion than the CAISO reaches.  While we
are cognizant of the extremely difficult situation the CAISO operators faced during the

_____

    [61]See, 90 FERC & 61,006 at 61,010-2 (2000).

Case 3:07-cv-03243-JSW    Document 9-10    Filed 08/03/2007    Page 4 of 39

Docket Nos. EL00-95-081 et al                                                    - 41 -

Refund Period, the CAISO's mislogging of certain OOS transactions as OOM was nevertheless a violation of its tariff and procedures and must be rectified by the best means available.  Moreover, the fact that the CAISO failed to follow its own procedures a second and third time by failing to maintain the OSMOSIS and SLIC records properly does not make it any more reasonable that market participants, in this case sellers, should bear the burden of the CAISO's errors.  The CAISO must use the best information available to it to determine which of the mislogged OOS transactions were non-congestion transactions.

132.    Furthermore, since there is no evidence to indicate that the OSMOSIS and SLIC record errors would be more likely to increase the number of OOS non-congestion transactions identified than to decrease them, we find that the CAISO's proposal to start with its OSMOSIS findings and then reduce them further where they don't conclusively cross-check with the SLIC logs, would be inappropriate.  Rather the OOS non-congestion transactions identified with OSMOSIS records will be the starting point and will be supplemented with any additional OOS non-congestion transactions identified through the SLIC logs.

**Minimum Run Time for Combustion Turbines**

**Background**

133.    The presiding judge made it clear that combustion turbines dispatched for their minimum run time can set the MMCP throughout that minimum run time, not just in the first 10-minute interval, consistent with the Commission's June 19 Order,[62] and CAISO Operating Procedure M-403.

134.    In the Refund Order, the Commission adopted this finding and noted that it saw no conflict between the presiding judge's proposed findings on residual energy and combustion turbines.[63]  As demonstrated by the presiding judge, the energy produced by

---

[62]The Commission rejected the CAISO's argument that "combustion turbines should not set the proxy price, because they do not have the flexibility to be dispatched on a 10-minute basis." June 19 Order at 62,560.  The Commission found that, "If a combustion turbine is the last generator dispatched, its bid should establish the market clearing price." Id.

[63]Residual energy is energy produced due to dispatch instructions for a preceding dispatch interval while the resource ramps to its new dispatch operating target.  Under the CAISO Tariff and pertinent operating procedures, residual energy is paid at the MCP for the interval in which the unit was actually dispatched.

Docket Nos. EL00-95-081 et al                                                    - 42 -

combustion turbines when they are dispatched by the CAISO for their entire minimum run times is not residual energy, it is dispatched energy and should be eligible to set the MMCP.

## Comments

135.    The CA Generators argue that, despite Commission precedent and the CAISO's own procedures, the CAISO has characterized dispatches associated with a combustion turbine's minimum run time as a mix of residual energy and uninstructed energy; two types of energy that are ineligible to set the MMCP. Accordingly, CA Generators ask the Commission to clarify that any dispatches associated with a combustion turbine's minimum run time be categorized as dispatched energy for purposes of calculating refunds.

## Discussion

136.    We will grant the requested clarification. The CAISO must correct any instances where, in violation of its own operating procedures, it has mischaracterized a dispatch associated with a combustion turbine's minimum run time as anything other than dispatched energy.

### SMUD's Refund Liability

137.    SMUD states that the Commission in its Refund Order should have corrected an error it alleges that the presiding judge made concerning a PX exhibit that SMUD contends was superseded. SMUD contends that the effect of the PX's submission of this revised exhibit was to eliminate approximately $1.6 million in refunds owed to SMUD, and impose an additional amount of approximately $1.6 million in refunds owed by SMUD.

138.    Additionally, SMUD requests that the Commission clarify the following: (1) how refunds will flow to customers; (2) that an opportunity will be provided for sellers to address the CAISO and PX quantification of unpaid balances; and (3) that parties will retain their rights to pursue arbitration and/or dispute resolution.

## Discussion

139.    In the Refund Order, we stated that we would defer a finding on the accuracy of the PX's rerun of its settlements and billing process until after the PX submits a compliance filing detailing these calculations. Furthermore, we stated that SMUD will have the opportunity to review and contest the PX's figures following the PX's submission of this

Docket Nos. EL00-95-081 et al                                           - 43 -

compliance filing. SMUD requests that the Commission rule on the merits of this issue so that the PX will have clear direction when it makes its compliance filing and direct the PX to return the $1.6 million in refunds owed to SMUD, and eliminate the same from SMUD's refund liability. Since it would be beneficial for us to review the PX's compliance filing that will contain details concerning these contested calculations, we will defer making a decision on the effect of the PX submission until we review this filing. Accordingly, we will deny SMUD's rehearing request on this issue.

140. Regarding how refunds will flow to customers, at this point we believe that the provisions of the CAISO and PX tariffs, in combination with our own refund regulations,[64] should be sufficient. However, if any issues do arise, they can be raised following submission by the CAISO and PX of the compliance filings ordered herein. Furthermore, as reiterated elsewhere in this order, SMUD will have the opportunity to address the PX and CAISO compliance filings that will detail the settlements and billing calculations. Once the Commission has also had the opportunity to review these compliance filings and comments to these filings, we will direct how refunds will flow to customers. We also clarify that SMUD is not foreclosed from utilizing the dispute resolution process or arbitration procedures under the CAISO Tariff to dispute the level of amounts it alleges that the CAISO owes to it on a pre-mitigation basis.

**Refunds Calculated Separately by Billing Month**

**Comments**

141. Salt River Project requests that the Commission clarify that refunds must be calculated by billing month, and not aggregated, because to do otherwise "risks substantial cost-shifting that would disproportionately impact those parties . . . such as [Salt River Project] that fully paid amounts above the just and reasonable rate." Salt River Project claims that this would be consistent with the historical billing practices of the CAISO and PX.

**Discussion**

142. We find Salt River Project's vague assertion of harm to be an insufficient basis to grant it's request for clarification on this issue at this time. While we expect the CAISO and PX to adhere to their historical billing practices as much as possible as they rerun their settlement systems and calculate refunds, we recognize that the complexities of this proceeding could lead to real-world issues that may require them to deviate from historical

---

[64] See 18 C.F.R. ' 35.19a.

Docket Nos. EL00-95-081 et al                                                    - 44 -

practices. We believe that the appropriate time to address any such deviations will be during the compliance phase of this proceeding when any such deviations will be known.

## Emissions Cost Offset Issues

### RECLAIM Trading Credit Issues

#### Background

143.    As part of their March 3 submissions in response to the Commission's order permitting additional discovery into alleged market manipulation, CA Parties argued that the RECLAIM Trading Credit (RTC) market administered by the South Coast Air Quality Management District (SCAQMD) should be investigated prior to allowing parties to offset emissions costs against their refund liabilities.  As noted in the Refund Order at paragraph 151, CA Parties alleged that some generators may have engaged in "wash" trades of emissions credits in order to both raise the price of the credits and to create the impression that the RTC market was more active than it actually was.  In response, Dynegy provided an alternative explanation for the RTC trades cited by CA Parties.

144.    The Refund Order rejected CA Parties' request because, essentially, CA Parties' allegations provided no basis to open an investigation of the RTC market when there were other reasonable explanations for the cited trades, and because the presiding judge performed a company-specific analysis of emissions claims and found that those claims had been adequately supported.

#### Comments

145.    CA Parties continue to argue that "possible" manipulation in the RTC market administered by SCAQMD should be investigated prior to allowing parties to offset emissions costs against their refund liabilities.  CA Parties argue that the Commission erred by ". . . reject[ing] reliance on public data collected by SCAQMD . . ." while choosing to ". . . believe the assertions of Dynegy Β a private, self-interested party . . ."[65] CA Parties also assert that even if the Dynegy transactions involve exchanges of different products, there could be some overlap between the products that would allow Dynegy to perform these swaps in order to shift its regulatory accounting for emissions from one period to another.[66]  Next, CA Parties briefly allege that these transaction pairs follow a

---

[65]CA Parties' Request for Rehearing at 92.

[66]Id.

Docket Nos. EL00-95-081 et al                                          - 45 -

pattern of "walking up" RTC prices in a short period. Finally, CA Parties note that some of the RTC trading price information contained in Dynegy's data response to an inquiry from Trial Staff differs from the corresponding price information recorded by SCAQMD in its database. The prices reported to Trial Staff are significantly lower. CA Parties assert that this discrepancy might be an indication of something significant.

