1   Marie Fiala (State Bar No. 79676)
2   Russell P. Cohen (State Bar No. 213105)
    HELLER EHRMAN LLP
3   333 Bush Street
    San Francisco, CA  94104-2878
4   Telephone:  (415) 772-6000
    Facsimile: (415) 772-6268
5   Email:  Marie.Fiala@hellerehrman.com

6   Gary M. Kaplan (State Bar No. 155530)
7   HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
    A Professional Corporation
8   Three Embarcadero Center, Seventh Floor
    San Francisco, CA 94111-4024
9   Telephone  (415) 434-1600
    Facsimile  (415) 217-5910
10  Email:  gmkaplan@howardrice.com

11  Attorneys for Defendant  PACIFIC GAS & ELECTRIC COMPANY

12

13                  UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16  PUBLIC UTILITY DISTRICT NO. 2 OF          Case No.: C 07-03243 JSW
17  GRANT COUNTY, WASHINGTON,
                                              Chapter 11 Case
18                            Plaintiff,
                                              Bankr. Case No.  01-30923 DM
19        vs.
                                              **DEFENDANT PACIFIC GAS AND**
20  PACIFIC GAS AND ELECTRIC COMPANY,         **ELECTRIC COMPANY'S**
                                              **OPPOSITION TO PLAINTIFF'S**
21                            Defendant.      **MOTION FOR (I) WITHDRAWAL OF**
                                              **REFERENCE OF PROOF OF CLAIM**
22                                            **AND (II) TRANSFER OF VENUE**
                                              **THEREOF**
23
                                              Date:   October 12, 2007
24                                            Time:  9:00 a.m.
25                                            Courtroom:  2, 17th Floor
                                              Judge:  Hon. Jeffrey S. White
26

27

28

1

2

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1

II.  STATEMENT OF ISSUES ............................................................................ 2

III. STATEMENT OF FACTS ............................................................................. 3

     A.   The PX and ISO Markets in 2000 and 2001. ...................................... 3

     B.   Power Prices Skyrocketed During the California Energy
          Crisis. ................................................................................................... 3

     C.   FERC Re-Set Prices in the PX and ISO Markets. ............................... 4

     D.   PG&E Filed for Bankruptcy. ............................................................... 6

     E.   The Ninth Circuit Opinion in *Bonneville Power
          Administration v. FERC*. .................................................................... 7

     F.   PG&E and Others Sought Relief Against Grant and Other
          Governmental Sellers in Court. ........................................................... 8

     G.   Grant Resurrects Its Lawsuit Against the ISO and Others in
          Washington. ......................................................................................... 9

IV.  ARGUMENT ............................................................................................... 10

     A.   Because the Confirmed Plan of Reorganization Does Not
          Allow Grant to Adjudicate Its Claim Outside of the
          Bankruptcy Court, Grant's Motion for Withdrawal of the
          Reference Must Be Denied. ............................................................... 10

     B.   Grant County Fails to Meet the Legal Standards for
          Withdrawal of the Reference. ............................................................ 13

          1.   Efficiency Counsels Against Withdrawal of Grant's
               Claim. ..................................................................................... 14

          2.   Grant Offers No Other Justification to Support
               Withdrawal ............................................................................. 17

     C.   The Request to Transfer Venue to the Eastern District of
          Washington Should Be Denied. ......................................................... 18

V.   CONCLUSION ............................................................................................ 21

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

1

## TABLE OF AUTHORITIES

2

### Cases

3

*Bank Midwest, N.A. v. Cyberco Holdings, Inc.,*
4
    2005 U.S. Dist. LEXIS 25834 (W.D. Mich. Oct. 20, 2005) ..................................... 16

5
*Big Rivers Electric Corp. v. Green River Coal Co., Inc.,*
6
    182 B.R. 751 (W.D. Ky. 1995) ................................................................. 16

7
*Bonneville Power Administration v. FERC,*
    422 F.3d 908 (9th Cir. 2005)........................................................... passim
8

*Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.,*
9
    181 F. Supp. 2d 1111 (E.D. Cal. 2001) ................................................... 15

10
*California ex rel. Lockyer v. Dynegy, Inc.,*
11
    375 F.3d 831 (9th Cir. 2004)............................................................. 3

12
*City of Tacoma v. Taxpayers of Tacoma,*
13
    357 U.S. 320 (1958) ........................................................................ 18

14
*CoreStates Bank, N.A. v. Huls Am., Inc.,*
    176 F.3d 187 (3d Cir. 1999) ............................................................... 10
15

*First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough,*
16
    81 F.3d 1310 (4th Cir. 1996)............................................................. 10

17
*Hatzel & Buehler, Inc. v. Central Hudson Gas & Elec. Corp.,*
18
    106 B.R. 367 (D. Del 1989) ............................................................... 13

19
*Heritage Hotel Ltd. Partnership I v. Valley Bank of Nevada,*
    160 B.R. 374 (9th Cir. BAP 1993),
20
    *aff'd*, 59 F.3d 175 (9th Cir. 1995)....................................................... 10

21
*Holstein v. Brill,*
22
    987 F.2d 1268 (7th Cir. 1993) ............................................................ 12

23
*In re Am. Int'l Airways, Inc.,*
24
    66 B.R. 642 (Bankr. E.D. Pa. 1986)...................................................... 20

25
*In re Castle Industries, Inc.,*
    147 B.R. 941 (Bankr. E.D. Ark. 1992)................................................... 12
26

*In re Cinematronics, Inc.,*
27
    916 F.2d 1444 (9th Cir. 1990)............................................................ 14

28

*In re County of Orange*,
    219 B.R. 543 (Bankr. C.D. Cal. 1997) ........................................................................ 10

*In re DeLorean Motor Co.*,
    49 B.R. 900 (E.D. Mich. 1985) ............................................................................13-14

*In re Diamond Mortg. Corp. of Illinois*,
    105 B.R. 876 (Bankr. N.D. Ill. 1989) ........................................................................ 12

*In re Enviro-Scope Corp.*,
    57 B.R. 1005 (E.D. Pa. 1985) ..................................................................................... 16

*In re Harris Pine Mills*,
    44 F.3d 1431 (9th Cir. 1995) ...................................................................................... 14

*In re Holmes*,
    306 B.R. 11 (Bankr. M.D. Ga. 2004) ......................................................................... 21

*In re Logan Place Properties, Ltd.*,
    327 B.R. 811 (Bankr. S.D. Tex 2005) ........................................................................ 12

*In re Onco Invest. Co.*,
    320 B.R. 577 (Bankr. D. Del. 2005) ..................................................................... 19, 21

*In Re Onyx Motor Car Corp.*,
    116 B.R. 89 (S.D. Ohio 1990) .................................................................................... 13

*In re Orion Pictures Corp.*,
    4 F.3d 1095 (2d Cir. 1993) ......................................................................................... 14

*In re Planet Hollywood Intern.*,
    274 B.R. 391 (Bankr. D. Del. 2001) ........................................................................... 12

*In re Rainbow Trust, Business Trust*,
    200 B.R. 785 (Bankr. D. Vt. 1996) ............................................................................ 10

*In re Rickel & Associates, Inc.*,
    260 B.R. 673 (Bankr. S.D.N.Y. 2001) ....................................................................... 12

*In re Sevko, Inc.*,
    143 B.R. 114 (N.D. Ill. 1992) ..................................................................................... 16

*In re Sun West Distributors, Inc.*,
    69 B.R. 861 (S.D. Cal. 1987) ...................................................................................... 14

*In re TIG Ins. Co.*,
    264 B.R. 661 (Bankr. C.D. Cal. 2001) ....................................................................... 19

DEFENDANT PG&E CO.'S OPPOSITION TO PLAINTIFF'S MOTION FOR WITHDRAWAL AND TRANSFER - CASE NO. C 07-03243 JSW

*In re U.S. Airways Group, Inc.*,
    296 B.R. 673 (E.D. Va. 2003) ................................................................. 13