## Discussion

146.   We will deny rehearing on this issue. First, contrary to CA Parties' assertion, we have not rejected reliance on SCAQMD data. Quite the reverse is true. CA Parties presented us with certain data collected by SCAQMD and CA Parties' interpretation of what that data might mean. In response, Dynegy provided an alternative interpretation of the same SCAQMD data that fit the facts presented to us at least as well as CA Parties' interpretation. Our decision, thus, fully relied on SCAQMD's public data. It was the interpretation of that data by CA Parties that we found unpersuasive. Since CA Parties have no less self-interest in the outcome of this issue than Dynegy, there is no reason to simply presume that CA Parties' interpretation was correct when an equally plausible alternative interpretation existed.

147.   Regarding the argument that there may be an overlap between the RTC products exchanged, CA Parties have not explained how this potential overlap would impact matters at issue, and, in any event, have not demonstrated that Dynegy actually followed this procedure.

148.   Finally, with regard to the actual prices reflected in the SCAQMD database and the Trial Staff data response, we find nothing that we can act on. The emissions trading market is not administered by a public utility under our jurisdiction. It was created, and is administered, without need of our approval. In CA Parties' own words,[67] the SCAQMD is ". . . the relevant enforcing regulatory agency . . ." and nothing has been presented to us to indicate that SCAQMD has done anything more than provide raw data that is open to multiple reasonable interpretations. Certainly, nothing has been presented to us to indicate that SCAQMD itself has determined that wrong-doing was perpetrated in its market. Under the circumstances, there is no basis for us to question the emissions trading practices reflected in that raw data.

_____

[67] Id.

Docket Nos. EL00-95-081 et al                                                    - 46 -

**What Emissions Amounts Should Be Offset Against Refund Calculations?**

**Background**

149.   Among other things, the presiding judge rejected Trial Staff's recommendation that only emissions costs associated with mitigated intervals should be recoverable as an offset to refunds.  In their initial comments, Trial Staff and the CA Parties both continued to argue for this limitation but the PX replied that the data it has on emissions costs would not permit it to accommodate this proposal.  Noting the limitations on the PX's data, the Refund Order affirmed the presiding judge's finding.

**Comments**

150.   On rehearing, CA Parties state that both the presiding judge and the PX misunderstood their position and, thus, that the Commission erred by relying on their arguments.  According to CA Parties, there is no data limitation that would prevent implementation of their proposal, the proposed calculation would not be difficult, and the fundamentals of the calculation have already been accomplished and accepted by the Commission.  Specifically, CA Parties argue that sellers claiming emissions offsets have already performed part of the allocation in order to identify the portion of their total emissions costs that relates to CAISO and PX sales (mitigated or unmitigated).  CA Parties note that the presiding judge generally accepted these allocations and the Refund Order, in turn, adopted those findings.

151.   According to CA Parties, only one simple step remains.  Once the final MMCPs are calculated, the ratio of mitigated sales (in MWh) to total sales to the CAISO or PX will be known and that ratio can be applied to the total CAISO and PX emissions costs that have already been identified and approved.

152.   As further support, CA Parties note that in the April 22 Order the Commission clarified that the additional fuel cost allowance would not be applicable for intervals where sales were not mitigated.  CA Parties argue that the same reasoning should apply for emissions costs.

**Discussion**

153.   The Commission will grant rehearing on this issue.  Upon consideration of CA Parties' new arguments, we agree that the emissions cost offset should be treated the same way as the fuel cost allowance for non-mitigated intervals and that there appears to be no technical reason why it cannot be.

**Allocation of Emissions Costs**

## Background

154.    In the Refund Order the Commission summarily adopted the presiding judge's finding as to how emissions costs should be applied and directed that Refund Period emissions costs should be allocated to customers on the same basis as prospective period emissions costs; i.e., they should be allocated to load-serving entities based on CAISO Gross Control Area Load.

## Comments

155.    CA Parties argue that the Commission erred in both of these actions.  Regarding adoption of the presiding judge's finding as to how emissions costs should be applied, CA Parties continue to argue that there is a need to calculate sales and purchases separately so that those who both sold and bought during a period, but were net sellers, will not escape paying for their portion of the emissions costs associated with their purchases.

156.    Regarding the determination to allocate emissions costs to customers based on Gross Control Area Load, CA Parties continue to argue that export load should share in the burden.

## Discussion

157.    Regarding the argument that emissions costs on sales and purchases should be calculated separately, we continue to disagree with CA Parties.  Given the existence of an active market in emissions credits, the likelihood is that in any given instant like amounts of power purchases and sales will be associated with like amounts of emissions costs because markets tend toward equilibrium price levels.  Accordingly, calculating emissions costs on the net purchase or sale should yield essentially the same result as calculating emissions costs on purchases and sales separately and then netting.  Even if there is occasionally a small difference, perhaps stemming from the fact that not all emissions costs come from the emissions trading market, we do not believe that the added complexity of separate purchase and sale calculations would be cost-effective compared to the questionable benefits.

158.    Regarding the allocation of emissions costs during the Refund Period based on the CAISO's Gross Control Area Load, our clarification in the Refund Order was based on decisions made in earlier orders and is appropriately supported.  The June 19 Order directed that the CAISO's new emission allowance administrative charge be assessed

:0031016-3056 Issued by FERC USEC 10/16/2003 in Docket#: EL00-95-081

Docket Nos. EL00-95-081 et al                                                      - 48 -

against all in-state load served on the CAISO's transmission system.[68]  The December 19 Order confirmed that total gross load is the most appropriate method to assess these costs because of the reliability function served by the CAISO's markets.[69]  Accordingly, the clarification in the Refund Order that Refund Period emissions costs would be allocated to the CAISO's Gross Control Area Load merely reflected an appropriate effort to conform the Refund Period emissions allocation with the prospective emissions allocation that was approved earlier.  Nothing raised in CA Parties' arguments on rehearing convinces us that emissions costs should be allocated differently between the two periods.

**Miscellaneous Issues**

**APX Refund Liability**

**Background**

159.   In the Refund Order, the Commission found that the Automated Power Exchange (APX), like other private California Scheduling Coordinators, is liable for refunds associated with energy it scheduled on behalf of underlying energy suppliers.  In making this finding, the Commission adopted the presiding judge's finding that the CAISO and the PX should not be thrust into the position of settling up with entities with whom they did not contract and to whom their tariffs are not applicable.[70]  From this, the Commission found that APX, because it had a relationship with the CAISO and PX through their respective tariffs, should be held liable for amounts owed by or owing to the CAISO and/or the PX.[71]

**Comments**

160.    In its request for rehearing, APX asserts that the Commission's decision would make it liable for refunds based on activities outside of its control.  APX asserts that it did

---

[68]95 FERC & 61,418 at 62,562 (2001) (June 19 Order).

[69]97 FERC & 61,293 at 62,370 (2001) (December 19 Order).

[70]See Proposed Findings at paragraph 857.

[71]Proposed Findings at paragraph 857.

Docket Nos. EL00-95-081 et al                                                    - 49 -

not sell power in the California markets.[72]  Instead, APX claims that sellers relied on it to forward their schedules and energy bids to the CAISO and PX.  Therefore, APX avers that it never was the beneficiary of sales proceeds.[73]  According to APX, it received a volumetric service fee and the revenue generated by the fee was unaffected by the price at which APX Participants sold power.[74]

161.    APX argues that the presiding judge=s holding that it should be primarily liable for refunds because it is listed on the CAISO and PX settlement reruns has no merit.  APX points out that the Commission=s orders[75] make clear that the sellers or suppliers of power, not their intermediaries, are the parties that should pay refunds.  It contends that the presiding judge ignored these portions of the Commission=s hearing order.[76]

162.    According to Morgan Stanley, Coral Power (an APX customer) contends that it has no refund obligation under the Commission=s previous orders.[77]  APX states that Coral told APX that it will not reimburse APX under the refund plan that places financial responsibility for refunds on the Scheduling Coordinators and not directly upon suppliers.[78]  APX contends that this would be an unjust and unreasonable result.

163.    APX asserts that imposing liability for refunds on it would result in lower refunds.[79]  It states that it lacks the funds to compensate California=s consumers.  According to APX,

_____

[72]Request for Rehearing at 7.  C.f., Automated Power Exchange, Inc., 82 FERC &61,287 (1998), where the Commission construed both the bidding participants that sell generation and APX to be engaged in the wholesale sale of electric energy in interstate commerce.

[73]Request for Rehearing at 2; Ex. APX-1 at 2:15.

[74]Request for Rehearing at 8, n.9.

[75]See 101 FERC &63,026.

[76]Request for Rehearing at 13-14.

[77]Morgan Stanley Capital Group Inc.=s Request for Rehearing of the Commission=s March 26, 2003 Order, Docket Nos. EL00-95-084 and EL00-98-069 at 13.

[78]Response of APX to Coral Power Motion for Clarification, Docket Nos. EL00-95, et al.

[79]Request for Rehearing at 2.