*In re Vencor, Inc.*,
    284 B.R. 79 (Bankr. D. Del. 2001) ......................................................... 12

*In re Wedtech Corp.*,
    81 B.R. 237 (S.D.N.Y. 1987) ................................................................. 16

*In re Windsor Comm. Group, Inc.*,
    53 B.R. 293 (Bankr. E.D. Pa. 1985) ..................................................20-21

*Lu v. Dryclean-U.S.A. of California, Inc.*,
    11 Cal. App. 4th 1490 (1992) ........................................................... 18, 19

*McGill v. Hill*,
    644 P.2d 680 (Wash. Ct. App. Div. 1 1982) ......................................... 20

*Miller v. United States*,
    363 F.3d 999 (9th Cir. 2004) ................................................................. 10

*Oliner v. Kontrabecki*,
    2006 U.S. Dist. LEXIS 93190 (N.D. Cal. Dec. 12, 2006) ....................... 15

*Public Utils. Comm'n v. FERC*,
    462 F.3d 1027 (9th Cir. 2006) ..................................................... 3, 4, 5, 6

*Security Farms v. Int'l Bhd. of Teamsters*,
    124 F.3d 999 (9th Cir. 1997) ......................................................14, 15, 17

*Smith, Valentino, & Smith, Inc. v. Superior Court*,
    17 Cal. 3d 491 (1976) ........................................................................ 18, 19

*United States Trustee v. CF&I Fabricators of Utah, Inc. (In re CF&I Fabricators of Utah, Inc.)*,
    150 F.3d 1233 (10th Cir. 1998) .............................................................. 12

*United States v. Kaplan*,
    146 B.R. 500 (D. Mass 1992) ................................................................. 13

*United States v. Star Route Box 1328*,
    137 B.R. 802 (Bankr. D. Or. 1992) ......................................................... 15

*Universal Cooperatives, Inc. v. FCX, Inc. (In re FCX, Inc.)*,
    853 F.2d 1149 (4th Cir. 1988) ................................................................ 12

iv

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Statutes

11 U.S.C. §1101(2)............................................................................................................ 13

11 U.S.C. § 1127(b)......................................................................................................11-12

11 U.S.C. § 1141 ....................................................................................................... 10, 11

16 U.S.C. §§ 791a, *et seq.* .................................................................................................. 3

28 U.S.C. § 157 ............................................................................................................... 14

## Miscellaneous

10 *Collier on Bankruptcy*
    ¶ 7087.02 (15th ed. rev. 2003) ................................................................................ 19

15 C. Wright, A. Miller, & E. Cooper, *Fed. Prac. & Proc.*
    §§ 3851 and 3853 (2d ed. 1986 & Supp. 2003) ........................................................ 21

Restatement (Second) of Conflicts of Laws
    § 187 (1971) ........................................................................................................ 20

## I.    INTRODUCTION

This motion by Public Utility District No. 2 of Grant County, Washington ("Grant") arises out of Pacific Gas & Electric Company's ("PG&E") bankruptcy proceeding filed in the aftermath of the 2000-2001 California Energy Crisis.  The motion is both procedurally improper and substantively unjustified.

The California Energy Crisis resulted from a combination of market dysfunction and active manipulation by some sellers that caused electricity prices in the California wholesale electricity markets to skyrocket during the period May 2000 to June, 2001.  PG&E, which was required by law to purchase electricity in the dysfunctional California markets to serve its customers, paid out billions of dollars more to purchase wholesale power than it recovered in rates from its retail power sales.  As a result, PG&E amassed crippling debt and was forced on April 6, 2001 to file for bankruptcy protection.  Grant filed a claim in PG&E's bankruptcy proceeding for amounts allegedly due for power it sold at inflated prices to PG&E, through the California markets, during the Energy Crisis (the "Grant Claim").  The Bankruptcy Court eventually confirmed a Plan of Reorganization that, *inter alia*, referred the Grant Claim to the Federal Energy Regulatory Commission ("FERC") for disposition.  Now, three years later, Grant asks for the withdrawal of the reference of its claim from the Bankruptcy Court, and transfer to the District Court for the Eastern District of Washington, where Grant has instituted a lawsuit against two other California utilities seeking to recover payment for power sales it made during the Energy Crisis.

Grant's motion is far too late, and also improper.  The order confirming PG&E's Plan of Reorganization ("Plan") is a final judgment of the Bankruptcy Court with res judicata effect.  The Plan bars Grant from adjudicating its claim in any forum other than as was prescribed therein, to wit, at FERC.  Modification of the Plan is necessary before Grant may pursue the remedy it now requests from this Court.  But Grant, as a creditor, is not entitled to seek modification or otherwise rewrite the provisions of the Plan, which has been substantially consummated.  For this reason, Grant's motion should be denied without any need for consideration of the remaining issues raised therein.

1

In any event, Grant has not (and cannot) show that the requested withdrawal of the reference is justified. Leaving for FERC the determination of the amounts owed by or to Grant, as the Bankruptcy Court required pursuant to its confirmation order, is not only mandated by the Plan, but also is far more efficient. FERC has determined that the prices that prevailed during the Energy Crisis were unjust, unreasonable and unlawful. For the past several years FERC has been engaged in the enormous undertaking of re-calculating the price for each of the millions of transactions, including Grant's sales to PG&E, that took place in the California markets during the Energy Crisis. All of the relevant parties, including Grant, are participants in that process. FERC will continue and conclude its calculations whether or not the Grant Claim is withdrawn. In light of that ongoing proceeding, withdrawal of the reference would only create unnecessary duplication of effort and the attendant risk of inconsistent outcomes.

Contrary to Grant's argument, FERC has not been deprived of the authority to calculate the California market participants' refund liabilities by the Ninth Circuit's recent opinion in *Bonneville Power Administration v. FERC*, 422 F.3d 908 (9th Cir. 2005). The only function FERC lacks jurisdiction to undertake in light of the *Bonneville* holding is enforcement of its refund order against governmental entities such as Grant — that is, compelling a governmental entity to pay the refunds it owes to purchasers as the result of FERC's revision of prices. Under *Bonneville*, compelling payment of the refund obligation must be pursued in a court via a contract action if the governmental entity chooses not to honor its contractual commitment to charge no more than the FERC-approved price for power. *Bonneville* provides no excuse for departing from the provisions of the Plan even if this motion were procedurally proper, which it is not.

## II.    STATEMENT OF ISSUES

Should this Court withdraw the reference of the Grant Claim from California Bankruptcy Court to this Court and, then, transfer that claim to the District Court for the Eastern District of Washington?

DEFENDANT PG&E CO.'S OPPOSITION TO PLAINTIFF'S MOTION FOR WITHDRAWAL AND TRANSFER - CASE NO. C 07-03243 JSW

III.     **STATEMENT OF FACTS**

PG&E is an investor-owned utility that is obligated by law to supply electrical power to businesses and residents in Northern and Central California.  In 2000-2001, the time period relevant here, PG&E was required by statute to purchase most of its power supply through auction markets operated by the California Power Exchange ("PX") and the California Independent System Operator ("ISO"), both non-profit corporations organized under California law.  *Public Utils. Comm'n  v. FERC*, 462 F.3d 1027, 1037-39 (9th Cir. 2006) ("*CPUC*").

A.     **The PX and ISO Markets in 2000 and 2001.**

The PX was created to function as California's principal power market.  *CPUC*, 462 F.3d at 1037-38.  It conducted daily auctions in which buyers purchased power for the following day, and also operated hourly auctions to allow buyers to make any necessary adjustments to their day-ahead purchases.  *Id.*  The ISO's main role was to safely and reliably operate California's transmission grid.  To meet this obligation, the ISO operated its own wholesale power markets, where it could buy, in real time, the electric power it needed to perform this vital function.  *Id.* at 1038-39.