Docket Nos. EL00-95-081 et al                                    - 50 -

it transferred the revenue associated with the sales to the CAISO and PX long ago.[80]  APX
avers that it cannot pay any refunds unless it first obtains that revenue from the sellers that
used APX as an intermediary.

164.    As an alternative, APX suggests that, at most, the Commission should require a
form of joint and several liability among APX and its Participants.[81]  Under APX=s
proposal, it would be required to allocate its Participants= amounts owed and owing as a
result of the Commission=s order and the CAISO and PX settlement reruns.[82]  But,
according to APX, if a shortfall remains as a result of non-payment by its Participants, the
Participants that failed to pay would be liable for any unpaid amounts.[83]

165.    In the Proposed Findings, the presiding judge provided a methodology for
distributing the refund liability, should it not all be assigned to APX.[84]  The presiding
judge recommended using a pro rata distribution among the APX Participants for APX-PX
pass-through service.  But, APX never identified any of the bids as Apre-matched@ bids, so
Calpine witness Bulk testified that it is reasonable and fair to adjust all bids submitted to
APX=s PX p-t service.[85]  Additionally, Trial Staff suggested clarification that the pro rata
allocation of refunds should be based only on the unmatched or net buy and sell
transactions that were bid into and settled by the PX.  Finally, Morgan Stanley states
(1) that the Commission should recognize the rights of APX participants to receive
payments for defaults and misapplied charges like any other seller; and (2) that it is
arbitrary and capricious for the Commission to order the CAISO and PX to submit
compliance filings, but to not impose the same requirement on APX to ensure that APX
properly derives, allocates and collects amounts owed to or owing from APX market
participants.

---

[80]See Id.

[81]See Id. at 28.

[82]See Id. at 28-29.

[83]See Id. at 29.

[84]See Proposed Findings at paragraph 861-70.

[85]Ex. APX-3 at 8.

Docket Nos. EL00-95-081 et al                                    - 51 -

**Discussion**

166.    We will grant APX=s rehearing request on this issue and find that APX Participants, along with Scheduling Coordinators such as APX, are liable for refunds in this proceeding. The Commission has very broad discretion as to whether and when to order refunds to ratepayers.[86] "Customer refunds are a form of equitable relief, akin to restitution, and the general rule is that agencies should order restitution only when 'money was obtained in circumstances that the possessor will give offense to equity and good conscience if permitted to retain it.'"[87] The APX as an independent scheduling service provider has more similarities to the PX than with energy producers. In fact, APX through its operation of hourly spot markets competed with the PX, not with electricity producers.[88] Given the unique nature of APX's business operation as an independent scheduling service provider and its similarity to the PX and given that sellers who used APX's services, not APX itself, retained the vast majority of the revenue that resulted from the excessively high electricity prices in California during this period,[89] we find it reasonable that customer refunds be paid by these sellers because it "will give offense to equity and good conscience if [they are] permitted to retain [excessive revenues]."[90] Therefore, the Commission is exercising its broad discretion over refunds in this instance to assign refund liability in a way consistent with equitable considerations, including assigning the refund liability to include APX Participants.

---

[86]See e.g., Town of Concord, et al., v. FERC, 955 F.2d 67, 76 (D.C. Cir. 1992). "[A]bsent some conflict with the explicit requirements or core purposes of a statute, we have refused to constrain agency discretion ... . The agency need only show that it 'considered relevent factors and ... struck a reasonable accomodation among them.'" Id. (quoting Las Cruces TV Cable v. FCC, 645 F.2d 1041, 1047 (D.C. Cir. 1981). See also, Public Serv. Comm'n v. Economic Regulatory Admin., 777 F.2d 31, 34-36 (D.C. Cir. 1985). This refund authority does not conflict with the prohibition on retroactive ratemaking. See 955 F.2d at 75.

[87]Id. (quoting Atlantic Coast Line R.R. v. Florida, 295 U.S. 301 at 309 (1935)).

[88]See Automated Power Exchange v. FERC, 204 F.3d 1144, 1149 (D.C. Cir. 2000). The Commission also concluded that, like the PX, APX exercised "effective control" over sales in its market and was an "integral part of the transactional chain." See 82 FERC & 61,287 (1998).

[89]See Request for Rehearing at 2; Ex. APX-1 at 2:15.

[90]955 F.2d at 75 (quoting 295 U.S. at 309).

167.   Also, flowing refunds through APX would increase the chances of continued litigation and delay.[91]  Some APX Participants assert that they are not liable for refunds for transactions paid by APX as an intermediary.[92]  Requiring that refunds come directly from APX Participants promotes the equitable and timely payments to California consumers.

168.   Furthermore, we have reviewed the Commission's earlier finding that APX, because it had a relationship with the CAISO and PX through their respective tariffs, should be held liable for amounts owed or owing to the CAISO and/or the PX.  Given the nexus between this tariff relationship and a finding of refund liability, we have carefully re-examined CAISO tariff relationships and now recognize that APX Participants, not APX, have tariff relationships directly with the CAISO.  Specifically, the CAISO Tariff includes provisions outlining its rights to directly order suppliers to increase/decrease production as part of dispatch to assure reliability and system stability.[93]  In addition, a contractual relationship exists between an APX Participant and the CAISO under reliability-must-run contract.[94]  We find that these contractual relationships and the CAISO Tariff provisions support our finding that APX Participants should be held liable for refunds.

169.   This finding of refund liability for APX Participants is consistent with the Commission=s preliminary finding in a June 25, 2003 Order, that those energy suppliers found to have Agamed@ the California market will be required to make Aa monetary remedy of disgorgement of unjust profits and . . . may warrant other additional, appropriate non-

---

[91]At least one producer, Coral Power, LLC, has stated that it will not reimburse APX should the Commission opt to use APX as an intermediary.  See Response of APX to Coral Power Motion for Clarification, Docket No. EL00-95, et al.  The added procedural morass of using APX as an intermediary can only increase the likelihood of such positions and delays, while not aiding in returning moneys to the proper parties.

[92]Request for Rehearing at 8.

[93]See, e.g., CAISO Tariff Vol. I, Section 5.1.3 (stating A[W]hen the [CA]ISO has used the Ancillary Services that are available to it under Y Ancillary Services bids which prove to be effective in responding to the problem and the [CA]ISO is still in need of additional control over Generating Units, the [CA]ISO shall assume supervisory control over other Generating Units.@).

[94]See CAISO Tariff Vol. I, Section 5.2.1 (defining a RMR contract as Aa contract entered into by the [CA]ISO with a Generator who operates a Generation Unit giving the [CA]ISO the right to call on Generator to generate energy.@); See also, Pro Forma Must-Run Service Agreement, CAISO Tariff Appendix G.

monetary remedies.[95]  Among those suppliers were Morgan Stanley Capital Group, Inc. (Morgan Stanley) and Coral Power, LLC (Coral Power).[96]  Because both used APX=s scheduling services to reach the CAISO and/or PX to sell their energy in the California market,[97] we have already found that an APX Participant will directly be held accountable for this monetary remedy.  We find nothing to justify different treatment of the refund settlement process.  Accordingly, we reverse the finding in our Refund Order that refunds deriving from APX Participant behavior should necessarily flow from APX to the CAISO, with APX seeking recovery of debts from its Participants.

170.  Based on the Commission's previous finding that APX and its Participants are all energy suppliers,[98] APX proposed the use of joint and several refund liability among the Participants, excluding liability for itself.[99]  Coral Power (an APX Participant) asserted that the Commission=s previous orders in this proceeding absolve it from any obligation in the refund process for energy scheduled through APX and thus it claims to have no refund liability.[100]  Joint and several liability is traditionally used where activity of multiple parties creates harms that cannot be distinguished from one another and there is no reasonable basis for determining the contribution of each in the resulting harm.[101]  It is our

---

[95]Order to Show Cause Concerning Gaming And/Or Anomalous Market Behavior, Docket Nos. EL03-137-000, et al. June 25, 2003.

[96]See Docket Nos. EL03-151-000 and EL03-160-000.

[97]Morgan Stanley Capital Group Inc.=s Request for Rehearing of the Commission=s March 26, 2003 Order, Docket Nos. EL00-95-084 and EL00-98-069 at 9-10.  See also, Response of APX to Coral Power Motion for Clarification, Docket No. EL00-95, et al. (responding to Coral Power=s assertion that it will fight any attempt by APX to recover refunds from it; this, by definition, is an acknowledgment by Coral power that it is an APX Participant).

[98]See Automated Power Exchange, Inc., 82 FERC &61,287 (1998).

[99]See Request for Rehearing at 28-29.