All sales and purchases of power in the PX and ISO markets were required to be made pursuant to tariffs filed with and approved by FERC.  *Id.* at 1039-39.  The PX and ISO Tariffs are the legal equivalent of federal regulations.  *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 841 (9th Cir. 2004).  They specify in detail the rules of the road for the California markets, prescribing the functions of the markets themselves and the obligations owed by market participants.  Important for present purposes, the Tariffs contain the formulas used to establish prices for all purchases and sales in those markets, allow FERC to review and amend market prices pursuant to its exclusive jurisdiction under the Federal Power Act, 16 U.S.C. §§ 791a, *et seq.*, and require sellers to charge no more than the FERC-approved prices.  Under the Tariffs, in general, all sellers during a particular time period received the same price—called a "market clearing price"— for all transactions in a particular market.  *CPUC*, 462 F.3d at 1038-39.

B.     **Power Prices Skyrocketed During the California Energy Crisis.**

Beginning in May 2000, the prices demanded by sellers in the PX and ISO markets shot up to unprecedented levels and stayed there for the next year, generating windfall profits for all sellers.

3

1   *Id.* at 1039.  The power crisis had severe negative effects on the stability and financial integrity of

2   PG&E, and ultimately imposed billions of dollars in additional costs on ratepayers, including

3   business and residential customers throughout the State.  *Id.* at 1042-43.

4          In order to obtain sufficient electric power to maintain the reliability of California's electric

5   grid during the crisis period, the ISO at times was required to find and buy electric power through

6   mechanisms other than its single-price auction.  *Id.* at 1051.  Such emergency power was known as

7   "out-of-market" or "OOM" power, and was procured by the ISO under the provisions of the ISO

8   Tariff.  *Id.* at 1051-53.  Suppliers of OOM power regularly demanded extraordinarily high prices

9   for such sales and got them, because the ISO had no choice but to buy energy to ensure grid

10  reliability.  *Id.* at 1052.  The ISO charged market participants, including PG&E, for the power it

11  bought through OOM sales.

12         Grant was one of the sellers from which the ISO purchased OOM power in November and

13  December 2000, at the height of the power crisis.  Complaint ¶ 3 (McAllen Decl,[1] Ex. D).  *See also*

14  *San Diego Gas & Elec. Co.*, 109 FERC ¶ 61,218 at ¶¶ 66-69 (2004) ("November 23, 2004 Order")

15  (Grant RJN,[2] Ex. 6).  As a result, Grant earned windfall profits on those sales; the price that it

16  charged would later be determined to be unjust, unreasonable and unlawful.

17  **C.      FERC Re-Set Prices in the PX and ISO Markets.**

18         In August 2000, at the request of PG&E and other buyers, FERC commenced a broad

19  investigation into sellers' rates in the PX and ISO markets.  *CPUC*, 462 F.3d at 1041.  Based on

20  that investigation and the associated proceedings (collectively the "Refund Proceeding"),[3] FERC

21  concluded on July 25, 2001, that sellers in the PX and ISO markets had sold electric power at

22

23         [1]  References to "McAllen Decl." are to the Declaration of Peter G. McAllen filed by Grant
    in Support of its Motion on August 3, 2007 (Docket No. 7).

24
25         [2]  References to "Grant RJN" are to the Request for Judicial Notice filed by Grant in
    Support of its Motion on August 3, 2007 (Docket No. 9).

26         [3]  Grant intervened as a party and gained full participatory rights in the Refund Proceeding,
    including the ability to apply for rehearing and to appeal from any adverse FERC ruling.  Motion to
27  Intervene Out of Time of Public Utility District No. 2 of Grant County, Washington, *San Diego
    Gas & Elec. Co.*, FERC No. EL00-95-004, *et al.* (Aug. 10, 2001) (PG&E Request for Judicial
28  Notice ("PG&E RJN" Ex. 1).

DEFENDANT PG&E CO.'S OPPOSITION TO PLAINTIFF'S MOTION FOR WITHDRAWAL AND TRANSFER -
CASE NO. C 07-03243 JSW

1   unjust, unreasonable and unlawful rates, and that the rates should be corrected for the period

2   October 2, 2000, to June 20, 2001 (the "Refund Period"). *San Diego Gas & Elec. Co.*, 96 FERC

3   ¶ 61,120 (2001) ("July 25, 2001 Order") (Grant RJN, Ex. 1). *See also CPUC*, 462 F.3d at 1043.

4   FERC adopted a methodology to recalculate the maximum competitive market prices that would

5   have existed in the PX and ISO markets if sellers had charged just and reasonable rates, *i.e.*, the

6   "Mitigated Market Clearing Price" or "MMCP." July 25, 2001 Order at pp. 61,516-19 (Grant RJN,

7   Ex. 1); *CPUC*, 462 F.3d at 1043. FERC ordered the PX and ISO to apply the MMCP to sales

8   during the Refund Period to recalculate the charges that all sellers should have received in place of

9   the previous unlawful prices. Prices that exceeded the MMCP were unlawful and subject to refund.

10  *CPUC*, 462 F.3d at 1043.

11          FERC also held that the ISO Tariff applied with full force to the OOM sales made by Grant

12  and others to the ISO. July 25, 2001 Order, 96 FERC at 61,515 (Grant RJN, Ex. 1). Such

13  purchases were authorized by the ISO Tariff, were made to maintain transmission system reliability

14  during times when the stability of the grid was threatened, and were as much a part of the FERC

15  regulated market as the auction market transactions. As FERC noted, such purchases "are

16  contemplated in the ISO Tariff as a backstop to the ISO's auction markets." *San Diego Gas &

17  Elec. Co., et al.*, Docket Nos. EL00-95-001, et al., 97 FERC ¶ 61,275 at 62,195 (2001) (Grant RJN,

18  Ex. 2). The Ninth Circuit confirmed that conclusion. *CPUC*, 462 F.3d at 1051-53 (affirming

19  FERC's conclusion that OOM sales were a backstop to the ISO auction market and were subject to

20  mitigation).

21          Grant sought rehearing of the July 25, 2001 Order, but FERC rejected Grant's arguments for

22  reversal in a series of orders culminating in a final decision on November 23, 2004. *See, e.g., San

23  Diego Gas & Elec. Co.*, Docket Nos. EL00-95-081 and EL00-98-069, Request for Rehearing of

24  Public Utility District No. 2 of Grant County, Washington (filed Apr. 24, 2003) (Grant RJN, Ex. 4);

25  November 23, 2004 Order at ¶¶ 66-69 (Grant RJN, Ex. 6). FERC concluded: "The Commission is

26  not persuaded . . . that the transactions at issue are anything other than OOM transactions made

27  under the CAISO Tariff and therefore jurisdictional. November 23, 2004 Order at ¶ 69 (Grant RJN,

28  Ex. 6). As a result of that order, Grant was entitled to receive only the FERC-corrected price for its

DEFENDANT PG&E CO.'S OPPOSITION TO PLAINTIFF'S MOTION FOR WITHDRAWAL AND TRANSFER -
CASE NO. C 07-03243 JSW

1  OOM sales to the ISO, not its full original price.  Grant sought review of the November 23, 2004

2  Order by petition to the Ninth Circuit Court of Appeals.  McAllen Decl. ¶ 3.  That petition is still

3  pending.

4      **D.    PG&E Filed for Bankruptcy.**

5      PG&E was not permitted to immediately pass through to its customers the exorbitant costs

6  of buying electric power during the Energy Crisis.  As a result, it amassed crippling debt to finance

7  those costs.  PG&E's credit ratings fell below investment grade, making it ineligible to buy power

8  through the PX and ISO.  On April 6, 2001, PG&E filed a voluntary petition for bankruptcy under

9  Chapter 11 in the Bankruptcy Court for the Northern District of California.  McAllen Decl. ¶ 8;

10  *CPUC*, 462 F.3d at 1042.  On August 31, 2001, Grant filed a proof of claim in that case for the

11  amounts allegedly due for the electricity it had sold to the ISO on behalf of PG&E, but for which it

12  alleged it had not yet been paid (the "Grant Claim").  McAllen Decl. ¶ 8.  *See also* Proof of Claim

13  (McAllen Decl., Ex. G).