[100]See Morgan Stanley Capital Group Inc.=s Request for Rehearing of the Commission=s Refund Order, Docket Nos. EL00-95-084 and EL00-98-069 at 13; Response of APX to Coral Power Motion for Clarification, Docket Nos. EL00-95, et al., (Apr. 16, 2003).

[101]See Restatement (Second) of Torts:  Apportionment of Harm to Causes ' 433A (1965).  There is a general preference to avoid use of joint and several liability when apportionment is possible.  See also, W. Page Keeton, et al., Prosser and Keeton on the

Docket Nos. EL00-95-081 et al                                          - 54 -

expectation that bid data will be sufficiently complete in nearly all instances to permit apportionment.[102]  We find that apportionment better distributes refund liability and should be used whenever possible.  However, where the data for apportionment is insufficient, we find that joint and several liability is appropriate for recovery of these refund liabilities.  Therefore, we find that because APX as well as all of its Participants are energy suppliers, they should all be held jointly and severally liable for refund liabilities, associated with energy scheduled by APX that cannot be apportioned to a specific entity.  To facilitate the apportionment process, we will require APX to submit a compliance filing as soon as possible but no more than five months after the date of the issuance of this order containing the results of its determination of the refund liability of each of its Participants.

171.    We find that the pro rata allocation of refund liability outlined by the presiding judge can successfully function in tandem with the apportionment system described above.  APX states that bids in the p-t service used the applicable PX market clearing price.  After price is defined as the marginal clearing price, the pro rata allocation of refund liability determines each party's share based on the one remaining term in the equation, i.e. volume.[103]  We find that Staff was correct to clarify that the pro rata allocation of refunds should be done based only on the unmatched or net buy and sell transactions that were bid into and settled by the PX.[104]  Therefore, we find that the use of a pro rata allocation as described by the presiding judge and clarified by Staff resolves the problem of refund liability apportionment for much of the energy in question.

172.    We also find that to the extent that APX Participants are owed payments for defaults and misapplied charges, they should try to resolve these payment issues in accordance with their agreements with APX.

---

Law of Torts ' 52 at 345 (AWhere a factual basis can be found for some rough practical apportionment, which limits defendant=s liability to that part of the harm of which that defendant=s conduct has been a cause in fact, it is likely that apportionment will be made@).

[102]We have already, in a July 25 Order, held that CAISO=s revised settlement data would be the basis for a determination of refund liability and a determination of the amounts owed to APX.  See Proposed Findings at paragraph 860.

[103]See Proposed Findings at paragraph 863.

[104]See Staff IB at 13.

**Authority to apply refunds to governmental entities.**

## Background and Comments

173.    Several parties, including BPA, AEPCO, Silicon Valley Power, Redding, Glendale, and NCPA commented on the Commission's authority to apply refunds to governmental entities.  Generally, these parties state the following:  (1) the Commission has no authority to apply the Refund Order to governmental utilities; (2) non-public entities should not be subject to refunds; and (3) refund liability can not be applied retroactively.

174.    Grant County "is not challenging the Commission's [governmental entity] jurisdictional theory in [its] request for rehearing."[105]  Rather, Grant County "has sought to demonstrate that the narrow theory upon which the Commission based its authority to compel refunds from [governmental entities] in [the July 25 and December 19] Orders simply does not fit the factual circumstances of [its] sales to the ISO."[106]  According to Grant County, it is undisputed that (1) its only sales involving CAISO were negotiated sales made under the WSPP Agreement, not the CAISO Tariff; (2) it never submitted bids into the CAISO's single-priced FERC-regulated organized markets or agreed to accept any prices established through those markets; (3) it was not a scheduling coordinator or a participating generator with the CAISO, and did not sign any agreement with the CAISO that explicitly acknowledged the Commission's jurisdiction regarding its sales; and (4) its sales to the CAISO were made under the WSPP Agreement, which states that "[n]othing contained in this Agreement shall give FERC jurisdiction over those Parties not otherwise subject to such jurisdiction or be construed as a grant of jurisdiction over any Party by any state or federal agency not otherwise having jurisdiction by law."[107]

175.    Additionally, Grant County argues that its sales to the CAISO were not OOM sales subject to mitigation but were, instead, bilateral sales exempt from mitigation.  As support, Grant County cites two early Commission Orders that addressed the CAISO's ability to

---

[105]Rehearing Request at 3.

[106]Id.  Grant County's sales to the CAISO were made between November 17, 2000 and December 13, 2000 for approximately 23,000 MWh at a cost of approximately $18 million (at an average price of $783/MWH).  Grant County also states that the CAISO still owes it this $18 million and that over $7 million (at an average price of $304/MWh) would be "lost" if its sales are mitigated.

[107]Id. at 3-4, 13-14 (citing WSPP Agreement, Rate Schedule FERC No. 6 Original Sheet No. 25 (effective July 1, 2001) ' 13.1).

Docket Nos. EL00-95-081 et al                                              - 56 -

direct participating generators[108] to supply energy outside of the CAISO markets.[109] In those orders, such directives were described as "OOM calls." Accordingly, Grant County argues that only bilateral sales by a participating generator should be considered OOM sales to the CAISO and bilateral sales by a non-participating generator should not.

## Discussion

176.    We deny the requests for hearing that generally challenge our authority to apply refunds to governmental entities in the specific circumstances delineated in our prior orders in this proceeding,[110] for the reasons provided in those prior orders.

177.    We grant rehearing as to Grant County, however, as we find the circumstances of its sales to the CAISO, as described above, unlike those generally by the governmental entities involved in this proceeding, provide us with neither personal jurisdiction over Grant County nor subject matter jurisdiction over its CAISO sales. Unlike those other governmental entities, Grant County did not make sales under the CAISO Tariff into the CAISO's centralized, single clearing price auction markets under which all sellers received the same price for a given sale.[111] Nor did Grant County enter into any arrangement with the CAISO, i.e., a Scheduling Coordinator Agreement or a Participating Generator Agreement, that explicitly acknowledged our jurisdiction regarding its CAISO sales.[112] Since we are granting rehearing concerning the Commission's jurisdiction over Grant County's sales to the CAISO, we need not address Grant County's argument that its bilateral sales to the CAISO were mischaracterized as OOM sales.

**Refunds to buyers and payments of amounts owed to sellers to be made simultaneously as an offset, rather than separately**

178.    Turlock and Glendale request clarification that refunds to buyers and payments of amounts owed to sellers are to be made simultaneously and, thus, offset against each other.

---

[108]Generators who have executed a Participating Generator Agreement.

[109]Citing 90 FERC & 61,006 at 61,010-11 (2000) and 95 FERC & 61,159 at 61,516 (2001).

[110]See San Diego Gas & Electric Company et al., 96 FERC & 61,120 (2001), reh'g, 97 FERC & 61,275 (2001).

[111]See 97 FERC at 62,181-83.

[112]See Id. at 62,182.

Docket Nos. EL00-95-081 et al                                                    - 57 -

179.    NCPA requests rehearing of the Refund Order because it does not squarely address NCPA's argument that certain funds owed to NCPA by PG&E that are unrelated to the refund proceeding,[113] should nevertheless be offset against refunds determined in this proceeding.

**Discussion**

180.    Regarding the request for clarification, it is a settled matter that refunds will be offset against amounts still owed as determined in this proceeding.[114] The very concept of an offset precludes any possibility that sellers would be required to remit refunds to buyers without first netting out amounts still owed to sellers. Accordingly, it is also a settled matter that amounts owed both by and to parties, as determined in this proceeding, will be offset against each other and only the net result of this offset will flow to or from parties. No further clarification is required.

181.    Regarding NCPA's argument, we must deny rehearing. While we are sympathetic to NCPA's potential cash flow dilemma if there is a lengthy period between completion of the Refund Proceeding here and the PG&E bankruptcy proceeding before the bankruptcy court, there is simply no nexus between the two proceedings that would permit NCPA to offset its pre-petition bankruptcy claim against its refund liability determined in this proceeding. Unlike any unpaid balances that could be directly determined in this proceeding to be due NCPA as a seller, the pre-petition bankruptcy claims arise from a different issue not addressed in this proceeding and will ultimately be addressed in a different forum, the bankruptcy court. Furthermore, until the bankruptcy court has addressed NCPA's claims, those claims are essentially speculative in this proceeding and, thus, are not appropriate for offset here. There is simply no basis to permit this proposed offset.

**Effect of the Williams Settlement**

182.    Williams requests that the Commission clarify the California refund proceeding by accepting Williams' proposal for effectuating its November 11, 2002 settlement agreement with the California State Releasing Parties.[115] On December 30, 2002, the Commission

---

[113]According to NCPA these funds consist of pre-petition bankruptcy claims against PG&E of approximately $6 million.

[114]July 25 Order at 61,520.