14      The Bankruptcy Court confirmed a Plan of Reorganization for PG&E on December 22,

15  2003 (the "Plan").  McAllen Decl. ¶ 8; Plan (McAllen Decl., Ex. H); Confirmation Order (PG&E

16  RJN, Ex. 4).  The Plan classified the Grant Claim and several dozen similarly situated claims as

17  "Class 6 – ISO , PX, and Generator Claims"[4] and referred them to FERC for liquidation, *i.e.*, a

18  determination of the amount actually owed by PG&E to each claimant.  *Id.* § 4.15(c).

19      As of the date hereof, all ISO, PX and Generator Claims are Disputed.  The Debtor agrees
        that for purposes of determining the amount of Allowed ISO, PX and Generator claims that

20      are not resolved consensually by settlement, the Debtor will prosecute the FERC Refund
        Proceedings only before the FERC or any Court to which an appeal from the FERC order

21      may be taken, and will not attempt to obtain a determination of such matters before the
        Bankruptcy Court . . . .

22

23  *Id.*

24      A Disputed ISO, PX and Generator Claim shall become an Allowed Claim on the date
        designated by FERC when payments are to be made on account of ISO, PX and Generator

25      Claims, pursuant to an unstayed order in the FERC Refund Proceedings: provided, however,

26  _____

27      [4]  The Plan defines "ISO, PX, and Generator Claims" as "all Claims against [PG&E] arising
    from amounts due to the ISO, PX and various power generators based on purchases of electricity or
    ancillary services by [PG&E] in markets operated by the PX and the ISO."  Plan § 1.1 (McAllen

28  Decl., Ex. H).

DEFENDANT PG&E CO.'S OPPOSITION TO PLAINTIFF'S MOTION FOR WITHDRAWAL AND TRANSFER -
CASE NO. C 07-03243 JSW

that if no date is designated in such order, a Disputed ISO, PX and Generator Claim shall automatically become an Allowed Claim forty-five (45) days after the issuance of such order, provided such order has not been stayed.

*Id.* § 5.4(g)(i).  So, once FERC has liquidated the Class 6 Claims, they become "Allowed Claims," meaning that PG&E will pay those claims in accordance with the distribution procedures set forth in the Plan.  *Id.* §§ 4.1, 4.2, 4.15(a).

### E.    The Ninth Circuit Opinion in *Bonneville Power Administration v. FERC.*

While PG&E's bankruptcy case proceeded, certain governmental sellers (cities, counties, irrigation districts, states and a federal agency) mounted a challenge to FERC's enforcement authority over them.  Those sellers filed a petition for review of FERC's July 25, 2001 Order, which had concluded that FERC had authority to compel *all* sellers in the PX and ISO markets to pay refunds.  *Bonneville*, 422 F.3d at 910.  ***The Bonneville petition did not raise the issue presented in the pending appeal by Grant, i.e., whether Grant's OOM sales are subject to the terms of the ISO Tariff and thus to price mitigation.***  Grant was not even a party to the *Bonneville* petition.

The Ninth Circuit granted the petition on September 6, 2005.  *Bonneville*, 422 F.3d at 911. Specifically, the Ninth Circuit held that FERC lacked jurisdiction under the Federal Power Act to compel governmental entities to pay refunds.  *Id.* at 920.  It "set aside FERC's orders related to the 2000 and 2001 spot market to the extent the orders subject the governmental entities . . . to FERC's refund authority."  *Id.* at 911.  The Ninth Circuit, however, did not set aside FERC's determination that the prices charged were unjust, unreasonable, and unlawful.  Nor did it set aside the methodology adopted by FERC to determine the maximum price that could be charged to customers under the PX and ISO Tariffs during the Refund Period.  In fact, the Ninth Circuit recognized the broad continuing scope of FERC authority to re-set prices under those tariffs and otherwise regulate the markets, and that such exercise of authority could indeed be enforced against even governmental entities.  *Id.* at 925-26.

As a condition of selling energy in the California markets, most sellers—including governmental entities—had entered into contracts to abide by all terms of the PX and ISO Tariffs, which governed the operations of those markets.  Most sellers signed written contracts to that

7

1  effect; certain sellers, including Grant, are bound under an implied-in-fact contract by virtue of

2  having participated in the California markets and sold power under the relevant Tariffs.  Those

3  Tariffs require sellers to charge no more than the FERC-approved price and to refund overcharges

4  if FERC corrected the prices at which they sold power.

5          In *Bonneville*, the Ninth Circuit noted specifically that market participants could, as an

6  alternative remedy, bring claims in court directly against governmental sellers to enforce the

7  contractual obligations created by the operative tariffs and related agreements.  *Id.* at 925-26.  The

8  Ninth Circuit observed that that the governmental sellers' agreements to abide by the PX and ISO

9  Tariffs "serves to demonstrate that the remedy, if any, may rest in a contract claim, not a refund

10 action.  Such an approach is not novel . . . ."  *Id.*, citing *Alliant Energy, Inc. v. Neb. Pub. Power

11 Dist.*, Civ. No. 00-2139, 2001 WL 1640132 (D. Minn. Oct. 18, 2001), *aff'd*, 347 F.3d 1046 (8th Cir.

12 2003).

13          **F.       PG&E and Others Sought Relief Against Grant and Other Governmental
                        Sellers in Court.**

14          Following *Bonneville*, PG&E, Southern California Edison ("SCE"), and San Diego Gas &

15 Electric Company ("SDG&E") (collectively, the "Utilities")[5] moved to enforce their private

16 remedies in court.  In April 2007, the Utilities filed a breach of contract action in Los Angeles

17 Superior Court against Grant and other governmental sellers, seeking to recover refunds they owed

18 to the Utilities and ultimately California's ratepayers.  *See PG&E et al. v. Arizona Elec. Power

19 Cooperative, Inc. et al.*, Case No. BC369141, Los Angeles Superior Court (filed Apr. 9, 2007) (the

20 "Los Angeles Action").

21          Grant attempts to distinguish itself from the other defendants in the Los Angeles Action

22 (MPA[6] at 11), but it is no different.  All of the defendants sold power in the California markets

23 during the Energy Crisis.  All of the defendants charged prices later determined to be unjust,

24 unreasonable, and unlawful by FERC.  All of the defendants are contractually bound by the terms

---

26          [5]  The California Electricity Oversight Board also joined as a plaintiff, on behalf of the State
of California in its oversight role to ensure the proper functioning of California's power markets.

27          [6]  Reference to "MPA" are to the Memorandum of Points and Authorities filed by Grant in
28 Support of its Motion on August 3, 2007 (Docket No. 6).

DEFENDANT PG&E CO.'S OPPOSITION TO PLAINTIFF'S MOTION FOR WITHDRAWAL AND TRANSFER -
CASE NO. C 07-03243 JSW

of the PX and ISO Tariffs, including FERC's authority to mitigate prices and the requirement to refund overcharges. Although Grant contends it is not subject to personal jurisdiction in California (*see, e.g.,* MPA at 21), the ISO Tariff—to which Grant's OOM sales are subject—expressly provides that any lawsuit be brought in a California court. ISO Tariff § 20.7 (PG&E RJN, Ex. 2).

**G.    Grant Resurrects Its Lawsuit Against the ISO and Others in Washington.**

The Los Angeles Action will determine Grant's contractual obligation and includes all the parties necessary to that determination. Nonetheless, two months after that action was filed, Grant moved to resurrect its own long dormant (and duplicative) lawsuit in the District Court for the Eastern District of Washington against the ISO, SCE, and SDG&E (the "Washington Action"). Grant did not name PG&E as a defendant, as doing so would have run afoul of the anti-suit injunction adopted by the California Bankruptcy Court. Plan §§ 9.5, 9.6 (McAllen Decl., Ex. H) (prohibiting any party from commencing or continuing any action with respect to any claim that arose prior to PG&E's bankruptcy). Grant initiated the Washington Action more than three years ago, seeking payment of the *full* original price—that is, the unjust, unreasonable and unlawful price—for its OOM sales during the Energy Crisis. Grant contends in that action that its sales did not occur under the ISO Tariff—directly contrary to FERC's holding in the November 23, 2004 Order—and that its sales therefore are not subject to price mitigation. *See, e.g.,* Grant Cmplt. ¶¶ 34-40 (McAllen Decl., Ex. D).Grant Cmplt. (Prayer for Relief ¶ 3) (McAllen Decl., Ex. D).