[115]The California State Releasing Parties are comprised of the following:  the Governor of the State of California; the State of California Department of Water

Docket Nos. EL00-95-081 et al                                                                    - 58 -

granted Williams' request to partially dismiss it from the California refund proceeding "to the extent that the proceeding directs refunds for electric power sold by Williams to the [California State Releasing Parties]."[116]  Generally, the CA Parties support Williams' method for effectuating the settlement agreement.[117]  However, because Williams has not yet filed the settlement agreement with the Commission and we have not accepted it, we will defer making a decision on how to effectuate the settlement agreement until after we have assessed its possible impact on rates, terms and conditions of service.  Accordingly, we will direct Williams to file the settlement agreement with the Commission for our review.

**Moving the refund effective date from October 2, 2000 to a different time**

**Comments**

183.    The CA Parties request that the Commission provide a remedy for market manipulation that they allege occurred from May 1, 2000 through October 1, 2000.  The CA Parties propose that the Commission provide such a remedy by ordering the CAISO and PX to apply the Refund Period MMCP methodology to this earlier time period and to order all sellers from this earlier period to disgorge amounts charged above the MMCPs thus calculated.

**Discussion**

184.    We will reject the CA Parties proposal to apply the MMCP methodology to a time period that predates the Refund Period.  In the Refund Order, the Commission stated in paragraph 149 that "[a]ny future Commission findings of energy market manipulation that result from our ongoing review would not result in a resetting of the refund effective date in this proceeding, which is based on the requirements of Section 206 of the Federal

---

Resources; the California Public Utilities Commission; the California Electricity Oversight Board; and the Attorney General of California.

[116]San Diego Gas & Electric Company, et al., 101 FERC & 61,391 at P 15 (2002).

[117]In a timely request for clarification or in the alternative rehearing in another related proceeding, NCPA states that the settlement agreement contains a provision in which "unnamed California Cities, Counties and Political Subdivisions" release "any and all claims of any nature whatsoever" that they have against Williams.  NCPA, which is a participant in the California refund proceeding, requests that the Commission clarify that NCPA and its members are not bound by the release.

Docket Nos. EL00-95-081 et al                                              - 59 -

Power Act, and would have no impact on the just and reasonable clearing prices developed for the Refund Period."[118]  Given these Federal Power Act requirements, the Commission directed that a remedy for market manipulation that may have occurred prior to the Refund Period would be through the initiation of one or more additional enforcement actions against entities found to have committed market manipulation in violation of the CAISO and PX tariffs.  The proposed remedy in such a proceeding would be disgorgement of profits by those entities that are found to have violated one or both of these tariffs.  Any such company-specific disgorgement or other appropriate remedies would be in addition to the refunds associated with the mitigated market clearing prices developed pursuant to this order and could apply to conduct both prior to the Refund Period and during the Refund Period.  Since there is no legal basis for the CA Parties' proposed remedy, we will deny this part of their rehearing request.

**Jurisdictional bar because of the 9th Circuit's review of MMCP**

**Comments**

185.   The CA Generators state that the Commission's adoption of its staff's recommendations is jurisdictionally barred and violates the APA and due process.  Specifically, the CA Generators argue that Section 313(b) of the Federal Power Act bars the Commission's consideration or adoption of its staff's gas cost recommendation because once a Commission order is pending on appellate review as of the time that the Commission has filed the record with the appellate court, the Court of Appeals has exclusive jurisdiction to modify the Commission order.

186.   The CA Generators contend that even if the Commission retained jurisdiction to modify the gas cost component of the refund methodology, the adoption of the new proxy price in reliance on a Commission staff "Final Report on Price Manipulation in Western Markets" (Final Report) violates the due process requirements in the FPA, APA, and the Commission's regulations.  The CA Generators state that the Final Report is not part of the hearing record on which the Commission must base its conclusions because the Final Report was issued in Docket No. PA02-2-000 and, thus, the Commission's findings were not based on a preponderance of the record evidence.  Moreover, the CA Generators state that because the Final Report is a product of an agency investigation, rather than an adjudication, materials from the investigation may not be used as part of the adjudicatory record.  In extending this argument, the CA Generators state that the Commission erred by failing to make an independent adjudicative inquiry, one that is not tainted by its staff's use

---

[118]See San Diego Gas & Electric Company et al., 96 FERC & 61,120 at 61,504 (2001).

Docket Nos. EL00-95-081 et al                                          - 60 -

of allegedly biased consultants known as "the Analysis Group." The CA Generators state
that the Commission has failed to provide parties in the adjudicatory proceeding requisite
notice and opportunity to comment on the findings made in the Final Report or of the
underlying data and analysis. Also, the CA Generators state that the Commission did not
allow notice and comment on the Commission's acceptance of the substitute gas price
proxy and instead the Commission relied on "untested assumptions." Finally, the CA
Generators argue that the Commission's failure to properly take account of the record
violates the requirement of reasoned decision-making and is arbitrary and capricious and
an abuse of discretion in violation of the APA and must be set aside.

### Discussion

187.    The CA Generators are incorrect that the Federal Power Act bars the Commission's
consideration or adoption of its staff's gas cost recommendation. The CA Generators state
that FPA Section 313(b) supports its contention that once a Commission order is pending
on appellate review as of the time that the Commission has filed the record with the
appellate court, the Court of Appeals has exclusive jurisdiction to modify the Commission
order. However, as the CA Generators point out in footnote 14 of their filing, the Ninth
Circuit Court of Appeals, in ruling on a May 23, 2002 Commission motion, stated the
following:

> The Court is asserting exclusive jurisdiction over matters in which rehearing was
> denied and a petition for review was filed from the order denying rehearing. The
> Commission may issue further orders in the underlying docket Nos. EL00-95, et al.,
> which address matters not addressed in earlier rehearing orders, without leave of
> this court.[119]

Since the Commission determined in the Refund Order that a new methodology will be
used to calculate gas proxy prices and this methodology was never addressed in earlier
rehearing orders, the conditions under which the Ninth Circuit would have had exclusive
jurisdiction over this methodology did not exist and the Commission did not need leave of
the Ninth Circuit to adopt it.

188.    The CA Generators state that the Final Report is not part of the hearing record on
which the Commission must base its conclusions because the Final Report was issued in
Docket No. PA02-2-000 and, thus, the Commission's findings were not based on a
preponderance of the record evidence. We find that this argument and all of the related

---

[119]Public Utilities Commission of the State of California et al., v. FERC, 9th Cir.
Nos. 01-71051, et al.

Docket Nos. EL00-95-081 et al                                            - 61 -

CA Generators' arguments concerning due process are without merit. The Commission
directed its staff to determine whether and, if so, the extent to which California and
Western energy markets were manipulated during 2000 and 2001. In considering the Final
Report's conclusions concerning the effect of market manipulation on gas prices, the
Commission took administrative notice of its staff's fact-finding investigation results that
gas prices in the California spot market were artificially high, in part due to market
manipulation.

189.    Furthermore, we find no merit to the CA Generators' contention that the
Commission erred by employing consultants known as "the Analysis Group." The
Commission through its staff hired Michael Quinn of "the Analysis Group" in conjunction
with Professor Robert S. Pindyck[120] of the Massachusetts Institute of Technology to
perform econometric analysis in order to assist staff in its analysis of gas trading. Simply
because Dr. Quinn, who has a doctorate in Economics from Princeton University and is an
expert on matters involving natural gas transportation and distribution, has served as a
consultant to other energy industry parties does not establish that a conflict of interest
exists. The CA Generators mistakenly assume that "the Analysis Group" participated in
the staff's decision-making process and in the formulation of its recommendations. In fact,
Dr. Quinn performed the limited function of econometric analysis on specific issues
affecting gas trading activities from data that the Commission staff supplied.

190.    Moreover, the CA Generators are incorrect in stating that because the Final Report
is a product of an agency investigation, rather than an adjudication, materials from the
investigation may not be used as part of the adjudicatory record. As the Supreme Court
recognized in Winthrow v. Larkin, 421 U.S. 35 at 58 (1975), ". . . the combination of
investigative and adjudicative functions does not, without more, constitute a due process
violation . . . ." The Supreme Court elaborated that "[t]he contention that the combination
of investigative and adjudicative functions necessarily creates an unconstitutional risk of
bias in administrative adjudication has a much more difficult burden of persuasion to
carry. It must overcome a presumption of honesty and integrity in those serving as
adjudicators; and it must convince that, under a realistic appraisal of psychological
tendencies and human weakness, conferring investigative and adjudicative powers on the
same individuals poses such a risk of actual bias or prejudgement that the practice must be
forbidden if the guarantee of due process is to be adequately implemented."[121] Since the

---

[120]Professor Pindyck is Bank of Tokyo-Mitsubishi Professor of Economics and
Finance at MIT's Sloan School of Management. Professor Pindyck is a nationally
recognized econometrician with a specialty in energy futures markets.