The Washington Action has been stayed at Grant's request for more than three years to allow Grant to petition for review of FERC's November 23, 2004 Order. McAllen Decl. ¶ 3. Although its petition for review is still pending, Grant recently moved, and the court agreed on July 26, 2007, to lift the stay in the Washington Action. Order Lifting Stay (McAllen Decl., Ex. F). Grant, by this motion, hopes to withdraw, transfer, and consolidate its claim against PG&E with that duplicative action.

DEFENDANT PG&E CO.'S OPPOSITION TO PLAINTIFF'S MOTION FOR WITHDRAWAL AND TRANSFER - CASE NO. C 07-03243 JSW

## IV.    ARGUMENT

### A.    Because the Confirmed Plan of Reorganization Does Not Allow Grant to Adjudicate Its Claim Outside of the Bankruptcy Court, Grant's Motion for Withdrawal of the Reference Must Be Denied.

Grant's request for withdrawal of the reference so that it can have its claim transferred for resolution in the Washington Action is barred by PG&E's confirmed Plan of Reorganization.  As an initial matter, that Plan is a contract that is binding on all parties, including Grant.  *Miller v. United States*, 363 F.3d 999, 1004 (9th Cir. 2004) ("A Chapter 11 bankruptcy plan is essentially a contract between the debtor and his creditors. . . ."); 11 U.S.C. § 1141(a) ("the provisions of a confirmed plan bind the debtor. . . and any creditor").  Moreover, because it has been confirmed by the Bankruptcy Court (*see* Confirmation Order (PG&E RJN, Ex. 4)) the Plan also has the full force and effect of a final judgment.  *First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough*, 81 F.3d 1310 (4th Cir. 1996).  All disputes that were or could have been raised about the confirmed Plan—emphatically including the treatment of any creditor's claim—are resolved by the terms of the Plan and, the doctrine of *res judicata* bars any party—including Grant—from rehashing them.  *See Heritage Hotel Ltd. Partnership I v. Valley Bank of Nevada (In re Heritage Hotel)*, 160 B.R. 374, 377 (9th Cir. BAP 1993), *aff'd*, 59 F.3d 175 (9th Cir. 1995); *In re County of Orange*, 219 B.R. 543 (Bankr. C.D. Cal. 1997).  Accordingly, Grant has only those rights that the Plan gives it, and Grant may not expand those rights through this Motion.  *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187 (3d Cir. 1999); *In re Rainbow Trust, Business Trust*, 200 B.R. 785 (Bankr. D. Vt. 1996).  The preclusive effect of a confirmed Plan applies with equal force to procedures established by the Plan.

As detailed in Section III.D. above, the Plan expressly provides that the Grant Claim—along with the other Class 6 Claims—shall be liquidated by FERC.  Plan § 4.15(c) (McAllen Decl., Ex. H).  The Plan also precludes Grant from pursuing its claim against PG&E in any forum other than what is provided for in the Plan.  It states:

> [E]xcept as otherwise expressly provided herein, the Confirmation Order or a separate order of the Bankruptcy Court, all entities who have held, hold or may hold Claims against or Equity Interests in [PG&E], are permanently enjoined, on and after the Confirmation Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity

10

> Interest . . . .   The injunction shall also enjoin all parties in interest, including, without limitation, all entities who have held, hold or may hold Claims against or Equity Interests in [PG&E], from taking any action in violation of the Confirmation Order.

*Id.* §9.6.  The order confirming the Plan contains substantially identical restrictions.  Confirmation Order ¶ 25 (PG&E RJN, Ex. 4).  These provisions articulate the "discharge injunction" of Section 1141 of the Bankruptcy Code.  11 U.S.C. § 1141.  As Grant itself expressly recognizes in its Motion, "this discharge injunction prohibited Grant from directly naming [PG&E] as a defendant in the Washington District Court proceeding . . . ."   MPA at 10.  Grant cannot circumvent these injunctive provisions now by seeking to withdraw the reference of its claim in order to transfer adjudication of its claim to the Washington Action.

Grant tries to avoid this absolute bar by asserting that it reserved the right to adjudicate its claim in the Bankruptcy Court, as opposed to FERC.  MPA at 10-11.  But this argument fails.  On April 1, 2004, the Bankruptcy Court entered an order extending the time within which PG&E could lodge certain limited objections to claims, after they had been liquidated by FERC.  Extension Order (McAllen Decl., Ex. K).  Grant relies on the following provision of that Order:  "This Order is without prejudice to the right of Public Utility District #2 of Grant County ('Grant County') to seek adjudication in [the Bankruptcy] Court, through appropriate noticed motion, of the allowance of its Claim."  Extension Order at ¶13 (McAllen Decl., Ex. K).  Grant specifically agreed to the provisions of the Extension Order; Grant's counsel (the same counsel appearing for Grant on the present Motion) represented to the Bankruptcy Court at the March 5, 2004, hearing: "We have seen the form of order and we are satisfied."  Hrg. Tr. at 40:17-40:18 (PG&E RJN, Ex. 6).  But the Extension Order, at most, reserved Grant's right to seek liquidation of its claim *by the Bankruptcy Court*; it did not give Grant the right to seek adjudication *in some other forum*, such as the Washington District Court.  Accordingly, the Extension Order does not help Grant.

Therefore, the confirmed Plan would have be to modified before Grant could seek to have its claim adjudicated in a forum other than the Bankruptcy Court or FERC.  Grant has not sought, let alone obtained, such a modification.  Nor could it.  Only the proponent of a plan may modify it after confirmation, and then, only if the plan has not been substantially consummated.  11 U.S.C.

§ 1127(b).[7]   The Plan itself contains similar restrictions:  "[t]he Plan may be amended or modified by the Proponents acting collectively at any time after the Confirmation Date and before substantial consummation of the Plan."  Plan §11.11(a) (McAllen Decl., Ex. H).  Neither condition has been met here.

First, Grant is not the "proponent" of the Plan,[8] and is not otherwise a proper party to seek amendment of the Plan.  Courts have recognized that creditors—such as Grant—lack standing to seek modification of a plan, even in light of changed circumstances.  *E.g.*, *In re Planet Hollywood Intern.*, 274 B.R. 391, 400 (Bankr. D. Del. 2001) (rejecting request to modify confirmed plan despite changed circumstances in view of creditor's lack of standing); *In re Vencor, Inc.*, 284 B.R. 79, 85 (Bankr. D. Del. 2001) (denying creditor relief from provisions of confirmed plan deemed tantamount to request for plan modification based on limitations of Section 1127(b)).  Courts have likewise refused to grant other remedies that would effectively circumvent the strict requirements of Section 1127.  *See In re Rickel & Associates, Inc.*, 260 B.R. 673, 678-79 (Bankr. S.D.N.Y. 2001) (neither rules governing relief from judgment or order nor bankruptcy court's general equitable powers can be invoked to bypass Section 1127 restrictions regarding modification of confirmed plan; court cannot modify substantially consummated plan, even at proponents' request, based on changed circumstances); *In re Logan Place Properties, Ltd.*, 327 B.R. 811, 813-14 (Bankr. S.D. Tex 2005) (Section 1127(b) precludes court from modifying confirmed plan despite alleged mutual mistake underlying plan); *In re Castle Industries, Inc.*, 147 B.R. 941, 945 (Bankr. E.D. Ark. 1992) (dismissing complaint effectively seeking to rewrite terms of debtor's confirmed plan based on Section 1127(b) limitations).

Second, it is beyond dispute that the Plan was "substantially consummated" long ago.