[121]Id. at 47.

J031016-3036 Issued by FERC OSEC 10/16/2003 in Docket#: EL00-95-081

Docket Nos. EL00-95-081 et al                                             - 62 -

CA Generators have not carried their burden of showing that bias existed in these
proceedings, we find no merit to these arguments.

191.    We also find no merit to the CA Generators' contention that the Commission has
failed to provide parties in the adjudicatory proceeding requisite notice and opportunity to
comment on (1) the findings made in the Final Report or of the underlying data and
analysis; and (2) the Commission's acceptance of the substitute gas price proxy. The
Commission provided all parties the opportunity for the submission and consideration of
facts pertaining to its findings in the Refund Order, which included findings from the Final
Report, through rehearing and the on-the-record technical conference, which its staff held
on May 22, 2003, to address issues concerning the information submitted on generators'
fuel cost allowance submissions, including the substitute gas price proxy.[122] In fact, each
of the suppliers comprising the CA Generators participated in the May 22, 2003 technical
conference and the CA Generators filed comments on rehearing of the Refund Order.
Moreover, for the same reasons, we find no merit to the CA Generators' statement that the
Commission improperly relied on "untested assumptions" in finding "that a competitive
electricity market required that there be a competitive gas market, or that the gas market
was not, in fact, competitive." All parties were given the opportunity to comment on these
alleged "untested assumptions" through rehearing and the May 22, 2003 technical
conference. Finally, we note that Dynegy, Mirant and Reliant, as the "Indicated
Generators," filed a request for a 30-day extension of time in which to file comments on
the Commission staff's August 13, 2002 Initial Staff Report. On September 6, 2002, the
Commission's Deputy Secretary issued a Notice of Extension of Time in which it granted
all parties an extension of time to file comments until October 15, 2002. Since the
Commission provided all parties with the opportunity to submit comments on findings in
the Initial Staff Report, including those that found that gas prices were artificially high, in
part due to market manipulation, we find no merit to the CA Generators' concerns that the
Commission's reliance on the Final Report findings concerning these market manipulation
issues violated due process. For all of the above reasons, we find that the Commission
properly took into account the record in this proceeding through reasoned decision-
making. Accordingly, we will deny the part of the CA Generators' request for rehearing
concerning due process issues.

---

[122]See California v. FERC, 329 F.3d 700 (2003).

Docket Nos. EL00-95-081 et al                                                    - 63 -

**Discovery Relating to all Settlement Adjustments and Reruns**

**Background**

192.    The Refund Order summarily adopted the presiding judge's recommendation that the CAISO and PX perform complete settlement reruns as part of the compliance filing process.

**Request for Clarification**

193.    The CA Generators ask the Commission to clarify that the CAISO and PX settlements processes, as they apply to Refund Period transactions and reruns, will be treated as compliance filings in this proceeding.  The CA Generators also ask that the Commission prescribe a supervised process under which all future CAISO and PX settlement adjustments and reruns would be conducted on the record, subject to discovery and comment by parties in this proceeding.  Finally, the CA Generators request that the Commission require the CAISO to give notice in this proceeding of its proposed tariff amendment 51 preparatory adjustments, in addition to all subsequent settlement adjustments and reruns, that affect the baseline of pre-mitigation transactions for the CAISO's settlements and billing process.[123]

**Discussion**

194.    We direct the CAISO and the PX to submit within five months of the issuance date of this order compliance filings containing the results and supporting data of their respective settlements and billing processes that are the subject of this refund proceeding. While parties will be given an opportunity to comment on these compliance filings, at this time, we will not dictate process steps concerning discovery.  However, as discussed above in the Interest section (paragraph 108) we are relying on the CAISO to follow through on its proposed process to help market participants better understand the adjustments that it intends to make.

195.    Additionally, because Docket No. ER03-746-000 already exists for parties in that proceeding to receive notice concerning proposed tariff amendment 51 preparatory adjustments and because we find no merit to the CA Generators' contention that these adjustments are "compliance actions" in this proceeding, we will deny the CA Generators' request that the CAISO provide notice concerning tariff amendment 51 preparatory adjustments in this proceeding.

---

[123]See Docket No. ER03-746-000.

Docket Nos. EL00-95-081 et al                                                    - 64 -

**Fuel Cost Allowance Recovery in Proportion to Gross Load**

## Comments

196.    The CA Generators state that the Commission did not specify, in its Refund Order, how the additional fuel cost allowance would be recovered from the market.  Because the fuel cost allowance is similar to the emissions cost offset, the CA Generators ask the Commission to clarify that the fuel cost allowance will be allocated to customers as an offset to refunds in proportion to customers' Gross Control Area Load in the same manner as emissions cost offsets.

## Discussion

197.    We agree that the additional fuel cost allowance is similar to the emissions cost offset in that it reflects a set of costs that we have found to be appropriate for recovery in this proceeding.  Also, because no direct bilateral obligations existed under the CAISO regime, and because we have declined to direct the CAISO to attempt to assign bilateral obligations where none ever existed, costs such as the fuel cost allowance and the emissions cost offset must be allocated to customers on some basis.  Accordingly, the same allocation to customers is appropriate for both classes of costs, and we will so clarify.

**Puget Settlement**

198.    Puget Sound Energy, Inc. requests "out of an abundance of caution" that the Commission accept a joint stipulation, in the record as Exhibit No. JS-II-3, in which the presiding judge determined to be just and reasonable two bilateral transactions between Puget and the CAISO and proposed that these transactions would be settled and paid in accordance to the joint stipulation.  We accept this joint stipulation and other joint stipulations that the presiding judge adopted in his proposed findings.

Docket Nos. EL00-95-081 et al                                    - 65 -

**Fuel Cost Allowance Issues**

199.    Several other fuel cost allowance issues have been raised on rehearing of the
Refund Order.  However, these issues are inextricably intertwined with issues raised on
rehearing of the April 22 Order,[124] in the generators' fuel cost allowance filings and the
CA Parties' motion to reject those filings, and in the tech conference convened to address
those issues.  Accordingly, the Commission will issue a subsequent order addressing fuel
cost allowance issues.  This should not, however, delay the start of the CAISO and PX
reruns.

**Commission Investigation of Allegations of Physical Withholding**

200.    On September 2, 2003, California Parties filed a motion in the refund proceeding
for clarification and request for additional procedures or, in the alternative, a request for
rehearing regarding the Commission=s determination on physical withholding.  California
Parties state that they raised issues of physical withholding in testimony that they
submitted on March 3 and March 20 in the refund proceeding.  They contend that the
Commission initiated an undocketed, non-public inquiry to address issues related to
allegations of physical withholding, which to date has excluded participation of California
Parties.  Arising from the non-public inquiry, on August 1, 2003, the Commission made
available to the public Staff=s Initial Report on Physical Withholding by Generators Selling
Into the California Market and Notification to Companies (Report), in which Staff
indicated that it had no credible evidence as of the date of the Report to support further
investigation of certain entities.  California Parties seek clarification whether the
Commission (1) intended to address their March 3 and March 20 testimony in the non-
public inquiry and (2) has made any determinations regarding the merit of that evidence.
They also request that the Report be placed in the record in the refund proceeding, and that
the Commission institute further procedures in the refund proceeding to address the issues
of physical withholding raised by the California Parties.  Alternatively, if the Commission
does not provide the requested clarification, they assert that the Report must be treated as a
dispositive order in the refund proceeding to which they seek rehearing because it denies
due process, contradicts the evidence and the law and violates the mandate of the Ninth
Circuit Remand Order.

**Discussion**

201.    In the first instance we reject California Parties= motion to incorporate Staff=s
Report into the Refund Proceeding or to treat it as a request for rehearing of that report,

---

[124]103 FERC & 61,078 (2003)(April 22 Order).

Docket Nos. EL00-95-081 et al                                                    - 66 -

which is merely a Staff report and certainly not a final agency action.  Alternatively, it is rejected as an untimely request for rehearing of our conclusion set forth in the Refund Order regarding the distinction between the refund proceeding and enforcement actions.[125]  In addition, we deny the request based on its substance, as discussed below.