---

[7]  *See also United States Trustee v. CF&I Fabricators of Utah, Inc. (In re CF&I Fabricators of Utah, Inc.)*,  150 F.3d 1233, 1238 (10th Cir. 1998); *Holstein v. Brill*, 987 F.2d 1268, 1270 (7th Cir. 1993); *In re Diamond Mortg. Corp. of Illinois*, 105 B.R. 876, 880 (Bankr. N.D. Ill. 1989) ("Confirmation of a plan in effect sets the plan in stone unless the proponent chooses to alter it before it is substantially consummated."); *Universal Cooperatives, Inc. v. FCX, Inc. (In re FCX, Inc.)*, 853 F.2d 1149, 1158 n.13 (4th Cir. 1988).

[8]  The Plan defines "PG&E Proponents" as "the Debtor and the Parent," *i.e.*, Pacific Gas and Electric Company and PG&E Corporation.  Plan § 1.1 (McAllen Decl., Ex. H).

1    Bankruptcy Code Section 1101(2) defines substantial consummation as:  (i) transfer of substantially

2    all of the property proposed under the plan; (ii) assumption by the debtor of the business or

3    management of substantially all of the property dealt with by the plan; and (iii) commencement of

4    distributions under the plan. 11 U.S.C. §1101(2).  The effective date of the Plan of Reorganization

5    was April 12, 2004, at which point, each of these conditions were met.  Notice of Effective Date

6    (PG&E RJN, Ex. 5); Plan § 4.2(d) (distributions occur on effective date); § 7.6 (governance of

7    debtor after effective date); § 9.2  (revesting of assets to debtor on effective date); § 9.3 (providing

8    for the operation of the reorganized debtor after the effective date).  *See also* Post-Confirmation

9    Report (PG&E RJN, Ex. 7).

10           Accordingly, Grant may not seek to modify the substantially consummated Plan pursuant to

11   Section 1127(b).  And, because withdrawal of the reference in order to transfer the Grant Claim to

12   the Washington Action would effectively rewrite provisions of the Plan, Grant may not circumvent

13   the Plan in order to achieve the same relief by this Motion.  Regardless of any alleged change in

14   circumstances or how Grant's request is couched, the Motion should be denied on this ground

15   alone.

16           In light of this absolute bar to the relief requested, the Court need not reach the remaining

17   arguments tendered by Grant's Motion.  In any event, none of those additional arguments would

18   support the relief Grant seeks.

19       **B.     Grant County Fails to Meet the Legal Standards for Withdrawal of the
                  Reference.**

20           Even if the Plan could be amended, Grant has failed to meet its burden of demonstrating

21   cause for discretionary withdrawal of the reference.  *See In re U.S. Airways Group, Inc.*, 296 B.R.

22   673, 677 (E.D. Va. 2003) (burden of demonstrating cause for withdrawal is on the movant); *Hatzel*

23   *& Buehler, Inc. v. Central Hudson Gas & Elec. Corp.*, 106 B.R. 367, 370 (D. Del 1989) (same).

24   That burden is a substantial one; withdrawal is permitted only on a showing of exceptional

25   circumstances and overriding interests.  *United States v. Kaplan,* 146 B.R. 500 (D. Mass 1992); *see*

26   *also In Re Onyx Motor Car Corp.*, 116 B.R. 89, 91 (S.D. Ohio 1990) (motion for withdrawal of

27   reference not well received absent exceptional and compelling circumstances); *In re DeLorean*

28

13

1   *Motor Co.*, 49 B.R. 900, 912 (E.D. Mich. 1985) (overriding interest must be shown to overcome

2   presumption that Congress intended to have bankruptcy proceedings adjudicated in bankruptcy

3   court).  In addition, none of the factors to be considered by the Court—including, (i) the efficient

4   use of judicial resources; (ii) the delay and costs to the parties; (iii) uniformity of bankruptcy

5   administration; (iv) the prevention of forum shopping; and (v) other related factors—tip the scales

6   in favor of withdrawal of the reference.  *Security Farms v. Int'l Bhd. of Teamsters,* 124 F.3d 999,

7   1008 (9th Cir. 1997).

8              **1.       Efficiency Counsels Against Withdrawal of Grant's Claim.**

9              Grant's primary argument—that judicial efficiency supports withdrawal—is patently wrong.

10  the Grant Claim is, by its own admission, a "core" proceeding (MPA at 17), pursuant to 28 U.S.C.

11  § 157(b)(2)(B), since it involves the allowance or disallowance of a claim against PG&E's

12  bankruptcy estate.  This is central to the determination of whether withdrawal of the reference is

13  efficient.

14             Core proceedings go to the heart of the bankruptcy court's authority.  28 U.S.C. § 157(b)(2);

15  *In re Harris Pine Mills,* 44 F.3d 1431, 1436 (9th Cir. 1995); *In re Orion Pictures Corp.*, 4 F.3d

16  1095, 1101 (2d Cir. 1993) ("A district court considering whether to withdraw the reference should

17  first evaluate whether the claim is core or non-core, since it is upon this issue that questions of

18  efficiency and uniformity will turn."); *In re Sun West Distributors, Inc.*, 69 B.R. 861, 863 (S.D. Cal.

19  1987).  A bankruptcy court may hear and make final determinations on core claims—by definition,

20  an efficient procedure for resolving such claims.  28 U.S.C. § 157(b)(1).

21             In contrast, non-core proceedings relate only *peripherally* to the bankruptcy case.  *See* 28

22  U.S.C. § 157(b)(3).  Findings made by a bankruptcy court in non-core proceedings are subject to an

23  inefficient two-tiered layer of review; they must be reviewed by the district court (under a de novo

24  standard if there are timely objections) before they become final.  *Id.*; 28 U.S.C. §§ 157(b)(1),

25  157(c)(1), (e); *In re Harris Pine Mills*, 44 F.3d at 1436.  Moreover, a bankruptcy court cannot

26  conduct jury trials in non-core proceedings unless the parties have consented thereto.  *See, e.g., In*

27  *re Cinematronics, Inc.,* 916 F.2d 1444, 1451 (9th Cir. 1990).  As a result, the bankruptcy courts'

28

1    handling of non-core proceedings carries with it inherent inefficiencies.[9]  Because the same is not

2    true with respect to core proceedings—like the adjudication of the Grant Claim—Grant must point

3    elsewhere to show that withdrawal of the reference is inefficient.  It fails to do so.

4        If an argument is to be made for efficiency, in fact, it counsels for denying this Motion and

5    leaving the Grant Claim with FERC, precisely as the Plan requires.  The Class 6 Claims in PG&E's

6    bankruptcy—which include the Grant Claim—are not simple, stand-alone claims that could be

7    easily carved out and transferred to another venue, as Grant would suggest.  Rather, they arise out

8    of complex, intertwined transactions made in a highly regulated market pursuant to complicated

9    tariffs.  When a seller like Grant sold power into the ISO market, that power was combined with

10   power from other sellers and delivered to any number of market buyers that needed it.  Thus, a

11   single power sale at the root of a Class 6 Claim might have involved any number of market buyers,

12   not just PG&E.[10]

13       So far, FERC and the ISO have spent over three years untangling these transactions to

14   determine who owes what to whom.  FERC's expertise and intimate familiarity with these claims

15   amply justified the Bankruptcy Court's decision to have FERC liquidate them.  *See United States v.*

16   *Star Route Box 1328,* 137 B.R. 802, 806 (Bankr. D. Or. 1992) (expertise of court handling claims is

17   factor to consider in deciding motion to withdraw); *Oliner v. Kontrabecki*, 2006 U.S. Dist. LEXIS

18   93190, at *11 (N.D. Cal. Dec. 12, 2006) (familiarity of court with facts weighed in favor of denying

19   motion to withdraw); *Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*, 181 F. Supp.

20   2d 1111, 1121 (E.D. Cal. 2001) (noting that FERC has special expertise concerning the ISO Tariff

21   and that, barring an emergency, courts should allow FERC to act first on tariffs).