202.   The Ninth Circuit directed the Commission to allow the California Parties to adduce additional evidence in the Refund proceeding.  Consistent with this direction, we allowed further discovery.  In reaching our decision in the Refund proceeding, the Commission has taken into account the entire record, including the additional evidence filed on March 3 and March 20, 2003.  However, nothing in this evidence has caused the Commission to change the refund formula utilized in this proceeding.  Nor does the evidence provide a basis for the Commission to change the October 2, 2000 refund effective date established in this proceeding, or otherwise provide a basis for making modified or new findings.[126]  As we explained in the Refund Order, any future Commission findings of energy market manipulation that result from our ongoing review will not (and, indeed, as a legal matter cannot) result in a resetting of the refund effective date, which is based on the requirements of Section 206 of the FPA, and will have no impact on the just and reasonable clearing prices developed for the refund period.[127]  Rather, as we indicated we would do in our earlier order, we have initiated separate enforcement actions against entities that may have committed market manipulation in violation of the CAISO or PX tariffs.[128]

203.   Based on information obtained in producing the final report in Docket No. PA02-2-000, and any relevant evidence obtained in the 100 days= discovery, the Commission=s Staff is conducting investigations of various forms of market manipulation, including physical withholding, that may have violated the ISO Tariff on file with the

_____

[125] Refund Order at paragraph 149.

[126] See July 25 Order, 96 FERC & 61,120 at 61,504.

[127] Refund Order at paragraph 149.

[128] Since the Commission has already provided a remedy for any market manipulation that may affect transactions outside the scope of this proceeding, we also find no merit to the CA Parties' contention on rehearing that the Commission must provide refunds for bilateral sales of 30 days or less to CERS during the Refund Period and we will deny rehearing on this issue.  We also adopted the presiding judge's proposed finding to allow these transactions between CERS and the CAISO to be exempt from mitigation.  See 101 FERC & 63,026 at paragraph 19 (2002).

Commission. Any disgorgement of monies recovered though these separate enforcement investigations will be in addition to refunds directed in this Section 206 proceeding, and will not affect the calculation of refunds for reasons stated in the Refund Order. The Commission has broad discretion on whether and how to pursue enforcement actions. The Commission has equally broad, nonreviewable discretion to determine when and whether to settle enforcement actions.[129] We do not interpret the Ninth Circuit=s order to limit the Commission=s discretion to consider in other proceedings the evidence adduced by the California Parties in the 100 days= discovery that was ordered in this proceeding.[130]

204.    The reason for this approach is guided by the requirements of the FPA. In prior orders, we have explained that, in an FPA Section 206 proceeding instituted upon complaint or on our own motion, our authority to set new rates or new terms or conditions of service is prospective only from the refund effective date, in this case October 2, 2000.[131] If the Commission finds that existing rates, terms or conditions of service are no longer just and reasonable or are unduly discriminatory or preferential, the Commission is authorized to fix a new rate or to fix practices "to be thereafter observed." 16 U.S.C. ' 824e(a) (2000).

205.    As a separate matter, the Commission may, in its discretion, investigate violations of the FPA, an order, or tariff term or condition.[132] If a violation is found, various forms of remedy, including a disgorgement of unjust profits, may be pursued. The particular remedy is informed by the nature and extent of the violation. In contrast, in a Section 206 proceeding, a refund is the return of money for a rate or charge paid by a customer that is in excess of the amount that would have been paid under the just and reasonable rate or charge.[133] Thus, a refund proceeding involves a determination of whether a rate or charge

---

[129] E.g., Baltimore Gas & Electric Co. v. FERC, 252 F.3d 456 (D.C. Cir. 2001).

[130] Indeed, the Court explicitly Adefer[ed] to the discretion of FERC to determine how this new evidence should be adduced.@ See also, e.g., Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 543-44 (1978) (A[a]bsent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties@).

[131]December 19 Order, 97 FERC & 61,275 at 62,198-99.

[132]See July 25 Order, 96 FERC & 61,120 at 61,508.

[133]See Sections 205(e) and 206(b) of the FPA.

Docket Nos. EL00-95-081 et al                                    - 68 -

is in excess of the just and reasonable rate, which could result from any one of a number of circumstances, and does not necessarily implicate any wrongdoing by the entity directed to pay the refund.

206.   In other words, enforcement investigations and FPA Sections 205 and 206 represent two different means of ensuring that the requirements of the FPA are met.  FPA Sections 205 and 206 provide the statutorily prescribed mechanisms for changing rates, terms or conditions of service.  In the circumstances here, the Enforcement investigations provide the means to gather facts relating to whether an entity has violated the terms of tariffs or contracts that are approved or accepted under Section 205 or 206.  The Commission here is appropriately using the authorities and procedural mechanisms laid out in the FPA. California Parties= request would merge the enforcement investigations and refund proceeding that the Commission has kept distinct for the reasons stated above. Accordingly, we deny California Parties= request that the Report be placed in the record in the refund proceeding, and that the Commission institute further procedures in the refund proceeding.  Likewise, we deny the alternative request for rehearing.

**Mirant Bankruptcy**

207.   On September 12, 2003, the Bankruptcy Court for the Northern District of Texas issued a ATemporary Restraining Order Against the Federal Energy Regulatory Commission@ (ATRO@) in In re Mirant Corp. (Mirant Corp. v. FERC), Adversary Proceeding No. 03-4355, which enjoins the Commission Afrom taking any action, directly or indirectly, to require or coerce the [Mirant] Debtors to abide by the terms of any Wholesale Contract [to which a Mirant Debtor is a party] which Debtors are substantially performing or which Debtors are not performing pursuant to an order of the Court unless FERC shall have provided the Debtors with ten (10) days= written notice setting forth in detail the action which FERC seeks to take with respect to any Wholesale Contract which is the subject of this paragraph.@

208.   Should the TRO be converted into a preliminary injunction, an action that the Commission opposes, the Commission will appeal that order. Despite the Commission=s disagreement with the validity of the TRO and its expectation that the TRO (or a preliminary injunction) will be vacated on appeal, the Commission must comply with it until vacated. The TRO requires ten days= written notice before the Commission takes a proscribed action with respect to a covered Mirant Wholesale Contract. Accordingly, to the extent that this Order requires Mirant to act in a manner proscribed by the TRO, the Order will provide written notice to Mirant of the action that FERC will take with respect to a covered Mirant Wholesale Contract, which action will not become effective until ten (10) days after issuance of this Order. In all other respects, this Order is effective immediately.

Docket Nos. EL00-95-081 et al                                              - 69 -

The Commission Orders:

(1)    The Commission hereby denies rehearing in part, grants rehearing in part, and grants clarification in part of the Refund Order, as discussed in the body of this order.

(2)    The Commission hereby directs the CAISO and PX to submit compliance filings as soon as possible but no more than five months after the date of issuance of this order containing the results of their revised reruns, as discussed in the body of this order.

(3)    The Commission hereby directs Williams to file the settlement agreement with the Commission, as discussed in the body of this order.

(4)    The Commission hereby directs APX to submit a compliance filing as soon as possible but no more than five months after the date of the issuance of this order containing the results of its determination of the refund liability of each of its Participants.

By the Commission.  Commissioners Massey and Brownell dissenting in part with separate statements attached.

( S E A L )

Magalie R. Salas,
Secretary.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | |
|---|---|
| San Diego Gas & Electric Company,<br>Complainant,<br><br>v.<br><br>Sellers of Energy and Ancillary Services Into<br>Markets Operated by the California<br>Independent System Operator Corporation<br>and the California Power Exchange Corporation,<br>Respondents. | Docket Nos.  EL00-95-081<br>EL00-95-074<br>EL00-95-086 |
| Investigation of Practices of the California<br>Independent System Operator and the<br>California Power Exchange | Docket Nos.  EL00-98-069<br>EL00-98-062<br>EL00-98-073 |

(Issued October 16, 2003)

MASSEY, Commissioner, <u>dissenting in part</u>:

I support today's order in almost all respects.  With this order, the Commission takes another step toward putting refunds in the hands of California customers that paid unjust and unreasonable rates during the Western energy crisis.

There are, however, two aspects of this order with which I do not agree.   First, I do not agree with the order's denial of the California parties' motion for clarification and request for additional procedures.  Various issues from this refund proceeding and other matters have been appealed to the Ninth Circuit Court of Appeals.  In an August 21, 2002 order, the court instructed the Commission to adduce additional evidence of market manipulation by various sellers.  The Commission allowed parties to adduce such additional evidence (the 100 Days Evidence).  Based at least in part on this evidence, the Commission has conducted enforcement investigations regarding anomalous bidding behavior and physical withholding in the California PX and ISO markets.  In the context of these investigations, the Commission staff has decided not to pursue certain sellers for physical withholding and the Commission has approved settlements regarding

2

misbehavior.[1] The California parties have requested further procedures in the refund proceeding to address the issues of physical withholding. Today's order denies the request. I would grant it.