22       *Bonneville* does nothing to remove the Grant Claim from this complex mass of millions of

23

24       [9]  Indeed, Grant cites key cases in which the decision to withdraw the reference was strongly

25   impacted by a finding that the proceedings at issue were non-core, without acknowledging this key
     point.  In *Security Farms,* for example, the court found a motion for withdrawal appropriate

26   because, "[i]n this case efficiency was enhanced by withdrawing the reference *because non-core*
     *issues predominate.*" *Security Farms*, 124 F.3d at 1008 (emphasis added).

27
         [10]  *See* Proof of Claim, Attachment A at 1 (McAllen Decl., Ex. G) (admitting that, with

28   respect to its ISO sales, Grant "does not know who the obligor is").

1  intertwined transactions.  As discussed in Section III.E. above, *Bonneville* did not alter FERC's

2  finding that Grant's OOM sales are governed by the terms and conditions of the ISO Tariff, nor did

3  it divest FERC of authority to determine the amounts properly due under that Tariff.  *Bonneville*

4  simply stands for the proposition that only a court can enforce FERC's ultimate refund

5  determinations against governmental sellers, like Grant.  The efficiency considerations that led the

6  Bankruptcy Court to refer the Grant Claim along with the other Class 6 Claims to FERC in the first

7  place still apply with full force today.

8         Grant asserts that courts frequently withdraw the reference where another pending action

9  involves common issues of fact and law, in order to avoid the risk of inconsistent decisions.  MPA

10  at 13.  But Grant fails to connect the dots on this point.  A risk of inconsistent decisions exists in

11  cases where the proceedings involve different parties.  In such a scenario, parties to the non-

12  bankruptcy proceedings may freely relitigate the issues resolved by the bankruptcy court, leaving

13  open the possibility of conflicting rulings.  *Bank Midwest, N.A. v. Cyberco Holdings, Inc.* 2005 U.S.

14  Dist. LEXIS 25834, at *14 n.1 (W.D. Mich. Oct. 20, 2005).  The key cases cited by Grant involve

15  precisely this scenario.[11]  When such parallel cases involving different parties exist, withdrawal of

16  the reference can be both sensible and efficient.

17         But, contrary to Grant's assertions, withdrawing the reference with respect to the Grant

18  Claim not only fails to eliminate, but would enhance, any such risk.  The FERC Refund

19  Proceedings involve every single party Grant means to haul into court in the Washington Action—

20  PG&E, SCE, SDG&E, and the ISO—as well as other ISO market participants.  FERC is calculating

21  the prices that should have prevailed in the markets for *all* of these parties because it has a statutory

22  obligation to ensure that sellers charged only just and reasonable rates.  Withdrawing the reference

23  regarding the Grant Claim would not make the FERC Refund Proceedings go away, or somehow

24  moot one of the other venues in which it is being decided.  Instead, withdrawal of the reference of

25  the Grant Claim would result in inefficiencies, producing yet another piece of entirely duplicative

26

27         [11] *See, e.g., Big Rivers Electric Corp. v. Green River Coal Co., Inc.,* 182 B.R. 751 (W.D.
Ky. 1995); *In re Sevko, Inc.,* 143 B.R. 114 (N.D. Ill. 1992); *In re Wedtech Corp.,* 81 B.R. 237

28  (S.D.N.Y. 1987); *In re Enviro-Scope Corp.,* 57 B.R. 1005 (E.D. Pa. 1985).

1  litigation in yet another forum.

2  **2.**    **Grant Offers No Other Justification to Support Withdrawal**

3  Not only does Grant's efficiency argument fail, Grant does not provide the Court with any

4  other legitimate justification for withdrawal of the reference.

5  **Delay and Costs to the Parties:**  It is obvious that, if Grant is permitted to open up yet

6  another litigation front against PG&E in addition to the existing FERC Refund Proceedings and the

7  Los Angeles Action, the multiplicity of proceedings would greatly increase the delay in and

8  escalate the costs of ultimately resolving the controversy between the parties.

9  **Uniform Administration of Bankruptcy Estate:**  Grant admits that withdrawal would

10  have no positive effect on uniform administration of the bankruptcy estate.  MPA at 15.  But, in

11  fact, separating the Grant Claim from the other Class 6 Claims and having it adjudicated separately

12  in the Washington Action, while the dozens of other similarly situated claims are being liquidated

13  through the FERC Refund Proceedings, actually undermines the uniform administration of PG&E's

14  bankruptcy estate.  Thus, this factor weighs against withdrawal of the reference.

15  **Forum Shopping:**  Similarly, the fact that Grant is forum shopping weighs affirmatively

16  against withdrawal of the reference.  *See Security Farms*, 124 F.3d at 1008.  This motion is a thinly

17  disguised attempt by Grant to obtain a new forum so that it can avoid FERC's Orders that have

18  been adverse to its interests and instead seek the full original price for its OOM sales.  If its claim

19  were left with the Bankruptcy Court, and thus liquidated by FERC, Grant would not receive the full

20  original price, but rather a mitigated price calculated by FERC, for its OOM sales.  Such forum

21  shopping should not be permitted.[12]

22  In sum, withdrawal of the reference would be inefficient, increase costs, disrupt the uniform

23  _____

24  [12] Grant will no doubt argue that PG&E is forum shopping by filing a lawsuit in the Los
Angeles Superior Court.  But a party that is forced into a new forum cannot reasonably be accused
25  of forum shopping.  PG&E sought to pursue its refund claims at FERC until *Bonneville* held that
PG&E *must* sue in court to enforce the refund calculations as a matter of contract.  *Bonneville,* 422
26  F.3d at 925-926.  Having no other option, PG&E then sued in *California¸* in a court that is proper
under the forum-selection clauses in the ISO and PX Tariffs.  ISO Tariff § 20.7 (PG&E RJN, Ex.
27  2); PX Tariff § 19.6 (PG&E RJN, Ex. 3) (forum-selection clauses naming California as appropriate
venue for lawsuits involving ISO and PX Tariffs).  By contrast, Grant has not been forced out of
28  any forum.

17

resolution of the Class 6 Claims, and encourage forum shopping.  Because Grant has failed to demonstrate cause for withdrawal of the reference, its motion should be denied.

### C.    The Request to Transfer Venue to the Eastern District of Washington Should Be Denied.

If this Court withdraws the reference, Grant asks that its claim for payment against PG&E be transferred to the Eastern District of Washington, where it may be consolidated with the Washington Action.  MPA at 18-22.  Even if withdrawal is granted, such transfer should be denied on account of the following factors.

**Contractual Forum Selection Clause Placing Venue in California:**  The ISO Tariff requires that any action relating to it be brought in a court in the State of California.  The Tariff provides:

> Market Participants irrevocably consent that any legal action or proceeding arising under or relating to this ISO Tariff to which the ISO ADR Procedures do not apply, shall be brought in any court of the State of California or any federal court of the United States of America located in the State of California.  Market Participants irrevocably waive any objection that they may have now or in the future to said courts in the State of California as the proper and exclusive forum for any legal action or proceeding arising under or related to this ISO Tariff.

ISO Tariff § 20.7 (PG&E RJN, Ex. 2).  According to FERC's November 23, 2004 Order, Grant's Claim is subject to the ISO Tariff.  November 23, 2004 Order at ¶¶ 66-69 (Grant RJN, Ex. 6).  That Order is the operative relevant law, unless and until it is reversed by the Ninth Circuit.  It may not be reconsidered pursuant to Grant's collateral attack in this Court.  *See City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958) (federal courts of appeals have exclusive jurisdiction to hear challenges to FERC orders).[13]  As such, this Court may not disregard the contractual forum-selection clause in the ISO Tariff.  *Smith, Valentino, & Smith, Inc. v. Superior Court*, 17 Cal. 3d 491, 495-96 (1976) (enforcing contractual forum selection clause); *Lu v. Dryclean-U.S.A. of California, Inc.*, 11 Cal. App. 4th 1490, 1493 (1992) (same).[14]  Therefore, the Grant Claim—even if

---

[13]  For this same reason, statements by Tim Culbertson, the General Manager of Grant, in his declaration filed in support of Grant's motion suggesting that Grant's OOM sales were not subject to the terms and conditions of the ISO Tariff should also be disregarded by this Court.  *See* Culbertson Decl. ¶¶ 7-15, 18-20 (Docket No. 8).