The effects of any withholding from the California markets should be taken into account by the Commission in determining just and reasonable rates during the refund period. I dissented from the Commission's refusal to do so in our July and December 2001 orders in the refund proceeding.[2] Since the issuance of these orders, there have been significant indications that manipulation, including withholding, was a factor in the California markets during the refund period. Indeed, those indications, raised in the Staff Final Report and elsewhere, have been sufficient for the Commission to launch a number of enforcement investigations. Many of those investigations are still outstanding. Thus, I do not agree with the conclusion in today's order that nothing in the evidence adduced has caused the Commission to change the refund formula utilized in this proceeding. Moreover, the evidence adduced has not been tested in an open proceeding with the valuable input of the affected parties.

The Commission should grant the California parties' request for additional procedures to resolve issues upon which the 100 days evidence bears, and the procedures should be part of the refund proceeding. The California parties convinced the court, in the refund case, to require additional evidence on manipulation to be adduced, and such evidence was adduced by the California parties. Given that, the California parties are integral to the assessment of and weight to be given the evidence adduced. The Commission should not decide, in isolated enforcement proceedings, issues upon which the court-ordered adduced evidence has a bearing where those that adduced the evidence are not parties and have no appeal rights.

The order supports its refusal to grant the California parties' request by drawing a sharp distinction between enforcement investigations, as means to remedy violations of the FPA or tariffs, and Section 206 proceedings as means to set just and reasonable rates. I question this distinction. Behavior uncovered in an enforcement investigation, where a tariff is violated, unquestionably can result in unjust and unreasonable rates that must be remedied, particularly in a market setting.

Second, today's order denies the requests for rehearing that challenge the Commission's authority to extract refunds from governmental entities. This aspect of the refund methodology was set out in the Commission's July 25, 2001 order.[3] I disagreed

---

[1] 102 FERC ¶61,108 (2003), 104 FERC ¶61,089 (2003), and 105 FERC ¶61,008 (2003).

[2] San Diego Gas & Electric Company et al., 96 FERC ¶61,120 (2001) and 97 FERC ¶61,275 (2001).

[3] San Diego Gas & Electric Company et al., 96 FERC ¶61,120 (2001).

3

with this decision at that time and developments since then have not convinced me otherwise.  In my view, the Commission does not have this authority.

For these reasons, I dissent in part from today's order.

_____
William L. Massey
Commissioner

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

San Diego Gas & Electric Co. et al.                    Docket Nos. EL00-95-081 et al.

(Issued October 16, 2003)

BROWNELL, Commissioner, dissenting in part:

    A sleeve transaction is a transaction between a seller and a purchaser that is "sleeved" by a third party who provides the necessary financial connection. When either of the parties to a transaction decides that it can not transact with its counter party, they can ask a third party (i.e., the sleeving party) to enter into contracts with the two other parties to facilitate the transaction. During the refund period (October 2, 2000 to June 21, 2001), the lack of creditworthy counter parties caused the CAISO to have difficulties purchasing needed power. To assist the CAISO in buying additional power, certain creditworthy entities sleeved these transactions. The creditworthy entities purchased from sellers that would not sell directly to the CAISO market due to uncreditworthy counter party buyers, and resold to the CAISO market despite the lack of creditworthy counter party buyers. These sleeving parties resold the power at their cost or cost plus to reflect the service being provided. Parties that sleeved transactions for the CAISO have asked the Commission to exempt their sleeving transactions from the refund methodology.

    The Commission addressed this matter in the May 15 Order in this proceeding.[1] The parties providing the sleeving service to the CAISO argued that they will under recover their costs and, therefore, there would be no incentive for them to provide such a credit service. In a May 15, 2002 Order, the Commission decided not to make an exception for sleeving. In that order, the Commission reasoned that it is sufficient that marketers will be allowed to make a showing as to whether the refund methodology results in an overall revenue shortfall for their transactions. Moreover, the Commission indicated that its approach would not be a disincentive to sell into the CAISO market because this approach is only for a locked in refund period and different rules apply looking forward. Here, the majority denies the parties' rehearing requests on this issue concerning sleeve transactions because the parties have raised nothing new.

---

[1]99 FERC & 61,160 at 61,652 (2002) [The Refund Order did not address this issue, See, 102 FERC & 61,317 (2003)] .

Docket Nos. EL00-95-081 et al                                                                2

     Since the May 15 Order, two Administrative Law Judges have concluded based on an evidentiary record that sleeve transactions should not be subject to refund.[2] In PacifiCorp, the presiding judge determined that imposing a refund obligation on sleeve transactions will in all probability end the practice.[3] In Nevada Power, the presiding judge noted the argument that a refund obligation would have a chilling effect on the willingness of parties to sleeve and found that imposing a refund obligation on sleeve transactions without the ability of the sleeving party to seek recovery from the selling counter party would be arbitrary and contrary to the Federal Power Act.[4] Furthermore, the record in both cases demonstrated that sleeve transactions benefitted the market. In PacifiCorp, the presiding judge determined that sleeving was a valuable service.[5] In Nevada Power, the presiding judge stated "[t]his record establishes that sleeves increase market liquidity by facilitating transactions between counterparties that cannot deal directly with each other."[6]

     The resolution of this issue is one of equity. The Commission has very broad discretion as to whether and when to order refunds to ratepayers.[7] Based on the additional information that has been adduced, I am convinced that, on balance, the equities lie with the sleeving parties. I would grant rehearing.

---

    [2]See, PacifiCorp, et al., 102 FERC & 63,030 at 65,092 (2003) and Nevada Power Company, et al., 101 FERC & 63,031 at 65,324 (2003).

    [3]102 FERC & 63,030 at 65,092 (2003).

    [4]101 FERC & 63,031 at 65,324 (2003).

    [5]102 FERC & 63,030 at 65,092 (2003).

    [6]101 FERC & 63,031 at 65,324 (2003).

    [7]See e.g., Town of Concord, et al., v. FERC, 955 F.2d 67, 76 (D.C. Cir. 1992). "[A]bsent some conflict with the explicit requirements or core purposes of a statute, we have refused to constrain agency discretion ... . The agency need only show that it 'considered relevent factors and ... struck a reasonable accommodation among them.'" Id. (quoting Las Cruces TV Cable v. FCC, 645 F.2d 1041, 1047 (D.C. Cir. 1981). See also, Public Serv. Comm'n v. Economic Regulatory Admin., 777 F.2d 31, 34-36 (D.C. Cir. 1985). This refund authority does not conflict with the prohibition on retroactive ratemaking. See 955 F.2d at 75.

Docket Nos. EL00-95-081 et al                                                    3

The CAISO was short of supply and could not purchase additional power due to the credit status of its counter party buyers. There was no obligation for parties to provide a sleeving function. However, they did and sleeving allowed the CAISO to purchase additional power that otherwise would not be available. Parties willing to sleeve promoted a more liquid and robust electricity market as the record in two evidentiary proceedings demonstrates. Undeniably, sleeving benefitted California consumers. Moreover, the price charged for the sleeving function was modest. In some instances, there was no charge for sleeving. In others transactions, the charge for sleeving was 3 to 5 percent of the purchase power cost. At most, the sleeving charge was 15 percent of the cost of power. As the presiding judge in PacifiCorp stated about an entity sleeving "...[t]here is no valid reason to treat it as some sort of pariah".[8] The majority opinion on this issue does not strike an equitable balance and, therefore, I respectfully dissent on this issue.

In this order, the Commission also uses its discretion to granting rehearing to ameliorate the refund liability of the Automatic Power Exchange (APX) in a situation very similar to the sleeving transactions.

In the Refund Order, the Commission found that APX was liable for refunds associated with energy it scheduled on behalf of underlying energy suppliers and did not impose liability directly upon the suppliers. APX is an independent scheduling provider. On rehearing, APX argues that it did not sell power in the California markets. Instead, APX claims that sellers (APX Participants) relied on it to forward their schedules and energy bids to the CAISO and PX. According to APX, it received a volumetric service fee and was not a beneficiary of the sales proceeds. Consequently, APX asserts that it should have no refund liability. In the alternative, APX suggests that, at most, we should require a form of joint and several liability among APX and its Participants. Under this approach, refund liability would first be apportioned to those sellers (APX and APX Participants) that can be identified as owing the refund and, where the data is insufficient to determine the particular seller, the refund liability will be distributed on a pro rata basis to the APX and APX Participants.

Using its broad discretion over when to order refunds, the Commission grants rehearing and adopts APX' alternative proposal. Although the majority acknowledges that APX, through its unique business operations as an independent scheduling service provider, competed with the PX, not with electricity producers, the order nonetheless retains residual refund liability for APX. APX is simply an intermediary. As APX

---

[8]102 FERC & 63,030 at 65,092 (2003).

Docket Nos. EL00-95-081 <u>et</u> <u>al</u>                                    4

asserts, and consistent with the service it was providing, it does not have funds to make refunds because the revenue associated with the power sales was transferred to the CAISO and PX long ago. Therefore, I would exempt APX from any refund liability.


_____
Nora Mead Brownell
Commissioner