[14]  A party seeking to defeat a contractual forum selection clause must demonstrate that enforcement would be unreasonable under the circumstances.  *Smith, Valentino, & Smith*, 17 Cal.

18

1    the reference is withdrawn—may not be transferred to the Washington District Court.

2          Aside from the contractual forum-selection clause, Grant does not prove by a preponderance

3    of the evidence—as it must—that the initial venue in this case should be disturbed.  There is a

4    "strong presumption" in favor of maintaining venue where the bankruptcy is pending.  *In re TIG*

5    *Ins. Co.*, 264 B.R. 661, 668 (Bankr. C.D. Cal. 2001); *In re Onco Invest. Co.*, 320 B.R. 577, 579

6    (Bankr. D. Del. 2005).[15]  As discussed below, neither the "interests of justice" nor the "convenience

7    of the parties"—the primary factors considered by courts—favor transfer.  *In re TIG*, 264 B.R. at

8    669; *In re Onco Invest.*, 320 B.R. at 579; 10 *Collier on Bankruptcy* ¶ 7087.02 (15th ed. rev. 2003)

9    (movant has the burden of proving that transfer would be in the interests of justice or for the

10   convenience of the parties).

11         **Interests of Justice:**  Grant contends that the "interests of justices" are better served by

12   transfer, since litigation in Eastern District of Washington would be more efficient than that in the

13   Bankruptcy Court.  MPA at 20-21.  But the Washington Action has been stayed for over three

14   years.  Although the stay has recently been lifted, the defendants in that action have yet even to

15   appear and respond to the complaint.  In contrast, the Bankruptcy Court has already confirmed the

16   Plan and referred the Grant Claim and the other Class 6 Claims to FERC for liquidation.  FERC is

17   and has been liquidating those claims; it is untangling the complex transactions in the PX and ISO

18   markets, including Grant's OOM sales, and determining what was delivered to whom and when,

19   and what the just and reasonable price for each of those sales should be.  All of the relevant

20   parties—including Grant, the ISO, PG&E, SCE, SDG&E, and other market buyers to whom power

21   from Grant may have been delivered—are participants in that process.  That process will continue

22   regardless of whether or not the Grant Claim is transferred to the Eastern District of Washington.

23   Accordingly, no judicial economy or efficiency would be achieved by the requested transfer.

24   _____

25   3d at 495-96.  A clause is not unreasonable even where a party has not signed the agreement
     containing the clause or when enforcement would cause inconvenience or additional expense.  *Id.*
     *See also Lu*, 11 Cal. App. 4th at 1493.

26

27        [15]  Grant suggests that this presumption is weakened here because the bankruptcy
     proceeding is post-confirmation.  MPA at 21.  That is not true.  Because, as discussed above,

28   withdrawal of the reference of the Grant Claim will disrupt the uniform administration of the Class
     6 Claims and, thus, PG&E's bankruptcy estate, this presumption is still warranted.

DEFENDANT PG&E CO.'S OPPOSITION TO PLAINTIFF'S MOTION FOR WITHDRAWAL AND TRANSFER -
CASE NO. C 07-03243 JSW

1    This conclusion is in no way undermined by the fact that PG&E has filed suit in Los

2  Angeles Superior Court against Grant and other governmental sellers.  PG&E initiated the Los

3  Angeles Action because a court (rather than FERC) is the only forum in which PG&E (along with

4  the other Utilities) may enforce its contract remedies against Grant and the other governmental

5  sellers.  MPA at 21.  Although FERC may re-set the prices at which governmental sellers sold

6  power to the Utilities pursuant to the PX and ISO Tariffs, FERC lacks the authority to compel them

7  to refund any overcharges to the Utilities.  *Bonneville*, 422 F. 3d at 911.  Since PG&E cannot obtain

8  final relief against Grant from FERC, it must seek that relief from a court.

9    Other factors also indicate that the "interests of justice" weigh against transfer from the

10  California Bankruptcy Court to the Eastern District of Washington.  The California courts have a

11  unusually strong interest in resolving this dispute.  The Grant Claim arises from sales of high-priced

12  electricity into California's markets during the height of the California Energy Crisis.  To the extent

13  PG&E is successful in litigating the Grant Claim, that success will redound to the benefit of

14  PG&E's customers:  California residents and businesses.  This dispute accordingly presents matters

15  of enormous public interest to the people of California.  Moreover, the ISO Tariff—which governs

16  Grant's OOM sales—is governed by and construed in accordance with California law.  ISO Tariff

17  § 20.7 (PG&E RJN, Ex. 2).  The Grant Claim for payment for its OOM sales will therefore be

18  evaluated under California, not Washington, law.  *See McGill v. Hill*, 644 P.2d 680, 683-84 (Wash.

19  Ct. App. Div. 1 1982) (giving effect to express choice-of-law clause in contract).  *See also*

20  Restatement (Second) of Conflicts of Laws § 187 (1971).

21    **Convenience of the Parties:**  Nor does the convenience of the parties tip the scales in favor

22  of transfer.  Transfer from this Court to the Eastern District of Washington is a zero sum game; it

23  would simply shift the costs and inconvenience of litigating out-of-state case from Grant to PG&E.

24  Such circumstances do not justify transfer.  *In re Am. Int'l Airways, Inc.*, 66 B.R. 642, 644 (Bankr.

25  E.D. Pa. 1986) ("Where a transfer would merely shift the inconvenience from one party to the other

26  . . . [the] choice of forum should not be disturbed.").  To meet its burden with respect to this factor,

27  Grant must establish by a preponderance of the evidence that the balance of convenience weighs

28  clearly and substantially in favor of the proposed transfer.  *Id.  See also In re Windsor Comm.*

20

DEFENDANT PG&E CO.'S OPPOSITION TO PLAINTIFF'S MOTION FOR WITHDRAWAL AND TRANSFER - CASE NO. C 07-03243 JSW

*Group, Inc.*, 53 B.R. 293, 296 (Bankr. E.D. Pa. 1985); *In re Holmes*, 306 B.R. 11, 17-18 (Bankr. M.D. Ga. 2004). It cannot do so.[16] Indeed, Grant admits as much when it states that the Eastern District of Washington would be "at least as convenient" as this Court. Grant's request for a transfer should be denied.

## V.    CONCLUSION

For the reasons stated above, Grant's motion for withdrawal of the reference and transfer of its claim should be denied.

DATED: August 24, 2007             Respectfully submitted,

                                   HOWARD RICE NEMEROVSKI CANADY FALK &
                                   RABKIN
                                   A Professional Corporation

                                   HELLER EHRMAN LLP


                                   By  /s/ Marie Fiala
                                         Marie Fiala

                                   Attorneys for Defendant
                                   PACIFIC GAS & ELECTRIC CO.

---

[16] Grant's general allegation that "all of [its] evidence and witnesses relevant to this dispute are located in Ephrata, Washington" (MPA at 22) is insufficient to establish an inconvenience justifying transfer. Grant has not shown that the evidence could not be easily copied and transported nor has it identified specific key witnesses, indicated what their testimony would be, or shown that any of its witnesses would be particularly inconvenienced by appearing before this Court. Absent such specificity, a motion to transfer may not be granted. *In re Holmes,* 306 B.R. at 17-18 (denying motion for transfer to New York where defendant merely alleged that most witnesses resided there and failed to show that the records at issued could not be copied or easily transported); *In re Onco Invest.*, 320 B.R. at 580. *See also* 15 C. Wright, A. Miller, & E. Cooper, *Fed. Prac. & Proc.* §§ 3851 and 3853 (2d ed. 1986 & Supp. 2003).

21